## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN POVERTY LAW CENTER, in its individual capacity and on behalf of its clients detained at LaSalle Detention Facility, Irwin County Detention Center, and Stewart Detention Center 400 Washington Ave. Montgomery, Alabama 36104 | Civil Action No. 1.18-cv-_____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| U.S. DEPARTMENT OF HOMELAND SECURITY 3801 Nebraska Avenue, NW Washington, D.C. 20016; | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT 500 12th Street, SW Washington, D.C. 20536; | |
| KIRSTJEN NIELSEN, Secretary of Homeland Security, in official capacity 3801 Nebraska Avenue, NW Washington, D.C. 20016; | |
| THOMAS HOMAN, Deputy Director and Acting Director, U.S. Immigration and Customs Enforcement, in official capacity 500 12th Street, SW Washington, D.C. 20536; | |
| CLAIRE TRICKLER-MCNULTY, Acting Director. U.S. Immigration and Customs Enforcement, Office of Detention Policy and Planning, in official capacity 500 12th Street, SW Washington, D.C. 20536; | |

MATTHEW ALBENCE, Executive Associate
Director,  Enforcement & Removal Operations,
in official capacity
500 12th Street, SW
Washington, D.C. 20536;

TAE JOHNSON, Assistant Director for Custody
Management, Enforcement & Removal Operations,
in official capacity
500 12th Street, SW
Washington, D.C. 20536;

NATHALIE R. ASHER, Acting Assistant Director,
Field Operations for Enforcement and Removal
Operations, in official capacity
500 12th Street, SW
Washington, D.C. 20536;

DAVID RIVERA, Field Office Director, U.S.
Immigration and Customs Enforcement,
New Orleans Field Office, in official capacity
830 Pine Hill Road
Jena, Louisiana 71342;

SEAN GALLAGHER, Field Office Director, U.S.
Immigration and Customs Enforcement,
Atlanta Field Office, in official capacity
180 Ted Turner Drive, SW. Suite 522
Atlanta, Georgia 30303

Defendants.

## INTRODUCTION

1.      The United States currently detains hundreds of thousands of noncitizens in civil

immigration prisons each year. These detainees include both documented and undocumented

people. Many have been in the United States for years and have strong family and community

ties. Others have arrived more recently, frequently after fleeing persecution in their home

countries. The basis for detaining noncitizens in immigration prisons is civil, not criminal. Many

of these detained people have claims that would allow them to remain in the United States, and

many also have viable claims that they should be released on bond or parole pending completion of their removal proceedings. Legal representation often ensures that such people are not unnecessarily detained for long periods of time, and also frequently makes the difference between whether they are allowed to remain safely in the United States or are permanently separated from family and returned to danger or even death.

2.     Noncitizen detainees represented by counsel are 10-and-a-half times more likely to succeed in their cases, and almost seven times more likely to obtain bond, as compared to their *pro se* counterparts. Individuals who are released from detention and are able to secure counsel are almost 20 times more likely to succeed in their cases than detainees without counsel.[1]

3.     The Fifth Amendment to the U.S. Constitution contemplates the crucial role of counsel in high-stakes court proceedings. Courts consistently interpret this amendment to afford people in removal proceedings the right to legal representation at their own expense at full and fair hearings. Yet this right is all but illusory for the thousands of people whom Defendants detain in isolated prisons in remote and rural parts of the United States.

4.     For decades, the Department of Homeland Security, Immigration and Customs Enforcement, and their officials ("Defendants") have deliberately detained people in immigration prisons far away from legal resources. Consistent with this longstanding practice, Defendants have contracted with local municipalities and private prison companies to detain noncitizens in some of the most rural and remote locales in the Southeast—far from major cities, law firms, nonprofit legal organizations, and professional interpretation services.

---

[1] *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Penn. L. Rev. 1, 49, 70 (2015) (describing different outcomes for represented versus unrepresented noncitizens in removal proceedings between 2007 and 2012).

5.     Defendants' imprisonment practices have far-reaching and devastating consequences. Those ensnared by Defendants' practices often have strong ties to their communities, having lived in the United States for many years. Their families are torn apart often for years: parents are separated from their children and spouses from each other and other family members—all with enormous emotional fallout. When a parent or other primary wage-earner is imprisoned for long periods of time, these families face immediate economic hardship as well.

6.     Families face the additional burden of having to travel great distances to see their loved one in a far-removed immigration prison. Many families cannot afford the cost, in terms of either time or dollars, that this travel requires and must forego any visits, putting further strain on the family. Employers and communities lose valuable contributors, often with no notice, creating further dislocation. And for those who have fled their home countries more recently due to persecution, their imprisonment in the United States simply continues a cycle of trauma they sought to escape. Without legal representation, the prospects for asserting their rights and reuniting with their families are dim.

7.     And yet imprisoned in such isolated settings, people often find it impossible to secure counsel. Moreover, in the rare instances where people in these rural detention centers are able to retain counsel, Defendants detain so many people in these prisons that the small number of attorney-visitation rooms makes attorney-client meetings extremely difficult—if not impossible.

8.     Defendants create and maintain substantial barriers that prevent meaningful access to and communication with attorneys, such as forcing attorneys to wait hours to meet with

a single client, restricting access to critically needed interpreters, and substantially impeding the ability of people to speak remotely and confidentially with their attorneys via telephone.

9.      Exacerbating these hurdles to accessing counsel, Defendants fail to prevent their agents who operate these remote prisons from erecting additional barriers between detainees and attorneys. Although Defendants are ultimately responsible for ensuring that conditions in these prisons comply with constitutional dictates, Defendants permit the day-to-day operators of these prisons to enjoy virtual impunity in engaging in obstructive conduct, such as unjustifiably interrupting attorney-client visits, denying attorney-client meetings during counts and shift changes, preventing attorneys from seeing their clients even when visitation rooms are available, frequently and arbitrarily changing visitation rules, and listening in on attorney-client communications.

10.     Attorneys and others providing assistance with legal representation undergo harassment for the "unpopular work" of representing these detainees. Defendants' tactics include following legal representatives off detention center property, examining them on the side of the road, and accusing them of supporting "illegal immigration"; forcing them to remove undergarments before entering civil prisons; pressuring them to end attorney-client visits early; interrupting and interrogating them during client visits; and trapping them for hours in locked areas of the prisons.

11.     Such policies and practices further interfere with detainees' access to, and communication with, their attorneys and impede attorneys' ability to provide effective, constitutionally guaranteed representation that comports with their ethical obligations.

12.     Nationally, only 14 percent of detained noncitizens are represented in immigration removal proceedings—compared to 37 percent of all immigrants. Representation

rates are even lower—in some cases, as low as six percent—for noncitizens held in some of the large, rural detention centers in the Southeast. The comparatively paltry representation rates in the Southeast flow directly from Defendants' policies, practices, and omissions.

13.     This lawsuit is brought by a provider of legal services, the Southern Poverty Law Center ("SPLC"), on behalf of itself and its clients detained in three detention centers in the Southeastern United States—LaSalle Detention Facility in Jena, Louisiana ("LaSalle"); Irwin County Detention Center in Ocilla, Georgia ("Irwin"), and Stewart Detention Center in Lumpkin, Georgia ("Stewart"). The totality of barriers to accessing and communicating with attorneys endured by detainees in these prisons deprives SPLC's clients of their constitutional rights to access courts, to access counsel, and to obtain full and fair hearings, in violation of the Due Process Clause of the Fifth Amendment. In addition, Defendants' conduct violates SPLC's rights under the First Amendment to represent civil detainees.

## PARTIES

14.     Plaintiff is the Southern Poverty Law Center ("SPLC")—a non-profit corporation based in Montgomery, Alabama, that engages in litigation and advocacy to make equal justice and equal opportunity a reality for all, including the most vulnerable members of our society. Lawsuits brought by SPLC have challenged institutional racism and remnants of Jim Crow segregation; bankrupted white supremacist groups; and advocated for the civil rights of children, women, people with disabilities, immigrants and migrant workers, the LGBT community, prisoners, and many others who faced discrimination, abuse, and exploitation. Plaintiff also has a history of litigation and advocacy regarding the conditions of confinement for those in government custody, including immigration imprisonment. SPLC brings this litigation on behalf of itself and its clients detained at LaSalle, Irwin, and Stewart.

6

15.     In 2017, SPLC launched the Southeast Immigrant Freedom Initiative ("SIFI")—a legal representation project that aims to provide high-quality *pro bono* legal representation and to safeguard due process rights for the thousands of people held in civil prisons across the Southeast. At the expense of fully pursuing and fulfilling its institutional goals, SPLC has been forced to devote and redirect significant portions of its monetary and personnel resources to counteract the unlawful barriers to accessing and communicating with counsel that Defendants have imposed at LaSalle, Irwin, and Stewart.

16.     The myriad barriers to meaningful representation endured by SPLC's clients at LaSalle, Irwin, and Stewart, which are the basis for this constitutional challenge, not only undermine their chances of prevailing in removal proceedings but also make it virtually impossible for them to pursue litigation on their own behalf to protect their constitutional rights.

17.     Any lawyers who tried to represent SPLC clients in civil litigation would encounter the same obstacles to access with which SIFI's staff and volunteers are currently grappling—including the inadequate number of attorney-visitation rooms, lack of contact visits, unavailability of interpreters, lack of access to video-teleconferencing ("VTC") and telephones, lack of confidentiality, prohibition on electronic devices, and arbitrary changes in rules regarding attorney visitation. In fact, communicating with counsel to remediate access barriers would have the perverse consequence of exacerbating these very barriers due to the scarcity of attorney-client visitation rooms and confidential telephone lines.

18.     Further, given that most of SPLC's detained clients have limited knowledge of the U.S. legal system and lack proficiency in English, the likelihood that they could undertake litigation *pro se* is virtually nil. Even if legal representation were available, many would be deterred from pursuing constitutional litigation due to a fear of retaliation by Defendants and

their agents that could adversely impact their immigration cases. This is especially true in light of the intimidating conduct of Defendants' agents detailed herein. Likewise, communicating with attorneys to pursue civil remedies to vindicate their rights to access counsel and the courts would further limit the insufficient time that detainees have to seek and consult counsel regarding their removal proceedings, thereby further dis-incentivizing their pursuit of civil remedies.

19. Given that SPLC's detained clients are substantially hindered from protecting their own rights, SPLC has third-party standing to bring this action based on its role in providing noncitizen detainees with legal services and its ability to properly and zealously frame the issues.

20. Defendant U.S. Department of Homeland Security ("DHS") is a federal executive agency responsible for, among other things, enforcing federal immigration laws and overseeing lawful immigration to the United States.

21. Defendant U.S. Immigration and Customs Enforcement ("ICE") is a component of DHS. As the principal investigative arm of DHS, ICE is charged with enforcement of immigration laws. ICE's primary duties include the investigation of persons suspected to have violated immigration laws, and the apprehension, detention, and removal of noncitizens who are unlawfully present in the United States.

