## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN POVERTY LAW CENTER, in its individual capacity and on behalf of its clients detained at Stewart Detention Center, LaSalle Detention Facility, and Irwin County Detention Center;<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; KIRSTJEN NIELSEN, Secretary of U.S. Department of Homeland Security, in official capacity; THOMAS HOMAN, Deputy Director and Acting Director of U.S. Immigration and Customs Enforcement, in official capacity; CLAIRE TRICKLER-MCNULTY, Acting Director for U.S. Immigration and Customs Enforcement, Office of Detention Policy and Planning, in official capacity; MATTHEW ALBENCE, Executive Associate Director of Enforcement & Removal Operations, in official capacity; TAE JOHNSON, Assistant Director for Custody Management, Enforcement & Removal Operations, in official capacity; NATHALIE R. ASHER, Acting Assistant Director, Field Operations for Enforcement and Removal Operations, in official capacity; DAVID RIVERA, Field Office Director, U.S. Immigration and Customs Enforcement New Orleans Field Office, in official capacity; and SEAN GALLAGHER, Field Office Director, U.S. Immigration and Customs Enforcement Atlanta Field Office, in official capacity;<br><br>Defendants. | Civil Action No.<br>1:18-cv-00760-CKK |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## Table of Contents

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 3

A.   SPLC Established the Southeast Immigrant Freedom Initiative to Provide Ethical, Effective Pro Bono Representation to Noncitizens Subject to Heightened Enforcement and Imprisoned in the Rural South. ........................................................................ 4

B.   Ethical and Effective Pro Bono Representation of Detained Immigrants Requires Sufficient Communication between Counsel and Client. ................................................. 5

C.   SPLC Represents Clients at LaSalle with Immediate Needs to Communicate With Their Lawyers. ................................................................................................................... 9

D.   Defendants Are Blocking SPLC's Clients from Ethical and Effective Representation by Preventing Access to Lawyers. ..................................................................................... 11

1.   SPLC Clients Cannot Reliably or Effectively Meet In-Person with Their Lawyers. .... 11

2.   SPLC Clients Cannot Reliably or Effectively Communicate with their Lawyers Over the Telephone. ................................................................................................................. 15

E.   The Lack of Access to Legal Representation Is Unnecessary, Unjustifiable, and Contrary to Defendants' Stated Policies. ..................................................................... 18

F.   Court Intervention is Necessary to Ensure a Meaningful and Just Outcome in the May 17, 2018 Deportation Hearing of a Nigerian Client. ..................................................... 20

LEGAL STANDARD ...................................................................................................... 21

ARGUMENT .................................................................................................................... 22

A.   There Is a Substantial Likelihood that SPLC Will Succeed on the Merits. ................. 22

1.   Defendants Have Deprived SPLC's Clients of Their Fifth Amendment Due Process Rights. ............................................................................................................................ 22

2. SPLC Has Standing To Assert Its Clients' Fifth Amendment Claims. ........................... 36

B.   Defendants' Ongoing Violations of the Constitutional Rights of SPLC's Clients Constitute Irreparable Harm. ........................................................................................ 42

C.   The Balance of Equities and Public Interest Weighs Heavily in Favor of SPLC and Its Detained Clients, Whose Constitutional Rights Are at Stake. ...................................... 44

CONCLUSION ................................................................................................................. 45

## Table of Authorities

<u>Cases</u>

*Aid for Women v. Foulston*, 441 F.3d 1101 (10th Cir. 2006) ...............................................41, 42

*Al-Aulaqi v. Obama*, 727 F. Supp.2d 1 (D.D.C. 2010) .........................................................39

*Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004) ................................................42

*Baires v. I.N.S.,* 856 F.2d 89 (9th Cir.1988) ........................................................................31

*Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001).............................................................24, 25

*Benjamin v. Kerik*, 102 F. Supp.2d 157 (S.D.N.Y. 2000).......................................................25

*Bounds v. Smith*, 430 U.S. 817 (1977).............................................................................44, 45

*Campbell v. Miller*, 787 F.2d 217 (7th Cir. 1986) ...............................................................23

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) ................................40

*Castaneda-Delgado v. INS,* 525 F.2d 1295 (7th Cir. 1975) .................................................31

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)............... 3, 22

*Ching v. Lewis*, 895 F.2d 608 (9th Cir. 1990) ....................................................................28

*Colmenar v. I.N.S.*, 210 F.3d 967 (9th Cir. 2000)................................................................33

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) ..................................39

*Covino v. Vermont Dep't of Corr.*, 933 F.2d 128 (2d Cir. 1991) .........................................24

*Craig v. Boren*, 429 U.S. 190 (1976)..................................................................................39

*Dakane v. U.S. Att'y Gen.*, 399 F.3d 1269 (11th Cir. 2005)................................................30

*Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356 (D.C. Cir. 1999) ................................22

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009)..............................22

*Dep't of Labor v. Triplett*, 494 U.S. 715 (1990)..................................................................40

*Eisenstadt v. Baird,* 405 U.S. 438 (1972) ...........................................................................36

*Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718 (S.D. Ind. 2016)............40, 41

*Foucha v. Louisiana*, 504 U.S. 1 (1992).............................................................................34

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ........................................................42, 44, 45

*Gramegna v. Johnson*, 846 F.2d 675 (11th Cir. 1988) ........................................................24

*Guild v. Securus Technologies, Inc.*, No. 1:14-CV-366-LY, 2015 WL 10818584
(W.D. Tex. Feb. 4, 2015) .................................................................................................39

*Haitian Refugee Center v. Baker,* 789 F. Supp. 1552 (S.D. Fla. 1991)................................37

*Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987) ................................36, 37

*Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442 (S.D. Fla. 1980) ..................................44

*Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023 (5th Cir. 1982) ............................................44

*Handlovits v. Adcock*, 80 F.Supp. 425 (E.D. Mich. 1948)...................................................31

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................................................37

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017)...........................................7, 10, 33, 34

*Johnson-El v. Schoemehl*, 878 F.2d 1043 (8th Cir. 1989) ...........................24, 27, 28

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ...........................................40

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .............22

*Lepelletier v. F.D.I.C.*, 164 F.3d 37 (D.C. Cir. 1999)...........................................36, 40

*Leslie v. Attorney Gen.*, 611 F.3d 171 (3d Cir. 2010)...........................................30, 31

*Louis v. Meissner*, 530 F. Supp. 924 (S.D. Fla. 1981)...........................................24, 31

*Lozada v. I.N.S.*, 857 F.2d 10 (1st Cir. 1988) ...........................................31

*Lyon v. I.C.E.*, 171 F. Supp.3d 961 (N.D. Cal. 2016)...........................................33, 34

*Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708 (D.C. Cir. 1985)..45

*Mathews v. Diaz*, 426 U.S. 67 (1976) ...........................................23

*Mathews v. Eldridge*, 424 U.S. 319 (1976)...........................................33, 34

*Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006) ...........................................7

*McClendon v. City of Albuquerque*, 272 F. Supp. 2d 1250 (D.N.M. 2003) ...........................29

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)...........................................42

*Nasir v. Morgan*, 350 F.3d 366 (3d Cir. 2003)...........................................39

*Northeast Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251
(S.D. Ohio June 7, 2017) ...........................................37, 38, 42

*Northwest Immigrant Rights Project v. USCIS*, No. C15-813JLR, 2016 WL 5817078
(W.D. Wash. Oct. 5, 2016) ...........................................39

*Nunez v. Boldin*, 537 F. Supp. 578 (S.D. Tex. 1982)...........................................*Passim*

*O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420 (D.C. Cir. 1992)...................45

*Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal. 1988)...........................23, 24

*Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990) ...........................................23

*Ozoanya v. Reno*, 968 F. Supp. 1 (D.D.C. 1997)...........................................30

*Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278
(3d Cir. 2002)...........................................39, 40

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087
(D.C. Cir. 2015) ...........................................38, 39

*Powers v. Ohio*, 499 U.S. 400 (1991) ...........................................36, 39, 40

*Procunier v. Martinez*, 416 U.S. 396 (1974) ...........................................23, 24, 29

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ...........................................27

*Reese Brothers, Inc. v. U.S. Postal Serv.*, 531 F. Supp.2d 64 (D.D.C. 2008) ...........................39

*Reno v. Flores*, 507 U.S. 292 (1993) ...........................................23

iv

*Rosales v. ICE*, 426 F.3d 733, 736 (5th Cir. 2005)...............................................30

*Rose v. Woolwine*, 344 F.2d 993 (4th Cir. 1965)..................................................31

*Rothner v. City of Chicago*, 929 F.2d 297 (7th Cir. 1991) ................................40

*Saucedo v. Enders*, No. Civ. EP03CA433, 2004 WL 911309 (W.D. Tex. Apr. 16, 2004)...23

*Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998)................45

*Singleton v. Wulff*, 428 U.S. 106 (1976) ......................................................40, 41

*Taseko Mines Ltd. v. Raging River Capital*, 185 F. Supp. 3d 87 (D.D.C. 2016)..................22

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) .......................................................23

*Twyman v. Crisp*, 584 F.2d 352 (10th Cir. 1978) ...............................................23

*Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp.2d 106 (D.D.C. 2012)................36, 39

*Ukrainian-American Bar Ass'n v. Baker*, 893 F.2d 1374 (D.C. Cir. 1990) .........................36

*United States v. Saucedo-Velasquez,* 843 F.2d 832 (5th Cir.1988) ........................31

*Veasey v. Perry*, 29 F. Supp.3d 896 (S.D. Tex. 2014)..........................................39

*ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1 (D.D.C. 2012).............................44

*Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7 (2008) ...........................44

*Wrenn v. D.C.*, 167 F. Supp. 3d 86 (D.D.C. 2016)...............................................42

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...........................................................27

## Statutes & Regulations

6 U.S.C. § 251 ............................................................................................15, 35

8 U.S.C. § 1226 ..............................................................................................5, 6

8 U.S.C. § 1229 ...................................................................................................6

8 U.S.C. § 1229a ..............................................................................................6, 8

8 C.F.R. § 236.1 ..............................................................................................5, 6

8 C.F.R. § 239.1 ...................................................................................................6

8 C.F.R. § 1003.13 ...............................................................................................6

8 C.F.R. § 1003.14 ...............................................................................................6

8 C.F.R. § 1003.19 ...............................................................................................6

8 C.F.R. § 1230 ....................................................................................................6

8 C.F.R. § 1236.1 .............................................................................................6, 7

8 C.F.R. § 1239.1 .................................................................................................6

8 C.F.R. § 1240.10 ...............................................................................................6

8 C.F.R. § 1240.12 ...........................................................................................6, 8

**Other Sources**

Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Penn. L. Rev. 1, 49 (2015) ........................................................................*Passim*

Jean Pierre Espinoza, *Ineffective Assistance of Counsel in Removal Proceedings: 'Matter of Compean and the Fundamental Fairness Doctrine'*, 22 Fla. J. Int'l L. 65, 66 (2010)..........31

Memorandum from James R. McHenry III, Director, Executive Office for Immigration Review (EOIR) to Office of the Chief Immigration Judge, All Immigration Judges, All Court Administrators, All Immigration Court Staff (Jan. 17, 2018)................................................8

Executive Office for Immigration Review, Immigration Court Practice Manual

(Nov. 2, 2017)......................................................................................................................6, 8

## INTRODUCTION

Plaintiff Southern Poverty Law Center ("SPLC") seeks a preliminary injunction requiring Defendants to protect SPLC's clients' Fifth Amendment right to meaningful legal representation while they are imprisoned at the LaSalle ICE Processing Center (known as "LaSalle Detention Facility" or "LaSalle"). The lack of meaningful access to attorneys at LaSalle—an immigration prison in the rural and remote town of Jena, Louisiana—is a present and ongoing crisis that requires immediate emergency relief. Plaintiff SPLC represents 31 people imprisoned at LaSalle—most of whom are hundreds of miles from their homes. Although at least 28 of SPLC's imprisoned clients will likely have immigration hearings in the month of May, Defendants have erected unconstitutional barriers that prevent clients from reliably, effectively, and adequately conferring with their lawyers to prepare for these potentially life-altering proceedings, which will determine whether they are released from prison and able to remain lawfully in the United States, or removed to countries where they may face persecution, severe harm, or even death.

