## DECLARATION OF DR. DORA SCHRIRO

I, Dora Schriro, declare as follows:

I.      **Background and Qualifications**

1. I am a career public servant who has served as an executive-level administrator, policy maker, and homeland security advisor. I was appointed to lead a number of city and state agencies and a federal office.

2. I was the Commissioner of the Connecticut Department of Emergency Services and Public Protection consisting of six state agencies including the Connecticut State Police and Homeland Security and Emergency Management, from 2014 through 2018. I served concurrently as Connecticut's Homeland Security Advisor from 2016 through 2018. My Department of Homeland Security (DHS) security clearance was Top Secret. During my tenure as Director, we grappled with Ebola and through our Division of Emergency Management and Homeland Security, developed a protocol specifically for the state's first responders. Additionally, as the state's Homeland Security Advisor, I interfaced with many of the DHS offices and agencies on an ongoing basis including the Federal Emergency Management Agency with which we had an active and ongoing partnership.

3. I was Senior Advisor to DHS Secretary Janet Napolitano on U.S. Immigration and Customs Enforcement (ICE) Detention and Removal, and the founding Director of the ICE Office of Detention Policy and Planning in 2009. During my tenure, I authored the report *Immigration Detention Overview and Recommendations*, DHS' template for immigration detention reform. My report included a number of recommendations specific to risk assessments, the continuum of control, pre-release planning, alternatives to detention, and healthcare. Specific to healthcare, I found the assessment, treatment, and management of pandemic and contagious diseases was inconsistent across Division of Immigration Health Services (DIHS)-staffed and non-dedicated facilities and recommended improvements should be made to ensure that all facilities are capable of managing large-scale outbreaks. Access to legal information, another mandated service, was often treated as optional and had to be addressed. Accountability, the operating framework and process for decision-making, was not but should the means by which ICE would provide oversight, pursue improvement, and achieve transparency. I regret to say these conditions continue to affect the agency's performance today.

4. I was the Commissioner of two city jail systems: the St. Louis City Division of Corrections, which included the St. Louis Police Department Prison Intake Facility, from 2001 to 2003; and the New York City (NYC) Department of Correction from 2009 to 2014. I was also the Warden of the Medium Security Institution, a jail in St. Louis City, Missouri, from

1989 to 1993. During an earlier appointment to the NYC Department of Correction as Assistant Commissioner for Programs Services from 1985 to 1989, I was responsible for most the mandated activities including the operation of all the jails' law libraries.

5. I was the Director of two state correctional systems: the Missouri Department of Corrections, which encompasses state prisons, probation, and parole, from 1993 to 2001; and the Arizona Department of Corrections, which encompasses state prisons and parole, from 2003 to 2009. During my tenure as Director of the Arizona Department of Corrections, the department was the first correctional system to be selected Winner of the Innovations in American Government awards program, for a prison-based reform that we named Parallel Universe, pre-release preparation in which all inmates participated from the first to the last day of their incarceration guided by norms and values closely mirroring those of the community. As Director of the Missouri Department of Corrections, I also served on the state's Sentencing Commission.

6. I was a member of the adjunct faculties of University of Missouri-St. Louis Department of Criminology from 1990 to 1998, St. Louis University School of Law from 2000 to 2002, and Arizona State University Sandra Day O'Connor School of Law from 2005 to 2008, during which time I taught graduate-level Criminology and Correctional Law courses and led Sentencing Seminars.

7. I have served continuously on the Women's Refugee Commission since 2012, and the American Bar Association (ABA) Commission on Immigration since 2014.

8. I am knowledgeable about both the American Correction Association and ICE Performance-Based and National Detention Standards, including Medical Care, Disability Identification, Assessment and Accommodations, and Classification Systems, which is premised on objective, evidence-based risk assessments and the least restrictive housing and community-based assignments consistent with those assessments. I have also participated in the development of ABA professional standards for both correctional systems and ICE detention facilities. I am familiar with the California Board of State and Community Corrections Title 15 Minimum Standards for Local Detention Facilities.

9. I am knowledgeable about the operation of civil detention and criminal pre-trial and sentenced correctional facilities, and the individuals in the custody of both systems.

10. I have served as a corrections expert for the California Department of Justice, Disability Rights California, and the Hampton County, Massachusetts Sheriff's Department. I am currently engaged by the California Department of Justice, the Southern Poverty Law

Center, the American Civil Liberties Union, Human Rights First, and the St. Louis University School of Law Legal Clinics.

11. A complete and correct resume, which includes a list of my publications from the last ten years, is attached as Appendix A.

12. In the previous four years, I have testified as an expert at trial or by deposition in the following case: *Endicott v. Hurley*, No. 2:14-cv-107 DDN (E.D. Mo.).

13. The Southern Poverty Law Center (SPLC) represents immigration detainees assigned by ICE to the Pine Prairie ICE Processing Center (Pine Prairie facility) and the LaSalle ICE Processing Center (LaSalle facility) in Louisiana, and the Stewart County Detention Center (Stewart facility) and the Irwin County Detention Center (Irwin facility) in Georgia. The Pine Prairie ICE facility, the LaSalle facility, and the Stewart facility are dedicated immigration facilities; the Irwin facility is not.[1] A dedicated facility may house only immigration detainees whereas a non-dedicated facility may house one or more correctional populations in addition to ICE detainees.

14. The Pine Prairie facility, the LaSalle facility, and the Stewart facility must comply with ICE 2011 Performance-based National Detention Standards (PBNDS)(revised 2016).[2] The Irwin facility must comply with ICE 2008 Performance-based National Detention Standards.[3] These detention standards set forth minimum requirements for the care of persons in ICE custody.

15. Access to Counsel requirements are enumerated in five detention standards.[4] They are Standard 6.4 Law Libraries and Legal Material[5] and Standard 6.5 Legal Rights Group Presentations[6] each one in its entirely, and relevant portions of Standard 5.1

---

[1] Facility Inspections, ICE Dedicated Non-Dedicated Facility List (4.6.20), https://www.ice.gov/facility-inspections, [hereinafter ICE Facility Inspections].
[2] ICE 2011 Performance-based National Detention Standards (rev. Dec. 2016, last reviewed/updated Dec. 18, 2019), https://www.ice.gov/detention-standards/2011 [hereinafter 2011 PBNDS].
[3] *Id.* ICE 2008 Performance-based National Detention Standards (last reviewed/updated Dec. 18, 2019), https://www.ice.gov/detention-standards/2008, [hereinafter 2008 PBNDS].
[4] ICE Detention Standards, https://www.ice.gov/factsheets/facilities-pbnds
[5] ICE 2008 PBNDS, Law Library and Legal Research Material, https://www.ice.gov/doclib/dro/detention-standards/pdf/law_libraries_and_legal_material.pdf; ICE 2011 PBNDS, Law Library and Legal Research Material, https://www.ice.gov/doclib/detention-standards/2011/6-3.pdf [hereinafter, collectively, "PBNDS Law Library and Legal Research"].
[6] ICE 2008 PBNDS, Legal Rights Group Presentation, https://www.ice.gov/doclib/dro/detention-standards/pdf/law_libraries_and_legal_material.pdf; ICE 2011 PBNDS, Legal Rights Group Presentation, https://www.ice.gov/doclib/detention-standards/2011/6-4.pdf. [hereinafter, collectively, "PBNDS Legal Rights Group Presentation"].

Correspondence and Other Mail,[7] Standard 5.6 Telephone Access,[8] and Standard 5.7 Visitation.[9] This analysis is based upon four of the five standards, Correspondence and Other Mail, Telephone Access, Visitation, and Law Libraries and Legal Material. Consideration of Law Libraries and Legal Material is included because it also directly addresses the issues at hand. Also considered are revisions adopted by ICE in 2016, and applicable to all facilities, to fortify its commitment and rectify compliance issues impacting limited English proficiency detainees, detainees with disabilities, and detainees in special housing units.[10] Performance indicators for each of these detention standards are provided as Appendix B.

16. There are few substantive differences between 2008 and 2011 Performance-based National Detention Standards (rev. 2016) concerning Access to Counsel.[11] The 2016 Revisions are applicable to all facilities.[12] This analysis is based on the 2011 Performance-based National Detention Standards (rev. 2016).

## II.   DHS and ICE Have Historically Failed to Adequately Monitor and Oversee Its Detention Facilities

17. As detailed in Section V below, DHS and ICE are currently failing to ensure that the individuals in its custody have crucially needed access to lawyers during the COVID-19 pandemic. To provide historical context for this current failure, I briefly trace in this section ICE's long-entrenched abdication of its oversight function.

18. ICE monitors immigration detention facility activity and operations by several means to ensure compliance and to address deficiencies. They include on-site agency monitors at larger facilities; an independent office, the Office of Detention Oversight, within ICE but outside of Enforcement and Removal Operations (ERO) to conduct independent reviews; and a contract with the Nakamoto Group Inc. to make annual inspections.

---

[7] *Id*. ICE 2008 PBNDS, Correspondence and Other Mail, https://www.ice.gov/doclib/dro/detention-standards/pdf/correspondence_and_other_mail.pdf; ICE 2011 PBNDS, Correspondence and Other Mail, https://www.ice.gov/doclib/detention-standards/2011/5-1.pdf [hereinafter, collectively, "PBNDS Correspondence and Other Mail"].

[8] *Id*. ICE 2008 PBNDS, Telephone Access, https://www.ice.gov/doclib/dro/detention-standards/pdf/telephone_access.pdf; ICE 2011 PBNDS, Telephone Access, https://www.ice.gov/doclib/detention-standards/2011/5-6.pdf[hereinafter, collectively, "PBNDS Telephone Access"].

[9] ICE 2008 PBNDS, Visitation, https://www.ice.gov/doclib/dro/detention-standards/pdf/visitation.pdf; ICE 2011 PBNDS, Visitation, https://www.ice.gov/doclib/detention-standards/2011/5-7.pdf [hereinafter, collectively, "PBNDS Visitation"].

[10] ICE Detention Standards, https://www.ice.gov/factsheets/facilities-pbnds, 2016 Revisions, Summary of Revisions to the ICE Performance-Based National Detention Standards, December 2016, (last reviewed/updated Dec. 18, 2019), https://www.ice.gov/detention-standards/2011 [hereinafter 2016 Revisions].

[11] 2008 PBNDS, *supra* note 3, and 2011 PBNDS, *supra*, note 2 [hereinafter PBNDS].

[12] 2016 Revisions, *supra* note 15.

4

19. These efforts to achieve and maintain compliance, as implemented, have failed to realize their intended outcomes – accountability, transparency, and continuous improvement.

20. The U.S. Office of Government Accountability (GAO) has made several recent studies of ICE detention operations. The GAO identified a number of reoccurring impediments to realizing these minimum requirements including its ongoing inability to assess cost, failure to adopt and assess performance measures across facilities and over time, continued use of multiple detention standards, and an apparent lack of interest in detainee complaints and concerns.