22. Defendant Kirstjen Nielsen is the Secretary of DHS. Nielsen is charged with enforcing and administering immigration laws. She oversees each of the component agencies within DHS, including ICE, and has ultimate authority over all policies, procedures, and practices relating to ICE detention facilities. She is responsible for ensuring that all individuals held in ICE custody are detained in accordance with the Constitution and all relevant laws. Defendant Nielson is sued in her official capacity.

23.     Defendant Thomas Homan is the Deputy Director and Senior Official Performing the Duties of Director of ICE. Homan oversees the enforcement of the nation's immigration laws and the operation of the government's immigration detention system. To that end, he directs the administration of ICE's detention policies, procedures, and operations, including those regarding the detention of noncitizens at LaSalle, Irwin, and Stewart. He is also responsible for ensuring that all individuals held in ICE custody are detained in accordance with the Constitution and all other relevant laws. Defendant Homan is sued in his official capacity.

24.     Defendant Matthew Albence is the Executive Associate Director of ICE's Enforcement and Removal Operations ("ERO"). ERO enforces the nation's immigration laws, identifies and apprehends removable noncitizens, and detains and removes these individuals from the United States when necessary. ERO transports removable noncitizens from point to point, manages noncitizens in custody or in an "alternative to detention" program, provides access to legal resources (such as law textbooks, cases, and statutes) and representatives of advocacy groups, and removes individuals from the United States who have been ordered deported. Defendant Albence is sued in his official capacity.

25.     Defendant Claire Trickler-McNulty is the Acting Director of ICE's Office of Detention Policy and Planning. Trickler-McNulty oversees ICE's efforts to improve the current immigration detention system, working extensively with both internal and external stakeholders. Defendant Trickler-McNulty is sued in her official capacity.

26.     Defendant Tae Johnson is the Assistant Director for Custody Management, Enforcement and Removal Operations. In this capacity, Johnson is responsible for policy and oversight of the administrative custody of noncitizen detainees and oversees detention

operations, including those at local prisons operating under intergovernmental service agreements and contract detention facilities. Defendant Johnson is sued in his official capacity.

27.     Defendant Nathalie R. Asher is the Acting Assistant Director, Field Operations for Enforcement and Removal Operations. Asher oversees 24 field office directors nationwide. She has authority over the implementation of any remedy provided by the court and is in an immediate supervisory position to oversee compliance. Defendant Asher is sued in her official capacity.

28.     Defendant Sean Gallagher is the Field Office Director for the ICE Atlanta Field Office. Gallagher has day-to-day responsibility for policies, procedures, and practices relating to the detention of immigrants in Georgia. He is responsible for ensuring that all individuals held in ICE custody in detention centers in Georgia are detained in accordance with the Constitution and all relevant laws. Defendant Gallagher is sued in his official capacity related to Irwin and Stewart.

29.     Defendant David Rivera is the Field Office Director for the ICE New Orleans Field Office. Rivera has day-to-day responsibility for policies, procedures, and practices relating to the detention of immigrants in Louisiana. He is responsible for ensuring that all individuals held in ICE custody in detention centers in Louisiana are detained in accordance with the Constitution and all relevant laws. Defendant Rivera is sued in his official capacity related to LaSalle.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant). Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. §§ 702, 706.

31.     This Court has jurisdiction to enter declaratory and injunctive relief to recognize and remedy the underlying constitutional violations under 28 U.S.C. §§ 2201 and 2202 (declaratory relief), and 28 U.S.C. § 1651 (writs).

32.     Personal jurisdiction and venue is proper pursuant to 28 U.S.C. § 1391(e) because one or more defendants reside in the District of Columbia, and Defendants DHS and ICE are headquartered in this District.

## STATEMENT OF FACTS

33.     The United States is the world's leading incarcerator with over two million people in prisons and jails across the country. But not all of the United States' incarceration stems from our criminal justice system; the United States also maintains the world's largest immigration detention system.

34.     Immigrants held in detention are not criminal detainees, but rather civil detainees who are awaiting adjudication of their immigration cases and are held pursuant to civil immigration laws.

**Civil Immigrant Imprisonment in the United States**

35.     Civil detention in America has followed a trajectory similar to criminal detention. In the 1980s and 1990s—as America's prison boom accelerated—mass civil detention of immigrants emerged.

36.     In 1994, the U.S. government detained 6,000 noncitizens per day. By 2005, that number had grown to 20,000. Today, the government detains over 38,000 immigrants per day, or over 350,000 people each year.



FY 1994–2017
## Average Daily Population of Immigrant Detainees

**This graph tracks the average daily population of noncitizens held in immigration detention from FY 1994-2017.[2]**

37.     The origin of this civil detention expansion is linked to the United States' enactment of two laws in 1996—the Antiterrorism and Effective Death Penalty Act (AEDPA) and the Illegal Immigrant Reform and Immigrant Responsibility Act (IIRIRA). These laws expanded mandatory detention and also rendered any non-U.S. citizen, including legal permanent residents who committed certain offenses**,** vulnerable to detention and deportation.

---

[2] Chad C. Haddal & Alison Siskin, *Immigration-Related Detention:  Current Legislative Issues*, CONGRESSIONAL RESEARCH SERVICE, p. 12 (Jan. 27, 2010), *available at*: https://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1712&context=key_workplace  (Data for FY 1994-2010) (last accessed Apr. 3, 2018);  Alison Siskin, *Immigration-Related Detention:  Current Legislative Issues*, CONGRESSIONAL RESEARCH SERVICE, p. 13 (Jan. 1, 2012), *available at*:  https://digitalcommons.ilr.cornell.edu /cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1887&context=key_workplace (Data for FY 2010-2012) (last accessed Apr. 3, 2018); U.S. DEP'T OF HOMELAND SEC., *U.S. Immigration and Customs Enforcement - Budget Overview*, (2018), *available at*: https://www.dhs.gov/sites/default/files/publications/CFO/17_0524_U.S._Immigration_and_Customs_Enforcement.pdf (Data for FYI 2013-2016) (last accessed Apr. 3, 2018);  Laura Wamsley, *As It Makes More Arrests, ICE Looks For More Detention Centers*, NAT'L PUB. RADIO, Oct. 26, 2017, *available at*:  https://www.npr.org/sections/thetwo-way/2017/10/26/560257834/as-it-makes-more-arrests-ice-looks-for-more-detention-centers (Data for FY 2017) (last accessed Apr. 3, 2018).

38.     In cases where detention is not legally required, ICE has discretion to determine whether noncitizens should be released on bond, parole, recognizance, or subject to other conditions.[3]  For the majority of people held in immigration prisons, there is no law requiring that they be imprisoned before their hearings.

39.     ICE's use of certain types of alternatives to detention has resulted in high rates of appearance at court proceedings—the purpose that initially drove the creation of the immigration detention system—and substantially reduced costs.  Yet, civil detention of noncitizens has significantly expanded since 2009.

40.     In 2009, Congress mandated that ICE maintain at least 33,400 detention beds in immigration prisons across the country. ICE has used this so-called "bed mandate" or "bed quota" to justify enforcement actions against individuals who could be detained to fill those beds. The number of beds included in the mandate has steadily increased since its inception.

41.     Defendants detain immigrants who are in removal proceedings in over 200 immigration prisons across the country.

42.     In January 2017, the Trump Administration took office armed with an aggressive immigration enforcement agenda, and civil arrests on immigration charges increased by 38 percent within its first four months. By October 2017, ICE was eyeing locations for five new detention centers that could house thousands more detainees, while the number of immigration arrests continued to increase.

43.     Detained people may languish in ICE's prisons for years before their removal proceedings are completed. Accessing and retaining an attorney substantially increases the odds

---

[3] *See* 8 C.F.R. §§ 236.1(c), 1236.1(c).

that an immigrant detainee will be released on bond or parole and therefore avoid such prolonged detention.

**Defendants' Oversight of Private Prisons Holding Noncitizens**

44.     ICE's Performance Based National Detention Standards ("PBNDS") govern  the prisons it uses to hold civil detainees, including service processing centers, contract detention facilities, and state or local government facilities used by ERO pursuant to intergovernmental service agreements to hold detainees for more than 72 hours.

45.     According to ICE's website, the PBNDS were "crafted to . . . increase access to legal services  .  .  ., improve communication with detainees with no or limited English proficiency, . . . and increase . . . visitation."

46.     The PBNDS provide that meetings between detainees and attorneys or legal assistants are "confidential" and "shall not be subject to auditory supervision." Private consultation rooms shall be available for such meetings. If all such rooms are in use and an attorney wishes to meet in a different room, "the request shall be accommodated to the extent practicable."

47.     With respect to conduct during legal visits, the PBNDS require the facility's procedures to "provide for the exchange of documents between a detainee and the legal representative or assistant, even when contact visitation rooms are unavailable." Any written material provided to detainees during such meetings "shall be inspected but not read."

48.     On regular business days, legal visits may take place during scheduled meal periods, in which case detainees "shall receive a tray or sack meal after the visit."

49.     Prior to the establishment of an attorney-client relationship, "a legal service provider's representative need not complete a Form G-28 . . . ." In addition, visitors, including

14

attorneys and legal representatives, "are not required to file a Form G-28 to participate in a consultation visit or provide consultation during an asylum officer interview or Immigration Judge's review of a negative credible fear determination."

50.     During regular legal visitation hours, legal assistants are explicitly permitted to meet alone with detainees "[u]pon presentation of a letter of authorization from the legal representative under whose supervision he/she is working."

51.     The PBNDS, which are specifically incorporated into ICE's management contracts for LaSalle, Irwin, and Stewart, are not enforced.

52.     Even if the PBNDS were enforced at LaSalle, Irwin and Stewart, they are wholly insufficient to protect the important rights of noncitizens held in these prisons. The PBNDS further reflect that Defendants have no interest in maintaining the obstacles to accessing and communicating with attorneys detailed herein.

53.     ICE's routine interference with SPLC's clients' access to counsel—by detaining them in facilities with an insufficient number of attorney-visitation rooms, depriving them of confidential contact with their attorneys, and preventing the exchange of documents—violates even the minimal protections embodied in the PBNDS.

**Complexity of Immigration Law**

54.     Immigration is complex and highly technical.[4] Several federal courts have observed that the immigration laws rival the tax laws in their complexity.[5]

---

[4] *See Drax v. Reno*, 338 F.3d 98, 99 (2d Cir. 2003) (referencing the "labyrinthine character of modern immigration law—a maze of hyper-technical statutes and regulations that engender waste, delay, and confusion for the Government and petitioners alike"); *Baltazar-Alcazar v. INS,* 386 F.3d 940, 947-48 (9th Cir. 2004) ("A petitioner must weave together a complex tapestry of evidence and then juxtapose and reconcile that picture with the voluminous, and not always consistent, administrative and court precedent in this changing area."); *United States v. Aguirre-Tello*, 324 F.3d 1181, 1187 (10th Cir. 2003) ("The district judge observed that immigration law

55. The Supreme Court has consistently reaffirmed the "purely civil" nature of immigration proceedings.[6]

56. Civil immigration proceedings pit the government against the noncitizen in an adversarial process where each side is presumed to have the ability to represent its own interests. A DHS attorney—called the trial attorney—trained in substantive immigration law and immigration court procedures represents the government. This attorney acts as a prosecutor, and seeks to establish the noncitizen's removability.