For these clients, there may never be a more important time to consult with their legal representatives; however, Defendants' conduct effectively prevents them from doing so. LaSalle has the capacity to imprison 1,200 people, but has only **one room** for legal visits. This means that SPLC attorneys and *pro bono* volunteers are routinely delayed in visiting clients for hours, and sometimes prevented from visiting their clients at all. Confidential legal phone calls are arbitrarily capped at 20 minutes and effectively limited to only once a week. There are no other means for SPLC's clients to effectively communicate in a timely manner with their lawyers at LaSalle.

While already acute, the need for court intervention to remedy these unconstitutional conditions has become an emergency. A Nigerian client of SPLC's Southeast Immigrant Freedom Initiative ("SIFI") is scheduled for a hearing on the merits of his asylum claim on May 17, 2018.

1

The client is represented by SPLC volunteer attorneys whose most recent in-person visit with the client was arbitrarily terminated. The attorneys had to fly home without finishing their discussions with the client, and have been attempting for weeks to schedule confidential phone calls so that they may gather all the information needed for the client's case. As of filing, there is no way for these attorneys to gain sufficient access to their client to adequately prepare for the May 17 hearing. Another SIFI attorney has a hearing on May 22, 2018, and is concerned about accessing the client.

Further, the number of clients represented by SPLC has doubled since SPLC filed this lawsuit in early April. The need to represent twice the number of clients at LaSalle emerged from a series of events that occurred the day after SPLC filed suit. On April 5, 2018, Immigration and Customs Enforcement ("ICE") executed the largest workplace immigration raid in a decade.[1] This raid led to the transfer of dozens of immigrants from their home in Bean Station, Tennessee—700 hundred miles away—to LaSalle. Eighteen of those immigrant workers retained SPLC to represent them in their immigration proceedings. Defendants' ongoing failure to accommodate meaningful access to and communication with legal counsel has significantly exacerbated the unconstitutional conditions detailed in Plaintiff's Complaint as the number of clients at LaSalle grows.

Defendants Department of Homeland Security ("DHS"), ICE, and their officials (collectively, "Defendants")[2] have failed to comply with their nondelegable duty to ensure that people in their custody at LaSalle are afforded their Fifth Amendment rights to counsel, access to

---

[1] Maria Sacchetti, *ICE raids meatpacking plant in rural Tennessee; 97 immigrants arrested*, Wash. Post (Apr. 6, 2018), https://www.washingtonpost.com/local/immigration/ice-raids-meatpacking-plant-in-rural-tennessee-more-than-95-immigrants-arrested/2018/04/06/4955a79a-39a6-11e8-8fd2-49fe3c675a89_story.html?utm_term=.af7667b6ad01; s*ee also* Maria Perez, *ICE Raid at Meatpacking Plant Leads to 97 Immigrants Arrested*, Newsweek (Apr. 7, 2018, 12:01 PM), http://www.newsweek.com/ice-raid-meatpacking-plant-workers-arrested-97-tennessee-876376; *see also* Declaration of Tomas Ayala Sanchez ("T. Sanchez Decl."); Declaration of Luis Bautista Martinez ("Martinez Decl.").
[2] Defendants include a number of officials employed by DHS and ICE.

courts, and full and fair hearings. This Court's immediate intervention is necessary to prevent imminent and irreparable injury. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Absent immediate injunctive relief, SPLC's clients at LaSalle will remain detained and will potentially be deported, because Defendants have deprived them of meaningful access to their attorneys during what are likely to be the most complex and consequential proceedings of their lives. SPLC seeks a preliminary injunction during the pendency of this litigation that requires Defendants to protect the Fifth Amendment right to meaningful legal representation of all SPLC clients imprisoned at LaSalle.

## STATEMENT OF FACTS

This lawsuit seeks to remedy the unconstitutional restraints placed on SPLC's clients to meaningfully access and communicate with their lawyers while detained at three immigration prisons: LaSalle, Irwin County Detention Center ("Irwin") and Stewart Detention Center ("Stewart"). *See* Dkt. #1. This motion seeks a preliminary injunction related only to LaSalle—a 1,200 bed immigration prison in Jena, Louisiana—based exclusively on the Fifth Amendment claims.

Legal representation in an immigration case often makes the difference between whether a noncitizen is allowed to remain safely in the United States or is permanently separated from family and deported to profound danger or even death. Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Penn. L. Rev. 1, 49 (2015).[3] Noncitizen detainees represented by counsel are *10-and-a-half times* more likely to succeed in their cases, and *nearly seven times* more likely to obtain bond, as compared to their pro se counterparts. *Id.* at 9, 49,

---

[3] *See* Sarah Stillman, When Deportation Is A Death Sentence (January 15, 2018), available at https://www.newyorker.com/ magazine/2018/01/15/when-deportation-is-a-death-sentence (April 16, 2018).

3

70. The ability to bond out is critical, because individuals who are released and are able to secure counsel are almost 20 times more likely to succeed in their cases than detainees without counsel. *Id.* Nationally, just 14 percent of detained noncitizens are represented in immigration removal proceedings—compared to 37 percent of all noncitizens in removal proceedings. *Id.* at 2. Rates are even lower at LaSalle, where the most recent data indicated that only six percent of detainees were represented. *Id.* at 38.

### A. SPLC Established the Southeast Immigrant Freedom Initiative to Provide Ethical and Effective Pro Bono Representation to Noncitizens Subject to Heightened Enforcement and Imprisoned in the Rural South.

Responding to the miserably low representation rates in rural southern immigration prisons and increased immigration enforcement,[4] SPLC launched SIFI. Declaration of Daniel Werner, SIFI Director ("Werner Decl."), ¶ 6. The project aims to provide high-quality *pro bono* legal representation to immigrants detained in the southeastern United States. *Id.* at ¶ 7. SIFI's broader mission is to protect the due process rights of noncitizens, educate the public about immigrants' rights and experiences, hold the government accountable for violations of immigrants' civil rights, and cultivate and expand attorney engagement in immigration deportation defense. *See* Werner Decl., ¶ 7.

SPLC launched its first on-site SIFI office in April 2017, at the Stewart Detention Center in Lumpkin, Georgia. Since then, SPLC has established SIFI offices at three more immigration prisons, including at LaSalle. Werner Decl., ¶ 8. Each office has three full-time staff: two attorneys and one non-attorney coordinator. *Id.*

---

[4] *See e.g.*, *Executive Order: Enhancing Public Safety in the Interior of the United States*, U.S. President (Jan. 25, 2017), *available at* https://www.whitehouse.gov/presidential-actions/executive-order-enhancing-public-safety-interior-united-states.

4

In one year's time, SPLC has hired 17 new employees, established four new offices, purchased property, and set up homes for employees living in rural southern communities. Werner Decl., ¶ 9. SPLC continually recruits and trains attorney and non-attorney volunteers whose assistance directly supports SIFI's mission of expanding access to legal representation of detained immigrants in the Southeast. Werner Decl., ¶ 12. Volunteer attorneys assist SIFI in various capacities, including by traveling from all over the country to SIFI's rural, on-site offices and providing *pro bono* legal assistance to detained clients in their bond and merits proceedings. *Id*. Those on-the-ground attorneys assist the full-time SPLC staff with representing clients in bond proceedings and applications for parole. Werner Decl., ¶ 13. Additionally, under SPLC supervision, remote attorneys provide *pro bono* representation in defending clients against removal from the United States ("merits" cases). *Id.*

SPLC has made a profound commitment to significantly expanding legal access at immigration prisons in the Southeast, both by assigning its own staff and facilitating the engagement of pro bono attorneys from across the United States. Werner Decl., ¶¶ 9-13. Its efforts have been thwarted by the access obstacles described in this motion—particularly at LaSalle, where SIFI is the only consistent provider of *pro bono* legal services to detained immigrants. *See* Declaration of Meredith Soniat du Fossat ("Soniat du Fossat Decl."), at ¶ 6. As a result, immigrants who desperately need *pro bono* representation are not able to access the lawyers who have come to this remote corner of Louisiana to offer their help for free.

### B. Ethical and Effective Pro Bono Representation of Detained Immigrants Requires Sufficient Communication between Counsel and Client.

A typical immigration case begins after an individual is arrested at, or near, the border or inside the United States. *See* 8 U.S.C. § 1226(a); 8 C.F.R. § 236.1. The Department of Homeland Security issues a charging document, or Notice to Appear ("NTA"), which must be served on the

5

individual and filed with the immigration court to initiate removal proceedings. 8 U.S.C. §

1229(a); 8 C.F.R. §§ 239.1, 1003.13, 1003.14, 1239.1. The purpose of these proceedings is to

determine whether the individual is entitled to remain in the United States. 8 U.S.C. §

1229a(a)(1); 8 C.F.R. §1240.12.

Unless the individual is subject to mandatory detention, ICE has legal authority to release

him or her on bond, recognizance, or subject to other conditions. *See* 8 C.F.R. § 236.1(c);

1236.1(c). Alternatively, ICE may detain the individual in one of its many immigration prisons.

*See* 8 U.S.C. § 1226(a); 8 C.F.R. § 236.1. Proceedings for detained immigrants are expedited.[5]

Allowing an immigrant facing deportation some opportunity to secure counsel, the

Immigration and Nationality Act ("INA") prohibits scheduling the first immigration court

hearing earlier than 10 days after service of the NTA, unless the individual requests an earlier

hearing. 8 U.S.C. § 1229(b)(1). This "master calendar" hearing is the functional equivalent of a

pretrial hearing, akin to arraignment, at which the noncitizen "respondent" is asked, among other

things, to admit or deny the factual allegations and charges in the NTA and to specify what, if

any, applications for relief from removal he or she intends to file. Practice Manual, § 4.15(e) at

74-75; *see* 8 U.S.C. § 1229a; (b)(4)-(5); 8 C.F.R. § 1240.10.

Most individuals held in immigration prison may appeal ICE's initial custody

determination before an immigration judge at a bond hearing. *See* 8 C.F.R. § 1003.19(a),

(h)(2)(i). Even where ICE has concluded that an individual is ineligible for bond, the

incarcerated noncitizen may generally request a bond hearing to challenge that finding. *See* 8

C.F.R. § 1003.19(h)(2)(ii). Immigration judges grant or deny bond based on an analysis of

---

[5] Executive Office for Immigration Review, Immigration Court Practice Manual, § 9.1(e) at 136-37 (Nov. 2, 2017), https://www.justice.gov/sites/default/files/pages/attachments/2017/11/02/practicemanual.pdf#page=73.

6

whether the noncitizen poses an actual danger to the community, a threat to national security, or a flight risk. 8 C.F.R. § 1236.1(d)(1); *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006).

Bond proceedings are critical. First, the immigrant has a considerable liberty interest in being free from imprisonment and able to reunite with his or her family, resume caretaking responsibilities, and derive support from his or her community. *Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017). Second, people who are represented by counsel and released on bond are significantly more likely to prevail in their removal cases than non-represented people who remain detained. *Cf.* Eagly & Shafer, *supra*, at 50 fig.14 (39% success rate versus 2% success rate); *see also* Declaration of Jeremy Jong ("Jong Decl."), at ¶ 8.

Lawyers need reliable and sufficient access to their clients to expeditiously obtain supporting evidence in support of the bond application. Declaration of Ira Kurzban ("Kurzban Decl."), at ¶ 12; *see also* Jong Decl., at ¶ 7. This means obtaining details about a client's family circumstances, community ties, financial circumstances, criminal history, and any medical issues suffered by the client and his family members. Kurzban Decl., ¶ 12; Jong Decl., ¶ 10; Declaration of Abigail Moyer ("Moyer Decl."), at ¶ 4. A preliminary assessment of the available relief from removal is also necessary to establish that the respondent is likely to appear for future hearings. Kurzban Decl., ¶ 12. Frequent client communication is essential during this process, because it is often a fact-specific inquiry that often involves sensitive information. Moyer Decl., ¶ 3; *see also* Kurzban Decl., ¶ 12.