- In October 2014, the Government Accountability Office (GAO) issued GAO-15-153, IMMIGRATION DETENTION, Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standards.[13] The GAO assessed the two different methods ICE used to collect and access data on detention costs and determined neither method yielded complete or correct data for managing detention costs across facilities and facility types. The GAO also evaluated the three different sets of detention standards that ICE employed, each with its own performance indicators and methodology, and concluded this practice further undercut its efforts towards a uniformly effective and efficient system.

- In February 2016, the GAO issued GAO-16-231, IMMIGRATION DETENTION, Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care.[14] The GAO determined similar practices impeded ICE Health Service Corp (IHSC) efforts to collect information about on-site and off-site health care services and to assess their utilization. ICE relied incorrectly on facility-specific, year-end decision-making to improve a nationwide health care system over a period of years. IHSC also neglected to conduct trend analyses of key performance indicators including detainee complaints.

- In May 2016, the GAO issued GAO-16-231, IMMIGRATION DETENTION, Additional Actions Needed to Strengthen DHS Management of Short-term Holding Facilities.[15] CBP and ICE both operate short-term holding facilities and neither had a mechanism to determine how many detainees exceeded the agencies' respective facility maximum lengths of stay. The GAO pointed out this problem was compounded by

---

[13] GAO-15-153, Immigration Detention, Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standards at https://www.gao.gov/products/GAO-15-153.

[14] GAO-16-231, IMMIGRATION DETENTION, Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care at https://www.gao.gov/assets/680/675484.pdf.

[15] GAO-16-231, IMMIGRATION DETENTION, Additional Actions Needed to Strengthen DHS Management of Short-term Holding Facilities, May 2016, at https://www.gao.gov/assets/680/677484.pdf.

delays in both agencies' recording of "book-ins" and "book-outs." The GAO also considered the various mechanisms DHS used to elicit and address detainees' complaints and concluded none clearly identified the facilities about which the complaints had been made. The failure to collect timely and complete information about both these activities impacted CBP and ICE assessments of bench (versus bed) utilization[16] and their compliance with their respective detention standards.[17]

21. The Department of Homeland Security Office of the Inspector General (DHS OIG) also studied DHS' oversight of ICE and reported on ICE detention operations. Of special note are recent reports with findings and recommendations concerning questionable procurement practices, faulty facility inspections and monitoring, continuing non-compliance with detention standards, and repeated failure to enforce contract requirements.

- In February 2018, the DHS OIG issued *Immigration and Customs Enforcement Did Not Follow Federal Procurement Guidelines When Contracting for Detention Services*.[18] The OIG determined ICE improperly modified an existing IGSA with the City of Eloy, Arizona to establish a 2,400-bed detention facility in Dilley, Texas, thereby increasing taxpayer cost by $438,00 annually in fees and another undetermined sum annually in detention services.  ICE disagreed with OIG's recommendation to discontinue modifying Eloy's IGSA to procure detention space in Dilley, Texas. The IGSA remains in place today.

- In June 2018, the DHS OIG issued *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements*.[19] This report addressed ICE's use of two inspection types, annual inspections, and onsite monitoring, to assess detention facilities' compliance with PBNDS. The OIG determined neither the inspections, a combination of private and public sector efforts, nor onsite agency monitoring, were implemented as intended. As a result, ICE failed to achieve compliance with detention standards and to address the underlying deficiencies. The OIG concluded although the practices ICE adopted mitigated some deficiencies, they did not yield the intended oversight or systematic improvements in detention conditions, some of which had been languishing for years. The OIG made five recommendations and ICE concurred with all of them. Fifteen months later, in

---

[16] Bench or bed capacity is a function of numbers admitted and released within a 24-hour day and each person's length of stay.
[17] Generally, CBP does not keep anyone in its custody for more than 72 hours. ICE designates some of its detention facilities as suitable for detention less than 72 hours and all the rest, for detention greater than 72 hours.
[18] DHS OIG, Immigration and Customs Enforcement Did Not Follow Federal Procurement Guidelines When Contracting for Detention Services, February 2018, at https://www.oig.dhs.gov/sites/default/files/assets/2018-02/OIG-18-53-Feb18.pdf.
[19] DHS OIG, ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements, June 2018, at https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf.

September 2019, Tae Johnson, Assistant Director for Custody Management, ICE Enforcement and Removal Operations, appeared before the Committee on Homeland Security, Subcommittee on Oversight, Management, and Accountability, regarding Oversight of Detention Facilities.[20] He reported, responding to the OIG findings, that ICE was reevaluating its current inspection practices and planned to modify some of its requirements. He stated ERO had also begun to monitor Nakamoto, the vendor with which it contracted to monitor detention facilities.

- In January 2019, the DHS OIG issued *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards*.[21] At the time of that study, ICE contracted for 206 detention facilities. The OIG focused on 106 facilities which, when combined, received in excess of $3 billion the prior year to detain removable aliens. Although ICE had a system in place to manage and oversee detention contracts, just 28 of the 106 contracts included the Quality Assurance Surveillance Plan (QASP) provision, which would allow ICE to impose financial penalties to ensure facilities met performance standards. The OIG determined ICE imposed financial penalties on only two occasions despite documenting thousands of instances of facilities' failures to comply with detention standards. Instead, ICE issued waivers, exempting facilities with deficient conditions, from complying with certain standards. The OIG discovered ICE also failed to generate written instruction to govern the waiver process, thereby enabling staff at HQ and in the field to grant waivers without clear authority to do so.

- Also, in January 2019, the DHS OIG issued *DHS Needs to Improve the Process for Identifying Acquisition Planning Capability Needs*.[22] DHS acquisition planning had been an area of weakness since the department's inception. Efforts to improve included a process to guide identification of agency capabilities, gaps, and opportunities, and adding controls to prevent its circumvention by the agencies. DHS was uneven in its enforcement, however; failing to hold the agencies accountable for not following instructions, failing to document those shortfalls, and failing to improve upon the guidance it had previously promulgated.

---

[20] Statement of Tae Johnson, Asst. Director for Custody Management, ICE Enforcement and Removal Operations, regarding Oversight of Detention Facilities, before the Committee on Homeland Security, Subcommittee on Oversight, Management, and Accountability, September 2019, at https://www.ice.gov/sites/default/files/documents/Testimony/2019/190926johnson.pdf.

[21] DHS OIG, ICE Does Not Fully USE Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards, January 2019, at https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[22] DHS OIG, DHS Needs to Improve the Process for Identifying Acquisition Planning Capability Needs, January 2019, at https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-19-Jan19.pdf.

22. Most recently, in the wake of the pandemic, ICE suspended all facility annual inspections by the Nakamoto Group, Inc. for 30 days. Despite this vendor's documented deficiencies, in a time of heightened uncertainty, a marked increase in complaints by detainees, family members, attorneys and other advocates about facilities' non-compliance with detention standards, and less access by detainees to facility staff for assistance, additional oversight could be beneficial and should be resumed.

23. These failures of oversight extend to the four facilities at issue in this litigation.

- The Irwin County Detention Center,[23] It was last inspected by the Nakamoto Group, Inc. (NGI) on June 13, 2019.[24] Based on my experience having reviewed hundreds of detention files over the years, detainees filed far more grievances at this facility than at others, with a spike more than twice its elevated rate during the third quarter of 2019; NGI provided no information about those grievances. NGI identified eight deficiencies in five areas, five of which were reoccurring. NGI also provided little information about the deficiencies. NGI determined the facility's performance was "Acceptable."

- The Stewart County Detention Center[25] was last inspected by the Nakamoto Group, Inc. (NGI) on May 9, 2019.[26] The inspection forms that NGI used to conduct this inspection provided only aggregated information. NGI identified four deficiencies, one of which was reoccurring. NGI provided little information about the deficiencies. NGI determined the facility's performance "Meets Standards."

- The LaSalle ICE Processing Center[27] was last inspected by the Nakamoto Group, Inc. (NGI) on September 26, 2019.[28] NGI identified one unspecified deficiency concerning the standard, Law Library and Legal Material. NGI did not provide any information about this deficiency. NGI determined the facility's performance was "Acceptable."

---

[23] The Irwin facility, capacity 1,201 beds, houses U.S. Marshal Service (USMS) prisoners, ICE detainees, and Irwin County inmates. Fiscal Year 2020 to date, the ICE average daily population is 754 male and female detainees. ICE accesses the county-owned and -operated facility through the USMS agreement with Irwin County. The facility has no accreditations. It is operated by a private company called LaSalle Corrections.

[24] ICE Facility Inspections, Annual Inspection of the Irwin County Detention Center, June 13, 2019, https://www.ice.gov/facility-inspections.

[25] The Stewart facility, capacity 1,752 beds, is owned and operated by CoreCivic, formerly Corrections Corporation of America. Fiscal Year 2020 to date, the ICE average daily population is 1,550 male detainees. The LaSalle Economic Development Group has an intergovernmental service agreement (IGSA) with GEO, and ICE has an IGSA with the EDG. ICE is the only occupant.

[26] ICE Facility Inspections, Annual Inspection of the Stewart Detention Center, May 9, 2019, https://www.ice.gov/facility-inspections.

[27] The LaSalle facility, capacity 1,660 beds, is owned and operated by the Geo Group Inc. (GEO). Fiscal Year 2020 to date, the ICE average daily population is 1,221 male and female detainees. The LaSalle Economic Development Group (EDG) has an intergovernmental service agreement (IGSA) with GEO, and ICE has an IGSA with the EDG. ICE is the only occupant.

[28] ICE Facility Inspections, Annual Inspection of the LaSalle ICE Processing Center, September 26, 2019, https://www.ice.gov/facility-inspections.

- The Pine Prairie ICE Processing Center[29] was last inspected by the Nakamoto Group, Inc. (NGI) on April 25, 2019.[30] At the time of that inspection, the facility was "cohorting" over 500 detainees following an outbreak of mumps among the population. NGI did not indicate whether mandatory services were interrupted during the quarantine and if the facility took any measures to mediate the impact of the quarantine on detainees' access to mandated services including access to counsel. NGI identified two deficiencies about which no information was provided. Also missing on-line from the file was the accompanying Detention Review Summary Form or the Facility Significant Incident Summary report. NGI determined its performance was "Acceptable."

24. The examples of failed monitoring described above are not an anomaly. In 2009, DHS Secretary Napolitano appointed me Sr. Advisor on Immigration Detention and Removal Operations and directed that I make a comprehensive review and evaluation of the U.S. Immigration and Custom Enforcement system of immigration detention. Top among the recommendations in the report that followed, I wrote ICE should establish a system of immigration detention with the requisite management tools and informational systems to detain, or supervise in the community, the persons in its custody consistent with their standing as civil detainees held pursuant to civil immigration laws. To fulfill this obligation, ICE must also provide federal oversight of key detention operations to track performance and outcomes, commit to continuous improvement, and hold the agency and its contractors accountable.[31]

III.   **DHS & ICE Have a Continuing Duty to Ensure Access to Counsel During COVID-19**

25. The mission of the Department of Homeland Security (DHS) is emergency planning and preparedness for all manner of incursions, natural and man-made, foreign and domestic. Realization of this mandate helps to ensure that as a nation, we are ready to respond, informed by the evidence and faithful to the law.