57. Respondents—who bear the burden of proof to establish that they are statutorily entitled to immigration relief and, in many cases, merit a favorable exercise of discretion—must admit or deny allegations, compile voluminous evidence, and articulate sophisticated legal arguments. The opportunity for federal court review of removal orders is relatively limited because immigration judges' factual findings receive deference unless they are clearly erroneous.

58. Even for individuals who have representation in immigration court, adequate preparation time is crucial because clients likely will not provide their attorneys with all the information relevant to seeking relief at their first meeting. Some are unable or unwilling to share information immediately, even with their own attorneys, because they have suffered trauma in their home countries or on their journeys to the United States. Many are simply unaware of what

---

is technical and complex to the point that it is confusing to lawyers, much less to laymen."), *vacated*, 324 F.3d 1181 (en banc); *Lok v. INS*, 548 F.2d 37, 38 (2d Cir. 1977) ("Immigration laws bear a "striking resemblance …[to] King Minos's labyrinth in ancient Crete. The Tax Laws and the Immigration and Nationality Acts are examples we have cited of Congress's ingenuity in passing statutes certain to accelerate the aging process of judges").

[5] *See, e.g., Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1987) ("With only a small degree of hyperbole, the immigration laws have been termed 'second only to the Internal Revenue Code in complexity.'") (internal quotation and citation omitted).

[6] *See, e.g., INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984); *see also Fong Yue Ting v. United States*, 149 U.S. 698 (1893); *Li Sing v. United States*, 180 U.S. 486 (1901); *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952).

information is relevant and important to share. Others need time to build trust before sharing intimate personal details that are critical to prevailing in immigration court. Language barriers and the need for interpretation can lengthen this process.

59.     For individuals who are unrepresented, the challenges are significantly more daunting. Although the government has the burden of proof, the respondent may concede the allegations against him at the initial master calendar hearing. If that happens, the immigration judge may find that the government has established the respondent's removability, even in the absence of other evidence. Without meaningful representation, the respondent may forego the opportunity to contest the charges against him, identify potential avenues of relief, marshal the facts and law necessary to establish his eligibility, or follow the requisite procedures to apply.

60.     Additional challenges for the unrepresented lurk at every turn. For instance, applications for relief are in English and must be completed in English. If a *pro se* individual writes an application in a language other than English, the applications are deemed abandoned and the respondents are ordered removed. As a further example, an applicant seeking asylum or withholding of removal based on membership in a particular social group must clearly indicate on the record before the Immigration Judge the exact delineation of any proposed particular social group. Precise delineation is absolutely critical as it becomes the basis for the court's case-specific analysis to determine whether the proposed social group is immutable, "particular," and socially distinct in the country from which the respondent fled. Such a hurdle is almost impossible for a detained individual, without counsel, to overcome and obtain appropriate documentation to substantiate.

61.     Acknowledging the complexity of the immigration laws, the Office of the Chief Immigration Judge "recommends that those [respondents] who can obtain qualified professional representation do so."[7]

62.     Despite the hyper-technical nature of immigration law and the inherent imbalance of power between the government and the respondent, the immigration removal process lacks most of the basic procedural safeguards enshrined in the U.S. criminal justice system. Noncitizens in civil immigration proceedings have no right to government-appointed counsel or a speedy trial. Immigration judges may apply harsh immigration laws retroactively, allow the government to prove its case using unlawfully obtained evidence, and exercise an inordinate amount of discretion. Moreover, immigration proceedings are not governed by the Federal Rules of Evidence.

63.     The potentially life-altering consequences of removal proceedings, which "may result in the loss of all that makes life worth living,"[8] makes the lack of more checks and balances particularly inexcusable.[9]

**Release on Bond from ICE Prisons**

64.     Given the significant barriers to accessing counsel that detained immigrants face, release from prison can greatly enhance an individual's chances of prevailing in immigration court. In addition to restoring physical liberty, release facilitates a person's ability to retain and meaningfully engage with counsel. In fact, non-detained immigrants are five times more likely to

---

[7] U.S. DEP'T OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, IMMIGRATION COURT PRACTICE MANUAL § 2.2(a), "Unrepresented Aliens."
[8] *Bridges v. Wixon,* 326 U.S. 135, 147 (1945) (internal quotations omitted).
[9] For more information on the differences between the U.S. immigration system and the U.S. criminal justice system, *see* AM. IMMIGRATION COUNCIL, *Two Systems of Justice: How the Immigration System Falls Short of American Ideals of Justice* (March 2013), *available at*: https://www.americanimmigrationcouncil.org/sites/default/files/research/aic_twosystemsofjustic e.pdf (last accessed Apr. 3, 2018).

obtain counsel than those who are detained.[10] Further, non-detained immigrants have a substantially greater ability to access translation and interpretation services, to gather evidence for their cases, and to derive support from family and friends throughout the process.

65.     With the exception of certain individuals subject to mandatory detention, the Immigration and Nationality Act permits the release of noncitizens on their own recognizance or on bond.[11]

66.     Following the arrest of a noncitizen, DHS makes an initial custody determination regarding whether the individual should be released on bond, recognizance, or subject to other conditions.[12] DHS may also determine that an individual is subject to mandatory detention and thus ineligible for release, or exercise its discretion to deny release.[13]

67.     A detained individual is generally entitled to seek review of ICE's initial custody determination before an immigration judge at a hearing commonly termed a "bond hearing."[14] Even in cases where ICE has concluded that an individual is ineligible for bond, the detained individual may request a bond hearing to challenge that finding.

68.     At the bond hearing, the immigration judge determines whether the individual can be released on bond, recognizance, or subject to other conditions.[15] The detained individual bears the burden of proving that he does not pose a danger to persons or property; is not likely to

---

[10] Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Penn. L. Rev. 1, 32 (2015).
[11] 8 U.S.C. § 1226(a)(2)(A).
[12] *See* 8 C.F.R. §§ 236.1(c), 1236.1(c).
[13] *See id.*
[14] *See* 8 C.F.R. §§ 1003.19(a), (h)(2)(i).
[15] *See* 8 C.F.R. §§ 1236.1(d)(1), 1003.19.

abscond before his hearing; and does not threaten national security.[16] Detained noncitizens are approximately seven times more likely to be released on bond when represented.[17]

69.     The immigration judge has complete discretion to grant or deny release.[18] A request to reconsider a decision regarding custody status or bond may be allowed only if "circumstances have changed materially since the prior bond determination."[19]

70.     Both the detained individual and ICE can appeal the immigration judge's bond decision to the Board of Immigration Appeals within 30 days.[20]

**SIFI & Removal Defense**

71.     In 2017, Plaintiff launched SIFI to provide desperately needed legal representation to indigent immigrants detained in remote locations in the Southeast, where attorneys are scarce and immigration attorneys even more so. SPLC seeks to fulfill this mission by providing direct representation to detained immigrants in bond proceedings, training *pro bono* attorneys to provide effective representation to indigent detainees in their bond proceedings, and facilitating representation in merits hearings for people who would otherwise have no legal recourse.

72.     SIFI launched at Stewart in April 2017, at Irwin in August 2017, and at LaSalle in September 2017. SIFI is now on the referral list of each prison's Legal Orientation Program, which identifies potential *pro bono* legal resources for detainees.

---

[16] 8 C.F.R. § 1236.1(c)(8); *Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006).
[17] *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Penn. L. Rev. 1, 70 (2015).
[18] 8 U.S.C. § 1226(e).
[19] 8 C.F.R. § 1003.19(e).
[20] 8 CFR §§ 236.1(d)(3)(i), 1003.19(f), 1003.38.

73.     At the time of filing, SPLC and volunteers had communicated with 664 detainees at these three locations. The SIFI project currently represents 79 people at the three prisons at issue in this litigation.

74.     SPLC employs on-the-ground SIFI staff, including immigration attorneys and advocates whose offices are near the three prisons. In addition, SIFI relies on volunteer *pro bono* attorneys from across the United States who travel to the prisons for week-long rotations in order to meet with potential clients, conduct interviews, gather evidence, draft legal documents, and assist clients in obtaining release on bond or parole. Since SIFI's inception, volunteer attorneys have traveled from Seattle, New York, Chicago, San Francisco, and Washington, DC, among other cities.

75.     SPLC's advocacy, however, is not limited to SIFI's on-the-ground activities at the detention centers and local immigration courts. In addition, SIFI recruits *pro bono* attorneys from across the country to represent detainees in the merits phases of their cases, and SIFI staff provide supervision and technical support for all of these cases.

76.     Through SIFI, SPLC endeavors to provide effective and ethical removal defense to all its detained clients. To do so, SIFI staff and volunteers—like all immigration practitioners—require the ability to meaningfully, reliably, and confidentially communicate with their detained clients.

77.     In this context, effective communication often necessitates access to interpretation services in order for attorney and client to understand one another. An English-speaking attorney who cannot speak Portuguese and a Portuguese speaking client who cannot speak English would be hard-pressed to exchange the simplest of greetings, much less discuss the complex reasons why the client was forced to flee Brazil.

78.     Interpreters are therefore crucial not only for communicating with a client but also for gathering the information that is necessary to defend against removal.

79.     The importance of interpretation services for detainees is further reflected in recent revisions to the PBNDS, which explicitly state that prisons are expected to ensure that detainees who are limited English proficient ("LEP") have access to bilingual staff and/or professional interpretation services during phone calls and visits, including those involving legal consultation and counsel.

80.     Effective communication in this context also requires conditions conducive to establishing a client's trust, which may be essential to obtain critical evidence. Many detained immigrants have fled torture or other types of persecution, and they continue to suffer acute trauma while in detention; detention exacerbates existing trauma and may create new trauma. Although recounting their painful experiences is crucial for building a defense to removal, detained clients are routinely traumatized again in the process of recounting their experiences. Confidential contact visits between attorney and client provide the best mechanism for putting the client sufficiently at ease to share her experiences and assist in preparing a defense to removal.

81.     Reliable communication between attorney and client is also a critical component of removal defense. When attorneys are subject to long waits to see detained clients, their representation of those clients and others are detrimentally impacted.

82.     Long amounts of time spent in a waiting room is time that cannot be spent conducting legal research, gathering evidence, drafting legal documents, or meeting with other clients. Visits may be cut short due to time constraints or, worse, attorneys may be deterred from visiting detained clients at all.

83.     Attorneys representing detained clients from afar likewise require the ability to consistently communicate with their clients in order to discuss the details of their cases. This means being able to schedule client calls without unreasonable delay and having enough time to discuss necessary matters. These communications also may require the services of third-party interpreters in order for attorneys to effectively communicate with their clients.