Not surprisingly, immigrants who are represented in their bond proceedings are significantly more likely to be released. *See* Eagly & Shafer, *supra*, at 13 n.61, 49. At LaSalle, SPLC staff and volunteers engage in an exhaustive process to achieve release on bond for their clients. Prior to each hearing, they compile and submit a detailed packet of client-specific

materials and prepare each client to present testimony. Jong Decl., ¶ 7. Representation of individuals in bond proceedings can be very time-consuming. Moyer Decl., ¶ 3 ("[M]ost pro bono attorneys allocate approximately 20 to 50 hours to prepare an application for bond, depending on the complexity of the issues involved.") Many immigrants have never appeared in court or testified during an adversarial hearing before, and the experience can be overwhelming; accordingly, the attorney must spend adequate time preparing the client for the bond hearing. *See* Jong Decl., ¶¶ 10, 36 (noting that preparation of a client alone can take up to two hours).

In many cases the court will deny bond, set a bond that the client cannot afford, or find that the client is subject to mandatory detention. The client then remains imprisoned pending his merits hearing—an evidentiary hearing where the court determines whether the noncitizen is subject to removal from the United States and, if so, whether he is eligible for any type of relief from removal. Practice Manual, § 4.16 at 87-90; *see* 8 U.S.C. § 1229a; 8 C.F.R. § 1240.12.  The merits hearings of detained immigrants are expedited and should generally be completed within 60 days. Memorandum from James R. McHenry III, Director, Executive Office for Immigration Review (EOIR) to Office of the Chief Immigration Judge, All Immigration Judges, All Court Administrators, All Immigration Court Staff (Jan. 17, 2018), https://www.justice.gov/eoir/page/file/1026721/download.

The process of representing and preparing a client for a merits hearing is intensive. Kurzban Decl., ¶ 14. At the merits stage, the lawyer must delve into details of a client's past to comprehensively assess available avenues of relief, identify witnesses, and gather relevant evidence. *Id.* Initially, clients may not understand what information is needed, requiring multiple meetings to obtain all relevant material. *Id*. Further, clients can be re-traumatized by recounting past persecution and thus be hesitant to provide details that are vital to their cases. *Id.*

After completing the client's application for relief and compiling requisite supporting materials, the attorney must meet with the client to confirm accuracy, and then incorporate any new information into the application. Kurzban Decl., ¶¶ 16-17. Prior to the hearing, the attorney must spend additional time preparing the client to testify in court. *Id.* at ¶ 17. The level of sensitivity in these interactions makes in-person visitation critical to establish trust with a client and effectively represent his or her interests. Jong Decl., ¶ 10; Kurzban Decl., ¶ 14.

In addition, the Rules of Professional Responsibility require, *inter alia*, that immigration attorneys be competent and diligent in their representation of detained clients, regularly consult with them about the case, and keep attorney-client communications confidential. *See* ABA, Model Rules of Professional Conduct, Rules 1.1, 1.3, 1.4, 1.6.

### C.  SPLC Represents Clients at LaSalle with Immediate Needs to Communicate With Their Lawyers.

SPLC's clients have immediate needs to access their legal representatives. For instance, because of SIFI, a Nigerian man now has *pro bono* attorneys based in Connecticut and New York working on his asylum case. Declaration of Emanuel Frydland ("Frydland Decl."), at ¶ 1; Declaration of Jhon Sanchez, ("J. Sanchez Decl."), at ¶ 1. This man fled political persecution by Boko Haram and others in Nigeria—persecution that eventually led to the death of his parents and the disappearance of his sister. If he is returned to Nigeria, he fears suffering the same fate as his family, especially because he has spoken out against Boko Haram. Frydland Decl., ¶ 3. The immigration court has set his asylum hearing for May 17, 2018. *Id.*

In early May, the courts began setting the first master calendar hearings for SPLC's 18 clients detained in the largest workplace raid in a decade. Jong Decl., ¶ 5; T. Sanchez Decl.;

Martinez Decl.[6] These clients will be seeking bond to return to their homes and community in the Morristown, Tennessee area, which has been devastated by the loss of many of its members.[7]

The stakes associated with bond for these clients are very high. Before A.L.M. was arrested in the raid, she lived with her partner and three U.S. citizen children, L.M (13 years old), J.M. (12 years old), and D.M. (10 years old). Jong Decl., ¶ 45. All three children suffer from acanthosis nigricans, a skin condition associated with prediabetes. *Id.* J.M. and L.M. are also anemic. *Id.* The children have been profoundly impacted by their mother's absence. *Id.* The stakes are also high for A.C.M. She has a husband and a five-year-old son at home. Her husband works to pay for the essential needs of the family, while A.C.M. is the primary caretaker. Without her there, it is difficult for her husband to manage his responsibilities and take care of their son. *Id.*

With effective representation, these clients will have a chance of release on bond. Each has a substantial interest in freedom from physical restraints on individual liberty. *Hernandez* 872 F.3d at 994-95. They need to consult with their lawyers to adequately prepare for their bond hearings. These 18 SPLC clients were detained at the same time, and their hearings will be set in close proximity to one another. Jong Decl., ¶ 5. A number of these hearings have been set in early May along with those of other SPLC clients. It is anticipated that 28 hearings will be set in May. *Id.*

_____

[6] *See also* Maria Sacchetti, *ICE raids meatpacking plant in rural Tennessee; 97 immigrants arrested*, Wash. Post (April 6, 2018), available at https://www.washingtonpost.com/local/immigration/ice-raids-meatpacking-plant-in-rural-tennessee-more-than-95-immigrants-arrested/2018/04/06/4955a79a-39a6-11e8-8fd2-49fe3c675a89_story.html?utm_term=.44cb7659af51 (the "largest single workplace raid in a decade").

[7] Jonathan Blitzer, *In Rural Tennessee, A Big Ice Raid Makes Some Conservative Voters Rethink Trump's Immigration Agenda* (April 19, 2018), available at https://www.newyorker.com/news/dispatch/in-rural-tennessee-a-big-ice-raid-makes-some-conservative-voters-rethink-trumps-immigration-agenda.

### D. Defendants Are Blocking SPLC's Clients from Ethical and Effective Representation by Preventing Access to Lawyers.

SIFI began serving imprisoned immigrants at LaSalle in September 2017, when just six percent of the immigrants held there had legal representation. Werner Decl., ¶ 15. Today, SPLC represents 31 people imprisoned there—most of whom are hundreds of miles from their homes. Jong Decl., ¶ 6. By virtue of Defendants' decision to house immigrants at LaSalle, they have deprived these people access to legal representation. LaSalle is located in the remote town of Jena, Louisiana, approximately 220 miles and a nearly four hour drive from New Orleans. Werner Decl., ¶ 17. Until SPLC launched SIFI at LaSalle, there were no known immigration lawyers with offices in the vicinity of Jena. Werner Decl., ¶ 17. While SIFI aims to fill this crucial need for immigration lawyers at LaSalle, SPLC's mission and commitment to serving the LaSalle population has been obstructed at every turn by the myriad obstacles posed by Defendants' policies and practices.

### 1. SPLC Clients Cannot Reliably or Effectively Meet In-Person with Their Lawyers.

Defendants have severely circumscribed legal visitation at LaSalle—limiting legal visits to one room in a prison that can hold as many as 1,200 people. *See* Werner Decl., ¶ 17; Jong Decl., ¶ 6. Michael Berg, a corrections expert with over 40 years' experience, states that the provision of just one legal visitation room in a facility with the capacity to hold 1,200 immigrants is the lowest he has ever encountered and "inconsistent with prevailing norms in the correctional industry and the civil detention industry." Declaration of Michael Berg ("Berg Decl."), at ¶¶ 15, 33; *see also* Kurzban Decl., ¶ 18.

Jeremy Jong, the Lead Attorney at the SPLC's SIFI office in Jena, states that, on ordinary days, the single legal visitation room is frequently full. Jong Decl., ¶ 12. SPLC staff and SIFI volunteers have waited hours to meet with clients, despite what appears to be the ready availability

of alternative meeting rooms. *Id.*; Soniat du Fossat Decl., ¶ 7-10. An SPLC legal staff member once

waited five and a half hours to visit a client. *See* Declaration of Jenna Finkle ("Finkel Decl."), at ¶

12. Furthermore, LaSalle prohibits lawyers and legal staff from bringing electronics into any part of

the facility. Frequently, SPLC staff and SIFI volunteers arrive at LaSalle to meet with clients and

must choose between staying at LaSalle without access to their computers or phones—foreclosing

their productivity on pressing legal work for other LaSalle clients—or returning to the SIFI office

and attempting to meet with clients on another day. Jong Decl., ¶ 12.

The unacceptable barrier created by the existence of only one legal visitation room on

ordinary days at LaSalle is exacerbated by extraordinary enforcement action. On April 5, 2018,

nearly 100 workers at a meatpacking plant in Bean Station, Tennessee were rounded up by ICE,

and after being transferred to an army base and a detention center in Alabama, about 25 of the

workers were sent to LaSalle. Martinez Decl., ¶ 9; T. Sanchez Decl., ¶ 7. It is foreseeable that a

massive raid would cause a massive demand for representation, and SPLC staff and SIFI

volunteers immediately mobilized to meet that need.

During the week of April 9-13, 2018, when the workers started arriving at LaSalle, SPLC

had capacity to meet with as many as seven raid clients individually and simultaneously, in

addition to meeting with SPLC's existing clients. But because only one legal visitation room is

available, SIFI staff and volunteers had to meet with these clients sequentially by working

around the clock and waiting for indeterminate periods of time to see their clients. Jong Decl., ¶

34. The attorney-client meetings were rushed and incomplete. *See e.g.*, Jong Decl., ¶ 32.

For context, the Port Isabel Service Processing Center is an immigration prison in Texas.

It has a similar occupancy to LaSalle, but has 43 rooms available for attorney-client meetings.

Declaration of Debbie Cruz ("Cruz Decl."), at ¶ 4. Fifteen of these rooms are for contact visits,

and attorneys normally use those. *Id.* All rooms provide confidentiality. *Id.* Some of the attorney-visitation rooms have a telephone that attorneys can use to contact an interpretation service in order to facilitate communications with clients. *Id.* at ¶ 5. Attorneys are required to provide notice if they want to call an interpretation service. *Id.*

Legal visits at LaSalle are additionally delayed by prison procedures. LaSalle conducts six prison "counts" a day, during which time the facility is on lock-down and no visitation may be started. Jong Decl., ¶ 13. On average, each count takes 45 minutes to complete, and sometimes even longer. *Id*. LaSalle also maintains a complicated gender-based visitation schedule that prohibits simultaneous visitation with immigrants of the opposite gender in the family visitation room and the adjacent legal visitation room. Jong Decl., ¶ 16, Ex. 1. Frequently, SPLC staff and SIFI volunteers are unable to meet with a client—notwithstanding the urgency of the matter—because the client is not the same gender as those being seen in the adjoining family visitation room at the time of arrival. Jong Decl., ¶¶ 16, 34; J. Sanchez Decl., ¶ 5. While separating genders in incarcerated environments can be appropriate, barring a client from meeting with legal counsel because of gender is inconsistent with correctional norms and also unnecessary in the context of civil detention. Berg Decl., ¶¶ 25, 36. Wait times are further extended by staff shift changes, prison count, and policies for visiting clients housed in segregation, which require clearing the entire visitation area and deploying additional staff to transport clients to the meeting room. Jong Decl., ¶¶ 14-19; *see also* Berg Decl., ¶ 37 (prisons "can effectively conduct 'counts' and shift changes without suspending attorney-visitation").

The one room, in conjunction with these policies, makes legal visitation a complicated process fraught with delays. In one instance, an SPLC paralegal drove four and a half hours to meet with a male SPLC client at LaSalle. Finkle Decl., ¶ 2. When she arrived, it was not during

the male visitation period. *Id*. She returned two hours later when male visitation became

available, and then had to wait almost two more hours before meeting with her client because the

legal visitation room was still occupied by lawyers visiting female clients. Finkle Decl., ¶¶ 3-4.