26. The DHS was formed in November 2002. Since its inception, the United States and the world have encountered several pandemic diseases: an influenza pandemic (H1N1) in 2009, Ebola, also a viral infection in 2014, and the coronavirus (COVID-19) in 2020. In

---

[29] The Pine Prairie facility, capacity 700 beds, is owned and operated by the GEO Group Inc. (GEO). Fiscal Year 2020 to date, the ICE average daily population is 641 male detainees. ICE contracts directly from GEO. ICE is the only occupant.

[30] ICE Facility Inspections, Annual Inspection of the Pine Prairie ICE Processing Center, April 25, 2019, https://www.ice.gov/facility-inspections.

[31] Dora Schriro, DHS Immigration and Customs Enforcement, Immigration Detention Overview and Recommendations, Oct. 6, 2009, https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

9

the United States, the Department of Homeland Security along with the Department of Health and Human Services are the primary federal agencies whose responsibility it is plan, prepare and respond.

27. In detention facilities, infectious and contagious diseases such as mumps, measles, and chicken pox, reoccur periodically. Usually, the consequences are not severe and there are vaccines for some/all of them. Despite the regularity with which these outbreaks occur, ICE has not improved its practices, and is still prone to quarantining large groups of detainees, failing to screen and separate detainees who may be at risk by more measured means, and repeatedly disrupting detainees' access to counsel.

28. DHS's mandate to plan for emergencies including medical emergencies such as N1H1, Ebola and the coronavirus pandemics, and ICE's custodial obligations, require ensuring that its COVID-19 response protects detained individuals' ready access to their lawyers. Yet, as detailed herein, both DHS and ICE are failing to ensure that people have access to lawyers during this crucial time.

29. COVID-19 is a highly infectious and deadly disease. There is no vaccine to prevent transmission, and there is no cure for COVID-19 today.[32] The likelihood of recurrence is great.[33]

30. As of May 4, there were 3,529,408 confirmed cases of COVID-19 resulting in 248,025 deaths worldwide. The United States accounted for 1,194,145 confirmed cases and 68,797 deaths, more than any other country.[34] The states of Louisiana and Georgia have been severely impacted as well. There have been 29,673 confirmed cases and 1,991 deaths in Louisiana including the Evangeline Parish where the Pine Prairie ICE Processing Center (Pine Prairie facility) is located and reported 60 confirmed cases and one death, and the LaSalle Parish where the LaSalle ICE Processing Center (LaSalle facility) is located and reported 27 confirmed cases. In Georgia, there have been 29,145 confirmed cases and 1,207 deaths including Stewart County where the Stewart County Detention Center (Stewart facility) is located and reported 25 confirmed cases, Irwin County where the Irwin County Detention Center (Irwin facility) is located and reported 18 positive cases and one death.[35] ICE detainees account nationwide for 606 confirmed cases including the 25 people held at

---

[32] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, CDC, (LAST UPDATED APR. 26, 2020, 5:59PM), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.
[33] Ed Yong, *How the Pandemic Will End*, ATLANTIC (Mar. 25, 2020), https://www.theatlantic.com/health/archive/2020/03/how-will-coronavirus-end/608719/.
[34] Coronavirus (COVID-19) pandemic, May 4, 2020, at 1:47 PM, https://www.bing.com/search?q=pa+map+of+covid+19+cases+by+county&form=ANSPH1&refig=0afa3913a0be4a0fad9408b8f9276010&sp=2&qs=SC&pq=pa+map+of+covid-19+casse&sk=PRES1SC1&sc=2-24&cvid=0afa3913a0be4a0fad9408b8f9276010 [hereinafter COVID-19 cases].
[35] *Id.*

Pine Prairie facility, and 10 people held at the LaSalle facility in Louisiana, and 11 people held at the Stewart facility and 2 people held at the Irwin facility in Georgia.[36] An additional 39 confirmed cases represent ICE employees assigned to detention facilities including 2 staff members assigned to the Steward facility in Georgia.[37] ICE does not report the status of detention staff employed by the facilities.

31. The lethal and highly infectious nature of COVID-19 makes it even more important that DHS and ICE ensure individuals in detention can reliably and adequately communicate with lawyers.

32. For example, at each of the facilities at issue, immigration proceedings are ongoing.[38] Access to immigration lawyers is not only important for purposes of the removal determination itself, but immigration attorneys may be able to obtain their clients' release on bond or parole—especially given the dangers of detention during COVID-19. It is therefore incumbent on detention officials to ensure that detained people can freely communicate with their attorneys (and their attorneys' agents) during this pandemic.

33. Moreover, ready access to attorneys during COVID-19 is crucial for ensuring that detained persons' constitutional right to adequate medical care and statutory rights to disability accommodations are respected during this pandemic. Across the country, many detained persons are filing actions related to inadequate medical care and poor conditions during the COVID-19 pandemic. DHS and ICE are obligated to ensure that detained persons can communicate with lawyers concerning their conditions of confinement and are not impeded from accessing courts to vindicate their constitutional and statutory rights.

## IV. Consistent with a Long History of Oversight Failures, DHS and ICE Are Failing to Ensure Access to Counsel at the Four Facilities During COVID-19.

34. As detailed below, DHS and ICE are failing to ensure that people in their custody can adequately and reliably communicate with attorneys during the COVID-19 pandemic, including at the four facilities at issue.

35. To date, DHS and ICE have not issued any comprehensive guidance or mandate to ensure that attorney access is not materially impeded during the COVID-19 pandemic. I first outline ICE's inadequate response to COVID-19 as it relates to attorney communications.

---

[36] ICE Guidance on COVID-19, Confirmed Cases, last updated May 4, 2020 at 5:30PM.
[37] *Id.*
[38] U.S. Department of Justice, Executive Office for Immigration Review, EOIR Operational Status During Coronavirus Pandemic, (last reviewed May 4, 2020), https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic.

I then explain how, as a direct consequence, the four facilities at issue here fail to ensure adequate and reliable attorney communications for those in its custody.

36. To date, ICE has issued three directives of consequence concerning access to counsel and COVID-19. None of them is sufficient and, critically, none of them unequivocally mandates that detention facilities make crucially needed modifications to ensure that detained persons can adequately and reliably communicate with attorneys.

37. The ICE Health Services (IHSC) issued the first of the three directives, IHSC Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19), on March 6, 2020.[39] It did not concern access to counsel per se; however, the agency's approach to ascertaining whether symptomatic and monosymptomatic individuals were infected with the virus primarily by means of "cohorting" large numbers of detainees together for days had a profound impact on their health and their access to counsel.

38. ICE issued the second of three directives, Memorandum on Coronavirus Disease 2019 (COVID-19), Action Plan, Revision 1, on March 27, 2020.[40] Its stated goal was to ensure a unified response but that was not the case. The Memorandum is applicable only to ICE's 42 dedicated facilities therefore, it applies to the Stewart, LaSalle and Pine Prairie facilities and not to the Irwin facility.[41] With regards to the remaining 191 non-dedicated facilities, ICE deferred to local, state, tribal, territorial and federal public health authorities, recommending the actions contained in this memo be considered best practices.[42] Its brief treatment of only some of the issues relevant to access to counsel failed to provide crucially needed mandates for all detention centers. The affirmation, "Detainee access to legal representatives remains a paramount requirement…," was undercut mid-sentence with the qualification, "… and should be accommodated to the *maximum extent practicable*,"[43] language that signals individual detention facilities may continue to do as they please without fear of any consequences on their underlying contracts with ICE.

39. The Memorandum's brief treatment of other issues key to access to counsel failed to provide crucially needed mandates for all detention centers in the following ways.

---

[39] ICE Health Service Corps, Interim Reference Sheet On 2019-Novel Coronavirus (COVID-19) (Mar. 6, 2020) [hereinafter IHSC Interim Reference Sheet].

[40] ICE Enforcement and Removal Operations, *Memorandum on Coronavirus Disease 2019 (COVID-19) Action Plan, Revision 1*, ICE (Mar. 27, 2020), https://www.ice.gov/doclib/coronavirus/attF.pdf [hereinafter March 27 ICE Memorandum].

[41] A dedicated facility is an immigration detention center that houses only ICE detainees. A non-dedicated facility hosts more than one confined population. ICE currently utilizes 233 facilities to detain persons in its custody of which 42 are dedicated and 191 are non-dedicated. IHSC staffs 21 of the 42 dedicated detention facilities.

[42] ICE Facilities List, Facility Inspections, *supra* note 1.

[43] March 27 ICE Memorandum, *supra* note 40.

- ICE directed that facilities shall afford indigent detainees the same access and related privileges as are other detainees including the ability to make calls to the ICE-provided list of free legal service providers and consulates at no charge to the detainee or receiving party.[44] ICE did not require facilities to submit a plan with a timeline or to report progress.

- ICE directed that legal visitation must continue unless determined to pose a risk to the safety and security of the facility.[45] These are subjective terms for which ICE did not provide clear definitions or require field office review and opportunity for appeal.

- ICE stated that attorneys should be offered non-contact visitation (e.g., Skype or teleconference) first to limit exposures, but stipulated in-person contact visits should be permitted if determined essential by the legal representative.[46] ICE added that the ultimate legal visit approving authority lies with the warden or facility administrator, however; in which case the facility should notify the field office of any denied visit at the earliest opportunity.[47] ICE delegated its decision-making entirely to the facilities without any provision to review facility denials of attorneys' essential in-person meetings with clients.

- ICE directed that modified operations should be implemented to maximize social distancing in facilities "as much as practicable." Administrators should consider staggered mealtimes and recreation to limit congregate gatherings.[48] ICE provided no statement affirming that Law Library access is mandated, legal mail must be delivered timely without first being searched, document exchange must be facilitated, facsimiles and emails accepted, notarizing and making copies of documents must remain readily available, and scheduling of confidential phone calls and video visitation and including those utilizing interpreters must continue and without delay.

40. ICE issued the third of three directives, COVID-19 Pandemic Response Requirements, Version 1.0, on April 10, 2020.[49] The Pandemic Response Requirements (PPR) is the first communication from ICE to require all detention facilities comply with CDC guidance and which includes CDC recommendations about access to counsel, but not all of which ICE incorporated in its requirements. The PRR also directs all detention facilities comply with both the provisions of their relevant ICE contract or agreement and the detention standards applicable to their facility, already longstanding obligations. Additionally, ICE directs

---

[44] *Id.*, p. 2.
[45] I*d.*
[46] *Id.*
[47] *Id.*
[48] *Id.*, p. 6.
[49] ICE, ERO. Pandemic Response Requirements [hereinafter ERO COVID-19 PPR].

dedicated facilities must continue to comply with its March 27 Memorandum to Detention Wardens and Superintendents and subsequent updates.