84.     Detained clients must also be able to communicate confidentially with their attorneys. Although confidentiality is an important feature in all attorney-client relationships, the need for confidentiality is especially acute for detained immigrants in removal proceedings given the sensitivity of the issues that must be discussed.

85.     Many detainees have been targeted for persecution in the countries from which they fled, making them vulnerable to harm not only in their home countries but also at the hands of fellow detainees or guards. Without the assurance of confidentiality, detainees may be chilled from speaking about certain issues to their attorneys, which may detrimentally impact their cases. For example, a gay Iranian detainee, who has lived in the United States for decades, may be scared to discuss how his sexuality will make him a target for violence if he knows that a guard or a fellow detainee can overhear his every word.

86.     Confidential attorney-visitation rooms, as well as unmonitored telephone and videoconference lines, are crucial to ensure that detainees can speak openly and honestly with their attorneys and that attorneys can obtain the information necessary to effectively advise and advocate for their clients.

87.     In spite of the crucial need for effective, reliable, and confidential communication between attorneys and clients, Defendants have erected vast and numerous barriers that frustrate

SPLC's ability to zealously represent its clients at LaSalle, Irwin, and Stewart, and that preclude its clients from defending their own constitutional rights.

**The Detention Facilities and the Barriers to Access to Counsel**

88.     Although the Sixth Amendment does not guarantee a lawyer to immigrants in removal proceedings, the Due Process Clause of the Fifth Amendment "indisputably affords an [noncitizen] the right to counsel of his or her own choice at his or her own expense."[21] This right to counsel is "fundamental," and courts consistently "have warned [the government] not to treat it casually."[22] The right "must be respected in substance as well as in name."[23]

89.     "Th[is] right to counsel is a particularly important procedural safeguard because of the grave consequences of removal . . . [which] 'visits a great hardship on the individual and deprives him of the right to stay and work in this land of freedom.'"[24] Likewise, the right to counsel is a crucial procedural safeguard for detained noncitizens seeking release on bond or parole given the dire consequences of being imprisoned for a substantial and indeterminate amount of time.[25] While behind bars in immigration prisons, people are separated from their families, unable to maintain employment, and subjected to harsh conditions, including inadequate medical care and lack of recreation opportunities. For these reasons, procedural safeguards—including access to counsel—are crucial to ensuring that people are not unjustifiably imprisoned pending resolution of their removal cases.[26]

---

[21] *Leslie v. Att'y Gen. of United States*, 611 F.3d 171, 181 (3d Cir. 2010).
[22] *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 554 (9th Cir. 1990).
[23] *Baires v. INS*, 856 F.2d 89, 91 n.2 (9th Cir. 1988) (citation omitted).
[24] *Leslie*, 611 F.3d at 181 (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)).
[25] *See, e.g., Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017).
[26] *See id*. at 993-95.

90.     In spite of these constitutional commands, Defendants funnel tens of thousands of noncitizens into isolated prisons where they encounter substantial and often insurmountable barriers to accessing and communicating with counsel. Many of these prisons are located in rural and remote places hours away from major cities, immigration attorneys, and professional interpreters.



91.     Legal representation rates are staggeringly low in large civil immigration prisons in the Southeast. Only six out of every 100 people detained at Stewart have legal representation. The same is true at LaSalle. At Irwin, around 20 out of every 100 people have counsel.

92.     In the rare instances where detained people are able to obtain counsel, it is typical that legal representatives are required to travel two, three, or even four hours to these prisons, only to confront additional barriers to accessing and communicating with their clients once they arrive.

93.     Despite differences in the physical infrastructure at LaSalle, Irwin, and Stewart, similar barriers to access to meaningful representation exist at all three prisons. None of the prisons has an adequate number of attorney-visitation rooms to accommodate their populations:

LaSalle has one room for up to around 1,200 people. Stewart has three rooms for approximately 1,900 people. Irwin has one room for up to approximately 1,200 people.

94.     Attorneys at each prison must regularly wait in excess of an hour—and, in many cases, as long as three or four hours—to meet with their clients. As a result, attorneys often must cut meetings short or see only one client instead of several. Some attorneys do not take cases at these detention centers because they cannot spend the wait time in addition to the lengthy travel time and still provide ethical representation.

95.     Frequent "counts" and staff shift changes exacerbate these delays and sometimes prevent attorneys from visiting clients altogether.

96.     Once inside the attorney-visitation room, legal representatives and their clients face additional barriers to communication. All three prisons enforce policies that permit only non-contact visits, which hamper attorneys' ability to review documents with clients and also to create the rapport and trust that is crucial to gathering all the information necessary to defend against removal. Thick partitions separate lawyers from their clients.

97.     While a single closed-circuit telephone is provided in each attorney-visitation room, this means of communication impedes meaningful communication between attorney and client. Because only one phone is provided on the "attorney side" of the room, it effectively forecloses bringing paralegal or other support staff to assist with these meetings. For example, in those rare instances where an interpreter can be located and brought into the facilities, the interpreter must listen to the attorney with the ear that is not against the phone; interpret into the phone; listen to the client's response; and then interpret back to the attorney. The attorney and client cannot hear one another's voices. The tone and dynamic of the conversation is lost, thereby creating yet another barrier to effective communication between attorney and client.

98.     Making matters worse, the telephone lines themselves are compromised by significant static. As a result, the attorney and client cannot clearly hear each other over the closed-circuit phone, forcing them not only to repeat questions and answers but also to yell and thereby compromise confidentiality. Guards are routinely stationed outside the rooms as a matter of course or for frequent shift changes. The noise made by guards further impedes attorneys' ability to communicate with clients, and guards are able to hear what attorneys say inside the visitation rooms. For example, following an attorney interview with a prospective client at Stewart, the attorney overheard a guard remark to another guard that the attorney had not even been discussing removal issues with the client. Throughout the client visit, the client had remarked to the attorney that the guard had been frequently lurking behind the attorney at the visitation room door.

99.     In addition, the phones in the attorney-visitation rooms have short cords and are located in a way that virtually prevents attorneys and clients from facing one another directly, further frustrating their ability to effectively communicate.

100.    Each of the three prisons enforces a "no-electronics" policy which prohibits attorneys and staff from bringing in cell phones or laptops. The impact of these policies is felt in a number of respects. First, because there is no outside phone line to conference in an interpreter, the policy effectively denies an attorney access to remote interpretation services. The use of interpreters is critically necessary for attorneys and clients to communicate effectively, especially at these remote locations where there are no nearby interpreters who can appear in person. SPLC's staff and volunteers would have the ability to contact such interpretation services if Defendants permitted attorneys and their staff to bring in electronic devices such as cell phones or computers. Under the circumstances, however, attorneys are left to rely on gestures,

guesstimates, and whatever else can be communicated through broken or no English in order to gather crucial evidence to avert deportation. Many immigration attorneys refuse to take cases at these immigration prisons because they do not feel they can adequately and ethically represent clients with whom they cannot communicate.

101.    Other problems are created by the "no-electronics" policies. The prohibition not only prevents access to interpreters who could be contacted using a cell phone or laptop, but also limits attorneys' ability to efficiently represent their clients. If SPLC's attorneys and staff could bring computers or tablets into the visitation room, they could draft client declarations or other legal papers during their meetings with clients. Clients' stories could be memorialized, and errors could be corrected, in real time. This is particularly important given that long periods spent in the waiting room restrict the amount of time attorneys have to work on client cases. Attorneys who represent clients at other immigration prisons where laptops are permitted report that they are able to more effectively and efficiently represent their clients as a result of their access to computers. Some also report either access to landlines or the ability to use cell phones to contact interpreter services who would otherwise be inaccessible for in-person meetings.

102.    Importantly, numerous immigration detention centers across the country permit attorneys to bring electronic devices to client meetings, thereby facilitating efficient representation of the client as well as contact with interpreters. Examples include those prisons in Aurora, Colorado; Dilley, Texas; Florence, Arizona; Elizabeth, New Jersey; and Tacoma, Washington.

103.    In addition, the "no electronics" policies are not uniformly administered: ICE and private prison staff at some of the detention centers are allowed to have cell phones. In addition,

criminal defense attorneys are allowed to bring in laptops and use them during client meetings in at least one of the prisons.

104.    Many obstacles to accessing and communicating with counsel at LaSalle, Irwin, and Stewart stem from Defendants' practice of contracting with and failing to adequately supervise private prison companies, which have a financial incentive to understaff detention centers and to refuse to improve conditions that impede access. SPLC staff and volunteers are routinely informed that delays stem from insufficient staffing. Likewise, many of the access barriers described herein stem from poor or inadequate conditions in the facilities operated by these private companies. Money spent on additional staffing and on improving conditions is money that could be distributed to shareholders. At worst, Defendants permit their agents to focus on profit margins at the expense of the constitutional rights of people in their custody; at best, they blithely ignore the ongoing constitutional violations.

105.    In addition to these common barriers, unique hurdles at each facility further impede detainees' meaningful access to counsel and SPLC's ability to express and fulfill its mission.

### A.  LaSalle Detention Center

106.    LaSalle is located in Jena, Louisiana, a city of 3,435 residents, including the noncitizens detained there. LaSalle is approximately 220 miles—a nearly four-hour drive—from New Orleans. There were no immigration attorney offices in the vicinity of Jena, Louisiana, until SPLC launched SIFI in September 2017.

107.    Immigrant detention is the latest use of the facility, which originally opened in 1998 as the Jena Juvenile Corrections Facility. Advocacy groups reported significant civil and

human rights abuses there; the United States Department of Justice announced an investigation; and the prison was closed three years later after being deemed unfit for use.

108.    In 2005, the prison was repurposed to hold prisoners evacuated from New Orleans in the aftermath of Hurricane Katrina. The prison was closed down again after multiple reports of inhumane treatment at the facility.

109.    In 2007, the LaSalle Detention Facility opened its doors as an immigration prison.

110.    The transition to immigration imprisonment did not save the facility from its notorious reputation—LaSalle has had the highest number of deaths of any immigration prison in the United States over the last two years.[27]

111.    Defendants are ultimately responsible for ensuring that the conditions of the facility comply with constitutional and other legal requirements, including ensuring that detainees have meaningful access to legal representation. Defendants have utterly failed in that regard.

112.    LaSalle has capacity to hold 1,200 people. For context, that is one-third of the town's population.

113.    LaSalle has only one room for "confidential" attorney-client visits.

114.    The failure to equip LaSalle with an adequate number of rooms for visitation is telling—Defendants never planned for people imprisoned in isolated LaSalle to have the ability to consult with lawyers.