In another instance, on April 12, 2018, the Lead Attorney for the SIFI Jena office waited

over two hours to see three male detainees who had been arrested during the Tennessee raid.

Jong Decl., ¶ 32. That evening, the attorney-client visitation room was empty when he arrived

and remained empty throughout his wait. Jong Decl., ¶ 32. Because of count, the gender

visitation policy, and LaSalle staff's violation of its own "first-come, first serve" visitation rule,

he sat in the waiting room until 10:00 p.m. Jong Decl., ¶¶ 32, 44. Once he was finally able to

meet with the three men—all of whom are now SIFI clients—he had to rush to gather necessary

information before visitation hours ended at 11:00 p.m. Jong Decl., ¶ 32.

These barriers acutely impact SIFI clients' ability to meet with *pro bono* attorneys who

travel to LaSalle from afar. These volunteers are likewise forced to endure long waits of an hour or

more before they can see their clients. *See* J. Sanchez Decl., ¶¶ 4, 9; Declaration of Ajani Husbands

("Husbands Decl."), at ¶ 5. In one illustrative case, a merits attorney arrived early on the day of his

client's hearing to ensure that he was the first attorney in line and would not need to wait; yet, he

was still forced to wait for an hour, thereby losing crucial time that could have been spent preparing

his client for the hearing. Husbands Decl., ¶ 5. Because SIFI volunteer merits attorneys, who

usually travel from outside Jena, have limited time in the area, these long delays sometimes force

them to meet with their clients in the family visitation area even though it is not a confidential

setting. Husbands Decl., ¶ 5.

SIFI clients encounter additional barriers to communicating with their volunteer merits

attorneys inside the attorney visitation room. A "thick glass wall" separates the client from the

attorney. Frydland Decl., ¶ 9. The room has poor acoustics, and the closed-circuit telephone through which clients speak sometimes stops working. Frydland Decl., ¶ 9. Importantly, the room is not soundproof. Finkle Decl., ¶¶ 7-9. Even when a person is located at the furthest end of the adjacent family visitation room, individuals in the legal visitation room can "hear every word" spoken. Finkle Decl., ¶ 8.

It is Defendants' responsibility to ensure that individuals in their custody have adequate in-person access to their legal representatives. *See* 6 U.S.C. § 251(2); Berg Decl., ¶¶ 21-22. Defendants do nothing to end these barriers and therefore fail to fulfill this duty. Berg Decl., ¶ 39.

### 2.   SPLC Clients Cannot Reliably or Effectively Communicate with their Lawyers Over the Telephone.

Clients' inability to have timely in-person visits with their attorneys, in effect, forecloses them from meaningful access to adequate representation. The sole existing alternative to in-person communication at LaSalle is legal phone calls—an alternative that Defendants have rendered effectively unavailable to SPLC's clients at LaSalle.

Legal calls with clients at LaSalle are limited to 20 minutes per client, per day and must be set up significantly in advance. In practical effect, this limits clients to one 20-minute confidential legal call per week. Jong Decl., ¶ 23; *See also* Husbands Decl., ¶ 2; J. Sanchez Decl., ¶¶ 12-16; Frydland Decl., ¶¶ 15-24. This severe limitation on the number and length of legal calls is wholly inconsistent with prevailing correctional norms. Berg Decl., ¶¶ 43-44 ("In my forty years of experience in correctional facilities, I have never heard of a facility setting an across-the-board 20-minute limit on the duration of attorney-client calls.")

Moreover, because interpretation is needed to effectively represent the majority of immigrants in removal proceedings, the use of telephonic interpreter services is common in immigration practice. Jong Decl., ¶ 28. Yet, at LaSalle, calls that require interpretation are

15

effectively circumscribed even further than the 20-minute limit. It takes at least five minutes to conference in an interpreter. Jong Decl., ¶ 29. According to Melissa Fridlin Murrell, an expert professional interpreter, the addition of an interpreter cuts conversation time at least in half, because the interpreter must repeat every word spoken by both the lawyer and the client. Declaration of Melissa Fridlin Murrell ("Murrell Decl."), at ¶ 8. Because interpretation is necessary for the representation of most non-English or non-Spanish-speaking noncitizens at LaSalle, this 20-minute time limit effectively serves as a bar to providing adequate representation to these individuals. Jong Decl., ¶ 29; J. Sanchez Decl., ¶¶ 12-17; Frydland Decl., ¶¶ 15-25; s*ee generally* Murrell Decl. This is especially true in light of the remoteness of LaSalle and the lack of interpreters nearby. Jong Decl., ¶ 27. Considering these factors, calls with interpreters can end up as short as five to seven minutes long after connecting with interpreters and due to interpretation time adjustments.

   In addition to the 20-minute limit, the inability to timely schedule legal calls means they are not a reliable alternative to address time-sensitive matters, which often arise in the course of representing noncitizens in bond or removal proceedings. *See supra* Section B (proceedings for detained immigrants are expedited). The process for scheduling calls results in, on average, a week-long wait between making the request and speaking with the client. Jong Decl., ¶¶ 24-26. Sometimes, because of Defendants' failure to adequately communicate the request to non-English speaking clients and clients with mental impairments, the requested phone call never takes place, and the attorney is unable to communicate with his or her client at all. Jong Decl., ¶ 25.

The difficulties endured by SPLC staff and SIFI volunteers in communicating with their clients via telephone highlight how these barriers coalesce to foreclose clients' access to their lawyers and thereby violate their constitutional rights.

In one illustrative case, a Somali immigrant had requested SPLC's representation, but he spoke only Somali. SPLC agreed to represent him in his bond hearing, but because Somali interpreters are unavailable within reasonable driving distance of Jena —and LaSalle's electronics policy prohibits use cell phones that could be used to conference in interpretation services—it was impossible to communicate with the client during in-person attorney visitations despite SPLC's efforts. SPLC staff and SIFI volunteers were thus relegated to communicating with him through legal calls, where they could conference in a Somali interpreter. Jong Decl., ¶ 29; J. Sanchez Decl., ¶ 8. Given the 20-minute time limit and chronic scheduling difficulties at LaSalle, SPLC staff and SIFI volunteers were limited to, *at most*, once-a-week phone calls that lasted no more than 15 minutes, resulting in only about seven minutes of substantive case discussion after interpretation. Jong Decl., ¶ 29; Murrell Decl., ¶ 8. Despite their best efforts, his bond application was denied. Jong Decl., ¶ 29.

In another case, SIFI volunteer attorneys from New York and Washington, D.C. needed to conduct telephone calls with a client in order to gather evidence to support his asylum claim and also to prepare the client for his hearing. Husbands Decl., ¶¶ 1-2. The client's case was on an expedited docket, and therefore the attorneys had to gather the information quickly. Husbands Decl., ¶ 2. Yet, when the attorneys called the prison, they were confronted with numerous barriers in attempting to schedule a conversation with their client. Husbands Decl., ¶¶2-3. Frequently, no one at the prison picked up the phone. Husbands Decl., ¶ 3. On one occasion, the attorneys spent two full days calling the facility before a LaSalle staff member answered the

17

phone. *Id*. Even when the attorneys succeeded in reaching a staff member, it took days to a week before a confidential legal call could be scheduled. Husbands Decl., ¶ 2. Making matters worse, the 20-minute time restriction required the conversations to be "extremely succinct, which was challenging given the amount of substantive information [they] needed to discuss and the sensitive nature of the issues[]." Husbands Decl., ¶ 4. When the attorneys sought to schedule a follow-up call, the same series of events occurred: days passed before a LaSalle staff member answered the telephone; even more days passed before the call could take place; and when the call finally occurred more than a week later, it was again limited to just 20 minutes—despite the rapidly approaching merits hearing. Husbands Decl., ¶ 4. One of the attorneys described the dire consequences on the SPLC client as follows:

> Twenty minutes was far too short an amount of time to obtain all of the information necessary to properly represent my client in his removal proceedings, especially given that I was not able to talk to my client in a confidential call more than once a week due to the lengthy scheduling process.

Husbands Decl., ¶ 4.

Ira Kurzban, an expert on immigration law and practice, states that the restrictions on phone calls at LaSalle "present [] a scenario where the lawyer is prevented from effectively representing the client." Kurzban Decl., ¶ 19. LaSalle's telephone policies impede detainees from engaging in meaningful communications with their attorneys, making it "virtually impossible to represent effectively a client in what may be a life-or-death case." Kurzban Decl., ¶ 19).

### E.  The Lack of Access to Legal Representation Is Unnecessary, Unjustifiable, and Contrary to Defendants' Stated Policies.

LaSalle's provision of legal access is well below prevailing correctional norms and standards. Berg Decl., ¶¶ 16, 18. Access to legal representation at LaSalle even violates

18

Defendant ICE's minimal Performance Based National Detention Standards ("PBNDS"). Berg Decl., ¶ 30.

The PBNDS govern the operation and administration of LaSalle. Jong Decl., Ex. 3. These standards signal that Defendants have already approved and intend to provide a more fulsome level of access than is currently provided at LaSalle. For instance, when "private conference rooms are in use and the attorney wishes to meet in a regular or alternate visiting room," the PBNDS state that "the request shall be accommodated to the extent practicable." *Id.* at PBNDS 5.7(V)(J)(9). But despite the availability of alternative space for confidential legal visitation at LaSalle, Soniat du Fossat Decl., ¶¶ 7-10, Defendants have not ensured that such ready alternatives are made available for visits between SPLC and its clients.

As to phone access, the PBNDS prohibit immigration prisons from "restrict[ing] the number of calls a detainee places to his/her legal representatives" and from "limit[ing] the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones." Jong Decl., Ex. 3 at PBNDS 5.6(V)(F)(1). The PBNDS also mandate that immigration prisons "ensure privacy by providing a reasonable number of telephones on which detainees can make such calls without being overheard by staff or other detainees," *Id.* at PBNDS 5.6(V)(F)(2), and "allow detainees to make such calls as soon as possible after submission of requests, factoring in the urgency stated by the detainee." *Id.* at PBNDS 5.6(V)(E)(2). They require further that access to phone calls, including legal calls, be "granted within 24 hours of the request" and within the eight hours designed as "waking hours." *Id.*

These violations of Defendants' own detention standards are instructive as to the burden of providing constitutional access. Defendants can hardly argue that rectifying the violations of

19

the PBNDS would be overly burdensome or contrary to their interests, having imposed those requirements on themselves.

Nor are the access restrictions necessary to the operation of a civil immigrant detention facility. Before the immigrants arrested in the meatpacking raid were transferred to LaSalle, a number of them were housed at the Dekalb County Detention Center ("DCDC") in Alabama in conditions that starkly contrast with those at LaSalle. Declaration of David Washington ("Washington Decl."), at ¶ 3. In a recent visit to DCDC by SPLC, attorney-client access was expedient, comprehensive, and confidential. Within five minutes, guards escorted an SPLC attorney to a confidential legal visitation room—after passing at least three other confidential legal visitation rooms en route. *Id.* at ¶ 3. The attorney was able to conduct contact visits almost immediately after arriving in the room. Id. at ¶ 4. The attorney spent five hours interviewing potential clients. Id. at ¶¶ 5-6. Two days later, the ten SPLC clients were transferred to LaSalle where their access to counsel has been materially restricted ever since.

Moreover, there is some indication that LaSalle has readily available means to rectify the abysmal access obstacles—including additional, often empty, space for confidential visitation, and apparent access to confidential phone lines that could be utilized more frequently and for longer periods of time. Soniat du Fossat Decl., ¶¶ 7-10; Jong Decl., ¶¶ 23-26.