41. ICE Pandemic Response Requirements (PRR) contain critical enforcement tools that are required – its detention standards, facility contracts, and pandemic instruction – to provide the detained population with the access to counsel it is owed, and that is precisely the problem. The PRR identifies a number of crucially needed modifications in a number of areas *including* access to counsel—such as leveraging technology and facilitating telephonic appointments— and still, it fails to expressly mandate that these modifications be implemented. Instead, the PRR merely states over and over that these modifications "may" be implemented to the extent practicable.

42. The Pandemic Response Requirements suggest several ways to enhance legal visits. Nevertheless, the PRR is highly unlikely to rectify longstanding issues affecting access to counsel. Since its release, impediments to access have worsened for attorneys and their clients. These Requirements, as were those in the previous Memorandum, are merely requests.

43. ICE directed that during suspended (social) or modified (legal) visitation programs, facilities should provide access to virtual visitation options where available. When not possible, all visitors shall be screened on entry for symptoms of COVID-19 and temperature checks performed, when possible.[50]

44. ICE recommended facilities extend law library hours of operation and stagger detainee access to reduce social distancing.[51]

45. ICE added that it continues to explore opportunities to enhance attorney access while legal visits are impacted. For facilities at which immigration hearings are conducted or where detainees are otherwise held who have cases pending immigration proceedings ICE indicated this may include several promising practices:

- Adding all immigration attorneys of record to the Talton Pro-bono platform.

- Requiring facilities to establish a process for detainees/immigration attorneys to schedule appointments and facilitate the calls.

- Leveraging technology (e.g., tablets, smartphones) to facilitate attorney/client communication.

---

[50] *Id.*, p. 12.
[51] *Id.*, p. 13.

- Working with various detention contractors and telephone service providers to ensure all detainees receive some number of free calls per week.[52]

46. ICE did not commit to adopting any of the improvements. ICE did not indicate whether it would require a requisite level of effort by the facilities and field offices to enhance visitation at any location. It did indicate whether Headquarters would monitor to assess its impact and intervene as needed.

47. The U.S. Centers for Disease Control and Infection (CDC) issued Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities on March 23, 2020.[53] The CDC provided interim guidance concerning operational preparedness, prevention, and management, to ensure continuation of essential public services and protection of the health and safety of persons in custody and staff.[54] ICE incorporated portions of the CDC guidelines concerning access to counsel in its March 27 Memorandum and April 10 Requirements.

48. Missing from the documents issued by ICE is CDC instruction intended to improve communication and promote collaboration and that it is applicable to access to counsel:

- *Communication and Coordination*. Develop information-sharing with partners. Create and test communication plans to disseminate critical information to detained persons, staff, contractors, vendors, and visitors as the pandemic progresses. Communicate with the public about any changes to facility operations, including visitation.

- *Coordination with court officials*. Identify any lawful alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of COVID-19 transmission. While confirmation of suspected cases are pending confirmation or upon confirmation, when possible, arrange lawful alternatives to in-person court appearances.

- *Prevention practices for visitors*. If possible, communicate with potential visitors to discourage contact visits in the interest of their health and others. Perform verbal screening and temperature check for all visitors on entry. Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas. Provide visitors with information to prepare them for screening. Promote non-contact visits.

---

[52] *Id.*, pp. 12-13.
[53] U.S. Centers for Disease Control and Infection (CDC), Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Mar. 23, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html [hereinafter CDC COVID-19][54] *Id.*
[54] *Id.*

Consider reducing or temporarily eliminating the cost of phone calls. Consider increasing phone privileges.

- *Implementation, modification of visitation programs*. If moving to virtual visitation, clean electronic surfaces regularly. Inform potential visitors of changes and the reasons. Clearly communicate any changes to the detained population. If suspending contact visits, provide alternate means to engage with legal representatives and other individual with whom they have a legal right to consult.

49. ICE Pandemic Response Requirements incorporate some, not all, CDC guidelines including those concerning access to counsel, but direct all facilities to comply, presumably in full, with the CDC guidelines as well as the relevant ICE detention standards and ICE contract. If ICE headquarters has not made the effort to reconcile the differences in its instructions and those of the CDC, and issue one clear and unequivocal set of requirements that must be fulfilled, what assurance has ICE Headquarters that the field is willing or able to do so.

## V. Immigration Detention Oversight & Operational Deficiencies Impede Access to Counsel

50. As was established in Section II,  Immigration and Customs Enforcement has had considerable difficulty with detention operations for years. The agency is comprised primarily of law enforcement personnel with extensive expertise performing removal functions, but not in the design and delivery of detention facilities. Based on my years of executive experience in immigration detention, state and local correctional systems, and enforcement agencies including ICE, it is my opinion that ICE has not yet established a system of immigration detention with the requisite management tools, informational systems and oversight to detain and supervise this population as is required. Its lack of expertise *and* interest in this area, coupled with its continual search for more beds,  creates conditions under which ICE is continually deferential to its contractors and facility administrators, a situation that its providers take advantage.

51. ICE detention standards recognize attorneys must have access to their clients every day of the week including weekends and holidays.[55] Among its many performance-based requirements of the facilities to protect detainees' rights, "Facilities are required to provide access by means of in-person contact and non-contact visits, phone calls, and mail, all of which should be confidential and at no cost to either party."[56] "Facilities are encouraged to

---

[55] PBNDS Visitation, *supra* note 13.
[56] PBNDS Law Library and Legal Research Material, *supra*, note 5.

utilize electronic means of communication such as video-telephonic conferencing and Skype, to increase opportunity for access."[57]

52. What ICE says is not what ICE does. To follow is a brief summary of access to counsel prior to and during the pandemic at the Irwin, LaSalle, Pine Prairie and Stewart facilities.

53. Prior to the pandemic, attorneys report their ability to communicate with clients was limited in every modality: in-person visitation, video teleconference calls (VTC), phone calls, mail, email and facsimile. All four facilities had insufficient infrastructure to support attorney calls by video teleconference or phone. There were not enough computers, too few time slots to meet demand, not enough staff, and significant issues with scheduling practices.

54. Noteworthy examples of the facilities' chronic problems include the following.

- Irwin, LaSalle, and Stewart facilities did not allow contact legal visits; while at Pine Prairie, contact visits are the only form of in-person visitation.

- The number of visitation rooms at all four facilities was far too few to accommodate the large numbers of detainees they held, and contributed to long wait times, limited hours, and time limits well before stay-at-orders were in effect.

- Wait-times at all the locations for VTC visits precluded its use in time-sensitive matters when in-person visits were still possible.

- The Stewart, Irwin, and Pine Prairie facilities did not permit attorneys to phone off-site interpreters for translation assistance during in-person visitation, and the supportive technology at these locations was so limited, it further impeded their access to interpretation services.

- Mail was not a reliable method to exchange documents. Delays in sending and receiving and searching legal mail not in the presence of the detainee recipient were routine.

55. The pandemic has further taxed facilities' scant resources and ICE's lack of resolve. The providers continue to fail to address their longstanding deficiencies or to respond to the additional requirements ICE imposed. ICE continues to operationalize its requirements, as it had in the past, as mere requests.

---

[57] PBNDS Telephone Access, *supra* note 11.

56. Conditions have worsened in the past several months since the pandemic took hold.

A. **Failure to Increase the Number of Video Teleconferencing Equipment & Telephones and Hours of Operation**

57. The ICE Visitation Detention Standard directs in part, that each facility shall permit legal visitation 7 days a week, including holidays, for a minimum of 8 hours per day on regular business days (Monday through Friday), and a minimum of 4 hours per day on weekends and holidays. In emergency circumstances, facilities may consider requests from legal representatives for extended visits or visits outside normal facility visiting hours. The number of visitors a detainee may receive, and the length of visits, shall be limited only by reasonable constraints of space, scheduling, staff availability, safety, security and good order. Generally, visits should be for the maximum period practicable but not less than one hour. Detainees with hearing or speech disabilities shall be granted reasonable accommodations to allow for equal access to telephone services. Detainees may meet privately with current or prospective legal representatives and their legal assistants. Visits between legal representatives and assistants and an individual detainee are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings. Detainees shall be advised of their right to contact their consular representatives and receive visits from their consulate officers. Facilities are encouraged to provide opportunities for both contact and non-contact visitation with approved visitors during both day and evening hours. Persons allowed to attend legal visits include attorneys and other legal representatives, legal assistants, and translators and interpreters. Additionally, the facility shall permit messengers who are not legal assistants to deliver documents to and from the facility.[58]

58. The ICE Telephone Access Detention Standard directs in part, that detainees and their legal counsel shall be able to communicate effectively with each other. Privacy for detainee telephone calls regarding legal matters shall be ensured. Telephone access procedures shall foster legal access and confidential communications with attorneys. Detainees shall be able to make free calls to the ICE/ERO-provided list of free legal service providers. Telephones shall be maintained in proper working order. Detainees with hearing or speech disabilities shall be granted reasonable accommodations to allow for equal access to telephone services. Facilities shall strive to reduce telephone costs, including through the use of emerging telecommunications, voiceover, and Internet protocol technologies.[59]

---

[58] ICE Detention Standards, 5.7 Visitation, Visits by Legal Representatives and Legal Assistants (last rev. Dec. 2016 PBNDS Visitation, *supra* note 13.

[59] ICE Detention Standard, 5.6 Telephone Access (last rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/5-6.pdf.  PBNDS Telephone Access, *supra* note 11.

59. The ICE Law Libraries and Legal Material Detention Standard directs in part that detainees shall have access to courts and counsel. Detainees shall be able to have confidential contact with attorneys and their authorized representatives in person, on the telephone and through correspondence. Special scheduling consideration shall be given to detainees facing deadlines or time constraints.[60]

60. In the March 27 memorandum for Detention Warden and Superintendents through Field Office Directors,[61] [62] ICE ERO directed facilities to offer legal representatives non-contact visits, e.g., Skype or VTC, whenever possible to reduce the risk associated with COVID-19, and only provide contact visits when the representatives determined it was essential. ICE also directed that each facility must ensure all detainees are able to make calls to the ICE-provided list of free legal service providers and consulates at no charge to the detainee or receiving party. In order to partake of remote attorney visitation, and place calls to free legal service providers and consulates, ICE directed there must be both adequate access and sufficient communication equipment in good working order at every location, and a uniform system of oversight.[63]

61. It is unknown whether ICE ERO Headquarters required the Field Offices to monitor for compliance and what measures Headquarters took when the Field Offices or the facilities failed to comply. It is known ICE ERO, the Field Offices and facilities failed to comply. There are inadequate access and insufficient communication equipment in good working order at all four facilities, and no uniform system of oversight.