115.    Despite Defendants' assumption that few lawyers would travel several hours through rural Louisiana to represent people sent to LaSalle, the attorney visitation room is

---

[27] Oliver Laughland, *Inside Trump's Secretive Immigration Court: Far From Scrutiny and Legal Aid*," THE GUARDIAN, (June 7, 2017), *available at*: https://www.theguardian.com/us-news/2017/jun/07/donald-trump-immigration-court-deportation-lasalle (last accessed Apr. 3, 2018).

frequently full. When the only attorney-visitation room is occupied, lawyers sometimes wait in the small lobby for hours—as no suitable confidential room is made available as an alternative despite ample office space near the attorney-visitation room.

116.    The one attorney-visitation room is, in fact, not confidential. It is directly adjacent to a family-visitation room with several non-contact, visitation cubicles. The attorney-visitation room is not soundproof. Confidential conversations with clients about sexual abuse, political persecution, and other sensitive topics can be overheard by guards and by people in the family-visitation room on the other side of the thin wall.

117.    LaSalle conducts six counts per day, at least four of which are during attorney visitation. A visit cannot start during count, each of which lasts about 45 minutes but can last longer. A "count" is a procedure whereby prison staff members determine the whereabouts of each person at the facility. In addition to counts, shift changes stop attorney visitation. For instance, during the 6 p.m. shift change, visitation is delayed consistently for close to 45 minutes.

118.    While lawyers are sometimes permitted to use the family-visitation room if available, that room is even less suitable for confidential attorney-client communication. The room is comprised of several individual, interconnected cubicles. A guard is stationed in the room, within ear shot, and detainees awaiting their visits are seated approximately two feet behind the cubicles. Even attempts to speak in lowered voices are insufficient to prevent others from hearing a conversation.

119.    There is no slot or other opening in the plastic divider in the family-visitation room to permit the exchange of confidential, legal documents. Guards have instructed attorneys that no documents can be exchanged during these meetings. On occasion the guards will break this rule, and offer to take confidential papers from one person and deliver them to the person on

the other side of the divide. Guards frequently search the documents if they agree to bend the rules by delivering papers. In most instances, however, a meeting in the family-visitation room means no legal documents can be exchanged.

120.    The insufficient number of adequate attorney-visitation rooms at LaSalle has routinely caused SPLC's staff and volunteers to endure substantial waits in order to see clients, thereby diminishing SPLC's resources and undermining its mission to provide quality representation to its clients. These wait times are frequently in excess of 90 minutes and can be as long as five hours.

121.    Delays are compounded by specific, additional policies and practices maintained by Defendants at LaSalle. For example, if SPLC staff and volunteers seek to visit a client of one gender in the attorney-visitation room, they may not do so if the adjacent family-visitation room is being occupied by a detainee of the opposite gender.

122.    Attorneys cannot see a male client between 11 a.m. and 1 p.m. or a female client between 9 a.m. and 11 a.m. Attorneys are often unable to visit female clients during female-visitation hours because there is an attorney in the visitation room meeting with a male client. For attorneys trying to visit a specific client, available visiting hours are frequently quite limited because of a combination of the gender rules, count, and shift changes.

123.    The delays are often longer for clients who are being kept in segregation. The clients in segregation are often severely mentally ill. LaSalle will not bring a client being held in segregation to a visitation room if anyone else is in that room or in the adjacent family-visitation room. LaSalle only permits certain staff to transport clients held in segregation. This often causes even longer delays. An attorney could spend all day in the waiting room before being able to see a client who is held in segregation

124.    The long delays at LaSalle frequently require SPLC's staff and SIFI volunteers to cut meetings short. On occasion, SPLC's staff and volunteers also forego meetings with clients altogether out of concern that they will be forced to endure long delays that prevent them from completing other necessary legal work.

125.    In isolated Jena, access to remote interpretation is crucial. Many interpreters flatly refuse to travel to LaSalle even if compensated. Due to the lack of access to interpreters, SPLC has been unable to provide representation at LaSalle to detainees who speak certain languages because there was no way to communicate with them.

126.    SPLC's staff and volunteers would have the ability to contact remote interpretation services if the visitation room had a telephone or video teleconferencing, or if Defendants permitted attorneys and their staff to bring in cell phones or computers. But as a result of Defendants' restrictive policies, LEP detainees at LaSalle are virtually barred from reliable access to interpretation during in-person meetings with their attorneys. Defendants do not allow for VTC communications between lawyers and clients at LaSalle, despite the use of VTC in its courtrooms and for credible fear interviews and various embassy communications.

127.    VTC does not substitute for, but can complement, in-person visitation. If attorneys could use VTC at LaSalle, then SPLC—as well as other immigration practitioners— could communicate with clients through a remote interpretation service.

128.    Scheduling a telephone call with a LaSalle detainee is extremely difficult and involves significant delay. Attorneys frequently call LaSalle to schedule a phone call, but their calls often go unanswered. Although LaSalle has an answering machine, messages are frequently not returned.

129.    Reports vary regarding what happens after an attorney calls, but attorneys frequently receive no response whatsoever.

130.    On information and belief, LaSalle asserts that its policy is as follows: when a detainee requests a legal call, the request goes to the case manager, who has 72 hours to contact the attorney and schedule the call. Likewise, when attorneys request a legal call, the request is sent to "classification" and then to the detainee's case manager, who has 72 hours to schedule the call. Thus—even if LaSalle's policy were actually implemented in practice—it could take as long as three days to schedule a call, making phone calls an unreliable method to reach clients regarding time-sensitive matters.

131.    In practice, however, attorneys are scheduled for calls approximately seven days from the date of a request. An attorney cannot schedule more than one call with a client until the attorney and client have completed the first scheduled phone call. An attorney is required to repeat the scheduling process after the call takes place, often requiring another week before the next call.

132.    Such delay can have a detrimental impact on a detainee's case if the call was meant to prepare for an impending hearing, finalize a court filing, or address another time-sensitive matter.

133.    People who do not speak English or Spanish, and people who are severely mentally ill, often cannot understand or complete the paperwork that LaSalle requires in order to schedule a call with an attorney. For these detainees, obtaining a phone call on their own initiative is virtually impossible.

134.    LaSalle limits attorney phone calls to only 20 minutes per client per day. This is a wholly insufficient amount of time to complete any substantive task. If an attorney needs to draft

a client declaration, she cannot ask questions in 20 minutes that will elicit the necessary information. She also cannot advise a client regarding case strategy, explore ways to obtain evidence, obtain sufficient facts to credibly assess defenses to removal, or prepare a client for a hearing. By limiting attorney-client phone meetings to 20 minutes, LaSalle effectively prevents meaningful communication.

135.    Because of the difficulty involved in scheduling an attorney call, detainees in need of urgent advice sometimes resort to recorded phone lines, which are more easily available, despite the lack of confidentiality. These calls are also limited to 20 minutes.

136.    Not only is there a general dearth of interpreters within driving distance of Jena, Louisiana, there are no regularly available interpreters who are conversant in languages other than English and Spanish. In order to represent LEP clients who communicate in these languages, attorneys rely on language lines. Without an in-facility mechanism to access a language line, the sole avenue to communicate with these clients is by phone.

137.    Yet, time spent connecting to the language line is deducted from the 20-minute time period allotted for confidential attorney-client conversations. This puts LEP clients detained at LaSalle at a significant disadvantage if they need interpreters to communicate with their counsel. Based on the experience of SPLC employees and volunteers, the use of interpreters can more than double the length of a conversation—which further restricts their ability to consult with counsel.

138.    These barriers to telephonic communication have had especially dire consequences for detainees who are represented by SIFI volunteers from outside Louisiana, for whom reliable telephonic communication is indispensable to provide effective representation.

139.    For instance, SIFI volunteers from New York and Washington DC sought to schedule a phone call with their client at LaSalle to obtain information needed for his merits hearing. The client's case is assigned to an expedited docket, meaning that frequent substantive communication is crucial in order to prepare for the impending hearing. However, despite repeated attempts by the SIFI volunteers to call LaSalle to schedule a client call, no one picked up the phone. Days later, when a LaSalle staff member finally answered, the call could not be scheduled for several more days. In total, it took more than a week for the call to occur. Making matters worse, LaSalle staff limited the call to only 20 minutes, which was inadequate to gather the necessary information. When the attorneys sought to schedule a follow-up call, the same series of events occurred: days passed before a LaSalle staff member answered the telephone; even more days passed before the call could take place; and when the call finally occurred more than a week later, it was again limited to just 20 minutes—despite the rapidly approaching merits hearing.

140.    Because attorneys cannot schedule multiple phone calls with the same client on a given day and cannot spend more than 20 minutes on a given call, they must make in-person visits and wait hours to get into the single visitation room.

141.    Defendants and their agents are targeting SPLC and its volunteers based on hostility to SPLC's mission. The longer SIFI is operational at LaSalle, the more LaSalle staff seek to interfere with SPLC's efforts to meet with clients and prospective clients. For example, on March 30, 2018, Defendants prevented SIFI staff and volunteers from meeting with clients and prospective clients at LaSalle on the basis that they had not entered appearances in the relevant cases. This requirement had never been mentioned in the months since SIFI began operating at LaSalle or during the hundreds of previous visits. Enforcing such a policy would

prevent lawyers and clients from engaging in the communications needed to determine whether to enter into a representation. That is why Defendants' written policies actually provide that legal visitation cannot be denied on the basis that the lawyer has not entered a notice of appearance in the case. That same day SPLC clients had visits cancelled in the facility for people SIFI represents even though SIFI did, in fact have G-28 forms on file.

142.    Defendants' written policy is that legal assistants, with a letter of authorization from their supervising attorney, may visit detainees. That same day, legal volunteers were prevented from using the open attorney-client room because they were not lawyers and "ICE had not approved" them for legal visits. The prison staff terminated the meeting midway through and did not extend the same rules for legal visitation.

143.    Upon information and belief, Defendants have exclusively targeted SPLC in enforcing this purported policy in hostility toward the presence and mission of the organization and its volunteers.

### B.  Irwin County Detention Center

144.    Irwin is located in Ocilla, Georgia—a city of 3,604 residents that is 185 miles from Atlanta. The drive from Atlanta takes approximately three hours each way. Today, the immigration prison is the second largest employer in Irwin County.

145.    Irwin typically detains around 700 noncitizens in a correctional facility with the capacity to detain 1,200 people. The detainees at Irwin are transported there despite its remote and inconvenient location far from ICE's administrative offices, the vast majority of immigration lawyers, and the immigration courts in Atlanta that adjudicate the cases of many Irwin detainees. In addition to people in removal proceedings, Irwin also detains a number of federal pre-trial

detainees under the supervision of the U.S. Marshals Service and a minimal number of county pre-trial detainees.

146.    While Defendants are ultimately responsible for ensuring that conditions at the prison comply with constitutional and other legal requirements, Defendants are derelict in that duty because they have failed to remediate the substantial barriers that impede Irwin detainees' access to counsel.

147.    Irwin presently houses approximately 700 immigrant detainees but the prison has only one attorney visitation room for these immigrant detainees to access counsel. The one visitation room is frequently occupied when SIFI staff and volunteers arrive at the detention center to visit clients. That one room is not exclusively used for attorney-client visitations. Weddings, clergy visits and social worker meetings also take place there. Consequently, SIFI staff and volunteers are often subjected to delays of one hour or much longer—sometimes up to three or four hours.