**F.  Court Intervention is Necessary to Ensure a Meaningful and Just Outcome in the May 17, 2018 Deportation Hearing of a Nigerian Client.**

As discussed *supra*, the merits hearing for a Nigerian client is scheduled for May 17, 2018. Despite the remote *pro bono* attorneys' most persistent efforts, they have been unable to conduct any comprehensive, confidential communications. When the attorneys traveled to LaSalle from Connecticut to meet the client in person, their meeting with the client was arbitrarily terminated. Frydland Decl., ¶¶ 3, 6-14. The attorneys had to fly home without

finishing their discussions with the client, and have been attempting for weeks to schedule confidential phone calls so that they may gather all the information needed for the client's case. *See generally* J. Sanchez Decl.; Frydland Decl.

To illustrate, the volunteer attorney who resides in Connecticut attempted to arrange a call with the client on a Tuesday but was told a caseworker would need to call him back to schedule the call. Frydland Decl., ¶ 15. When he had not heard back by the following day, the attorney called again but was told that LaSalle has only one caseworker, who would not likely be able to respond until the following week. Frydland Decl., ¶ 16. After several more days passed, the volunteer attorney was forced to rely on a non-confidential phone line to speak with his client. Frydland Decl., ¶¶ 17-21. The SIFI volunteer attorney summarized the dire consequences of the combined 20-minute restriction and the long delays to schedule legal calls as follows:

> Given LaSalle's current policies, it will take numerous 20-minute calls just to obtain the necessary information from our client. It will then take numerous 20-minute calls to confirm the accuracy of the details of the petition that we have drafted. It will then take numerous more 20-minute calls to prepare the client for the hearing itself. . . . Because it takes many days to schedule only one 20-minute legal call, I am very concerned that we will not be able to have all the necessary calls to gather information, confirm details, and prepare our client for his hearing.

Frydland Decl., ¶¶ 22, 25. This inability to obtain all relevant information for the client's asylum claim makes it "impossible" to provide effective legal counsel—and, ultimately, to ensure that the "immigration judge can understand the reasons [the client] fled his country of birth to come to the U.S.A." J. Sanchez Decl., ¶ 17. The client desperately needs to communicate with his attorneys so he is not erroneously returned to the country where his family has been killed and kidnapped by Boko Haram. Frydland Decl., ¶ 3.

**LEGAL STANDARD**

To obtain preliminary injunctive relief, SPLC "must make a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal citation and quotations omitted)). These four factors "interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). "A district court must balance the strengths of the requesting party's arguments in each of the four required areas." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted). "If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id*. Even so, "[i]t is particularly important for the movant to demonstrate a likelihood of success on the merits." *Taseko Mines Ltd. v. Raging River Capital*, 185 F. Supp. 3d 87, 91 (D.D.C. 2016). SPLC, as shown below, easily meets this burden.

## ARGUMENT

### A.  There Is a Substantial Likelihood that SPLC Will Succeed on the Merits.

Plaintiff alleges that the totality of barriers to accessing and communicating with counsel at LaSalle violates three related procedural due process rights: the right to access courts; the right to counsel; and the right to a full and fair hearing. Because SPLC's clients cannot vindicate those rights themselves, SPLC asserts those rights on their behalves.

### 1.  Defendants Have Deprived SPLC's Clients of Their Fifth Amendment Due Process Rights.

The Fifth Amendment protects every noncitizen present in the United States from "deprivation of life, liberty, or property without due process of law . . . [e]ven [those] whose

22

presence in this country is unlawful, involuntary, or transitory[.]" *Mathews v. Diaz*, 426 U.S. 67,

77 (1976) (citations omitted). This protection extends to noncitizens in removal proceedings.

*Reno v. Flores*, 507 U.S. 292, 306 (1993). Here, Defendants' policies and practices at LaSalle

violate SPLC's clients' due process rights to (1) access to courts; (2) access to counsel; (3) a fair

and full hearing.

### a. Defendants are violating SPLC's clients' rights to access the courts.

The right to access the courts is violated where, as here, regulations and practices

"unjustifiably obstruct" the availability of representation and communication with retained counsel.

*See Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled on other grounds by Thornburgh v.

Abbott*, 490 U.S. 401 (1989). Immigrant detainees are ensured the same "right to access courts" as

U.S. citizens. *See e.g. Nunez v. Boldin*, 537 F. Supp. 578, 582 (S.D. Tex. 1982), *appeal dism'd

without op.*, 692 F.2d 755 (5th Cir. 1982); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1510

(C.D. Cal. 1988) (holding that [immigration] officials "have a constitutional duty not to obstruct

[detained immigrants'] access to courts," which includes a duty to protect "privacy in their

communications with their attorneys" and also their "right of telephonic access to their legal

representative"), *aff'd sub nom. Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990).

When assessing whether a detainee's right to access courts has been infringed, "[t]he

constitutionally relevant benchmark is *meaningful*, not total or unlimited access." *Campbell v.

Miller*, 787 F.2d 217, 226 (7th Cir. 1986) (emphasis in original).[8] Whether meaningful access exists

turns on the "totality" of circumstances. *Twyman v. Crisp*, 584 F.2d 352, 357 (10th Cir. 1978).

---

[8] *See also Saucedo v. Enders*, No. Civ. EP03CA433, 2004 WL 911309, at *2 (W.D. Tex. Apr.
16, 2004) ("A right of access to the courts guards against governmental practices that effectively
foreclose access and insures inmate access that is adequate, effective, and meaningful." (internal
quotations omitted)).

23

Factors relevant to this inquiry include but are not limited to: the location of the facility with respect to attorney availability,[9] the size of the population to be served,[10] whether a facility's policies or practices result in delays in accessing counsel and courts,[11] and whether the detainee is pretrial or a person who has been convicted.[12] Here, the totality of circumstances clearly forecloses LaSalle detainees from meaningfully accessing the courts.

### (1) Location of the Immigration Prison

Defendants "knowingly locate [ ] major detention facilities in communities with little or no legal representation available to indigent detainees." *Orantes-Hernandez*, 685 F. Supp. at 1500 (noting that American Correctional Association standards "provide that in locating new facilities an important consideration is that [t]he facility is geographically accessible to criminal justice agencies, community agencies and inmate lawyers, families and friends" (internal citations and quotations omitted)); *see also Louis v. Meissner*, 530 F. Supp. 924, 926 (S.D. Fla. 1981) (admonishing that immigrants had "been subjected to a human shell game" whereby the INA "sought to scatter them to locations that . . . are all in desolate, remote . . . areas, containing a paucity of available legal support"). LaSalle represents the epitome of remote imprisonment.

LaSalle is located over four hours from New Orleans, and far away from interpreters and any immigration attorneys other than SPLC's SIFI operation. Werner Decl., ¶ 17. Before SPLC opened SIFI, there were no known immigration lawyers in Jena. Werner Decl., ¶ 17. Due to LaSalle's remote location, Defendants must ensure that there are no additional barriers that unreasonably impede access to and communication with attorneys. *See Nunez*, 537 F. Supp. at 582

---

[9] *See, e.g., Procunier*, 416 U.S. at 420; *Covino v. Vermont Dep't of Corr.*, 933 F.2d 128, 130 (2d Cir. 1991); *Nunez*, 537 F. Supp. at 582.

[10] *See Nunez*, 537 F. Supp. at 582.

[11] *See, e.g., Gramegna v. Johnson*, 846 F.2d 675, 677 (11th Cir. 1988); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989).

[12] *See Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001).

(striking down barriers to accessing counsel in light of remoteness of immigration detention center); Berg Decl., ¶ 18.

### (2) Size of the Immigration Prison Population

LaSalle has only one legal visitation room for a population of up to 1,200 detainees. Jong Decl., ¶ 6. Courts have held that the right of access to courts is violated where the ratio of the detainee population to legal visitation rooms was far lower. For example, in *Benjamin v. Kerik*, the court found that pretrial detainees' right to access the courts and counsel had been unjustifiably obstructed because their attorneys were subjected to long waits to conduct legal visits due, in part, to an inadequate number of legal visitation rooms. 102 F. Supp.2d 157, 175-78 (S.D.N.Y. 2000), *aff'd Benjamin*, 264 F.3d at 187-88.

SPLC attorneys are similarly subject to long delays to meet with their clients at LaSalle— sometimes as long as five hours—due to LaSalle's large size and its corresponding lack of legal visitation rooms. *See* Jong Decl., ¶ 12; Soniat du Fossat Decl., ¶ 15; Husbands Decl., ¶ 5. Indeed, the ratio of legal visitation rooms to detainees at LaSalle (1:1200) is significantly more egregious than in *Benjamin*. *See* Brief of Appellees, *Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001), Nos. 00-9093, 00-9095, at *16 n.14 (noting that the ratio of counsel rooms to inmates ranged from 1:176 to 1:683).

### (3) Delays at the Immigration Prison Created By Defendants and Defendants' Agents

SIFI attorneys are subjected to substantial delays in communicating with their clients, both in person and telephonically. The lack of a sufficient number of legal visitation rooms frequently delays or prevents SIFI attorneys from meeting in person with their clients. Jong Decl., ¶ 12. Nor is the single legal visitation room actually available to all clients at all times during visitation hours.

LaSalle's policies regarding count, gender visitation, and shift changes substantially truncate the available time for meeting with a client, even when the legal visitation room is open.

Every day, LaSalle conducts six "counts" of the incarcerated population. Jong Decl., ¶ 13. All visitation during count is prohibited, and it can take as long as 45 minutes to "clear" count— sometimes longer. *Id.* LaSalle's gender visitation policy also exacerbates the limitations on accessing attorney-client visitation. Jong Decl., ¶¶ 15-16, Ex. 1. For example, on Mondays from 9:00 a.m. to 11:00 a.m., only male detainees may receive visitors, and on Mondays from 11:00 a.m. to 1:00 p.m. only female detainees can receive visitors. *Id.* Because the family visitation room is adjacent to the legal visitation room, a male detainee cannot visit with his lawyer while a female detainee is visiting with her family, dramatically reducing the time available for attorneys to see clients. Jong Decl., ¶¶ 15-16, 34, Ex. 1. These policies, in combination with the inadequate number of rooms, make it extremely difficult for clients to meet with their attorneys.

Delays also stem from a lack of staffing and poor shift change practices at LaSalle. The front desk goes completely unstaffed for extended periods of time, meaning that no guards are available to check visitors in. Jong Decl., ¶ 19. And even when staff are present, they are often unable or unwilling to facilitate timely attorney-client meetings. Jong Decl., ¶ 19. When LaSalle staff change shifts, the ensuing delay for attorneys waiting to meet with clients can last an additional 45 minutes. Jong Decl., ¶ 14.

Attorney-client phone communications are likewise fraught with obstruction and delay. When SPLC requests calls with its clients, its attorneys and staff must wait extended periods of time to schedule a 20-minute call. Jong Decl., ¶¶ 24-27; Frydland Decl., ¶¶ 15-21. The scheduling limitations effectively restrict clients to only one 20-minute confidential legal call a week. Because the scheduling process is so burdensome and time-consuming, attorneys and clients cannot

26

reasonably rely on legal calls as a timely option for substantive communications. *Id*.; *see also Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir. 1989) (finding that prison practices permitting only one 20-minute attorney call per week and one ten-minute call on weekends would violate access to courts). These restrictions severely impair the ability of SPLC clients to communicate with SIFI volunteer attorneys who reside out of state. *See* Frydland Decl., ¶¶ 1, 15-23.

**(4) Civil Detainees Need Access Akin to Pretrial Detainees**

The status of SIFI's clients as civil detainees makes meaningful access to courts even more critical. SIFI clients require reliable access to attorneys not to litigate issues that are merely collateral to their confinement, but rather to challenge the very basis of their detention. *See Benjamin*, 264 F.3d at 186 ("The reason pretrial detainees need access to the courts and counsel is not to present claims to the courts, but to defend themselves against the charges brought against them."). Moreover, because SIFI's clients are civil detainees, and the security concerns attendant to incarcerating individuals suspected or convicted of criminal activity are not present, Defendants cannot invoke any penological justification for the restrictions at issue. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (immigration proceedings "are civil, not criminal, and we assume that they are nonpunitive in purpose and effect"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 187 (D.D.C. 2015) ("The detention at issue in this case is undisputedly civil—*i.e.,* non-punitive in nature"); *Nunez*, 537 F. Supp. at 582 ("Another consideration in this decision is the fact that the detention center does not have the same security problems as a jail or prison.").