62. When ICE released its Pandemic Response Requirements on April 10, ERO reiterated all detention facilities and local jails housing ICE detainees "*must*" comply with the ICE national detention standards appliable to their facility.[64]

63. The Pandemic Response Requirements included an additional requirement, directing facilities where immigration hearings are conducted or detainees who have cases pending

---

[60] ICE Detention Standards, 6.3PBNDS Law Library and Legal Material (last rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/6-3.pdf., *supra* note 5.
[61] March 27 ICE Memorandum, *supra* note 49, p. 2.
[62] ICE maintains 24 field offices. Detention facilities in Georgia are overseen by the Atlanta filed office; detention facilities in Louisiana are overseen by the New Orleans field office. ICE Enforcement and Removal Operations Field Offices (last rev. 4/29/2020), https://www.ice.gov/contact/ero#fieldOffice. ICE issued directions to the field offices to convey to the facilities and delegated to each facility warden or superintendent final decision-making.
[63] ICE maintains 24 field offices. Detention facilities in Georgia are overseen by the Atlanta filed office; detention facilities in Louisiana are overseen by the New Orleans field office. ICE Enforcement and Removal Operations Field Offices (last rev. 4/29/2020), https://www.ice.gov/contact/ero#fieldOffice. ICE issued directions to the field offices to convey to the facilities and delegated to each facility warden or superintendent final decision-making. March 27 ICE Memorandum, supra note 49, p. 2.
[64] ERO COVID-19 PRR, *supra* note 58.

immigration proceedings are housed to establish a process for detainees and immigration attorneys to schedule appointments and facilitate these (remote) calls.[65]

64. The Pandemic Response Requirements also suggested (a) adding all immigration attorneys of record to the Talton Pro-Bono platform, (b) leveraging technology (e.g., tablets and smartphones) to facilitate attorney/client communication, and (c) working with the various detention contactors and telephone service providers to ensure that *all* detainees receive some number of free calls per week.[66]

65. It is unknown whether ICE ERO Headquarters required the Field Offices to monitor for compliance and what measures Headquarters took when the Field Offices or the facilities failed to comply. It is known that ICE ERO, the Field Offices and facilities failed to comply. There are both inadequate access and insufficient communication equipment in good working order at all four facilities, and no uniform system of oversight.

66. Since the suspension of all social visitation in response to the pandemic, the demand for VTC visits and attorney calls further exceeds its capacity. The facilities have made few changes and realized little improvement: Attorneys struggle to meet their ethical obligations to their clients. Detainees are unable to communicate with their attorneys.

67. Currently, attorneys wait as long as four to six days to receive a VTC appointment and as much as an additional six days to meet in-person or remotely with their client.

68. Facilities limit the number of VTC calls an attorney may have with their client in a period of time.

69. Clearing interpreters to participate in three-way calls continues to be impeded by the availability of the government attorneys to make those arrangements has not changed.

70. Appointments are made with little advance notice, and on a take-it-or-leave-it basis.

71. Appointments are canceled without notice or an explanation.

72. Detainees arrive late to appointments, and detainees are returned early to their housing units.

73. There is no clear practice in place to accommodate quarantined detainees to participate in a VTC or regular phone call with their attorney.

---

[65] *Id.*

[66] *Id.*

74. There is no apparent policy in place to enable an attorney to access her client by any means in the event of an emergency for the duration of the pandemic.

75. Attorneys continue to experience difficulty arranging confidential phone or video teleconferencing calls with their clients because there is not enough communication equipment in working order and corresponding connectivity to meet the demand.

76. Detainees continue to experience difficulties reaching their attorneys. As demand for phone use increases, the number of phones in dayrooms not working or disconnected is reported to have risen. The wait time for working phones is greater.

77. Additionally, the primary means by which detainees can speak with their attorney is from their housing units where most phone calls are recorded. There is also a phone to a hotline in the housing units and its calls are not recorded. None of the phone conversations in the housing units are confidential however, as all conversations can be overheard by staff and the other detainees in the unit.

78. All these conditions fail to comply with ICE Detention Standards. Non-compliance with ICE Detention Standards is also a material breach of the facilities' contracts with ICE. Failure to comply with ICE Detention Standards and facilities' contracts with ICE constitutes failure to comply with the ICE March 27 Memorandum for all dedicated detention facilities and the April 10 Pandemic Response Requirements for all detention facilities housing ICE detainees.

**B. Failure to Deliver Mail and Modify Document Exchange Procedures**

79. The ICE Correspondence and Other Mail Detention Standard directs detainees shall be able to correspond with their families, the community, legal representatives, government offices and consular officials. Incoming and outgoing letters shall be held for no more than 24 hours and packages no more than 48 hours before distribution, excluding weekends, holidays or exceptional circumstances. Incoming and outgoing mail, with the exception of special correspondence or legal mail, shall be opened to inspect for contraband and to intercept cash, checks and money orders. Detainees shall be permitted to send special correspondence or legal mail to a specified class of persons and organizations such as SIFI, and incoming mail from these persons shall be opened only in the presence of the detainees to check for contraband. All facilities shall implement policies and procedures addressing acceptable and non-acceptable mail. Detainees may receive as correspondence any material reasonably necessary for the detainee to present his/her legal claim, in accordance with this standard. When timely communication through the mail is not possible, the facility

Case 1:18-cv-00760-CKK-RMM   Document 105-4   Filed 05/07/20   Page 22 of 41

administrator may in his/her discretion allow for a reasonable amount of communication by means of facsimile device between the detainee and his/her designated legal representatives.[67]

80. The ICE Law Libraries and Legal Material Detention Standard requires detainees shall be able to have confidential contact with attorneys and their authorized representatives in person, on the telephone and through correspondence.[68]

81. The ICE Telephone Access Detention Standard requires detainees and their legal counsel shall be able to communicate effectively with each other.[69]

82. The ICE Visitation Detention Standard encourages facilities to provide opportunities for both contact and non-contact visitation with approved visitors during both day and evening hours. And, it requires the facility shall permit messengers who are not legal representatives or legal assistants to deliver documents to and from the facility, but not to visit detainees.[70]

83. When ICE released its Pandemic Response Requirements on April 10, ERO reiterated all detention facilities and local jails housing ICE detainees "*must*" comply with the ICE national detention standards appliable to their facility.[71]

84. Pandemic-related disruptions to in-person visitation and difficulties with remote communication have increased the need for reliable mail service and document exchange.

85. Mail service is not reliable at the four facilities. Attorneys use both the U.S. Postal Service and FedEx to send legal mail to detainees, but detainees do not receive everything that their attorneys have sent by either carrier. And, facilities do not routinely return undeliverable legal mail to the Postal Service or FedEx.

86. Delays in mail delivery transmittals impede attorney representation of their clients who increasing include medically vulnerable individuals. These delays can impact detainees' health as well as the outcome of their cases.

---

[67] ICE Detention Standard 5.1 PBNDS Correspondence and Other Mail (last rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/5-1.pdf., *supra* note 9.
[68] ICE Detention Standards, 6.3 PBNDS Law Library and Legal Material (last rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/6-3.pdf., *supra* note 5.
[69] PBNDS Telephone Access, *supra* note 11
[70] PBNDS Visitation, *supra* note 13.
[71] ERO COVID-19 PRR, *supra* note 58.

87. ICE and the facilities have not resolved mail delivery and three of the four facilities are unwilling to adopt facsimile or the Internet as alternative means of delivery. Only the Irwin facility has a system in place to accomplish this.

88. Attorneys also encounter difficulty corresponding directly with ICE by mail. There are occasions when ICE does not accept emails and did not respond to correspondence when it arrives by regular mail. Facsimiles have also proven to be unreliable.

89. Email and faxes are widely accepted and customary means of communication within the government including DHS, ICE and ERO and should be accommodated at all facilities.

90. The increased demand for humanitarian parole considerations may have increased the agency's workload; however, ICE has not put in place a viable plan to address it.

91. All these conditions fail to comply with ICE Detention Standards. Non-compliance with ICE Detention Standards is also a material breach of the facilities' contracts with ICE. Failure to comply with ICE Detention Standards and facilities' contracts with ICE constitutes failure to comply with the ICE March 27 Memorandum for all dedicated detention facilities and the April 10 Pandemic Response Requirements for all detention facilities housing ICE detainees.

**C.  Failure to Comply with Confidentiality Requirements**.

92. The ICE Visitation Detention Standard[72] directs visits between legal representatives and assistants and an individual detainee are confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings.

93. The ICE Correspondence and Other Mail Detention Standard[73] requires incoming and outgoing mail, with the exception of special correspondence or legal mail, shall be opened to inspect for contraband and to intercept cash, checks and money orders. Detainees shall be permitted to send special correspondence or legal mail to be specified class of persons and organizations, and incoming and outgoing mail from these persons shall be opened only in the presence of the detainees unless waived to check for contraband.

94. The ICE Telephone Access Detention Standard[74] requires privacy for detainee telephone calls regarding legal matters shall be ensured. Telephone access procedures shall foster

---

[72] PBNDS Visitation, *supra* note 20.
[73] PBNDS Correspondence and Other Mail, *supra* note 18.
[74] PBNDS Telephone Access, *supra* note 11.

legal access and confidential communications with attorneys. Detainees shall be able to have confidential contact with attorneys and their authorized representatives in person, on the telephone and through correspondence.

95. The ICE Law Libraries and Legal Material Detention Standard[75] requires detainees shall be able to have confidential contact with attorneys and their authorized representatives in person, on the telephone, and through correspondence.

96. Confidentiality is a concern under any circumstances and particularly during a pandemic when medical as well as legal information is at risk. It is also a commitment that ICE, and by extension, its agents must keep. When ICE released its Pandemic Response Requirements on April 10, ERO reiterated all detention facilities and local jails housing ICE detainees "must" comply with the ICE national detention standards appliable to their facility.[76]

97. Chronic and current coronavirus-related factors – risk of infection while attending an in-person attorney visit, significant and growing larger wait times for VTC calls/video conferencing, and problems with mail delivery and inspection – push detainees towards utilizing the regular phones and hotline numbers in their housing units to place legal calls to their attorneys with or without realizing these calls are recorded as well as overhead by other detainees and staff in the immediate area, because they have no other choice.

98. Physical plant limitations infringe upon confidentiality. Attorneys report VTC conferences with clients have been overheard in areas where there are no partitions or sound absorption.

99. Security practices also affect confidentiality. Attorneys report custody staff has the practice of standing closer to groups of three – the attorney, her client, and an interpreter. Additionally, the detainee's time out-of-cell to meet or speak with counsel, is an opportunity for a cell search, and the impermissible confiscation of legal material.

100.     All these conditions fail to comply with ICE Detention Standards. Non-compliance with ICE Detention Standards is also a material breach of the facilities' contracts with ICE. Failure to comply with ICE Detention Standards and facilities' contracts with ICE constitutes failure to comply with the ICE March 27 Memorandum for all dedicated detention facilities and the April 10 Pandemic Response Requirements for all detention facilities housing ICE detainees.