148.    These frequent, lengthy delays are compounded by Irwin's policy of prohibiting movement within the facility during count, while failing to efficiently transport clients prior to count. In other words, even when the attorney-visitation room is available prior to count, Irwin staff may fail to bring a client to the attorney-visitation room before count begins, meaning that an attorney must wait until count is over—sometimes up to an hour or more—before the visit can commence. And Irwin conducts seven counts per day, all of which are during times when attorneys are permitted to visit.

149.    Attorneys frequently occupy the room for many hours to see multiple clients, effectively precluding visitation for all detainees with other counsel.

150.     Making matters worse, once SIFI staff and volunteers are escorted into the visitation room, they frequently must wait long periods of time—sometimes close to an hour—for the detainee to be brought to them. Lawyers seeing more than one client frequently wait protracted periods for each client to be escorted to and from the visitation room.

151.     Conditions inside the single attorney-visitation room further frustrate detainees' ability to communicate with their attorneys. The room is not soundproof. Confidential conversations with clients about sensitive topics, like sexual abuse and political persecution, can be clearly overheard by employees of the detention center who often stand near or walk by the room, and by people in the nearby family visitation rooms.

152.     The door on the attorney visitation room is controlled by staff in the prison's operational control room. Once it is closed, the door locks; people in the room have no ability to get out, except by attracting the attention of the guard who operates the door from the control room. There is no mechanism—like a buzzer or speakerphone—in the visitation room to facilitate communication with the control room. Thus, attorneys are relegated to waving at the guard through the control room's tinted window and knocking on the window of the visitation room. On more than one occasion, attorneys have been trapped in the room for long periods of time. Meanwhile, other lawyers sit in the waiting room, and their clients are deprived of valuable time with their counsel.

153.     On certain days, Irwin permits SIFI attorneys and volunteers to conduct non-contact visits with clients in the family visitation room. But it is not a confidential meeting space. While attorneys meet with clients in that room, Irwin staff use the room as a throughway, and staff often loiter in an adjacent office, with the door open.

154.   As with LaSalle, the lack of contact during visits substantially hinders the ability to establish rapport and trust between lawyer and client. Public defenders and other criminal defense attorneys representing pre-trial detainees at Irwin are permitted to conduct contact visits with their clients. As a result, they can freely exchange documents with one another and more easily foster effective communication and trust.

155.   Whereas SIFI attorneys and volunteers are largely relegated to meet with clients in the single, non-contact attorney-visitation room, upon information and belief, public defenders are rarely required to use that room. Irwin allows public defenders to conduct contact visits with their clients in rooms located in an area of the prison that SIFI staff and volunteers are not permitted to enter.

156.   Irwin has two VTC computers that facilitate meetings between remote attorneys and their clients. VTC meetings take place from 9 a.m. to 4 p.m. with an hour-long break for lunch. While VTC has the potential to facilitate greater access to attorneys, the opportunities for client contact remain wholly insufficient.

157.   VTC meetings are strictly limited to one hour, which is often an insufficient amount of time to render legal advice.

158.   Mechanical issues regularly undermine basic communications during the one-hour VTC allotment.

159.   SPLC's meetings with clients on VTC have frequently been interrupted, cut short, delayed by connection issues, and/or subject to other interference. In such instances, Irwin guards strictly adhere to the one-hour limitation, thereby forcing SPLC staff and volunteers to rush through their conversations with clients on VTC. On one occasion, a VTC visit was cut

short because the guard who was facilitating the visit informed the attorney that she had to go to lunch.

160.    Irwin fails to adequately coordinate the VTC calendar—leading to missed appointments with clients and preventing attorneys from relying on VTC as a reasonable alternative to in-person visits. Irwin guards regularly forget to initiate the VTC visit, initiate VTC visits at unscheduled times, and bring the wrong person to the VTC room.

161.    VTC visitation at Irwin occurs in the law library. On information and belief, detainees are unable to use the law library between 9 a.m. and 4 p.m. when calls occur.

162.    Guards consistently tell SPLC's staff and volunteers that they cannot take all the available VTC slots—even when the slots are not being used. By preventing SIFI from scheduling as many meetings as possible, this arbitrary restriction creates a significant hardship to SPLC and its many volunteer attorneys.

163.    There are indications that Irwin gives preferential treatment to other visitors over SPLC personnel and volunteers. Despite a first-come, first-served visitation policy, social workers have received priority over SPLC staff and volunteers. On one occasion, Irwin staff interrupted an SPLC client visit to insist that the attorney room be vacated for a social worker visit. On another occasion, although a volunteer attorney had been waiting an hour to meet with a SIFI client, a social worker arrived and was permitted to meet with his clients first.

164.    Furthermore, upon information and belief, the attorneys for pre-trial, criminal detainees are allowed to bring their laptops to client meetings. This is at odds with the treatment of SPLC staff and volunteers, who have been consistently prohibited from bringing electronics into any part of the prison, including the waiting room.

165.    Defendants restrict attorney access to Irwin in other problematic ways. For instance, immigration court proceedings for Irwin detainees occur in Atlanta. The detainees participate in the proceedings via VTC from a room inside Irwin near the attorney-visitation room. Because Defendants restrict attorneys' access to that VTC room, lawyers representing Irwin detainees are forced to drive three hours to Atlanta and enter their appearance there rather than appearing alongside their clients in the detention center.

166.    Immigration judges say they have no authority over the prisons where Defendants choose to house civil detainees.

167.    While Defendants allow attorney access to the VTC rooms in some prisons during immigration hearings, this access is uniformly denied at Irwin.

168.    The three-hour drive means that lawyers cannot meet with their clients immediately before a morning hearing. All Atlanta bond hearings take place in the morning.

169.    Because attorneys are not in the same location as their clients, they cannot easily engage in confidential communications—for example, to request clarification of a factual point or advise the client on how to respond to a question from the immigration judge. To speak privately with the client, the lawyer must ask the immigration judge and trial attorney to leave the courtroom.

### *Stewart County Detention Center*

170.    Stewart is located in Lumpkin, Georgia. Lumpkin is a small town of approximately 1,091 residents and is approximately 140 miles from Atlanta—a drive of two and a half hours. Stewart County itself is one of Georgia's least populous counties, with fewer than 6,000 residents, of whom approximately 25 percent are people held at the detention center.

Lumpkin has very few businesses, no grocery store and no library. The detention center is the town's primary employer.

171.    Stewart County constructed the facility in 2004. In 2006, Defendant ICE entered into a contractual arrangement whereby the facility would serve as an immigration detention center.

172.    Defendants are ultimately responsible for ensuring that the conditions in the facility comply with constitutional and other legal requirements, including ensuring that detainees have meaningful access to legal representation. Defendants have utterly failed in that regard. Since SIFI launched at Stewart in April 2017, the conditions, policies, and practices at the facility have routinely prevented detainees from accessing their attorneys and have impeded attorneys' ability to meaningfully represent detained immigrants at Stewart.

173.    Although Stewart typically detains between 1,800 and 1,900 immigrants, the facility has only three attorney-visitation rooms.

174.    The small number of attorney-visitation rooms relative to the number of detainees, along with inadequate staffing, means that those visitation rooms are sometimes unavailable, such that SPLC attorneys and volunteers often must wait for extended periods before meeting with their clients.

175.    Delays are further compounded during detainee counts and shift changes when there can be no movement in the facility, including taking attorneys to visit clients. Stewart conducts six counts per day, at least two of which are scheduled during attorney visitation hours. Each count and shift change can take an hour or longer. On occasion, shift change and count occur back-to-back, thereby compounding delays to see clients. As a result, counts and shift changes substantially narrow the actual attorney visitation hours at each facility. Although

regular visitation hours are supposed to last until 5:00 p.m., SIFI staff and volunteers have arrived to conduct client visits prior to 5:00 p.m. only to be told that count was occurring; in some instances, count lasted until 5:00 p.m., and SIFI staff and volunteers were prevented from meeting with their clients. Even in instances when count was not occurring, SIFI staff and volunteers have arrived at Stewart well before 5:00 pm to meet with clients but were forced to wait until 5:00 p.m., when visitation hours end.

176.    SIFI staff and volunteers are thus frequently subjected to lengthy delays before they can see clients. Wait times in excess of one or two hours are frequent, and some staff and volunteers have been forced to wait as long as three hours. Attorneys cannot simply leave the facility and come back later because they risk losing their place in line.

177.    Between May 10, 2017 and December 22, 2017, the average wait time for SPLC's attorneys, staff, volunteers, and interpreters at the facility was almost an hour. Approximately 20 visits required waits in excess of two hours—many in excess of three and four hours. Moreover, attorneys are frequently subjected to further delay once inside the attorney-visitation room while waiting for their clients to be transported.

178.    SPLC volunteers and staff need to visit with multiple clients every day, making these wait times a substantial drain on SPLC's resources and undermining its ability to effectively advocate for its clients. In fact, attorneys spent more than 210 hours sitting in the waiting room at Stewart over the seven-month period between May and December 2017. That is more than a month of 40-hour work weeks.

179.    Due to the "no-electronics" policy enforced at Stewart, SIFI staff and volunteers must spend additional time trying to make up for the hours lost while waiting to meet with clients.

180.   Delays at Stewart routinely prevent SIFI staff and volunteers from spending sufficient time with clients, either because visitation hours may end or the attorney must cut the meeting short to see another client.

181.   In some cases, the lengthy delays have prevented SIFI attorneys and volunteers from meeting with their clients at all.

182.   Attorneys invariably must return to the facility to see their clients in order to discuss matters that could not be addressed due to time constraints at the initial meeting. Attorneys are again subjected to lengthy delays at the follow-up visit. As a result, matters that could have been handled within a single efficient visit often take multiple trips and multiple hours of waiting, thereby further straining SPLC's resources.

183.   These delays have prevented SIFI staff from meeting with clients and prospective clients prior to important court hearings. As a result, SPLC's clients and prospective clients have not been adequately prepared for their hearings.

184.   In one instance, SPLC learned about a potential client just prior to his bond hearing. A SIFI volunteer attempted to visit the person before his hearing to provide important advice. Yet, the delay of well over an hour prevented the attorney from speaking with the client prior to the hearing. The bond hearing went forward, and bond was denied.

185.   Because the "no-electronics" policy impedes access to interpreters and prevents SPLC from engaging in client work during lengthy waits, SPLC has sought to negotiate with Defendants to revise its prohibition on electronic devices at Stewart. SPLC has made multiple offers of accommodation, including proposals to purchase laptops with no cameras, bring in only pre-registered tablets that Stewart staff could inspect, and certify that any laptops or cell phones are utilized exclusively for client representation purposes. Defendants have implemented such

safeguards to permit attorneys to bring in electronic devices at other immigration detention centers. Yet, Defendants have outright rejected these proposals at Stewart and continue to prohibit attorneys from bringing electronic devices into the facility, which negatively impacts SPLC and its clients.