**(5) Additional Barriers to Meaningful Access**

While there is one designated "legal visitation" room at LaSalle, even that room is insufficient for legal visits for a number of reasons. First, although any legal visitation necessitates confidentiality, that need is especially acute in the context of immigration detention because

27

attorneys need to speak with their clients about sensitive issues such as torture, sexual trauma, and other issues that a client understandably may not want others to hear. Yet LaSalle's legal visitation room permits individuals in the adjoining family visitation room to hear the content of attorney-client communications, compromising confidentiality. Jong Decl., ¶ 21.

Second, the visits are arbitrarily non-contact visits: the client is separated from the attorneys by a partition, and all communication must occur via closed-circuit telephone, preventing the attorney and client from establishing rapport and effectively communicating with one another. *See* J. Sanchez Decl., ¶ 7; Frydland Dec., ¶ 9. Complicating matters further, the closed-circuit telephones have significant static, requiring the attorney and the client to yell through the small opening in the partition and further compromising confidentiality. *Johnson-El v. Schoemehl,* 878 F.2d at 1051-52 (holding, *inter alia*, that prison policy resulting in delays to speak with counsel, including non-private meetings, violated detainees' due process right to access courts); *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990) ("This apparently arbitrary policy of denying a prisoner contact visits with his attorney prohibits effective attorney-client communication and unnecessarily abridges the prisoner's right to meaningful access to the courts.").

Third, because there is no phone with an outside telephone line, and because of the no electronics policy, there is no way to contact interpreters. There are few interpreters in the area—and effectively no interpreters for languages other than Spanish—so a client who speaks a language other than Spanish is virtually guaranteed to encounter a significant and often insurmountable language barrier when meeting his or her attorney in the visitation room. As explained above, however, interpretation is needed to effectively represent the vast majority of immigrants in removal proceedings, and therefore the use of telephonic language services for interpretation is common in immigration law practice. Jong Decl., ¶ 28.

28

Fourth, the severe limitations on telephone calls and the lack of Skype access at LaSalle further restrict the ability of SPLC's clients at LaSalle to communicate with their attorneys. Even if attorneys succeed in scheduling phone calls with clients detained at LaSalle and are able to access telephonic language services, the 20-minute restriction on phone conversations precludes effective representation. A 20-minute call using an interpreter is the equivalent of a ten-minute conversation without an interpreter, according to interpretation expert Melissa Fridlin Murrell. She explains:

> Interpretation cuts in half the amount of content that may be conveyed within a certain amount of time. What would ordinarily be spoken once, must be spoken first by the speaker and repeated by the interpreter. This means that the amount of information conveyed in a twenty-minute legal call with interpretation will be no more than ten minutes of actual content.

Murrell Decl., at ¶8. This call then becomes only a five to seven minute call when time for making the call to conference in a language line is factored in. *See McClendon v. City of Albuquerque*, 272 F. Supp. 2d 1250, 1258 (D.N.M. 2003) (five-minute phone regulations unjustifiably obstruct the availability of professional representation).

These barriers to meaningfully accessing and communicating with attorneys are exacerbated by the obstructive conduct of Defendants' agents at LaSalle. Staff at LaSalle, for example, have refused SPLC's clients the right to meet with paralegals who are assisting on their cases. Torres Decl., ¶¶ 13-14. Likewise, SIFI volunteer attorneys have visited the facility to meet with clients on behalf of SIFI attorneys only to be told that they cannot meet with those clients because they are not attorneys of record—despite the fact that they are assisting on the case. J. Sanchez Decl., ¶¶ 9-11.

### (6) The Barriers are Unjustified

"Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier,* 416 U.S.

29

at 419. Here, Defendants cannot provide any justifiable rationale for maintaining the barriers to meaningful access to the courts described above.

SPLC presents the sworn statement of corrections expert Michael Berg to establish that the policies at LaSalle violate prevailing norms for civil detention. Mr. Berg opines that:

> LaSalle's policies of (a) only making one attorney-visitation room available for a facility that holds up to 1,200 inmates and (b) limiting attorney-client phone calls to 20 minutes, [are] inconsistent with the prevailing norms in the correctional industry and the civil detention industry for facilitating detainees' access to their attorneys, regardless of the level of security in a facility. In my opinion, these problems could easily be remediated and are not reasonably related to any legitimate security, budgetary or other administrative concern.

Berg decl., ¶¶ 18-19. In fact, Mr. Berg relays that in his 40 years of experience in correctional facilities, he has "never heard of a facility setting an across-the-board 20-minute limit on the duration of attorney-client calls," and that the ratio of only one attorney-visitation room for 1,200 detainees is among the lowest he has encountered. *Id.* at ¶¶ 34, 43.

Mr. Berg's declaration, combined with the totality of circumstances described above, establishes that SPLC will prevail on its claim that its clients' right to access courts is violated.

### b. Defendants Are Violating the Right of SPLC's Detained Clients to Counsel.

It is "well established" that immigrants have a right to counsel at their own expense in immigration proceedings under the Fifth Amendment Due Process Clause. *Dakane v. U.S. Att'y Gen.*, 399 F.3d 1269, 1273 (11th Cir. 2005); *Rosales v. ICE*, 426 F.3d 733, 736 (5th Cir. 2005); *Ozoanya v. Reno*, 968 F. Supp. 1, 8 (D.D.C. 1997) (internal citations omitted) (finding support in the Fifth Amendment Due Process Clause for a right to counsel in immigration proceedings). For immigrants facing deportation, "[t]he right to counsel is a particularly important procedural safeguard because of the grave consequences of removal." *Leslie v. Attorney Gen.*, 611 F.3d 171,

181 (3d Cir. 2010); *see also Rose v. Woolwine*, 344 F.2d 993, 995 (4th Cir. 1965); *Handlovits v. Adcock*, 80 F.Supp. 425, 428 (E.D. Mich. 1948). Courts have characterized the right to counsel in immigration proceedings as "'fundamental' and . . . that right must be respected in substance as well as in name." *Baires v. INS*, 856 F.2d 89, 91 n. 2 (9th Cir.1988) (internal citation omitted). *See also Lozada v. I.N.S.,* 857 F.2d 10, 13 (1st Cir. 1988); *United States v. Saucedo-Velasquez,* 843 F.2d 832, 834 n.2 (5th Cir.1988); *Castaneda-Delgado v. I.N.S.,* 525 F.2d 1295, 1300 (7th Cir. 1975).

The Fifth Amendment right to counsel in removal proceedings is the right to the "*effective* assistance of counsel where counsel has been obtained." *Dakane*, 399 F.3d at 1273 (emphasis in original); *see also* Jean Pierre Espinoza, *Ineffective Assistance of Counsel in Removal Proceedings: 'Matter of Compean and the Fundamental Fairness Doctrine'*, 22 Fla. J. Int'l L. 65, 66 (2010) (noting that various circuit courts have recognized a constitutional right to effective assistance of counsel in the immigration context). In *Nunez,* plaintiffs challenged policies and practices at the Los Fresnos detention facility that similarly impinged upon their right to counsel, including: (1) the limited hours for attorney visits, and (2) limitations on paralegal and legal assistant visitation. 537 F. Supp. at 580-81. Underscoring the remoteness of the facility, the court granted the plaintiffs' request for injunctive relief. *Id.* at 580-81; *see also Louis*, 530 F. Supp. at 926.

Here, Defendants' policies and practices violate the Fifth Amendment rights of SPLC's clients at LaSalle to access and communicate with their attorneys, who are thereby hindered from providing effective legal representation. As detailed in the attached declarations of SPLC attorneys and SIFI volunteers, the lack of legal-visitation rooms has impaired their representation of clients in myriad ways. When SIFI attorneys and volunteers visit the facility to conduct meetings, they are frequently subjected to lengthy delays of an hour or more—sometimes as long as two or three hours. Jong Decl., ¶ 12; Husbands Decl., ¶ 5; Frydland Decl., ¶ 7; J. Sanchez

31

Decl., ¶¶ 4, 9; Soniat du Fossat Decl., ¶ 15. Consequently, SPLC attorneys and SIFI volunteers

are frequently forced to rush through important in-person interviews at the expense of obtaining

all necessary information, Jong Decl., ¶ 32, and sometimes prevented from seeing their clients

altogether, *id*., ¶¶ 12, 32. This deprives clients of meaningful access to their lawyers to prepare

for their bond and/or merits hearings. Frydland Decl., ¶¶ 14-15; Husbands Decl., ¶¶ 5-6; Soniat

du Fossat Decl., ¶ 14; J. Sanchez Decl., ¶ 7. SIFI attorneys and volunteers are sometimes forced

to meet in the family visitation room, a non-confidential setting not proper for discussing

sensitive client information. Husbands Decl., ¶ 5; Jong Decl., ¶ 10. In these situations, attorney

and client are chilled from discussing matters that are important for the client's case but that the

client understandably does not want others to hear.

   Defendants' 20-minute limitation on legal calls and concomitant failure to schedule those

calls in a timely fashion likewise impair clients of SIFI attorneys and volunteers from obtaining

ethical and effective representation. The lack of any means to access interpreters for in-person

visitation means that attorneys must rely on legal calls in order to communicate with clients who

do not speak English or Spanish. *See, e.g.,* J. Sanchez Decl., ¶ 8; Jong Decl., ¶¶ 28-29. However,

the 20-minute limitation on phone calls effectively prevents attorneys from meaningfully using

interpretation services during these calls due to the crucial time lost contacting these services and

channeling communications through the interpreter. Frydland Decl., ¶ 23; J. Sanchez Decl., ¶ 8.

Even in those instances when an interpreter is not required, 20 minutes is not a sufficient amount

of time to gather all the information necessary to defend against removal, to confirm key facts,

and to prepare a client for his or her hearing. Husbands Decl., ¶ 4; Frydland Decl., ¶¶ 21-22.

   Defendants have likewise obstructed SPLC clients of access to non-attorney legal

representatives who are assisting in their cases. *See Nunez*, 537 F. Supp. at 582 ("Legal assistants

designated by an attorney must be allowed to visit that attorney's clients without the attorney

being present."). Recently, a SIFI attorney sent a paralegal to LaSalle with a letter giving him

authorization to meet with detainees.  Torres Decl., ¶ 5. Although the paralegal was initially

allowed to visit with detainees after a long wait, the paralegal was refused re-entry when he

returned to the facility with corrected client paperwork. Torres Decl., ¶¶ 6-12. The officer in

charge told the paralegal that he needed a bar card and refused to honor the authorization letter.

Torres Decl., ¶ 13-14. Similarly, SIFI volunteers who have been working under the supervision

of SIFI attorneys on client cases have been refused entry and also had their client meetings cut

short because they were not the attorneys of record on the case—despite the fact that they were

assisting on the case with authorization of the attorney. J. Sanchez Decl., ¶¶ 9-11.

        For these reasons, this court must intervene in order to ensure that Defendants' policies

and practices do not continue to deprive SPLC's clients of their right to meaningful and effective

assistance of their lawyers as mandated by due process.

### c.  Defendants Are Violating the Right of SPLC's Clients to a Full and Fair Hearing.

"The Fifth Amendment guarantees due process in deportation proceedings. As a result, [a

noncitizen] who faces deportation is entitled to a full and fair hearing of his claims and a

reasonable opportunity to present evidence on his behalf." *Colmenar v. I.N.S.*, 210 F.3d 967,

971 (9th Cir. 2000) (citation omitted); *see also Lyon v. I.C.E.*, 171 F. Supp.3d 961, 977 (N.D.