### D.  Failure to Accommodate LEP Detainees and Detainees with Disabilities

---

[75] PBNDS Law Libraries and Legal Material, supra note 5.
[76] ERO COVID-19 PRR, *supra* note 58.

101.     The 2016 revisions to the 2011 ICE Performance-based National Detention Standards represent a substantial effort to fortify detainee rights and facilities' responsibility to afford access for detainees including those who are limited in their English proficiency (LEP) and detainees with disabilities.[77] These protections include:

- Communication assistance for LEP detainees.

- Language assistance, including bilingual staff or professional interpretation and translation services, to provide LEP detainees with meaningful access to its programs and activities.

- Auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices (TTYs), interpreters, and notetakers, as needed for detainees with disabilities.

- Mobility assistance for physically or visually impaired persons, the infirm and the elderly.

- Other forms of reasonable accommodation.

102.     ICE did not issue any instruction concerning COVID-19 that modified these provisions to accommodate detainees with disabilities and limited English proficiency; therefore, these standards stand as written.

103.     Persons who are limited in their English proficiency (LEP) or have disabilities frequently require more time to complete tasks than do those who do not have these characteristics. One widely recognized method of accommodation is affording LEP individuals additional time.

104.     The use of translation and interpretative services requires more time as each question must be asked and answered in two languages, including the American Sign Language. The additional time for translation alone doubles the time needed, and differences in languages and dialects frequently require additional clarification, extending further the minimum time needed.

105.     The four facilities fail to do so.

---

[77] 2011 Operations Manual ICE Performance-Based National Detention Standards, 2016 Revisions PBNDS, *supra* note 2, Summary of Revisions to the ICE Performance-Based National Detention Standards, December 2016, https://www.ice.gov/detention-standards/2011.

106.    Attorneys who request additional time when scheduling an appointment with clients who will require interpretative services are routinely denied.

107.    In addition to outright denials, there are several other impediments to accommodation.

- In order to litigate Habeas Counsel petitions, legal staff must schedule remote consultations with clients and potential clients, and not in-person meetings, for all the reasons previously cited. Third party interpretation must be coordinated and provided by Habeas Counsel. There is no ability to request a remote legal visit for the weekend or in the evening. There is also no ability to schedule an expedite remote legal visit for any reason.

- When an interpreter is present, there is a tendency on the part of custody staff to remain nearby rendering a confidential visit, non-confidential.

- Detainees in quarantined housing units have less access, and less certain access to remote communication with counsel.

108.    All these conditions fail to comply with ICE Detention Standards. Non-compliance with ICE Detention Standards is also a material breach of the facilities' contracts with ICE. Failure to comply with ICE Detention Standards and facilities' contracts with ICE constitutes failure to comply with the ICE March 27 Memorandum for all dedicated detention facilities and the April 10 Pandemic Response Requirements for all detention facilities housing ICE detainees.

**E.  Failure to Address the Spread of Coronavirus in the Detention Facilities**.

109.    ICE directed all the detention facilities comply with the CDC's Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities to prevent the spread of COVID-19 at their locations.[78] Fundamental to compliance are social-distancing and aggressive sanitation and personal hygiene. Specific to legal visits, the CDC recommends verbal screening of visitors, 60% alcohol-based hand sanitizer availability at visitor entrance and exits, in the waiting areas and visitation rooms, that frequently touched items are cleaned and disinfected several times a day, and that everyone in those areas maintains a distance of 6 feet from one another.[79]

---

[78] CDC, Interim Guidance, *supr*a note 62.
[79] *Id*., p. 13-14.

110. Visiting attorneys report the areas to which they have access – the lobby, waiting areas, restrooms, and visiting rooms – are dirty, hand sanitizer is not available, and social distancing is not enforced. They also report rolling requirements for personal protection equipment – masks, and sometimes, specifically 95-respiratior masks, gloves and gowns – that they must bring with them and wear or they will denied entry. The insistence that the masks be 95-respirator masks, which is not a CDC requirement and often was unavailable for purchase and otherwise held for first responders, is both an arbitrary and highly effective way to impede attorney and detainee access to one another.  Additionally, this was not required of detention staff.

111. Attorneys also expressed concern that the facilities are not disinfecting frequent-touch items as CDC guidelines require, especially the phones that detainees use in their housing units, to call their attorneys and others.

**F. Summary of Violations of Performance-Based National Detention Standards**

112. There are several ICE detention standards that lay out the parameters of Access to Counsel. This analysis concerns four of them. They are Correspondence and Other Mail, Telephone Access, Visitation and Law Libraries and Legal Material. ICE also adopted special provisions in 2016, and applicable to all facilities, to fortify its commitment and rectify compliance with operational issues impacting limited English proficiency detainees and detainees with disabilities.

113. Based on my review of the declarations of SIFI attorneys concerning what is happening on the ground during the COVID-19 pandemic, I conclude that Defendants are likely violating the following standards set forth in the PBNDS:

114. Correspondence and Other Mail. This detention standard ensures detainees shall be able to correspond with their legal representatives, government offices and consular officials. In part, this requires incoming and outgoing mail, with the exception of special correspondence or legal mail, shall be opened to inspect for contraband and to intercept cash, checks and money orders. Correspondence may be delivered by a messenger. Incoming and outgoing letters shall be held for no more than 24 hours and packages no more than 48 hours before distribution, excluding weekends, holidays, or exceptional circumstances. All facilities shall implement policies and procedures addressing acceptable and unacceptable mail. Detainees may receive as correspondence, any material reasonably necessary for the detainee to present their legal claim, in accordance with this standard. When timely communication through mail is not possible, the facility administrator may in their discretion allow for a reasonable amount of communication by means of a facsimile

device between the detainee and their legal representative. ICE ERO and the facilities have failed to meet these requirements.

115.       Telephone Access. This detention standard requires detainees may communicate with legal representatives, consulates, courts, and government agencies by providing them reasonable and equitable access to telephone services. In part, this requires detainees and their legal counsel shall be able to communicate effectively with each other. Privacy for detainee telephone calls regarding legal matters shall be ensured. Telephone access procedures shall foster legal access and confidential communications with attorneys. Telephones shall be maintained in proper working order. Detainees with hearing or speech disabilities shall be granted reasonable accommodations to allow for equal access to telephone services. The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency and reasonable accommodation to avail themselves of this assistance. ICE ERO and the facilities have failed to meet these requirements.

116.       Visitation. This detention standard affirms visits between legal representatives and assistants and an individual detainee are confidential and shall not be subject to auditory supervision. In part, this requires private consultation rooms shall be available for such meetings. Each detainee may meet privately with current or prospective legal representatives and their legal assistants. Each facility shall permit legal visitation seven days a week, including holidays, for a minimum of 8 hours per day on regular business days, Monday through Friday, and a minimum of 4 hours per day on weekends and holidays. In emergency circumstances, facilities may consider requests from legal representatives for extended visits or visits outside normal facility visiting hours. Facility staff shall not be present in the confidential area during the meeting unless the legal representative or legal assistant requests the presence of an officer; however, as long as staff cannot overhear the conversation, staff may observe such meetings visually through a window or camera, to the extent necessary to maintain security. When a situation arises in which private conference rooms are in use and the attorney wishes to meet in a regular or alternate visiting room, the request shall be accommodated to the extent practicable. Such meetings shall be afforded the greatest possible degree of privacy under the circumstances. The facility's written legal visitation procedures must provide for the exchange of documents between a detainee and the legal representative or assistant, even when contact visitation rooms are unavailable. Documents or other written material provided to a detainee during a visit with a legal representative shall be inspected but not read. The facility shall permit messengers who are not legal representatives or legal assistants to deliver documents to and from the facility, but not to visit detainees. Detainees are entitled to retain legal material received for their personal use. ICE ERO and the facilities have failed to meet these requirements.

117.    Law Libraries and Legal Material. This detention standard affirms detainees shall have access to courts and counsel. In part, this requires detainees shall be able to have confidential contact with attorneys and their authorized representatives in person, on the telephone, and through correspondence. It directs the facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency. ICE ERO and the facilities have failed to meet these requirements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day in May 2020, in New York City, NY.

_____

Dora Schriro

# Appendix A

## DORA B. SCHRIRO, Ed.D.  J.D.
### EXECUTIVE EXPERIENCE

*State of Connecticut,* Middletown CT (2014–2018)
**CT Homeland Security Advisor** (2016–2018), DHS clearance, Top Secret, appointed by Gov. Dannel Malloy
**Commissioner**, Department of Emergency Services & Public Protection (2014–2018), appt. by Gov. Malloy
- Responsible for CT State Police, Emergency Management & Homeland Security, Scientific Services, Fire Prevention & Control, Police Officer Standards & Training, Statewide Telecommunications.
- FY2018 operating budget, $185M; federal grants, $348M; bond funding, $79M; 1817 employees
- Public Safety & Service, Homeland Security, and Emergency Response, Recovery & Resiliency
- Accomplishments: 1. Comprehensive procedural justice effort with body-worn cameras, all state police on patrol, civilian complaint process, 21st century curricula for state & local law enforcement, an investigative protocol for officer-involved shootings, annual reports of uses of force, traffic stops & police pursuits, mandatory police agency accreditation, and ICE-interface protocol; 2. Drug intervention & enforcement including a dark-web opioid taskforce, equipping all troopers and training first responders to administer naloxone; 3. Other harm reduction efforts including a multi-jurisdictional cybersecurity investigative unit, comprehensive gun control, community-focused active shooter preparedness, wrap-around DV safety & support, K-12 & post-secondary school safety planning, and Ebola & Zika first responder protocols

*City of New York,* New York, New York (2009–2014)
**Commissioner**, New York City Department of Correction, appointed by Mayor Michael Bloomberg
- Responsible for adult detention, prisoner processing, and operation of criminal court pens, an average of 12,000 inmates daily and 100,000 pretrial and city-sentenced inmate admissions annually
- FY2014 operating budget, $1.065B, capital budget, $691.9M; 10,440 employees
- Focus: Special Populations; Intake, Classification and Discharge Planning; Staff Accountability; Alternatives to Disciplinary Segregation; Alternatives to Detention
- Accomplishments: 1st U.S. Social Impact Bond funded program, adolescent pre-release initiative; Justice Reinvestment funded pre-release preparation for adults; pre-trial & post-plea diversion for the mentally ill; comprehensive reform of disciplinary segregation with clinical alternatives for special populations; centralized intake with risk & needs classification, gang identification, and discharge planning

*US Department of Homeland Security,* Washington DC (2009–2009)
**Senior Advisor to Secretary on ICE Detention and Removal**, appointed by DHS Sec. Janet Napolitano
**Director, ICE Office of Detention Policy and Planning,** appointed by ICE Asst. Sec. John Morton
- Focus: Design a civil detention system satisfying all safety and security needs and legal requirements
- Authored, *2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform*, DHS' adopted template for improving the operation of immigration detention
- Improved the efficiency and effectiveness and increased the transparency of ICE detention operations