186.    After SPLC staff complained in 2016 that video-teleconferencing was supposed to be available under the terms of the 2014 Stewart contract, two VTC portals were installed at Stewart. However, Defendants maintain policies that obstruct clients' reliable access to VTC for the purpose of communicating with their attorneys. For example, Defendants maintain a policy of strictly cutting off the calls one hour after the scheduled start time regardless of need or availability. Mechanical difficulties often delay or interrupt these calls. Yet, Stewart staff refuse to replace such lost time and instead insist on strictly adhering to the policy.

187.    In one case, an SPLC volunteer attorney met with an Arabic-speaking SIFI client to review the client's sworn declaration. Because there is no access to a language line in Stewart, VTC was the only mechanism by which the attorney could access an Arabic interpreter. The call began eight minutes late, and technical difficulties occurred approximately twenty-five minutes later. The attorney was able to resume the call twelve minutes before the hour expired, by which time the officer had sent the detainee back for count. When the volunteer asked the officer to bring the client back, she refused on the basis that the attorney had just seven minutes left of her allotted hour. The attorney was thus unable to complete review of the client's declaration during that meeting.

188.    Access to confidential telephone lines for attorney-client communications is not an alternative at Stewart. Upon information and belief, Stewart only allows confidential telephone calls between attorneys and clients if VTC is not working.

189.    All of these barriers to attorney-client communications are compounded by Defendants' failure to remediate persistently obstructive conduct by Stewart staff. Stewart staff frequently and arbitrarily change rules without notice; for example, the ever-evolving requirements to obtain visitation authorization have delayed client visits, blocked visits altogether, and drained SPLC's resources. Recently, SIFI staff followed the longstanding procedure of faxing a letter indicating which clients a volunteer attorney intended to visit the following day. After completing some visits in the morning, the volunteer attorney returned that afternoon to conduct the remaining client visits. However, Stewart staff refused her entry, insisting that she would need to fax a second letter if she wanted to re-enter the facility. The volunteer was unable to see her remaining clients that day.

190.    Similarly, during a recent set of client visits, SIFI volunteers sought to bring in business cards for their own clients as well as other indigent detainees in need of legal representation. However, Stewart guards refused to allow the SIFI volunteers to enter with any extra business cards. Guards have continued to enforce this policy with some regularity, thereby depriving unrepresented Stewart detainees of access to information that could assist them in securing crucially-needed legal counsel.

191.    Stewart guards have also engaged in conduct to pressure attorneys and detainees to keep legal visits short. Recently, during a prospective client interview with an attorney, a detainee noticed that a Stewart guard was pacing back and forth outside the attorney-visitation room. While the interview was in progress, the attorney overheard that guard state that the interview was taking too long. When the interview was finished, the same guard stated "Finally," signaling to the attorney that he should keep his remaining interview short.

192.    These recent occurrences are but a few of the many instances in which Defendants' agents have engaged in conduct that frustrates detainees' efforts to access legal counsel. Upon information and belief, such conduct is directed specifically and deliberately at SIFI staff and volunteers—not at other attorneys who visit the facility.

193.    Defendants have also failed to remediate other obstructive conduct by Stewart staff. In some instances, guards at Stewart have forced SIFI staff and volunteers to wait even when there are available attorney-visitation rooms. Upon information and belief, such conduct is directed specifically and deliberately at SIFI staff and volunteers—not at other attorneys who visit the facility. In a recent incident, a volunteer interpreter arrived at Stewart with two attorneys to facilitate visits with three clients. When she walked under the metal detector, it started beeping. A guard speculated that the underwire in her bra had triggered the detector. The volunteer requested that they use the readily available metal detection wand to clear her. The guard called for supervisory approval. After waiting for approximately 15 minutes, the volunteer asked another guard for an update on her clearance; in response, the guard asked the volunteer when she planned to change her clothes. She removed her bra in the public waiting area, passed through again, and the metal detector again beeped. She was then forced to leave the facility and change clothes before being allowed to re-enter. Although the Stewart guard refused to use the readily available wand on the SIFI volunteer, that volunteer observed the same guard using the wand on a non-SIFI visitor who set off the metal detector on the same day.

194.    Guards have also interrupted attorney-client meetings without cause. In one instance, a guard peered through the small window on the visitation door and opened the door during a client visitation, stating  that he had seen the attorney showing the client a photograph.

Although photographs are frequently critical pieces of evidence in removal cases, the guard interrogated the attorney about his conduct.

195.    Guards at Stewart have prevented SIFI staff and volunteers from wearing scarves and from carrying CDs that containing a client's immigration court files.

196.    Guards and Defendants' other agents have also inspected and commented on legal files held by attorneys and confiscated legal papers from detainees.

197.    In addition, Defendants have engaged in conduct aimed at intimidating SIFI staff and volunteers. For instance, a volunteer attorney left Stewart on the morning of March 13, 2018 at about 10:15 a.m. She lawfully stopped on the side of Main Street in order to take photos of the water tower and the signage pointing to the detention center, and then returned to her car and resumed driving.

198.    An ICE patrol car passed her, drove about halfway toward the detention center and turned around. The ICE officer drove up behind her, activated his lights, and pulled her over. The ICE officer, who did not immediately identify himself, asked what she was doing. When she explained, he acknowledged there was nothing wrong with taking photos, but said he still had to take her information. He asked if she had a business card, and she said no. He then asked for her name and phone number, which he transcribed with a pen on the palm of his hand. When he asked who she was with, she said "SPLC." He asked if she was helping to "support illegal immigration." and asked what she was doing. She said she was court watching. When he again asked for the name of her organization, she said "the Southeast Immigrant Freedom Initiative, with the Southern Poverty Law Center," and he wrote that information on the palm of his hand. The officer then said he had to write down her license plate information.

199.    An actual and substantial controversy exists between SPLC and Defendants as to their respective legal rights and duties with respect to Defendants' policies, practices, and omissions in obstructing SPLC's ability to zealously represent its clients. SPLC contends that Defendants' policies, practices, and omissions alleged herein violate the constitutional rights of SPLC and its clients as alleged in the following paragraphs.

### FIRST CLAIM FOR RELIEF

**Denial of Access to Courts in Violation of the Due Process Clause of the Fifth Amendment**

**(SPLC, on behalf of its clients detained at LaSalle)**

200.    SPLC realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

201.    The Due Process Clause of the Fifth Amendment guarantees noncitizen detainees the right of access to courts and prohibits the government and its agents from unjustifiably obstructing that access.

202.    As such, SPLC's clients require meaningful access to SPLC in order to seek release on both bond and parole and to defend themselves against removal from the United States—the very reason that they are detained at LaSalle.

203.    The regulations and practices at LaSalle unjustifiably obstruct the availability of meaningful legal professional representation for SPLC's clients and impede upon other aspects of their right of access to the courts. These regulations and practices are invalid.

204.    SPLC's clients at LaSalle are civil detainees.

205.    As a result, Defendants cannot invoke "penological interests" as justification for any of the barriers they have placed between SPLC's clients and SPLC.

206.    There are no security interests or administrative needs that justify these barriers at the expense of SPLC's clients' access to courts and counsel. Under the totality of the circumstances—including, but not limited to, the remoteness of the facility, the inadequate number of visitation rooms, restrictions on visitation hours, delays in attorney access, lack of confidentiality in visitation rooms, lack of meaningful access to interpretation services, and barriers to remotely and confidentially communicating with their attorneys, Defendants are detaining SPLC's clients in a manner that prevents them from meaningfully accessing courts.

207.    SPLC's clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

## SECOND CLAIM FOR RELIEF

**Denial of the Right to Counsel in Violation of the
Due Process Clause of the Fifth Amendment**

**(SPLC, on behalf of its clients detained at LaSalle)**

208.    SPLC realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

209.    The Due Process Clause of the Fifth Amendment guarantees SPLC's clients the right to the effective assistance of counsel in their removal proceedings at no cost to the Government.

210.    SPLC's clients have retained SPLC to represent them in removal proceedings.

211.    For all the reasons assigned above, Defendants' policies, practices, and omissions have created substantial barriers to SPLC's efforts to provide effective and ethical representation to its clients.

212.   SPLC's clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

### THIRD CLAIM FOR RELIEF

**Denial of the Right to a Full and Fair Hearing in Violation of the
Due Process Clause of the Fifth Amendment**

**(SPLC, on behalf of its clients detained at LaSalle)**

213.   SPLC realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

214.   The Due Process Clause of the Fifth Amendment guarantees SPLC's clients the right to a full and fair hearing in their removal cases.

215.   Defendants' conduct creates a substantial likelihood that SPLC's clients' rights to a full and fair hearing will be violated, because Defendants' policies and practices severely restrict the ability of Plaintiff to communicate with its clients and to conduct necessary legal work on their behalf in connection with their removal proceedings.

216.   SPLC's clients have a substantial interest in avoiding prolonged detention and ultimately prevailing in their removal proceedings.

217.   All of the obstacles to accessing and communicating with counsel described herein create a substantial risk that errors will occur in bond and removal proceedings; eliminating these barriers creates a greater likelihood of preventing an erroneous deprivation of SPLC's clients' rights.

218.   The government's interest in maintaining the current obstacles is de minimis, especially in light of the countervailing interests of SPLC's clients.

219.    SPLC's clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

### FOURTH CLAIM FOR RELIEF

**Denial of the Right to Free Speech in Violation of the First Amendment**
**(SPLC, on behalf of itself)**

220.    Plaintiff realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

221.    The First Amendment protects SPLC's activities as a legal organization in informing and representing its clients because those activities are modes of expression and association.

222.    Defendants' policies, practices, and omissions have interfered with and obstructed SPLC's ability to inform and represent its clients at LaSalle.

223.    The First Amendment also prohibits the government from restricting SPLC's expression on the basis of its viewpoint, or treating SPLC's expression differently from that of other attorneys on the basis of viewpoint.

224.    Upon information and belief, many of the obstacles described above have been targeted at the SPLC alone—and not other immigration lawyers who practice at LaSalle—due to SPLC's underlying mission.

*Irwin County Detention Center*

### FIFTH CLAIM FOR RELIEF

**Denial of Access to Courts in Violation of the**
**Due Process Clause of the Fifth Amendment**
**(SPLC, on behalf of its clients detained at Irwin)**

225.     SPLC realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

226.     The Due Process Clause of the Fifth Amendment guarantees noncitizen detainees the right of access to courts and prohibits the government and its agents from unjustifiably obstructing that access.

227.     As such, SPLC's clients require meaningful access to SPLC in order to seek release on both bond and parole and to defend themselves against removal from the United States—the very reason that they are detained at Irwin. The regulations and practices at Irwin unjustifiably obstruct the availability of meaningful legal professional representation for SPLC's clients and impede upon other aspects of their right of access to the courts. These regulations and practices are invalid.