Cal. 2016) (same). These principles of fairness embodied in the Due Process Clause extend to

bond proceedings for detained noncitizens. *Hernandez*, 872 F.3d at 981. To assess whether this

right to a full and fair hearing is violated, courts examine the three-pronged framework

prescribed in *Mathews v. Eldridge*, 424 U.S. 319 (1976): "(1) the interest at stake for the

individual, (2) the risk of an erroneous deprivation of the interest through the procedures used as

well as the probable value of additional or different procedural safeguards, and (3) the interest of the government in using the current procedures rather than additional or different procedures." *See Lyon*, 171 F. Supp.3d at 987-91 (applying *Mathews* balancing test to determine whether phone restrictions at immigration detention centers violated the right to a full and fair hearing of noncitizens seeking bond). Applying these factors here, SPLC will show that Defendants deprive SPLC's LaSalle clients of their rights to a full and fair bond hearing.

First, it is axiomatic that noncitizens have a compelling and "fundamental" interest at stake in bond proceedings, because "freedom from imprisonment is at the 'core of the liberty protected by the Due Process Clause.'" *Hernandez*, 872 F.3d at 992; *accord Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause[.]") Prolonged detention in immigration prisons subjects people to subpar medical and psychiatric care, economic burdens, and the collateral harms of being separated from their families. *See Hernandez*, 872 F.3d at 995.

Second, Defendants' policies and practices at LaSalle create a substantial and constitutionally intolerable risk that SPLC clients will be deprived of meaningful access to their lawyers, thus preventing them from both sharing information for their bond applications and preparing for the bond hearing itself. SPLC requires prompt, reliable, and sufficient means of communicating with its clients at LaSalle to gather critical facts and evidence for bond hearings. *See* Kurzban Decl., ¶¶ 12-13. Such evidence can be voluminous and may include information about family and community ties, financial circumstances, criminal history, and any medical issues suffered by the client or his family members. *See id*. at ¶¶ 12. Numerous conversations with clients may be necessary to establish rapport, cultivate trust, and gather all information relevant for the bond proceeding. *See id.* at ¶ 12. Research shows that access to an attorney

34

increases the likelihood that a detainee will secure bond and be released from immigration detention. Eagly & Shafer, *supra*, at 70-71.

Defendants' policies and practices, however, substantially impede SPLC's ability to accomplish these tasks that are crucial for representing its clients in bond proceedings.  Due to the insufficient number of legal visitation rooms and other limitations on access at LaSalle, SIFI attorneys are routinely and substantially delayed in, or functionally prevented from, meeting with their clients. Jong Decl., ¶¶ 12-20; Soniat du Fossat Decl., ¶ 15; Husbands Decl., ¶ 5. SIFI attorneys have been forced to rush client meetings or skip them altogether, Jong Decl., ¶¶34-36, and the 20-minute restriction on phone calls further prevents SIFI attorneys from gathering necessary information and preparing clients for their hearings. Compounding these issues, Defendants have erected unreasonable—and easily remediable—barriers to accessing interpretation services that are crucial for effective communication with their lawyers.

Finally, Defendants' interest in maintaining the procedures under challenge is *de minimis*. As an initial matter, Defendants are responsible for ensuring that the conditions at LaSalle satisfy constitutional dictates, including detainees' constitutional rights to meaningfully access and communicate with their legal counsel. *See* 6 U.S.C. § 251(2). Further, Defendants' own policies elucidated in the PBNDS and applicable to LaSalle require that detainees have meaningful access to their attorneys, both telephonically and in person. *See* Jong Decl., Ex. 3 at PBNDS 5.6(V)(F)(1); 5.6(V)(F)(2); PBNDS 5.6(V)(E)(2). Those policies further provide that LaSalle detainees must have access to interpretation services for both telephonic and in-person meetings with their lawyers.  *See* Jong Decl., Ex. 3 at 2011 PBNDS §§ 5.6, 5.7 Expected Outcome 10. Defendants can invoke no compelling security or administrative rationale to justify the policies and practices under challenge. *See* Berg Decl., at ¶¶ 19, 50, 53.

## 2. SPLC Has Standing To Assert Its Clients' Fifth Amendment Claims.

SPLC has third-party standing on behalf of its current clients to assert their claims alleging violations of their Fifth Amendment rights: (1) right to access courts; (2) right to counsel; and (3) right to a full and fair hearing. The Supreme Court has held that a litigant may assert the rights of third parties where three requirements are met: (1) the litigant "must have suffered an 'injury in fact,' thus giving him or her a 'sufficient interest' in the outcome of the issue in dispute"; (2) "the litigant must have a close relation to the third party"; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *Eisenstadt v. Baird,* 405 U.S. 438, 444-46 (1972); *see also Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 118 (D.D.C. 2012). This case presents the precise set of circumstances necessitating third-party standing.

First, SPLC has indisputably suffered an "injury in fact" because Defendants' conduct has frustrated its organizational mission and forced it to divert its resources from that mission. Courts have held that legal services organizations, like SPLC, have suffered an "injury in fact" where defendants' conduct has "thwarted" their "organizational purpose." *See Haitian Refugee Center v. Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987) (holding legal services organization had suffered sufficient "injury" for standing purposes where it alleged that its mission to provide legal representation to refugees had been thwarted).[13] Likewise, where a defendant's conduct has impaired an organization's ability to provide its services and thereby caused a drain on its resources, "there can be no question that the organization has suffered the requisite injury in fact."

---

[13] *Ukrainian-American Bar Ass'n v. Baker*, 893 F.2d 1374, 1378 (D.C. Cir. 1990) (holding legal services group had suffered sufficient injury to confer organizational standing where defendants' conduct interfered with the group's ability to fulfill its mission); *accord Lepelletier v. F.D.I.C.*, 164 F.3d 37, 42-43 (D.C. Cir. 1999) (holding that the denial of an opportunity to develop a business relationship constituted sufficient injury to confer third-party standing).

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Northeast Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *32, *34-35 (S.D. Ohio June 7, 2017) (granting third-party standing to organization that had suffered injury due to diversion of its resources within the meaning of *Havens*), *reversed in part on other grounds* 837 F.3d 612 (6th Cir. 2016).

Here, Defendants' obstructive conduct has injured SPLC by thwarting its institutional purpose of "safeguard[ing] immigrants' constitutional due process rights by increasing the level of legal representation" at LaSalle. Werner Decl., ¶¶ 6-7. SPLC is the only provider of *pro bono* immigration representation on-site in Jena. Immigration representation dramatically increases the likelihood an immigrant will succeed in bonding out of detention and on the merits of his or her case. *See* Eagly & Shafer, *supra*, at 13 n. 61, 49, 70-71; *see also* Jong Decl., ¶ 11; Moyer Decl., ¶ 4. Lawyers need reliable and sufficient access to their clients so that they can expeditiously obtain supporting evidence and conduct a preliminary assessment of available relief. Kurzban Decl., ¶ 12. Establishing rapport with a client and cultivating trust is critical to obtaining all the relevant information, but that process takes time. Kurzban Decl., ¶ 14; Jong Decl., ¶ 10. SPLC's inability to reliably, timely, and effectively communicate with its clients frustrates its mission and thereby endangers its clients, who are facing time-sensitive legal proceedings for which representation is likely to make a crucial difference. For these reasons alone, SPLC has suffered an "injury in fact." *Haitian Refugee Center v. Gracey*, 809 F.2d at 799; *see also Haitian Refugee Center v. Baker,* 789 F. Supp. 1552, 1558-60 (S.D. Fla. 1991) (holding that legal services organization had suffered injury due to Defendants' "denial of access to [a] particular group of [ ] refugees" and the group's "corresponding inability to fulfill its organizational mandate").

Defendants' obstructive conduct has also injured SPLC by forcing it to divert its institutional resources from its core mission. SPLC has invested considerable resources in SIFI, including hiring new staff, purchasing or leasing new offices and homes for on-site staff, and other efforts to encourage volunteer involvement. Werner Decl., ¶ 9. Moreover, SIFI volunteers invest their time, skills, and financial resources to volunteer at on-site locations like the Jena office. Werner Decl., ¶ 12; Soniat du Fossat Decl., ¶ 19. Yet, from the very day it first launched SIFI at LaSalle, SPLC has been forced to divert significant resources—financial and personnel—as a result of Defendants' policies and practices. SIFI staff and volunteers have traveled to LaSalle—in some cases from across the country—only to be told that they cannot meet with detainees and/or there is no available room. Soniat du Fossat Decl., ¶ 19; Husbands Decl., ¶¶ 2, 5-6; J. Sanchez Decl., ¶¶ 1-5. SPLC staff and SIFI volunteers have also had to work additional hours in order to compensate for the time lost due to the long waits to meet with their clients. Jong Decl., ¶¶ 12, 34-35.  Time wasted in the waiting room is time that the attorneys cannot do other necessary legal work. *Id.*; J. Sanchez Decl., ¶ 4. In addition, SPLC staff and SIFI volunteers have had to expend additional time making extra visits and extra phone calls to their clients to make up for those instances where they were deprived of access to their clients. Jong Decl., ¶¶ 12, 35; Frydland Decl., ¶¶ 24-25; Husbands Decl., ¶¶ 3-4. SIFI attorneys have had to travel to the detention center and take time away from other work where guards have refused paralegals entry to see clients. Torres Decl., ¶¶ 13-16. Had SPLC not had to endure these long delays and compensate for lost time, it could have represented additional detainees and engaged in other advocacy. Jong Decl., ¶¶ 12, 35. Under these circumstances, the injury requirement for standing is easily met.  *See Northeast Ohio Coal. for the Homeless*, 2016 WL 3166251, at *32-33, *34-35.[14]

---

[14] *See also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087,

Second, SPLC's interests are also sufficiently aligned with those of its detained clients to satisfy the "close relationship" requirement for third-party standing. Such a relationship must "allow the third-party plaintiff to operate fully, or very nearly, as effective a proponent of the potential plaintiff's rights as would the plaintiff himself." *Nasir v. Morgan*, 350 F.3d 366, 376 (3d Cir. 2003) (internal quotations and citations omitted); *see also Reese Bros., Inc. v. U.S. Postal Serv.*, 531 F. Supp.2d 64, 67 (D.D.C. 2008) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)); *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 118 (D.D.C. 2012); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010) ("[T]he requirement that the litigant and the third party have a close relationship such that there is an identity of interests between them helps to ensure that there will be 'little loss in terms of effective advocacy' by allowing the litigant to proceed on the absent third party's behalf." (quoting *Craig v. Boren*, 429 U.S. 190, 194 (1976)). Courts have recognized various relationships that may be sufficient to confer third-party standing, including lawyer/client, doctor/patient, vendor/customer, and candidate/voter. *See Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 288 n. 10 (3d Cir. 2002) (collecting authorities); *see also*

---

1093-96 (D.C. Cir. 2015) (holding that organization had suffered injury sufficient to satisfy standing where it had diverted sources in response to challenged conduct); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350-51 (11th Cir. 2009) (holding that the NAACP had established sufficient injury to challenge a voter ID law because it would need to "divert resources from its regular activities to educate voters . . . and assist voters in obtaining free identification cards . . . ."); *Northwest Immigrant Rights Project v. USCIS*, No. C15-813JLR, 2016 WL 5817078, at *10 (W.D. Wash. Oct. 5, 2016) (holding that legal services group had suffered adequate injury based on diversion of its resources caused by defendants' conduct); *Guild v. Securus Technologies, Inc.*, No. 1:14-CV-366-LY, 2015 WL 10818584, *4-5 (W.D. Tex. Feb. 4, 2015) (holding that plaintiffs alleged sufficient injury where defendants' conduct of recording attorney-client jail calls compelled attorneys to travel to jail and conduct costly in-person visits in order to protect the confidentiality of their communications with their clients); *Veasey v. Perry*, 29 F. Supp. 3d 896, 903-04 (S.D. Tex. 2014) ("In situations where a violation of individuals' rights will cause a drain on the resources of an association committed to the individuals' rights, the association has stated a case or controversy sufficient to confer standing on the association.").

39

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) (granting third-party standing to attorney seeking to assert rights of existing clients); *Dep't of Labor v. Triplett*, 494 U.S. 715, 720-21 (1990) (same).