*State of Arizona,* Phoenix, Arizona (2003–2009)
**Department Director**, Arizona Department of Corrections, appointed by Gov. Janet Napolitano
- Responsible for adult corrections and community supervision including 39,000 inmates and 7,200 parolees daily and 55,000 felons annually (21,000 admissions/11,500 case openings)
- FY2009 operating budget, $1.23B; 9,750 employees
- Focus: Systems reform, re-entry, victim services, strategic planning, privatization oversight
- Winner, 2008 Innovations in American Government, and first prison-based reform awards recipient

Dora B. Schriro, Ed.D. J.D.
Page 2

*City of St. Louis*, St. Louis, Missouri (2001–2003)

**Commissioner of Corrections**, St. Louis City Division of Corrections, appointed by Mayor Francis Slay

- Responsible for adult detention, prisoner processing, and city probation and parole including 1,500 jail inmates and 2,000 offenders on supervision daily (9,000 admissions/63,000 bookings annually)
- FY2003 operating budget, $68M; 615 employees
- Focus: Population management, alternative sentencing initiatives, staff development
- Opened and operated the city's first combined police prisoner processing and detention center

*State of Missouri*, Jefferson City, Missouri (1993–2001)

**Department Director**, Missouri Department of Corrections, appointed by Gov. Mel Carnahan

- Responsible for adult corrections and probation and parole services including 28,000 prisoners and 65,000 offenders on community supervision daily, 35,000 admissions/72,000 case openings annually
- FY2002 operating budget, $500M; 11,000 employees
- Focus: Systems and sentencing reform, litigation reduction, restorative justice, capital construction
- Winner, Council of State Governments Innovations award program; four-time Innovations in American Government Finalist and Semi-Finalist

*City of St. Louis*, St. Louis Missouri (1989–1993)

**Correctional Superintendent**, St. Louis City Division of Correction, appointed by Mayor Vince Schoemehl

- Responsible for 600 pre-trial and city sentenced inmates, 4,000 admissions annually
- FY1993 operating budget, $26M; 210 employees
- Focus: Court oversight, overcrowding, certified juveniles, community relations

*City of New York*, New York, New York (1984–1989)

**Assistant Commissioner**, New York City Department of Correction, appointed by Mayor Ed Koch

- Responsible for design and delivery of inmate programs services, programs development, grants
- Services provided to 100,000 pre-trial and city sentenced inmates annually by 200 employees
- Focus: Public-funded and accredited education, school-aged inmates; contracts management

**Assistant Deputy Director**, Office of the Mayor, Coordinator of Criminal Justice

- Grants administration, federal and state funded systems reforms, $189M annually
- Focus: Alternatives to detention, intermediate sanctions, policy analysis, applied research

## CONSULTING SERVICES

Dora B. Schriro Consulting Services, LLC (est. 2013)

## EDUCATION

St. Louis University, St. Louis, Missouri, Juris Doctorate, School of Law (2002)
Columbia University, New York, New York, Doctor of Education, Teachers College (1984)
University of Massachusetts at Boston, Massachusetts, Master of Education (1980)
Northeastern University, Boston, Massachusetts, Bachelor of Arts cum laude (1972)

## MANAGERIAL PROGRAMS

Council of State Governments, Toll Fellowship (2018)
Harvard University, JFK School of Government, Innovations in Governance (2005)
Harvard University, JFK School of Government, Strategic Public Sector Negotiations (1996)
Harvard University, JFK School of Government, Senior Executives in State and Local Government (1992)

Dora B. Schriro, Ed.D. J.D.
Page 3
## HONORS AND AWARDS, INNOVATIONS

Innovations in American Government, 2008 Winner, Getting Ready: Keeping Communities Safe
Innovations in American Government, 2000 Semi-finalist, Correcting Corrections
Innovations in American Government, 1999 Semi-finalist, Constituent Services
Innovations in American Government, 1998 Semi-finalist, Pre-Promotional Training
Innovations in American Government, 1997 Finalist, Constituent Services
Council of State Governments, 1998 Innovations Award Winner, Waste Tire to Energy
Council of State Governments, 1997 Innovations Award Regional Finalist, Pre-Promotional Training
Council of State Governments, 1996 Innovations Award Finalist, Constituent Services

## OTHER HONORS AND AWARDS

U.S. Department of Justice, Office for Victims of Crime, Allied Professional Award, 2012
Florida Immigrant Advocacy Center, American Justice Award, 2011
Hofstra University (Hempstead, New York) Presidential Medal, 2010
National Governors Association, Distinguished Service to State Government Award, 2006
Arizona Parents of Murdered Children, Filling Empty Shoes, 2006 Honoree
Farmingdale Public Schools (Farmingdale, New York), Wall of Fame, 2001 Inductee
St. Louis Forum, Trailblazer Award, 2000
Association of Correctional Administrators, Michael Francke Award for Outstanding Leadership, 1999
Jefferson City (Missouri) Ten Most Influential Women, 1998
Missouri Governor Award for Quality and Productivity, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000
Missouri Governor Torch of Excellence Gold Award, 1999
Missouri Governor Torch of Excellence Award, 1997
International Association of Correctional Training Personnel Award, Pre-Promotional Training, 1996
Women's Self-Help Center, Twenty Distinguished Women, 1996
St. Louis (Missouri) YWCA Special Leadership Award for a Government Official, 1995
Jefferson City (Missouri) News Tribune Statesman of the Month, June 1995

## PUBLICATIONS, IMMIGRATION DETENTION REFORM

*Weeping in the Playtime of Others: The Obama Administration's Failed Reform of ICE Family Detention Practices*, in Journal on Migration and Human Security, The Law that Begot the Modern U.S. immigration Enforcement System: IIRIRA 20 Years Later (December 2018)
*Women and Children First: An Inside Look at the Impediments to Reforming Family Detention in the U.S.*, in Challenging Immigration Detention, ed. by Flynn and Flynn. Edward Elgar Publishing (September 2017)
*Afterword, Intimate Economies, Anomie and Moral Ambiguity*, in Intimate Economies of Immigration Detention: Critical Perspectives, ed. by Conlon and Hiemstra. Routledge Publishers (2016)
*Improving Conditions of Confinement for Immigrant Detainees: Guideposts toward a Civil System of Civil Detention* in The New Deportation Delirium, ed. by Kanstroom and Lykes. NYU Press (2015)
*Family Immigration Detention: The Past Cannot be Prologue*, co-author, ABA Commission on Immigration (2015)
*Envisioning a Civil System of Civil Detention: Our Opportunity, Our Challenge* (Foreword), in Outside Justice, ed. by Brotherton, Stageman and Leyro. Springer Press (2013)
Improving Conditions of Confinement for Criminal Inmates and Immigrant Detainees, American Criminal Law Review, Georgetown University Law Center (Fall 2010)
The 2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform, U.S. Department of Homeland Security (October 2009)
Rethinking Civil Detention and Supervision, Arizona Attorney (July–August 2009)

Dora B. Schriro, Ed.D. J.D.
Page 4

## PUBLICATIONS, CORRECTIONS REFORM

*Smart and Safe: Making the Most of Adolescents' Time in Detention, the Physical Plant, Our Workforce, and the "What Works' Literature,* in The State of Criminal Justice, American Bar Association (2013)

*Corrections: The Justice-Involved Mentally Ill, A Practitioner's Perspective,* in The State of Criminal Justice, American Bar Association (2012)

*Good Science, Good Sense: Making Meaningful Change Happen – A Practitioner's Perspective,* Criminology & Public Policy, Vol. 11, No. 1, Special Issue (February 2012)

*Is Good Time a Good Idea?* Federal Sentencing Reporter, Vol. 21, No. 3 (February 2009)

*Correcting Corrections: The Arizona Plan: Creating Conditions for Positive Change in Corrections,* Confronting Confinement: A Report of the Commission on Safety and Abuse in American Prisons (2006)

*Missouri's Parallel Universe: Blueprint for Effective Prison Management,* Corrections Today (April 2001)

*Correcting Corrections: Missouri's Parallel Universe,* Papers from the Executive Sessions on Sentencing and Corrections, U.S. Department of Justice, Office of Justice Programs (May 2000)

*Avoiding Inmate Litigation: The 'Show-Me' State Shows How,* Sheriff's Magazine, (March–April 1999)

*Best Practices: Excellence in Corrections,* American Correctional Association (August 1998)

*Reducing Inmate Litigation,* Corrections Today (August 1998)

Corrections Management Quarterly, Issue Editor, Aspen Publications (1997)

Currents, Leadership St. Louis, Danforth Foundation (1992)

*What Makes Correctional Education Educational,* Journal of Correctional Education (September 1986)

Safe Schools, Sound Schools, ERIC Clearinghouse on Urban Education (January 1985)

*What Works with Serious Juvenile Offenders: US Experience,* Juvenile Delinquency in Australia (1984)

What Makes Correctional Education Educational: Ethnography of an Instructionally Effective School, University Microfilm (1983)


## STANDARDS, SENTENCING AND RELATED CIVIL-CRIMINAL JUSTICE REFORM ACTIVITIES

Women's Refugee Commission, Commissioner (2012–2020)

American Bar Association, Commission on Immigration, Special Advisor (2019–2020)

American Bar Association, Commission on Immigration, Advisory Board Member (2017–2019)

American Bar Association, Commission on Immigration, Standards for the Custody, Placement and Care; Legal Representation, and Adjudication of Unaccompanied Alien Children in the United States (2018)

U.S. Dept. of Homeland Security, DHS Family Residential Ctr. Advisory Committee, member (2015–2016)

American Bar Association, Commission on Immigration, Commissioner (2014–2016)

American Bar Association, Commission on Immigration, Co-chair, Standing Subcommittee on Punitive Segregation, (2012–2014)

American Bar Association, Commission on Immigration, Civil Detention Standards Task Force (2011–2012)

American Bar Association, Criminal Justice Standards Subcommittee, ACA representative (2005–2008)

Arizona State University School of Law, Sentencing Policy Seminar (2004–2005)

Arizona Attorney General Sentencing Advisory Committee (2004–2008)

St. Louis University School of Law, Instructor, Sentencing Policy Seminar (2000–2002)

Missouri Sentencing Advisory Commission, Vice Chair (1994–2001)

U.S. Department of Justice Executive Sessions on Sentencing and Corrections, in conjunction with Harvard University JFK School of Government and University of Minnesota Law School (1997–2000)

Partnership for Criminal Justice Workshop, Institute on Criminal Justice, University of Minnesota Law School, State Partner (1997–2000)

State Sentencing and Corrections Program, Vera Institute of Justice, National Associate (1999–2002)

U.S. Dept. of Justice, Bureau of Justice Assist., Discretionary Grant Program, Peer Reviewer (1994–2002)