228.     SPLC's clients at Irwin are civil detainees.

229.     As a result, Defendants cannot invoke "penological interests" as justification for any of the barriers they have placed between SPLC's clients and SPLC.

230.     There are no security interests or administrative needs that justify these barriers at the expense of SPLC's clients' access to courts and counsel. Under the totality of the circumstances—including, but not limited to, the remoteness of the facility, the inadequate number of visitation rooms, restrictions on visitation hours, delays in attorney access, lack of confidentiality in visitation rooms, lack of meaningful access to interpretation services, and barriers to remotely and confidentially communicating with their attorneys, Defendants are detaining SPLC's clients in a manner that prevents them from meaningfully accessing courts.

231.     SPLC's clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

## SIXTH CLAIM FOR RELIEF

### Denial of the Right to Counsel in Violation of the
### Due Process Clause of the Fifth Amendment

**(SPLC, on behalf of its clients detained at Irwin)**

232.     Plaintiff realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

233.     The Due Process Clause of the Fifth Amendment guarantees SPLC's clients the right to the effective assistance of counsel in their removal proceedings at no cost to the Government.

234.     SPLC's clients have retained Plaintiff to represent them in removal proceedings.

235.     For all the reasons assigned above, Defendants' policies, practices, and omissions have created substantial barriers to SPLC's efforts to provide effective and ethical representation to its clients.

236.     SPLC's clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

## SEVENTH CLAIM FOR RELIEF

### Denial of the Right to a Full and Fair Hearing in Violation of the
### Due Process Clause of the Fifth Amendment

**(SPLC, on behalf of its clients detained at Irwin)**

237.     SPLC realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

238.     The Due Process Clause of the Fifth Amendment guarantees SPLC's clients the right to a full and fair hearing in their removal cases.

239.     Defendants' conduct creates a substantial likelihood that SPLC's clients' rights to a full and fair hearing will be violated, because Defendants' policies and practices severely restrict the ability of Plaintiff to communicate with its clients and to conduct necessary legal work on their behalf in connection with their removal proceedings.

240.     SPLC's clients have a substantial interest in avoiding prolonged detention and ultimately prevailing in their removal proceedings.

241.     All of the obstacles to accessing and communicating with counsel described herein create a substantial risk that errors will occur in bond and removal proceedings; eliminating these barriers creates a greater likelihood of preventing an erroneous deprivation of SPLC's clients' rights.

242.     The government's interest in maintaining the current obstacles is de minimis, especially in light of the countervailing interests of SPLC's clients.

243.     SPLC's clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

## EIGHTH CLAIM FOR RELIEF
### Denial of the Right to Free Speech in Violation of the First Amendment
### (SPLC, on behalf of itself)

244.     Plaintiff realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

245.    The First Amendment protects SPLC's activities as a legal organization in informing and representing its clients because those activities are modes of expression and association.

246.    Defendants' policies, practices, and omissions have interfered with and obstructed SPLC's ability to inform and represent its clients at Irwin.

247.    The First Amendment also prohibits the government from restricting SPLC's expression on the basis of its viewpoint, or treating SPLC's expression differently from other attorneys on the basis of viewpoint.

*248.*    Upon information and belief, many of the obstacles described above have been targeted at the SPLC alone—and not other immigration lawyers who practice at Irwin—due to SPLC's underlying mission.

### Stewart Detention Center

### NINTH CLAIM FOR RELIEF

**Denial of Access to Courts in Violation of the Fifth Amendment Due Process Clause (SPLC, on behalf of its clients detained at Stewart)**

249.    SPLC realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

250.    The Due Process Clause of the Fifth Amendment guarantees noncitizen detainees the right of access to courts and prohibits the government and its agents from unjustifiably obstructing that access.

251.    As such, SPLC's clients require meaningful access to SPLC in order to seek release on both bond and parole and to defend themselves against removal from the United States—the very reason that they are detained at LaSalle. The regulations and practices at LaSalle unjustifiably obstruct the availability of meaningful legal professional representation for

SPLC's clients and impede upon other aspects of their right of access to the courts. These regulations and practices are invalid.

252.     SPLC's clients at Stewart are civil detainees.

253.     As a result, Defendants cannot invoke "penological interests" as justification for any of the barriers they have placed between SPLC's clients and SPLC.

254.     There are no security interests or administrative needs that justify these barriers at the expense of SPLC's clients' access to courts and counsel. Under the totality of the circumstances— including, but not limited to, the remoteness of the facility, the inadequate number of visitation rooms, restrictions on visitation hours, delays in attorney access, lack of confidentiality in visitation rooms, lack of meaningful access to interpretation services, and barriers to remotely and confidentially communicating with their attorneys, Defendants are detaining SPLC's clients in a manner that prevents them from meaningfully accessing courts.

255.     SPLC's clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

## TENTH CLAIM FOR RELIEF

### Denial of the Right to Counsel in Violation of the
### Due Process Clause of the Fifth Amendment
### (SPLC, on behalf of its clients detained at Stewart)

256.     Plaintiff realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

257.     The Due Process Clause of the Fifth Amendment guarantees SPLC's clients the right to the effective assistance of counsel in their removal proceedings at no cost to the Government.

258.     SPLC's clients have retained Plaintiff to represent them in removal proceedings.

259.     For all the reasons assigned above, Defendants' policies, practices, and omissions have created substantial barriers to SPLC's efforts to provide effective and ethical representation to its clients.

260.     SPLC's clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

### ELEVENTH CLAIM FOR RELIEF

**Denial of the Right to a Full and Fair Hearing in Violation of the
Due Process Clause of the Fifth Amendment**

**(SPLC, on behalf of its clients detained at Stewart)**

261.     SPLC realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

262.     The Due Process Clause of the Fifth Amendment guarantees SPLC's clients the right to a full and fair hearing in their removal cases.

263.     Defendants' conduct creates a substantial likelihood that SPLC's clients' rights to a full and fair hearing will be violated, because Defendants' policies and practices severely restrict the ability of Plaintiff to communicate with its clients and to conduct necessary legal work on their behalf in connection with their removal proceedings.

264.     SPLC's clients have a substantial interest in avoiding prolonged detention and ultimately prevailing in their removal proceedings.

265.     All of the obstacles to accessing and communicating with counsel described herein create a substantial risk that errors will occur in bond and removal proceedings, and eliminating these barriers creates a greater likelihood that no erroneous deprivation of SPLC's clients' rights will occur.

266.     The government's interest in maintaining the current obstacles is de minimis, especially in light of the countervailing interests of SPLC's clients.

267.     SPLC's clients have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and omissions and are entitled to injunctive relief to avoid any further injury.

## TWELFTH CLAIM FOR RELIEF

### Denial of the Right to Free Speech in Violation of the First Amendment
### (SPLC, on behalf of itself)

268.     Plaintiff realleges and incorporates by reference the foregoing paragraphs and incorporates them herein by this reference.

269.     The First Amendment protects SPLC's activities as a legal organization in informing and representing its clients because those activities are modes of expression and association.

270.     Defendants' policies, practices, and omissions have interfered with and obstructed SPLC's ability to inform and represent its clients at Stewart.

271.     The First Amendment also prohibits the government from restricting Plaintiff's expression on the basis of its viewpoint, or treating SPLC's expression differently from other attorneys on the basis of viewpoint.

272.     Upon information and belief, many of the obstacles described above have been targeted at the SPLC alone—and not other immigration lawyers who practice at Stewart—due to SPLC's underlying mission.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Accept jurisdiction of this case and set it for hearing at the earliest opportunity;

2. Issue a judgment declaring that Defendants' policies, practices, and omissions described herein violate SPLC's and its clients' rights under the United States Constitution;

3. Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Plaintiff and its clients to the unlawful acts and omissions described herein, and issue an injunction sufficient to remedy the violations of SPLC's and its clients' constitutional rights, including:

   a. An order that Defendants provide sufficient space for timely, confidential and contact attorney-client meetings;

   b. An order that Defendants do not locate more noncitizen detainees at LaSalle, Irwin, or Stewart than can be reasonably accommodated for attorney visitation space;

   c. An order that Defendants provide a cost-effective and functional means of accessing remote interpretation services within the attorney-visitation meeting rooms;

   d. An order that Defendants permit confidential attorney-client telephonic and/or video teleconference communications in excess of one hour without limitation on the number of such communications;

e. An order that Defendants institute protocols to ensure that such telephonic and/or video teleconference communications can be scheduled without unreasonable delay; and

f. An order that Defendants permit SPLC's staff and volunteers to use laptops, tablets and cellular telephones in the waiting rooms and attorney-visitation rooms after Plaintiff certifies that such use is in furtherance of its representation of its clients.

4. Grant Plaintiff its reasonable attorney fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law.

5. Grant such other relief as the Court deems just and proper.

Dated: April 4, 2018                              Respectfully submitted,


/s/ Lisa S. Graybill                              /s/ Melissa Crow
Lisa Graybill*                                    Melissa Crow (DC Bar No. 453487)
Jamila Johnson*                                   Law Office of Melissa Crow
Jared Davidson*                                   14608 Drum Hill Court
Southern Poverty Law Center                       North Potomac, MD  20878
201 St. Charles Avenue, Suite 2000                Tel:  202-355-4471
New Orleans, Louisiana 70170                      melissa@immjustice.com
Tel: (504) 486-8982
Lisa.Graybill@splcenter.org
Jamila.Johnson@splcenter.org
Jared.Davidson@splcenter.org


/s/ Natalie Lyons                                 /s/ Christian F. Henel
Natalie Lyons*                                    Christian F. Henel (DC Bar No. 989746)
Southern Poverty Law Center                       John T. Bergin (DC Bar No. 448975)
150 E. Ponce de Leon Ave., Ste. 340               Kilpatrick Townsend & Stockton LLP
Decatur, GA 30030                                 607 14th Street NW, Suite 900
Tel: (404) 521-6700                               Washington, D.C. 20005
Natalie.Lyons@splcenter.org                       Tel: (202) 481-9943
                                                  CHenel@kilpatricktownsend.com
                                                  JBergin@kilpatricktownsend.com

/s/ William E. Dorris     /s/ Maureen A. Sheehy

William E. Dorris*      Maureen A. Sheehy*
Susan W. Pangborn*     Gia L. Cincone*
Jeffrey Fisher*       Kilpatrick Townsend & Stockton LLP
Kilpatrick Townsend & Stockton LLP Two Embarcadero Center, Suite 1900
1100 Peachtree Street NE, Suite 2800 San Francisco, CA 94111
Atlanta, GA 30309      Tel: (415) 273-7571
Tel: (404) 815-6104     MSheehy@kilpatricktownsend.com
BDorris@kilpatricktownsend.com  GCincone@kilpatricktownsend.com
SPangborn@kilpatricktownsend.com
JFisher@kilpatricktownsend.com

Attorneys for Plaintiffs

* *Pro Hac Vice Motion Pending*