There can be no serious dispute that SPLC shares a "close relationship" with its clients detained at LaSalle. Critically, SPLC's relationship with its LaSalle clients is neither aspirational nor "hypothetical," *see Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004), but instead indisputably close and of "special consequence," *see Caplin*, 491 U.S. at 623 n.3, because SPLC's very mission is to protect the constitutional rights of its existing clients by providing them with ethical and effective representation in their removal cases. Werner Decl, ¶¶ 6-7; *see Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind. 2016) (refugee resettlement organization had sufficiently close relationship with its refugee clients because "its entire purpose and mission is to resettle refugees escaping dire circumstances"). Accordingly, SPLC and its clients share an "identity of interests" in ensuring that LaSalle detainees obtain meaningful access to counsel, such that SPLC will act as "an effective advocate of [its clients'] interests." *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 44 (D.C. Cir. 1999).[15]

Third and finally, SPLC's clients at LaSalle are "hindered" from protecting the interests that SPLC seeks to vindicate on their behalf. Courts have concluded that the hindrance requirement "does not require an absolute bar from suit, but '*some* hindrance to the third party's ability to protect his or her own interests.'" *Penn. Psychiatric Soc'y*, 280 F.3d at 290 (quoting *Powers*, 499 U.S. at 411 (emphasis added)). "In other words, a party need not face insurmountable barriers to warrant third-party standing." *Id*.; *accord Singleton v. Wulff*, 428 U.S. 106, 117-18 (1976). As a

---

[15] *See also Rothner v. City of Chicago*, 929 F.2d 297, 301 (7th Cir. 1991) ("[W]hen the interests of the litigant and the third party are closely related, the courts have viewed quite charitably assertions of third-party standing.").

result, courts have observed that the hindrance requirement "presents a relatively low threshold."

*Exodus Refugee Immigration, Inc.*, 165 F. Supp.3d at 732. Courts have identified various obstacles

that may warrant third-party standing.  For example, the "imminent mootness" of a legal claim

militates in favor of finding hindrance. *Singleton*, 428 U.S. at 117. Likewise, courts have found

hindrance where the very nature of the constitutional right at stake means that there are inherent

obstacles for the right holder to assert her constitutional rights. *See, e.g., Singleton*, 428 U.S. at 117;

*Aid for Women v. Foulston*, 441 F.3d 1101, 1114 (10th Cir. 2006).

    Here, the barriers preventing SPLC's clients from protecting their own rights are legion.

First, as in *Singleton*, where women were hindered from protecting their rights to privacy because

filing suit would vitiate that very privacy, SPLC's clients are substantially hindered from protecting

their interests because filing suit on their own behalf would have the perverse effect of impairing

those very interests. Specifically, SPLC's clients need to have their rights to access courts and

counsel vindicated so that they can have meaningful access to and communication with their

immigration lawyers in their ongoing and fast-moving removal proceedings. Yet, if SPLC clients

sought to vindicate those rights by filing a civil lawsuit on their own behalf, they would have even

less opportunity to confer with their immigration lawyers regarding their removal proceedings. The

attorney-client communications necessary for SPLC's clients to challenge access barriers, either

individually or as a class, would hinder them from preparing for their bond and removal

proceedings, because every hour that the single legal visitation room would be occupied to discuss

the civil suit would be an hour that detainees could not spend speaking in person with their

attorneys about their removal cases. The same is true of telephonic communications given the

limited availability of legal calls at LaSalle. In this way, the very nature of the constitutional injury

at stake—deprivation of access to court and counsel—hinders the ability of SPLC's clients to

vindicate their rights. *See Aid for Women*, 441 F.3d at 1114. Moreover, most of SPLC's clients do

not speak fluent English, have limited knowledge of the U.S. legal system, and have no access to

legal resources but for those provided by SPLC; therefore, they would be severely—if not

entirely—hampered from protecting their own constitutional interests. *See Northeast Ohio Coal. for

the Homeless*, 2016 WL3166251, at * 5; *accord Al Odah v. United States*, 346 F. Supp. 2d 1, 8

(D.D.C. 2004) (recognizing "it is simply impossible to expect [Guantanamo detainees] to grapple

with the complexities of a foreign legal system and present their claims to this Court without legal

representation"). Additionally, the imminent mootness of SPLC's clients' claims likewise

constitutes a substantial hindrance. By the time SPLC's clients could go through the lengthy process

of litigating their constitutional claims in federal court, their removal cases would almost certainly

be over,[16] and any SPLC clients who were ultimately deported would have little to no incentive to

continue prosecuting the case from abroad, impairing those very interests.

### B. Defendants' Ongoing Violations of the Constitutional Rights of SPLC's Clients Constitute Irreparable Harm.

Defendants are inflicting irreparable harm on SPLC's clients at LaSalle by interfering

with their Fifth Amendment rights. "It has long been established that the loss of constitutional

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills

v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal citations and quotations

omitted). Indeed, even an alleged constitutional violation may be sufficient to satisfy the

irreparable injury requirement for a preliminary injunction. *See, e.g., Wrenn v. D.C.*, 167 F.

Supp. 3d 86, 103 (D.D.C. 2016), *vacated on other grounds*, 864 F.3d 650 (D.C. Cir. 2017);

*Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

---

[16] Some of SPLC's clients' cases are on an expedited docket. *See* Husbands Decl., ¶ 2.

The imperative that SPLC's clients have timely access to their lawyers is particularly acute because they are subject to ongoing proceedings with potentially dire consequences, Berg Decl., ¶ 28; *see also* Kurzban Decl., ¶¶ 12-13, and many have impending hearings.

Obtaining release on bond significantly increases an individual's likelihood of a prevailing on the merits in removal proceedings. *See* Eagly & Shafer, *supra*, at 13 n. 61, 49. A client who is not in ICE custody can more easily obtain supporting evidence, contact potential declarants or witnesses, and work more closely and frequently with his or her attorney. Jong Decl., ¶¶ 8-9; *cf.* Moyer Decl., ¶ 5. Moreover, individuals can reunite with their families, resume caretaking responsibilities, and derive support from their communities. *Id.*

For individuals who are not released on bond, "continued incarceration . . . during the preparation process presents many obstacles." Kurzban Decl., ¶ 14. The nature of immigration proceedings requires that attorneys inquire into the client's extensive—and often sensitive— personal history. Kurzban Decl., ¶ 14; Jong Decl., ¶ 10. The client's lack of understanding as to what information is relevant or important, and the sensitive nature of the details involved, often means that several attorney-client meetings must take place in order to establish trust with the client and obtain all material facts. Kurzban Dec, ¶¶ 13-17; Jong Dec, ¶¶ 10-11. This can be a challenge even in prisons that have multiple contact visitation rooms and expansive telephone access—it is functionally impossible in a facility like LaSalle that fails to maintain even minimally consistent in-person or phone access. *See* Moyer Decl., ¶ 5.

Without the ability to obtain all relevant information and confirm the accuracy of the information conveyed in filings, attorneys cannot provide ethical, effective representation. Kurzban Dec, ¶¶ 13-17, 19; Jong Dec, ¶¶ 10-11.

43

Denying noncitizens in removal proceedings access to their attorneys in violation of the

Fifth Amendment unquestionably constitutes irreparable harm. Given the high stakes in bond

and removal proceedings and the strong correlation between legal representation and favorable

outcomes in both contexts, Defendants' unconstitutional conduct affects the "life, liberty, and

property [of SPLC's detained clients] in a most direct fashion." *See Haitian Refugee Ctr. v.*

*Civiletti*, 503 F. Supp. 442, 455 (S.D. Fla. 1980), *modified sub nom. Haitian Refugee Ctr. v.*

*Smith*, 676 F.2d 1023 (5th Cir. 1982). These consequences constitute the type of irreparable harm

necessary to support a preliminary injunction.

### C. The Balance of Equities and Public Interest Weighs Heavily in Favor of SPLC and Its Detained Clients, Whose Constitutional Rights Are at Stake.

"In considering whether the balance of equities favors granting a preliminary injunction,

courts consider whether an injunction would substantially injure other interested parties."

*ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 28 (D.D.C. 2012) (citations and internal

quotations omitted); *see also Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008)

(holding that "courts must balance the competing claims of injury and must consider the effect

on each party of the granting or withholding of the requested relief" with "particular regard for

the public consequences") (citations and internal quotations omitted).

Given Defendants' stated commitment to facilitating attorney-client communications—as

evidenced by the PBNDS, which mandate that private rooms be made available for legal

visitation and prohibit unnecessary restrictions on attorney-client telephone calls—the requested

injunction would do no more than require Defendants to comply with their own standards and

the Constitution.  Even if Defendants would incur additional costs or administrative burdens to

achieve compliance, the balance of equities in this case weighs heavily in favor of SPLC and its

clients, who are suffering grave deprivations of their constitutional rights.  *See Gordon*, 721 F.3d

at 653; *Bounds v. Smith*, 430 U.S. 817, 825 (1977) ("[T]he cost of protecting a constitutional right cannot justify its total denial."); *Nunez*, 537 F. Supp. at 582 ("[R]estrictions which are not reasonably related to orderly administration cannot stand.").

Given the grave consequences that may befall SPLC's clients absent court intervention, an injunction is warranted.  *See Serono Lab., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("It often happens that . . . one party or the other will be injured whichever course is taken. A sound disposition . . . must [then] depend on a reflective and attentive appraisal as to the outcome on the merits." (citations and internal quotations omitted))

Moreover, an injunction would serve the public interest "in maintaining a system of laws" where the government must comply with its constitutional and other legal obligations. *O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992); *see Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985) ("It has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated.") (collecting cases).

## CONCLUSION

SPLC has demonstrated that Defendants' conduct is inconsistent with the Constitution and ICE's own policies, which establish minimum benchmarks for the detention of noncitizens. An injunction is therefore needed to protect the constitutional rights of SPLC's clients at LaSalle. For these reasons, SPLC respectfully requests that the Court grant the requested preliminary injunction.

Dated: May 4, 2018                          Respectfully submitted,


/s/ Lisa S. Graybill                         /s/ Melissa Crow
Lisa Graybill*                               Melissa Crow (DC Bar No. 453487)
Jamila Johnson*                              Law Office of Melissa Crow
Jared Davidson*                              14608 Drum Hill Court
Southern Poverty Law Center                  North Potomac, MD  20878
201 St. Charles Avenue, Suite 2000           Tel:  202-355-4471
New Orleans, Louisiana 70170                 melissa@immjustice.com
Tel: (504) 486-8982                          *SPLC Cooperating Attorney*
Lisa.Graybill@splcenter.org
Jamila.Johnson@splcenter.org
Jared.Davidson@splcenter.org


/s/ Natalie Lyons                            /s/ Christian F. Henel
Natalie Lyons*                               Christian F. Henel (DC Bar No. 989746)
Southern Poverty Law Center                  John T. Bergin (DC Bar No. 448975)
150 E. Ponce de Leon Ave., Ste. 340          Kilpatrick Townsend & Stockton LLP
Decatur, GA 30030                            607 14th Street NW, Suite 900
Tel: (404) 521-6700                          Washington, DC 20005
Natalie.Lyons@splcenter.org                  Tel: (202) 481-9943
                                             JBergin@kilpatricktownsend.com
                                             CHenel@kilpatricktownsend.com


/s/ William E. Dorris                        /s/ Maureen A. Sheehy
William E. Dorris*                           Maureen A. Sheehy*
Susan W. Pangborn*                           Gia L. Cincone*
Jeffrey Fisher*                              Kilpatrick Townsend & Stockton LLP
Kilpatrick Townsend & Stockton LLP           Two Embarcadero Center, Suite 1900
1100 Peachtree Street NE, Suite 2800         San Francisco, CA 94111
Atlanta, GA 30309                            Tel: (415) 273-7571
Tel: (404) 815-6104                          MSheehy@kilpatricktownsend.com
BDorris@kilpatricktownsend.com               GCincone@kilpatricktownsend.com
SPangborn@kilpatricktownsend.com
JFisher@kilpatricktownsend.com


Attorneys for Plaintiffs


* *Admitted Pro Hac Vice*