Dora B. Schriro, Ed.D. J.D.
Page 5

## PRE-DOCTORAL EMPLOYMENT, LECTURING AND RELATED EXPERIENCE

Employment
- Executive Director, Planned Parenthood of Bergen County, Hackensack, New Jersey (1983–1984)
- Director, Correctional Education Consortium, Long Island City, New York (1982–1983)
- Supervising Social Worker, Franklin Public Schools, Franklin, Massachusetts (1978–1981)
- Director, Adult and Continuing Education, Franklin Public Schools, Franklin, MA (1978–1981)
- Director, Staff Development, Wrentham State School, Wrentham, Massachusetts (1977–1978)
- Program Administrator, Medfield-Norfolk Prison Project, Medfield, Massachusetts (1974–1976)

Academic Experience
- Instructor, Arizona State University School of Law, Corrections Law Seminar (2005–2008)
- Instructor, St. Louis University School of Law, Sentencing Policy (2000–2002)
- Senior Policy Fellow, Public Policy Research Center, University of Missouri-St. Louis (2001)
- Visiting Lecturer, Strategic Planning, National Institute of Corrections (1998–2002)
- Adjunct Professor, Criminal Justice, University of Missouri-St. Louis (1990–1998)
- Adjunct Professor, Criminal Justice, Long Island University at CW Post (1986–1988)
- Instructor, Innovation, Open Center of New York City (1987)
- Teaching Assistant, Field Research Methodology, Administrative Intern to the School Superintendent, Franklin Public Schools, Franklin, Massachusetts (1979)
- Visiting Lecturer, Special Education, Framingham State College, Framingham, Massachusetts (1979)
- Adjunct Professor, Psychology, Fischer Junior College, Boston, Massachusetts (1978)

Related Activities
- Institutional Research Board, St. Louis University (2002–2003)
- Institutional Research Board, University of Missouri-St. Louis (2001–2003)

**Contact information**:

611 King Avenue
City Island, NY 10464
917-710-7029
dora.schriro@gmail.com

Professional References available upon request

# Appendix B

Appendix B

**Access to Counsel, Key ICE Performance-Based National Detention Standards Indicators**

I.  ICE National Detention Standards delineate the immigration detainee's Access to Counsel. ICE's contract or written agreement with its detention providers including its enforcement provisions, is the means by which ICE procures and ensures provision of these critical activities is provided to the population. ICE Performance-Based National Detention Standards prescribe both the expected outcomes of each detention standard and the expected practices required to achieve them. This summary is based on the 2011 Performance-Based National Detention Standards (revised 2016).

II. There are two standards in their entirety that address access to counsel. They are: 6.3 Law Libraries and Legal Material, and 6.4 Legal Rights Group Presentations.

1.  6.3 Law Libraries and Legal Material. The purpose of this detention standard is to protect detainees' rights by ensuring their access to courts, counsel and comprehensive legal materials.

    a.  Key ICE Performance-Based Compliance Indicators, Law Libraries and Legal Material.
        i.    Detainees shall have access to courts and counsel.
        ii.   Detainees shall be able to have confidential contact with attorneys and their authorized representatives in person, on the telephone and through correspondence.
        iii.  Special scheduling consideration shall be given to detainees facing deadlines or time constraints.

    b.  COVID-19 Modifications to Law Libraries and Legal Material. ICE recommended facilities extend law library hours of operation and stagger detainee access to reduce social distancing.[1]

2.  6.4 Legal Rights Group Presentations. The purpose of this detention standard is to protect detainees' rights by providing all detainees' access to information presented by authorized persons and organizations for the purpose of informing them of U.S. immigration law and procedures.

    a.  Key ICE Performance-Based Compliance Indicators, Legal Rights Group Presentations.
        i.    Detainees shall have access to group presentations on U.S. immigration law and procedures and all other relevant issues related to the immigration court, appeals and removal processes, including a detainee's legal rights.

---

[1] ERO COVID-19 PRR, *supra* note 62.

Appendix B

        ii.     Detainees shall be able to communicate and correspond with representatives from the legal groups that make presentations at the facilities.

        iii.    Detainees shall have access to information and materials provided by legal groups. Organizations shall be permitted to distribute information in response to specific legal inquiries.

    b.     <u>COVID-19 Modifications to Legal Rights Group Presentations</u>. ICE suspended all legal orientation programs except for Department of Justice-funded presentations provided at a limited number of detention facilities.[2]

III. There are three additional detention standards with portions addressing access to counsel. They are: 5.1 Correspondence and Other Mail, 5.6 Telephone Access, and 5.7 Visitation.

    1.    <u>5.1 Correspondence and Other Mail</u>. The purpose of this standard is to ensure that detainees shall be able to correspond with legal representatives, embassies and consulates consistent with the facility's safe and orderly operation.

        a.    Key ICE Compliance Indicators, Correspondence and Other Mail.

          i.     Detainees shall be able to correspond with their families, the community, legal representatives, government offices and consular officials.

          ii.    Incoming and outgoing mail, with the exception of special correspondence or legal mail, shall be opened to inspect for contraband and to intercept cash, checks and money orders.

          iii.   Detainees shall be permitted to send special correspondence or legal mail to a specified class of persons and organizations, and incoming mail from these persons shall be opened only in the presence of the detainees (unless waived) to check for contraband (except when contamination is suspected).

          iv.   Incoming and outgoing letters shall be held for no more than 24 hours and packages no more than 48 hours before distribution, excluding weekends, holidays, or exceptional circumstances.

          v.    All facilities shall implement policies and procedures addressing acceptable and non-acceptable mail. Detainees may receive as correspondence any material reasonably necessary for the detainee to present their legal claim, in accordance with this standard.

          vi.   When timely communication through the mail is not possible, the facility administrator may in their discretion allow for a reasonable amount of communication by means of facsimile device between the detainee and his/her designated legal representatives.

---

[2] March 27 ICE Memorandum, *supra* note 53.

Appendix B

      b. <u>COVID-19 Modifications to Correspondence and Other Mail</u>. There are none.

2. <u>5.6 Telephone Access</u>. The purpose of this detention standard is to ensure that detainees may maintain ties with their families and others in the community, legal representatives, consulates, courts and government agencies by providing them reasonable and equitable access to telephone services.

      a. Key ICE Compliance Indicators, Telephone Access.

          i. Detainees and their legal counsel shall be able to communicate effectively with each other.

          ii. Privacy for detainee telephone calls regarding legal matters shall be ensured.

          iii. Telephone access procedures shall foster legal access and confidential communications.

          iv. Detainees with hearing or speech disabilities shall be granted reasonable accommodations to allow for equal access to telephone services.

          v. Telephones shall be maintained in proper working order.

          vi. Detainees shall be able to make free calls to the ICE/ERO-provided list of free legal service providers for the purpose of obtaining initial legal representation, to consular officials, the DHS OIG, and the ICE Office of Professional Responsibility Joint Intake Center.

          vii. Indigent detainees, who are representing themselves pro se, shall be permitted free calls on an as-needed basis to family or other individuals assisting with the detainee's immigration proceedings.

      b. <u>COVID-19 Modifications to Telephone Access</u>. ICE directed facilities to ensure all detainees are able to make calls to its list of free legal service providers and consulates at no charge to the detainee or the receiving party.[3]

3. <u>5.7 Visitation</u>. The purpose of this detention standard is to ensure that detainees shall be able to maintain morale and ties through visitation with their families, the community, legal representatives and consular officials, within the constraints of the safety, security and good order of the facility.

      a. Key ICE Compliance Indicators, Visitation.

          i. Detainees shall be able to receive visits from legal representatives, consular officials, and others.

---

[3] Effective March 13, ICE suspended social visitation until further notice to offset its impact. ICE "requested" the facilities maximize detainee phones, video visitation (e.g., Skype, FaceTime), email, and/or tablets with extended hours where possible. It also requested facilities make a "timely effort" to identify indigent detainees and afford them the same telephone access and related privileges. ICE provided no guidance how to accommodate increased demand for family/social and legal communication and contact.

Appendix B

      ii.      Visits between legal representatives and assistants and the detainee confidential and shall not be subject to auditory supervision. Private consultation rooms shall be available for such meetings.

      iii.    Each facility shall permit legal visitation seven days a week, including holidays, for a minimum of eight hours per day on regular business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays. The facility shall provide notification.

      iv.    In visits referred to as legal visitation, each detainee may meet privately with current or prospective legal representatives and their legal assistants. Legal visits may not be terminated for routine official counts.

      v.     In emergency circumstances, facilities may consider requests from legal representatives for extended visits or visits outside normal facility visiting hours.

      vi.    Persons allowed to visit include attorneys and other legal representatives, legal assistants, and translators and interpreters. Additionally, the facility shall permit messengers who are not legal representatives or legal assistants to deliver documents to and from the facility, but not to visit detainees.

b. <u>COVID-19 Modifications to Visitation.</u> The March 27 Memorandum directed non-contact legal visitation (e.g., Skype or teleconference) should be offered first to limit exposure to ICE detainees but in-person contact visitation should be permitted if determined essential by the legal representative. Prior to the in-person visit, the legal representative must undergo the same medical screening required for staff entry into the facility. The ultimate legal visit approving authority lies with the Warden or Facility Administrator; however, the facility should notify its local Field Office Director as soon as possible of any denied legal visits.[4]

The ERO COVID-19 PRR added, ICE continues to explore opportunities to enhance attorney access while legal visits are impacted.[5] For facilities at which immigration hearings are conducted or where detainees are otherwise held who have cases pending immigration proceedings, this may include:

i.    Adding attorneys of record to the Talton Pro-bono platform.

ii.   Requiring facilities to establish a process for detainees/immigration attorneys to schedule appointments and facilitate the calls.

iii.  Leveraging technology to facilitate attorney/client communication.

iv.  Working with detention contractors and telephone service providers to ensure all detainees receive "some number" of free calls per week.

The PRR also directed that there by communication with the public about any changes to facility operations including visitation programs. Facilities were encouraged to prohibit

---

[4] March 27 Memorandum, *supra* note 53.
[5] ERO COVID-19 PRR, *supra* note 62.

Appendix B

or, at a minimum, significantly adopt restricted visitation programs." ICE's meaning is unclear. Social visitation was suspended indefinitely effective March 13.

IV. ICE national detention standards also address accommodations for detainees with disabilities and limited English proficiency to partake of mandated activities including access to counsel.

1.  The facility shall provide communication assistance to detainees with disabilities and detainees who are limited in their English proficiency (LEP).

2.  The facility will provide detainees with disabilities with effective communication, which may include the provision of auxiliary aids, such as readers, materials in Braille, audio recordings, telephone handset amplifiers, telephones compatible with hearing aids, telecommunications devices for deaf persons (TTYs), interpreters, and notetakers, as needed.

3.  The facility will also provide detainees who have limited English proficiency (LEP) with language assistance, including bilingual staff or professional interpretation and translation services, to provide them with meaningful access to its programs and activities.

4.  There are no COVID-19 modifications to provisions to address accommodations for detainees with disabilities and limited English proficiency.