**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SOUTHERN POVERTY LAW CENTER,<br>　　　　Plaintiff,<br><br>　　v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY, *et al.*,<br>　　　　Defendants. | Civil Action No. 18-760 (CKK) |

**MEMORANDUM OPINION**
(June 17, 2020)

This case concerns detained immigrants' access to legal counsel and conditions of confinement in relation to four Immigration and Customs Enforcement ("ICE") detention facilities: LaSalle ICE Processing Center in Jena, Louisiana ("LaSalle"); Pine Prairie ICE Processing Center in Pine Prairie, Louisiana ("Pine Prairie"); Irwin County Detention Center in Ocilla, Georgia ("Irwin"); and Stewart Detention Center in Lumpkin, Georgia ("Stewart") (collectively, "the Facilities"). Pl.'s Second Am. Compl., ECF No. 70, ¶ 13. Plaintiff Southern Poverty Law Center ("SPLC") is an organization that provides representation for detained persons at these four Facilities. Recently, Plaintiff's efforts have focused on assisting detained individuals seeking to be released into the community due to the emergence and spread of COVID-19. Pending before the Court is Plaintiff's Motion for a Temporary Restraining Order, ECF No. 105.

Plaintiff argues that the Facilities' reactions to the COVID-19 pandemic violate Plaintiff's clients' rights to access counsel and substantive due process rights under the Fifth Amendment. Plaintiff seeks a temporary restraining order "directing Defendants to remove access barriers and remedy the dangerously punitive conditions at the four detention facilities at issue in this case." Pl.'s Mot. for Temp. Restraining Order at 1. In response, Defendants argue that Plaintiff lacks

1

standing, that this Court lacks subject-matter jurisdiction, and that Plaintiff does not satisfy the standard for a temporary restraining order and that, in particular, it has not shown a likelihood of success on the merits for either of its claims.  Upon consideration of the briefing,[1] the relevant authorities, and the record, the Court **GRANTS-IN-PART and DENIES-IN-PART** Plaintiff's Motion for a Temporary Restraining Order.

## I. EXECUTIVE SUMMARY

In this Memorandum Opinion, the Court first finds that Plaintiff has sufficiently demonstrated third-party standing and that there is subject-matter jurisdiction over its conditions of confinement claim.   As for standing, Plaintiff has established an injury in fact.  The policies and procedures at the Facilities have forced Plaintiff to divert resources and have thwarted its organizational mission, which includes providing legal representation to detained individuals at these Facilities, especially clients seeking to be released into the community in light of COVID-19.  *See infra* Section IV.A at 23–31.  The Court further finds that it has subject-matter jurisdiction over Plaintiff's conditions of confinement claim because the Immigration and Nationality Act's

---

[1] The Court's consideration has focused on the following:
- Pl.'s Mot. for a Temp. Restraining Order ("Pl.'s Mot."), ECF No. 105;
- Pl.'s Mem. of P. & A. in Supp. of Its Mot. for a Temp. Restraining Order ("Pl.'s Mem."), ECF No. 105-1;
- Notice of Supplementation to Pl.'s Mot. for a Temp. Restraining Order ("Pl.'s Suppl."), ECF No. 108;
- Defs.' Corrected Opp'n to Pl.'s Mot. for Temp. Restraining Order ("Defs.' Opp'n"), ECF No. 112;
- Pl.'s Reply in Supp. of Mot. for a Temp. Restraining Order ("Pl.'s Reply"), ECF No. 113; and
- Pl.'s Notice of Suppl. Authority ("Pl.'s Suppl. Notice"), ECF No. 119.

On June 16, 2020, Plaintiff also filed an additional Notice of Supplemental Facts, ECF No. 120, with two attached declarations, in which Plaintiff claimed that the restrictions at issue in this Memorandum Opinion were still ongoing.  However, the Court does not rely upon this Notice of Supplemental Facts in this Memorandum Opinion.   In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision.  *See* LCvR 7(f).

zipper clause, 8 U.S.C. § 1252(b)(9), does not extend to claims collateral to the removal process for which judicial review of the final order of removal may be ineffective or too late. Plaintiff's conditions of confinement claim falls into this category of collateral claims and is therefore reviewable at this juncture. *See infra* Section IV.B at 31–37.

The Court then concludes that Plaintiff has satisfied the requirements for a temporary restraining order for its conditions of confinement claim. First, the Court finds that Plaintiff has a likelihood of success on the merits for that claim: The conditions and restrictions that Plaintiff raises are likely punitive in violation of the Fifth Amendment. Defendants' apparent alternative to remote legal visitation—in-person legal visitation with certain precautions—is not a less harsh alternative to the conditions and restrictions placed on remote legal visitation. Due to the emergence and spread of COVID-19, in-person legal visitation is no longer viable as a primary vehicle of communication between legal representatives and detained individuals at these Facilities. *See infra* Section IV.C at 38–45.

Instead, out of necessity, remote legal communications and visits have become the primary method through which detained individuals may confer with legal representatives. But Defendants' response to this development with respect to increasing the capacity and possibilities for remote legal visitation and communication has been inadequate and insufficient. Moreover, the restrictions on and conditions relating to remote legal visitation and communication are disproportionate to Defendants' non-punitive governmental objectives and appear to be more restrictive than standards promulgated for criminal detainees. *See infra* Section IV.C at 46–70. The Court further finds that Plaintiff has shown that there will be irreparable harm without preliminary relief and that the balance of hardships and public interest weigh in favor of issuing temporary injunctive relief. *See infra* Section IV.C at 70–74.

Lastly, the Court describes the specific relief granted.  In broad strokes, the Court orders that Defendants shall comply with the optimal-level requirements of the Performance-Based National Detention Standards related to calls and video-teleconferences; shall ensure that the telephones, video-teleconference systems, and other devices used to access legal representatives are in good working order and shall designate points of contact at the Facilities for related issues; shall ensure that attorney–client confidentiality be maintained on legal calls and video-teleconferences; shall devise, implement, and advertise procedures for scheduling and accessing calls and video-teleconferences and shall designate points of contact at the Facilities for related questions and issues; shall comply with the CDC Interim Guidance with respect to the cleaning of devices and spaces used for legal calls and video-teleconferences; shall create, implement, and advertise procedures through which detained individuals and legal representatives may exchange confidential legal documents electronically and shall designate points of contact at the Facilities for related questions and issues; and shall train staff at the Facilities on the aforementioned procedures. *See infra* Section IV.D at 74–77.

## II. BACKGROUND

### A.  Procedural History and the Pending Motion

On April 4, 2018, Plaintiff commenced this lawsuit against Defendants, the United States Department of Homeland Security ("DHS") and the United States Immigration and Customs Enforcement ("ICE"), as well as various DHS and ICE officials, to challenge the constitutionality of Defendants' alleged failure to provide adequate access to legal counsel and courts for detained immigrants.  Pl.'s Mem. at 1.  In May 2018, Plaintiff filed a preliminary injunction to "resolve urgent access issues" at LaSalle, and in August 2018, the parties reached a mediated agreement. *Id.* at 4. In May 2019, this Court denied Defendants' motion to sever and transfer the pending case,

declining to sever the lawsuit into three separate actions and holding that "the interests of justice d[id] not warrant transfer of the unsevered case to a different forum." *S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-760 CKK, 2019 WL 2077120, at *4 (D.D.C. May 10, 2019). Plaintiff consequently amended its complaint and the parties commenced discovery.  Pl.'s Mem. at 4.

Certain detained immigrants at the four Defendant Facilities in this suit have also recently been involved in a class action challenging the hygiene conditions at the Facilities in the wake of COVID-19, *Fraihat v. U.S. Immigration & Customs Enforcement*, No. EDCV 19-1546 JGB, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020).  The court there issued preliminary relief and found that the plaintiffs were likely to succeed on the merits of one or more of their claims, which included "punitive conditions of confinement, in violation of the Fifth Amendment." *Id.* at *21, 25.  During a pandemic such as COVID-19, the court found, "it is likely punitive for a civil detention administrator to fail to mandate compliance with widely accepted hygiene, protective equipment, and distancing measures until the peak of the pandemic, and to fail to take similar systemwide actions as jails and prisons." *Id.* at *25.  Moreover, "the protective actions taken by comparable prison and jail administrators [had] been as favorable or more favorable than [the] Defendants'." *Id.*

On May 7, 2020, Plaintiff filed the pending Motion for a Temporary Restraining Order, seeking to compel Defendants into lifting certain restrictions and/or removing barriers that they claim are punitive and unreasonably limit their clients' access to legal counsel during the COVID-19 pandemic at the Facilities.  Pl.'s Mem. at 1; *see also* Pl.'s Mot.  Their arguments hinge on two different arguments or claims: first, that the conditions at the Facilities violate their clients' right to counsel; and second, that the conditions are punitive in violation of their clients' substantive

due process rights.  *See* Pl.'s Mem.  In support of its motion seeking a TRO and its reply to Defendants' motion in opposition, Plaintiff submitted the following declarations:

- Declaration of Aristoteles Sanchez Martinez ("Sanchez Martinez Decl."), ECF No. 105-2;

- Declaration of Benjamin Osorio ("Osorio Decl."), ECF No. 105-3;

- Declaration of Dr. Dora Schriro ("Schriro Decl."), ECF No. 105-4;

- Declaration of Homer Venters ("Venters Decl."), ECF No. 105-5;[2]

- Declaration of Homero López, Jr. ("López Decl."), ECF No. 105-6;

- Declaration of Laura G. Rivera ("Rivera Decl."), ECF No. 105-7;

- Declaration of Lorilei Williams ("Williams Decl."), ECF No. 105-8;

- Declaration of Shalini Goel Agarwal ("Agarwal Decl."), ECF No. 105-9;

- Supplemental Declaration of Shalini Goel Agarwal ("Supp. Agarwal Decl."), ECF No. 108-1; and

- Supplemental Declaration of Laura G. Rivera ("Supp. Rivera Decl."), ECF No. 108-2.

In response, Defendants argue that Plaintiff lacks standing, that this Court lacks subject-matter jurisdiction, and that Plaintiff cannot meet the applicable TRO standard for both its claims. *See* Defs.' Opp'n.  In support of its motion in opposition to Plaintiff's motion, Defendants

---

[2] Defendants note that Plaintiff did not include Dr. Venters' curriculum vitae and statement of compensation from his report. Defs.' Opp'n at 26 n.3.  Defendants also appear to object to parts of Plaintiff's declarations as "double hearsay." *Id.* at 43.  However, whether to grant preliminary relief is frequently based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  "Following this principle, courts generally permit consideration of hearsay evidence in connection with preliminary injunction motions." *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145, 155 (D.D.C.), *vacated and remanded on other grounds*, 493 F. App'x 108 (D.C. Cir. 2012).

submitted the following declarations:

- Declaration of Officer in Charge John Bretz ("Bretz Decl."), ECF No. 112-7;

- Declaration of Gary W. Chambarlain, Jr. ("Chambarlain Decl."), ECF No. 112-8;

- Declaration of Russell Hott ("Hott Decl."), ECF No. 112-9;

- Declaration of Tracy Moten ("Moten Decl."), ECF No. 112-10;

- Declaration of Assistant Field Office Director Patrick Musante ("Musante Decl."), ECF No. 112-11;

- Second Declaration of Patrick Musante ("Second Musante Decl."), ECF No. 112-12;

- Declaration of David Paulk ("Paulk Decl."), ECF No. 112-13;

- Second Declaration of David Paulk ("Second Paulk Decl."), ECF No. 112-14;

- Declaration of Matthew W. Reaves ("Reaves Decl."), ECF No. 112-15;

- Declaration of Facility Administrator Shad Rice ("Rice Decl."), ECF No. 112-16;

- Declaration of Facility Administrator Eric Staiger ("Staiger Decl."), ECF No. 112-17;

- Declaration of Russell Washburn ("First Washburn Decl."), ECF No. 112-18;

- Second Declaration of Russell Washburn ("Second Washburn Decl."), ECF No. 112-19;

- Third Declaration of Russell Washburn ("Third Washburn Decl."), ECF No. 112-20; and

- Fourth Declaration of Russell Washburn ("Fourth Washburn Decl."), ECF No. 112-21.

**B.  COVID-19 Pandemic and Relevant Related Litigation**

The novel coronavirus, COVID-19, is a disease that has led to a global pandemic.  *See* World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.  As of June 16, 2020, 7.94 million individuals have been infected worldwide, including 2.07 million people in the United States, of whom 115,484 have died.   World Health Org., *Situation Report–148* (June 16, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200616-covid-19-sitrep-148-draft.pdf?sfvrsn=9b2015e9_2.  On March 23, 2020, the Centers for Disease Control and Prevention ("CDC") released the Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Interim Guidance").  *See* Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (last visited June 17, 2020).  Furthermore, as of June 16, 2020, the entire population of ICE detention facilities is 24,713, and the number of detained individuals tested for COVID-19 is 7,364, of whom a total of 2,110 have tested positive as of June 17, 2020, while in ICE custody since testing began in February 2020.  ICE Guidance on COVID-19, *ICE Detainee Statistics*, https://www.ice.gov/coronavirus#citations (last updated June 17, 2020).

**C.  Defendants' Response to COVID-19 in This Case**

Defendants represent that, in response to the COVID-19 pandemic, they have implemented various protocols and safety precautions in order to reduce the risk of spreading the virus.  Defs.' Opp'n at 5.  These protocols include mandating the use of PPE for in-person attorney–client

meetings, as well as expanding the hours for remote consultations via video-teleconferencing ("VTC").  *Id.*

### 1. Stewart Detention Center

Defendants represent that Stewart has taken various steps to protect its detained immigrants, staff, and visitors during COVID-19.  *Id.* at 10.  First, though Stewart has the capacity to house 2,040 ICE detained immigrants, Defendants claim that as of May 15, 2020, Stewart's detained population is 1,129.  *Id.*; *see also* Second Washburn Decl. ¶ 5.  This number represents the facility's efforts to promote social distancing, as it previously housed 1,681 detained individuals on March 18, 2020.  Defs.' Opp'n at 10; *see also* Moten Decl. ¶ 19.  Second, "vulnerable detainees" are placed in "protective cohorts" to limit the contact between these individuals and the general population at the facility.  Defs.' Opp'n at 11.  These cohorts, or "units," are in a protective area, supported by a team of nurses, providers, and security.  *Id.*  In addition, Stewart created a "daily COVID-19 checklist," with the purpose of ensuring that each facility supervisor is kept updated as to new developments, is speaking with staff and detained individuals about the appropriate precautions, is encouraging any staff member or detained individual to seek medical care if they are experiencing symptoms, is engaging in educational efforts with its staff and detained individuals, is confirming the number of necessary materials and supplies, and is conducting daily sanitation inspections in their delegated areas.  *Id.*

With respect to in-person visitations, all attorneys are screened for COVID-19 symptoms prior to entrance to Stewart.  *Id.* at 12.  This includes filling out a medical questionnaire and completing a temperature check in accordance with the CDC Interim Guidance.  *Id.*; *see also* First Washburn Decl. ¶ 16.  If attorneys do not bring their own PPE, then the facility will provide it to them, free of charge.  Defs.' Opp'n at 13; *see also* Fourth Washburn Decl. ¶ 32.  Defendants claim

that in-person visits do occur at Stewart, taking place in secure visitation areas with a divider placed between the attorney and their client.  Defs.' Opp'n at 13; *see also* Fourth Washburn Decl. ¶ 21.

An attorney may also choose to have confidential meetings either through the "detainee telephone system" or through a VTC device.  Defs.' Opp'n at 13.  Defendants represent that in late March 2020, the VTC hours were expanded and meetings may now be scheduled between 8:00 a.m. and 6:00 p.m., Monday through Friday.  *Id.*; *see also* Fourth Washburn Decl. ¶ 62.  VTC visits are scheduled on a first-come, first-serve basis, with 60-minute time blocks and attorneys may not conduct more than one appointment with any one detained client on any single calendar day.  Defs.' Opp'n at 13.  According to Defendants, this expansion allows for 100 VTC legal meetings each week.  *Id.*; *see* Fourth Washburn Decl. ¶ 62.  Defendants further represent that "Stewart does not unilaterally cancel attorney VTC calls," but that appointments may be "frustrated" when "a detainee refuses to attend the appointment, or when the detainee was discharged."  Defs.' Opp'n at 13–14; *see* Fourth Washburn Decl. ¶ 73.

Additionally, Defendants represent that Stewart has 214 telephones that may be used to communicate with legal counsel.  Defs.' Opp'n at 14.  On April 24, 2020, Stewart implemented a new process to facilitate discussions between detained individuals and their legal counsel.  Defs.' Opp'n at 13.  This procedure allows an attorney to contact the facility, calling the Warden's Secretary during business hours, and schedule a time to speak with their client.  *Id.*; *see also* Fourth Washburn Decl. ¶ 56.  At the scheduled time, the detained individual is escorted to the Unit Manager's Office and is placed on the phone with their attorney.  Defs.' Opp'n at 14.  Defendants represent that during these meetings, "detainees are neither heard nor recorded," but only "visually observed during the call."  *Id.*; *see also* Fourth Washburn Decl. ¶ 57.

With regard to appropriately marked legal mail, Defendants claim that the mail is delivered, unopened, by a staff member to the detained individual.  Defs.' Opp'n at 15.  In front of the recipient, the staff member will open the mail, inspect its contents for any contraband, and then give the mail to the individual.  *Id.*  Finally, Defendants represent that "[n]o deficiencies have been noted with respect to the operation of the detainee telephone system, visitation, or legal access." *Id.* at 10; *see also* Fourth Washburn Decl. ¶ 6.

### 2. Irwin County Detention Center

As for Irwin, Defendants represent that as of May 15, 2020, Irwin's detained population is 497, with the capacity to host 920 detained immigrants.  Defs.' Opp'n at 15; *see also* Musante Decl. ¶ 18.  The population number has declined to promote social distancing during the pandemic, as the facility previously housed 615 detained individuals on March 18, 2020.  Defs.' Opp'n at 15; *see also* Musante Decl. ¶ 18.  On April 13, 2020, Irwin temporarily prohibited in-person visitations, with the sole exception being attorney visitations.  Defs.' Opp'n at 16.  Attorneys are required to wear a mask during in-person consultations, and if they do not bring one, the facility will provide them with one.  *Id.*; *see also* Musante Decl. ¶ 9.  Prior to entrance to Irwin, each person is screened, which includes a temperature check and completing a medical questionnaire. Defs.' Opp'n at 16.  In-person meetings take place in "[n]on-contact visitation rooms," which Defendants claim are separate rooms that allow for "complete and total privacy."  *Id.*; *see also* Musante Decl. ¶ 16.  These rooms are also cleaned and sanitized between each visit.  Defs.' Opp'n at 16.

In addition to in-person consultations, Defendants represent that Irwin provides for VTC communications and currently manages four operational VTC devices at its facility.  *Id.* at 17. Defendants represent that throughout the pandemic, Irwin's VTC devices have remained fully

operational and that detained individuals have had adequate access to the devices. *Id.*; *see also* Musante Decl. ¶¶ 18–19. An attorney may make a VTC appointment by calling or emailing the Inmates' Services Department, which manages a separate email address and phone line specifically for attorney VTC requests. Defs.' Opp'n at 17. Detained individuals may also make VTC requests, either by written requests or via a tablet device. *Id.* Defendants claim that Irwin reviews these requests daily and responds within twenty-four hours to schedule an appointment. *Id.*; *see also* Musante Decl. ¶ 38. If Irwin is informed that an emergency VTC session with a detained client is necessary, then Irwin "works diligently" to schedule that appointment, possibly even scheduling the appointment the same day as the request. Defs.' Opp'n at 17–18. Moreover, Irwin maintains a "regimented schedule for calls" so that VTC sessions remain confidential, and staff members are "careful not to abruptly cut-off an ongoing legal call." *Id.* at 18; *see also* Second Paulk Decl. ¶ 23.

In addition to VTC access, Defendants claim that an attorney and their detained client may also set up a telephone call. Defs.' Opp'n at 19. Irwin currently has 89 telephones, which are available Sunday through Thursday from 5:00 a.m. to 11:00 p.m., and Friday through Saturday from 5:00 a.m. to 1:00 a.m. *Id.*

With regard to legal mail, Defendants assert that an Irwin staff member takes the mail directly to the detained recipient upon arrival, opens it in front of the individual to complete a cursory check for contraband, and then hands it off to the individual. *Id.* Detained clients can also send their legal counsel confidential mail by obtaining supplies from the commissary and providing it to Irwin's mail service. *Id.* Finally, Irwin allows detained individuals to have access to a facsimile machine, allowing them to send confidential documents and other information to their attorneys. *Id.* Defendants state that documents obtained from the detained population are

12

faxed daily, and a staff member delivers a confirmation receipt to the detained individual once the fax is transmitted. *Id.* at 20; *see also* Second Paulk Decl. ¶ 61. Similarly, attorneys are provided with a designated legal fax number to deliver information to their detained clients, which is delivered to the recipient upon arrival. Defs.' Opp'n at 20; *see also* Second Paulk Decl. ¶ 62.

### 3. *LaSalle ICE Processing Center*

Defendants represent that in response to the pandemic, LaSalle is operating at 58% capacity, housing 769 detained individuals despite a capacity to host up to 1,335 individuals and a contract with ICE to house 1,160. Defs.' Opp'n at 20; *see* Rice Decl. ¶ 10; Reaves Decl. ¶ 19. Since the start of the pandemic, LaSalle has held town hall meetings and posted signs to inform the detained population of COVID-19 symptoms and demonstrate proper hand hygiene. Defs.' Opp'n at 20. LaSalle also provides detained individuals with soap and other supplies once a week, as well as three masks and the opportunity to request more if needed. *Id.* at 20–21. Additionally, LaSalle has increased cleaning procedures for frequently touched surfaces and objects, such as doorknobs, phones, VTC devices, recreation equipment, and tables. *Id.* at 20.

Apart from legal counsel, LaSalle has prohibited all other visitors from visiting its facility. *Id.* at 21. In-person legal meetings are available from 6:00 a.m. to 11:00 p.m. every day of the week, including holidays. *Id.* Defendants claim that LaSalle will provide attorneys with PPE if they do not bring their own, free of charge. *Id.*; *see also* Rice Decl. ¶ 24. In addition, to facilitate VTC meetings, LaSalle's VTC room availability has increased to three units, and the hours have expanded to 7:00 a.m. to 7:00 p.m., seven days a week. Defs.' Opp'n at 21. Defendants claim that there is no limitation to the number or frequency of legal communications, apart from VTC device availability. *Id.*; *see also* Rice Decl. ¶ 34. Defendants also represent that as a special accommodation to Plaintiff, LaSalle has agreed to a two-hour block (5:00 p.m. to 7:00 p.m.) of a

dedicated VTC machine for Plaintiff, in addition to access to the other available time slots.  Defs.'
Opp'n at 21; *see also* Rice Decl. ¶ 34.

Furthermore, LaSalle allows a detained client and their legal counsel to communicate by
legal mail.  Defs.' Opp'n at 21.  This mail must be clearly marked and will be delivered, unopened,
by a staff member to the recipient.  *Id.*  Once the staff member performs a cursory check for
contraband, the mail will be given to the detained individual.  *Id.*  In addition, detained individuals
may seal marked legal mail and deposit it to the facility's mail service, where it will be untouched
by staff members.  *Id.* at 21–22.  Defendants represent that LaSalle is unaware of any issues related
to the receiving or sending of legal mail.  *Id.* at 22; *see also* Rice Decl. ¶ 43.

### 4. Pine Prairie ICE Processing Center

According to Defendants, Pine Prairie incorporates the CDC Interim Guidance to educate
its staff members and the detained population.  Defs.' Opp'n at 22.  As of May 15, 2020, Pine
Prairie houses 435 detained individuals, though it has the capacity to host 730.  *Id.*; *see also*
Chambarlain Decl. ¶ 18.  This number has declined due to COVID-19, as the facility previously
housed 471 individuals on April 13, 2020.  Defs.' Opp'n at 22; *see also* Chambarlain Decl. ¶ 18.

In response to the pandemic, Pine Prairie has posted signs to inform its detained population
of COVID-19 symptoms and provide hand hygiene instructions.  Defs.' Opp'n at 22.  Staff
members also describe symptoms and demonstrate hand hygiene techniques in daily briefings, also
known as "town halls," and request that detained individuals report any symptoms to staff.  *Id.*
Detained individuals are provided with shampoo, body wash, tissue paper, and other hygiene
products twice a week, with soap available on demand.  *Id.*; *see also* Staiger Decl. ¶¶ 17, 35.
Defendants claim that the facility's living areas are cleaned and sanitized four times per shift, and
all detained individuals and staff members have been issued masks.  Defs.' Opp'n at 22.  For in-

person visitations, attorneys are required to wear masks and gloves, and the facility will provide PPE, free of charge, if the attorneys need them.  *Id.*

Furthermore, Pine Prairie has doubled the rooms for in-person visitations and has increased the window for both in-person and VTC meetings.  *Id.* at 23.  VTC access is now available from 8:00 a.m. to 7:00 p.m. during the week, and at 8:00 a.m. to 2:00 p.m. during the weekends.  *Id.* Defendants represent that no restrictions have been placed on the number or frequency of attorney–client communications, and that Plaintiff has continued to meet with their clients at Pine Prairie on a "frequent basis."  *Id.* at 22–23; *see also* Staiger Decl. ¶¶ 29, 41.

To make an appointment for a VTC meeting or phone call, an attorney must call or email the facility and request a time slot.  Defs.' Opp'n at 23.  Pine Prairie employs two individuals who are tasked with scheduling such requests.  *Id.*  In addition, because of COVID-19, detained individuals have been given free minutes to communicate with their legal counsel telephonically. *Id.*; *see also* Staiger Decl. ¶ 38.  There are no restrictions on this phone use and the telephones are available all day, each day of the week in the housing units.  Defs.' Opp'n at 23.  In addition, Pine Prairie has 166 tablets available for detained individuals to communicate with their counsel by VTC.  *Id.*  Defendants represent that all VTC devices have been tested several times, with successful results and no issues with connectivity or audio.  *Id.*; *see also* Chambarlain Decl. ¶ 44.

Finally, marked legal mail will be delivered, unopened, to the detained recipient.  Defs.' Opp'n at 23.  In front of the individual, a staff member will open the mail to ensure it does not contain contraband, prior to handing the mail to the detained individual.  *Id.* at 23–24.  Detained individuals may also mark legal mail and give it to the facility mail service, where it will be unopened by staff.  *Id.* at 24.

**D. Plaintiff's Claims Regarding the Detention Facilities**

Plaintiff established the Southeast Immigrant Freedom Initiative ("SIFI") in April 2017 to provide *pro bono* representation to immigrants in ICE custody at the four Facilities included in this lawsuit.  Pl.'s Mem. at 4.  Plaintiff represents that since SIFI's inception, SIFI attorneys and their detained clients in the Facilities have experienced "repeated and substantial barriers to meaningfully and reliably communicating with one another."  *Id.*  This disputed issue led Plaintiff to file the underlying lawsuit in April 2018.  *Id.*; *see also* Pl.'s Compl., ECF No. 1.  In light of the COVID-19 pandemic, Plaintiff seeks the pending motion for a TRO because Defendants allegedly "continue to refuse to remediate barriers to legal communications during the pandemic."  Pl.'s Mem. at 5.

Pursuant to the CDC Interim Guidance, detention facilities are encouraged to place limitations on in-person visits and increase access to telephones and VTC devices, as well as consider reducing or eliminating the cost of phone calls for detained individuals.  *Id.* at 6; *see also* CDC Interim Guidance at 13–14.  However, Plaintiff claims that Defendants have failed to implement the necessary changes to increase access to legal communications, thereby forcing SIFI attorneys to choose between conducting in-person visits, at an increased risk of exposure to themselves and their clients, or relying on telephones or VTC devices which were "already insufficient and unreliable prior to the pandemic and [are] now even worse."  Pl.'s Mem. at 6–7.  Due to the pandemic, Plaintiff alleges that in-person consultations have become "functionally impossible," while remote access methods have become "more limited."  *Id.* at 8.

Moreover, on March 23, 2020, ICE announced that all legal visitors are required to wear "gloves, N-95 masks, and eye protection" in order to conduct an in-person consultation.  *Id.* at 9; *see also* Rivera Decl. ¶ 18.  While Defendants represent that the Facilities provide PPE to attorneys

who did not bring their own, Plaintiff alleges that because there is a national shortage of N-95 masks, attorneys are unable to comply with ICE's PPE requirements and Defendants have not provided "any remedy" to facilitate in-person legal communications.  Pl.'s Mem. at 9–10.

### 1. VTC Access

According to Plaintiff, VTC access—the more effective means of legal communication compared to telephones—has become increasingly worse as the pandemic continues.  *Id.* at 10. Plaintiff claims that SIFI has experienced scheduling issues at the Facilities throughout the entire process, from delays in receiving a response to VTC requests to delays on the day of the scheduled appointment, as well as complete cancellations.  *Id.*; *see also* Rivera Decl. ¶¶ 22–29; Williams Decl. ¶¶ 11–12.  In a letter dated April 3, 2020, Defendants promised Plaintiff that because of the pandemic, they would expand VTC days and hours of operations at the Facilities.  Pl.'s Mem. at 10; *see also* Rivera Decl. Ex. B, ¶ 21.  However, Plaintiff represents that as of May 7, 2020, SIFI had seen "no evidence of these extensions."  Pl.'s Mem. at 10.  For example, according to SIFI staff at Stewart, the facility offered the same hours for VTC time slots as before the pandemic, 9:00 a.m. to 3:00 p.m.  *Id.* at 10–11.

In addition to scheduling delays, Plaintiff states that Defendants have further limited VTC access "through sudden and seemingly arbitrary restrictions at the Facilities."  *Id.* at 11.  Stewart has allegedly set a weekly cap on the number of VTC calls a SIFI attorney could have with the same detained client; Pine Prairie once rescheduled a VTC appointment because the assigned officer was on transport duty and could not escort the detained individual; LaSalle's VTC quality is "so poor" that one SIFI attorney will only conduct legal phone calls; and both Irwin and Stewart have cancelled VTC appointments without notice.  *Id.*; *see also* Rivera Decl. ¶¶ 24–28.  Plaintiff also alleges that SIFI attorneys experience additional communication barriers allegedly caused by

17

Defendants' "unreasonable time restrictions."  Pl.'s Mem. at 11.  According to Plaintiff, Pine Prairie limits VTC calls to thirty minutes, while Stewart's and Irwin's VTCs are limited to one hour.  *Id.* at 11–12.

Moreover, Plaintiff alleges that confidentiality between the attorneys and their detained clients is "severely compromised in the VTC rooms at the Facilities."  *Id.* at 12.  At Irwin, when VTC meetings are conducted in the library, Plaintiff claims that facility staff members frequently interrupt the meetings by entering the library and answering separate calls nearby.  *Id.*  At Pine Prairie, VTCs allegedly occur in adjacent cubicles with thin walls and the conversations are "clearly audible."  *Id.*  Defendants have also placed "inadequate safeguards" to protect the detained populations' exposure to COVID-19 during VTC appointments.  *Id.*  For example, at Irwin, one SIFI attorney has never seen his clients wear protective gloves during their VTC meetings.  *Id.*; *see also* Rivera Decl. ¶ 32.  And at Stewart, a detained client was never issued gloves, but instead wears a pair that an officer had discarded.  Pl.'s Mem. at 12; *see also* Sanchez Martinez Decl. ¶ 14. Accordingly, Plaintiff asserts that every time a detained individual leaves their cell for a VTC appointment, the individual risks exposure to COVID-19 as a result of Defendants' alleged failure to provide them with sufficient hygiene products and protection.  Pl.'s Mem. at 12–13; *see also* Venters Decl. ¶ 11.

### 2. Phone Access

As a result of Defendants' alleged restrictions on VTC appointments, Plaintiff claims that SIFI attorneys have resorted to "facility legal calls," which are confidential phone calls provided by the facility, to reach current and potential clients.  Pl.'s Mem. at 13.  Contrary to Defendants' representations, Plaintiff asserts that the process for setting up such phone calls is "unclear to clients and attorneys" at the Facilities, and until recently, was "impossible at Stewart or Pine

Prairie." *Id.*; *see also* Rivera Decl. ¶ 38.  For example, though detained immigrants at Pine Prairie may request legal calls through their case managers, most of them do not know the identity of their case manager.  Pl.'s Mem. at 14; *see also* Rivera Decl. ¶ 38.  Additionally, a SIFI attorney who has represented clients at Pine Prairie since 2018 claims to have never had a client successfully request a legal call.  Pl.'s Mem. at 14; *see also* Rivera Decl. ¶ 38.  And even when the process for requesting legal calls is clear, there are still scheduling delays and detained individuals are occasionally restricted from accessing such calls due to lockdowns in their units.  Pl.'s Mem. at 14; *see also* Rivera Decl. ¶¶ 40–42.  At LaSalle, Plaintiff claims that there are "significant connectivity issues" when attempting to include crucial third parties, such as additional attorneys or interpreters.  Pl.'s Mem.  at 14; *see also* Rivera Decl. ¶ 43.  According to Plaintiff, Defendants' solution is to have the client place the call on speaker phone, which raises additional confidentiality concerns because "conversations can be overheard by individuals in the next room."  Pl.'s Mem. at 14; *see also* Rivera Decl. ¶ 31.

Plaintiff also claims that Defendants have not taken adequate safety precautions for calls made by shared telephones.  Pl.'s Mem. at 15.  Detained clients are allegedly forced to stand in close proximity as they wait to use the shared telephones, thereby increasing their chances of contracting the virus as they lack PPE.  *Id.*; *see also* Venters Decl. ¶ 36.  Detained clients have also expressed to Plaintiff that the Facilities have failed to provide them with sufficient hygiene products, and that they have never seen anyone wipe down the telephones, neither detained individuals assigned to cleaning nor any staff member.  Pl.'s Mem. at 15; *see also* Sanchez Martinez Decl. ¶¶ 7, 12.

### 3. Legal Mail and Document Exchange

In addition to the aforementioned difficulties regarding remote access to legal communications, Plaintiff alleges that Defendants' COVID-19 policies on document exchange are "unreasonably restrictive" and make it difficult for Plaintiff to maintain contact and pursue their clients' cases.  Pl.'s Mem. at 16.  First, Plaintiff claims that Defendants stated that they will not retrieve fax documents or download electronic documents for detained individuals at the Facilities. *Id.*; *see also* Rivera Decl. Ex. B ¶ 53.  Plaintiff states that this policy is unreasonable since the Facilities utilize fax machines to send attorneys their clients' medical records, and Irwin already allows detained individuals to send faxes to their attorneys.  Pl.'s Mem. at 16–17.  Second, Plaintiff alleges that because of Defendants' various restrictions, Plaintiff must send postal mail to the Facilities, which was an unreliable method of communication even before the pandemic.  *Id.* at 17. Plaintiff states that it is common for delays to occur in the sending and receiving of mail.  *Id.*; *see also* Rivera Decl. ¶ 9.  For example, Pine Prairie has reports of legal mail being improperly searched.  Pl.'s Mem. at 17; *see also* Rivera Decl. ¶ 9.  Mail is also allegedly "periodically rejected regardless of the delivery service or the type of postage."  Pl.'s Mem. at 17; *see also* Rivera Decl. ¶ 50.  Plaintiff represents that these mail-related delays have had "grave consequences" for their medically vulnerable clients, in addition to generally harming their clients' chances of securing release.  Pl.'s Mem. at 18; *see also* Rivera Decl. ¶¶ 51–52.

Lastly, Plaintiff alleges that Defendants have restricted Plaintiff's access "to the ICE official who oversees their clients' parole requests and *Fraihat* custody redeterminations."  Pl.'s Mem. at 18.  According to Plaintiff, ICE has delayed in responding to humanitarian parole requests by weeks.  *Id.*; *see also* Rivera Decl. ¶ 56.  For example, a SIFI attorney submitted a humanitarian parole request for a "medically vulnerable client" on or around April 15, 2020.  Pl.'s Mem. at 18.

ICE then instructed the attorney to mail the request, not email it. *Id.* On April 28, the attorney emailed the ICE agent involved in her client's case, asking for a status update on the request, only to find out that ICE had never received the request. *Id.* She was then instructed to email the request, and an ICE agent responded to her within the hour, ultimately denying the request. *Id.*

### III. LEGAL STANDARD

A temporary restraining order ("TRO") is an extraordinary form of relief. An application for a TRO is analyzed using factors applicable to preliminary injunctive relief. *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011) (applying preliminary injunction standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (internal quotation marks omitted)). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193,

197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted).  "The four factors have typically been evaluated on a 'sliding scale.'"  *Davis*, 571 F.3d at 1291.  Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Id.* at 1291–92.

It is unclear whether the United States Court of Appeals for the District of Columbia Circuit's ("D.C. Circuit") sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015).  Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)).  However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis.  *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112.  In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome.

## IV. DISCUSSION

Before the Court considers each of the requirements for granting a TRO, it first addresses the preliminary issues of standing and subject-matter jurisdiction.  As the Court grants Plaintiff's Motion and issues injunctive relief on the basis of its arguments relating to the conditions of confinement claim under substantive due process, the Court does not consider Plaintiff's separate arguments focusing on its clients' access to counsel claims pursuant to the Fifth Amendment.

## A. Standing

Defendants first argue that Plaintiff lacks either organizational or third-party standing. As Plaintiff only argues that it has third-party standing, the Court will only consider whether Plaintiff has third-party standing.

The jurisdiction of federal courts is limited by Article III of the Constitution to the adjudication of actual, ongoing cases or controversies. This limitation "gives rise to the doctrine[] of standing." *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003); *see Sierra Club v. Jackson*, 648 F.3d 848, 852 (D.C. Cir. 2011) ("Article III of the Constitution limits the federal courts to adjudication of actual, ongoing controversies."). In general, "[t]he Supreme Court has cautioned that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Juvenile Matters Trial Lawyers Ass'n v. Judicial Dep't*, 363 F. Supp. 2d 239, 248 (D. Conn. 2005) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). It has not "treated this rule as absolute, however," and has "recogniz[ed] that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004).

A party relying on a claim of third-party standing must satisfy three requirements: (1) "injury in fact," (2) "a close relation to the third party," and (3) "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see Kowalski*, 543 U.S. at 130 (describing latter two requirements as "additional showings" on top of injury in fact requirement). An injury in fact must be "an invasion of a legally protected interest that is 'concrete and particularized,' 'actual or imminent,' and 'fairly traceable' to the challenged act of the defendant, and likely to be redressed by a favorable decision in the federal court." *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997) (quoting *Lujan v. Defenders of*

23

*Wildlife*, 504 U.S. 555, 560–61 (1992)).

### 1. Injury in Fact

Defendants first argue that Plaintiff lacks third-party standing because it has not satisfied the first prong of injury in fact, as it instead "relies entirely on alleged harms to detained aliens," Defs.' Opp'n at 30, when "a party 'must assert his own legal rights' and 'cannot rest his claim to relief on the legal rights . . . of third parties.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (quoting *Warth*, 422 U.S. at 499). Defendants also suggest that any aliens "adversely affected by the challenged policies" can bring their own suits to challenge the policies. Defs.' Opp'n at 31. In response, Plaintiff claims that its clients are hindered from bringing their own suits, and that it further has established an injury in fact because Defendants' conduct has thwarted its institutional purpose to represent its clients and because it has a close relationship with its detained clients.[3] Pl.'s Reply at 2–7. The Court agrees that Plaintiff has sufficiently established an injury in fact.

Courts have found that legal aid organizations suffer an injury when their "organizational purpose" or mission "has been thwarted." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987) (internal quotation marks omitted); *see Ukrainian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1378 (D.C. Cir. 1990) (finding that harm via "inability to counsel individual asylees" would interfere with "organizational purpose of furthering the beneficial integration of

---

[3] Despite Defendants' claim that Plaintiff sought standing on behalf of both its clients and potential clients, Defs. Opp'n at 30–31, Plaintiff clarifies in its Reply that it "seeks to represent only own clients." Pl.'s Reply at 4 n.2. This distinguishes this case from those cited by Defendants, such as *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000), in which the organization did not represent individual immigrants at particular facilities, *id.* at 1359, 1364. The Court therefore does not consider whether Plaintiff would have standing to bring suit on behalf of any third parties other than its own clients, with whom its attorneys have already ongoing, established attorney–client relationships.

individuals of Ukrainian descent," and concluding organization had shown injury in fact (internal

quotation marks omitted)); *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1161 (D. Or.

2018) (finding injury in fact when challenged policies and procedures prevented plaintiff "from

fulfilling its mission of advocating on behalf of noncitizens" and caused it to divert resources); *cf.*

*Juvenile Matters Trial Lawyers Ass'n*, 363 F. Supp. 2d at 249 (noting that organization must "set

forth a 'real and immediate' threat of injury to itself").

Plaintiff here claims that "Defendants' conduct has frustrated its organizational mission

and forced it to divert its resources." Pl.'s Reply at 2. In its Second Amended Complaint, Plaintiff

explains its organizational purpose, which extends to "litigation and advocacy regarding the

conditions of confinement for those in government custody, including immigration

imprisonment." Pl.'s Second Am. Compl. ¶ 15. Plaintiff specifically launched its initiative, SIFI,

"to provide desperately needed legal representation to indigent immigrants detained in remote

locations in the Southeast, where," Plaintiff alleges, "attorneys are scarce and immigration

attorneys even more so." *Id.* ¶ 97. Plaintiff "seeks to fulfill this mission by," among other things,

"providing direct representation to detained immigrants in bond proceedings" and "facilitating

representation in merits hearings for people who would otherwise have no legal recourse." *Id.*

Declarations submitted by Plaintiff in support of its Motion also show that this is Plaintiff's

mission. *See, e.g.*, Rivera Decl. ¶ 2 ("SIFI provides *pro bono* representation to detained

immigrants in proceedings before the Executive Office for Immigration Review, U.S. Immigration

and Customs and Enforcement ('ICE'), and the Board of Immigration Appeals ('BIA')."); 

Williams Decl. ¶ 1 (stating same). In particular, Plaintiff "focuses on seeking clients' release from

ICE custody," Rivera Decl. ¶ 2; Williams Decl. ¶ 1, which is especially relevant in light of the

current situation regarding COVID-19, *see* Pl.'s Reply at 2–3; *see also* Venters Decl. ¶¶ 9–13

(discussing spread of COVID-19 in detention facilities).  Plaintiff's attorneys represent individuals detained at the four centers that are Defendants in this case.  Pl.'s Second Am. Compl. ¶ 99; Rivera Decl. ¶ 3; Williams Decl. ¶ 2.

Plaintiff has sufficiently shown that the alleged policies and procedures, which Plaintiff claims are punitive, prevent Plaintiff from fulfilling its mission with respect to its clients at these centers to satisfy the injury in fact requirement.  Plaintiff claims that Defendants' policies and procedures, which focus on in-person legal visitation, prevent its attorneys from conferring with their clients.  Plaintiff has historically used multiple in-person visits to help clients prepare for bond motions, parole requests, and removal hearings.  Rivera Decl. ¶¶ 10–11.  These visits also involve exchanges of documents, which Plaintiff has found to be more reliable and quicker when done during in-person meetings.  *Id.* ¶¶ 9–11.  SIFI used to visit the centers two to three days a week, conducting in-person legal visits with, on average, two dozen people or more.  *Id.* ¶ 6.

Now, however, Plaintiff asserts that in-person legal visitation is no longer a consistently safe and viable option in the wake of COVID-19.  Despite this, they claim that Defendants have imposed restrictions on remote legal visitation and related conditions that frustrate their mission.  This includes delays in scheduling VTC appointments, delays on the day of the appointment, and cancellations.  Pl.'s Mem. at 10; Rivera Decl. ¶¶ 22–29 (providing examples of significant delays for VTCs); Williams Decl. ¶¶ 11–12 (describing delays in scheduling remote visitations for Irwin and Stewart).  The Rivera Declaration highlights one example.  A SIFI legal worker requested VTC calls with five people inside LaSalle.  Rivera Decl. ¶ 23.  No VTC appointments were available in the upcoming six days after her request.  *Id.*  Two of the people had recently "engaged in a hunger strike for more than 140 days and had recently [been] subjected to forced feeding via nasogastric tubes."  *Id.*  The other three were "medically fragile due to other conditions."  *Id.*  That

same legal worker encountered another six-day delay at that facility with respect to "another medically vulnerable client." *Id.* The purpose of the call was "time-sensitive" as the clients were all "seeking release due to their increased vulnerability of serious illness or death should they contract COVID-19." *Id.* ¶ 24. Plaintiff also claims there have been restrictions on the number of VTC calls with the same client, *id.* ¶ 25, calls scheduled on short notice, Williams Decl. ¶¶ 12, 20, poor VTC quality, Rivera Decl. ¶ 24; López Decl. ¶ 9, failure to notify attorneys or clients of calls, Rivera Decl. ¶ 33; Williams Decl. ¶ 21, and confidentiality concerns, Pl.'s Mem. at 12; Rivera Decl. ¶¶ 30–31; Williams Decl. ¶ 15; Osorio Decl. ¶¶ 5–6.

The above, of course, is not exhaustive even with respect to Plaintiff's claims specific to VTC. It does not include the issues that Plaintiff raises with respect to phone access restrictions, Pl.'s Mem. at 13–16 (citing declarations), or legal mail and document exchange restrictions, *id.* at 16–18 (citing declarations), all of which also thwart Plaintiff's organizational mission by making it more difficult for Plaintiff to effectively represent its clients (which involves, among other things, meeting with them and exchanging confidential information and documents). *See* Pl.'s Reply at 2–3. Nor does the above discuss how the additional time needed to coordinate in-person visits or navigate the remote visit system diverts resources from Plaintiff's primary mission; they could have, for instance, used that time to represent additional detained individuals. *See* Pl.'s Reply at 3–4; Rivera Second Supp. Decl. ¶ 14; Williams Decl. ¶ 19. Plaintiff has sufficiently shown that its alleged injuries are "concrete and specific to the work in which they are engaged" to satisfy the injury in fact requirement as to each of these categories. *Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986); *see People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1095 (D.C. Cir. 2015) (finding that organization established injury in fact when it had to "expend[] resources to counter" injuries).

All of these are traceable to Defendants, as they relate to policies and procedures enacted and enforced by them.  They are actual, imminent, ongoing, and not speculative, as the declarations provided by Plaintiff indicate.  This harm is also redressable by an order from this Court.  In short, Plaintiff has claimed an injury in fact sufficient for third-party standing.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (explaining that where conduct of defendant impairs organization's ability to provide services and drains its resources, "there can be no question that the organization has suffered injury in fact").

### 2. Close Relationship

The second prong of third-party standing requires that Plaintiff share a "close relationship" with the third parties.  In discussing this factor, the D.C. Circuit has noted that "the [Supreme] Court has never required a *confidential* relationship between the parties in order to have standing. To the contrary, it has only required a 'close relation' in the sense that there must be an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests."  *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999); *see Reese Bros., Inc. v. U.S. Postal Serv.*, 531 F. Supp. 2d 64, 67 (D.D.C. 2008) (explaining that relationship must give Plaintiff "a sufficiently concrete interest in the outcome of the issue in dispute to ensure that the plaintiff will be an effective advocate" (internal quotation marks omitted)); *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 289 (3d Cir. 2002) ("To meet this standard, this relationship must permit the psychiatrists to operate fully, or very nearly, as effective a proponent of their patients' rights as the patients themselves." (internal quotation marks omitted)).  Plaintiff's legal staff are parties to the attorney–client relationships at issue and are, in fact, advocates for their clients.  The mission of their organization and initiative is to provide representation to these clients.  This relationship is therefore sufficient to satisfy this requirement.

28

*See, e.g.*, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) (finding

that lawyer could bring lawsuit on behalf of criminal defendant); *Exodus Refugee Immigration,*

*Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind. 2016) (finding that organization "certainly ha[d]

a close relationship with its Syrian refugee clients" because "[i]ts entire purpose and mission [was]

to resettle refugees escaping dire circumstances"), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

### 3. Hindrance

The third prong requires that Plaintiff demonstrate that there is some "hindrance" to the

third party's ability to protect his or her own interests. *See Kowalski v. Tesmer*, 543 U.S.125, 129

(2004) (explaining that party invoking third-party standing must show that "the party asserting the

right has a 'close' relationship with the person who possesses the right," and "there is a 'hindrance'

to the possessor's ability to protect his own interests"). Defendants contend that litigants detained

at the Facilities at issue can "litigate as first parties," and that Plaintiff can "represent the alien in

a first-party challenge to the policies" as they "can and have done so." Defs.' Opp'n at 31 (citing

Williams Decl. ¶¶ 5–6 (noting that habeas petitions have been filed in District Court in Georgia on

behalf of several detained individuals)). Defendants therefore dispute that Plaintiff has

demonstrated that there is any hindrance to an individual alien being able to "protect his or her

own interests." *Am. Immigration Lawyers Ass'n. v. Reno*, 199 F.3d 1352, 1362 (D.C. Cir. 2000).

However, this prong "does not require an absolute bar from suit, but 'some hindrance to

the third party's ability to protect his or her own interests.'" *Pennsylvania Psychiatric Soc.*,

280 F.3d at 290 (quoting *Powers*, 499 U.S. at 411). "In other words, a party need not face

insurmountable hurdles to warrant third-party standing." *Id.* (citing examples). This factor

therefore "favors third-party standing" and "presents a relatively low threshold." *Exodus Refugee*

*Immigration, Inc.*, 165 F. Supp. 3d at 732. "Imminent mootness" is one of various obstacles that

may warrant third-party standing. *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (finding it appropriate for physician to assert rights of women patients—through challenge to constitutionality of state statute excluding certain abortions from Medicaid benefits—after noting several obstacles to patients' assertion of their own rights, including chilling effect of desire to protect privacy and imminent mootness). The nature of the constitutional right at stake may also present an inherent obstacle for the right holder when asserting the right. *See id.*; *see also Aid for Women v. Foulston*, 441 F.3d 1101, 1114 (10th Cir. 2006 ) (finding hindrance where third-party adolescent patients seeking heath care counseling wished to protect the privacy of care that they sought from public nature of court case).

Here, there are clear hindrances to the detained individuals filing their own suits, even with (or especially with) Plaintiff representing them. To begin with, in light of the restrictions implemented due to COVID-19, the already-limited time that detained individuals have to speak with their counsel would also have to cover a suit to vindicate these interests. This would, in turn, take away from the time that they had to prepare for any other proceedings, including those relating to their possible release. In other words, Plaintiff's clients "filing suit on their own behalf would have the perverse effect of impairing those very interests." *See* Pl.'s Reply at 6. Moreover, as in *Singleton*, there are chilling effects and privacy concerns that would hinder the detained individuals from filing their own suits. Imminent mootness is also at issue: by the time that the detained individuals could litigate their suits, their removal cases may have already concluded. And most of Plaintiff's clients "do not speak fluent English, have limited knowledge of the U.S. legal system, and have no access to legal resources but for those provided by" Plaintiff. *Id.* at 7. These obstacles that Plaintiff has presented are sufficient to satisfy the hindrance requirement.

As the Court finds that Plaintiff has satisfied the injury in fact, close relationship, and

hindrance requirements, Plaintiff accordingly has standing here.

## B. Subject-Matter Jurisdiction

Defendants next argue that Plaintiff has not established a likelihood of success with respect to subject-matter jurisdiction. Defs.' Opp'n at 31–35. Defendants argue that the Immigration and Nationality Act's ("INA") jurisdictional bars prevent these claims from "form[ing] the basis for" a temporary restraining order. *Id.* at 32.

The INA provides that "a petition for review filed with an appropriate court of appeals" is "the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. § 1252(a)(5). It also channels "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from* any action taken or proceeding brought to remove an alien from the United States" into "judicial review of a final order" of removal. *Id.* § 1252(b)(9) (emphasis added). Section 1252(b)(9) is an "unmistakable 'zipper' clause," *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999), that has been recognized as "breathtaking" in its reach, *Aguilar v. U.S. Immigration & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 9 (1st Cir. 2007). It "therefore swallows up virtually all claims that are tied to removal proceedings." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).

Defendants propose that sections 1252(a)(5) and 1252(b)(9) prevent this Court from hearing this Motion because the claims brought by Plaintiff "arise from" immigration removal proceedings. Defs.' Opp'n at 32. Defendants are incorrect as to Plaintiff's substantive due process claim. The Court does not venture an opinion here as to whether it would have jurisdiction over Plaintiff's Fifth Amendment access to counsel claim, as it decides the Motion on the basis of

Plaintiff's substantive due process claim.[4]

To begin with, not all claims brought by detained immigrants are barred by section 1252(b)(9).  Courts, including the court in *J.E.F.M. v. Lynch*, a case relied upon by Defendants, have distinguished between claims directly regarding the removal hearing and collateral issues. The former is barred; the latter is not barred.  In general, "claims that are independent of or collateral to the removal process do not fall within the scope of" the INA's zipper clause.  *J.E.F.M.*, 837 F.3d at 1032; *see also id.* ("Thus, we have distinguished between claims that 'arise from'

---

[4] The question of whether the Court would have jurisdiction over Plaintiff's access to counsel claim is a complicated one and the authorities are in equipoise.  Some courts have found that such claims, when they allege interference with a pre-existing attorney–client relationship, are collateral and thus not barred.  *See, e.g.*, *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1048 (C.D. Cal. 2019) ("Plaintiffs' INA and procedural due process claims do not hinge on events at any particular removal proceeding. . . . Plaintiffs' claims are based on a right protecting the attorney–client relationship from undue burden or interference."); *Arroyo v. United States Dep't of Homeland Sec.*, No. SACV 19-815 JGB (SHKX), 2019 WL 2912848, at *13 (C.D. Cal. June 20, 2019) ("But for purposes of the jurisdictional inquiry, it is enough that represented Immigrant Plaintiffs assert harm which accrues at the moment of geographic separation, rather than in reference to the fairness of their underlying removal proceedings. . . . Accordingly, the Court finds represented Immigrant Plaintiffs allege an injury to their established counsel relationship that is independent of and collateral to their removal proceedings."); *Innovation Law Lab v. Nielsen*, 342 F. Supp. 3d 1067, 1078 (D. Or. 2018) ("As with the legal question regarding an alien's indefinite detention in *Jennings*, the legal questions regarding detainees' access to their retained counsel in this case are 'too remote' from removal proceedings to fall within the scope of § 1252(b)(9) or (g).").
Other courts have found that such claims are barred, as the right to counsel is too closely bound up in the removal proceeding and related processes.  *See, e.g.*, *Aguilar*, 510 F.3d at 13 (finding barred plaintiffs' "claim that their detention and subsequent transfer by the government infringed their rights to counsel by barring their access to lawyers, interfering with preexisting attorney–client relationships, and making it difficult to secure counsel of their choosing"); *Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office of Immigration Review*, No. 1:20-CV-00852 (CJN), 2020 WL 2026971, at *8 (D.D.C. Apr. 28, 2020) (finding barred plaintiffs' "access-to-counsel and due process claims" because they arose "from the course of removal hearings"); *Avilez v. Barr*, No. 19-CV-08296-CRB, 2020 WL 570987, at *2 (N.D. Cal. Feb. 5, 2020) (finding barred claim that plaintiff's "transfer to [another facility] violate[d] her Fifth Amendment right to counsel"); *Alvarez v. Sessions*, 338 F. Supp. 3d 1042, 1048 (N.D. Cal. 2018) (finding barred claims alleging "disruption to an established representation relationship").  And, more recently, the Third Circuit has found that statutory right to counsel claims are barred, but constitutional ones are not.  *See E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d 177, 187–88 (3d Cir. 2020).

removal proceedings under § 1252(b)(9)—which must be channeled through the PFR process—and claims that are collateral to, or independent of, the removal process."); *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1047 (C.D. Cal. 2019) ("But *J.E.F.M.* is equally clear that the INA does not channel claims that are independent of or collateral to the removal process." (internal quotation marks omitted)).

Justice Samuel A. Alito's plurality opinion in *Jennings v. Rodriguez*, 138 S. Ct. 830, 839–41 (2018),[5] upon which Defendants also rely, recently explored this distinction when considering the "arising from" language in section 1252(b)(9).  The opinion counseled against an "expansive interpretation of § 1252(b)(9)" that "would lead to staggering results."  *Id.* at 840.  In particular, it noted that "cramming judicial review of" a claim "based on allegedly inhumane conditions of confinement" into "the review of final removal orders would be absurd."  *Id.*  Without delineating the exact scope of section 1252(b)(9), the opinion suggested that three categories of challenges would fall within it: (1) "review of an order of removal," (2) a challenge to "the decision to detain them in the first place or to seek removal," and (3) a challenge to "any part of the process by which their removability will be determined."  *Id.* at 841.  Ultimately, the opinion found that the Court had jurisdiction over the plaintiffs' claims, which related to whether detained immigrants were entitled to bond hearings to determine whether their continued detention was justified.  *Id.* at 838, 841.  Justice Stephen Breyer's dissent, joined by Justice Ruth Bader Ginsburg and Justice Sonia Sotomayor, would have read section 1252(b)(9) even more narrowly to only bar challenges to orders of removal.  *Id.* at 874 (Breyer, J., dissenting).  At least five Justices therefore agreed that

---

[5] This discussion takes place in Part II of the opinion, which was joined by Chief Justice John Roberts and Justice Anthony Kennedy.  However, as noted by the Court in the Memorandum Opinion, Justice Breyer's dissenting opinion, joined by Justice Ginsburg and Justice Sotomayor, took an even narrower view of this provision.  *See* 138 S. Ct. at 874 (Breyer, J., dissenting).

section 1252(b)(9) does not clearly bar challenges collateral to the removal proceeding.

The Third Circuit recently considered *Jennings* and the subsequent case of *Nielsen v. Preap*, 139 S. Ct. 954 (2019), in which "[t]he Justices largely reprised" their positions from *Jennings*. *E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d 177, 185 (3d Cir. 2020). It concluded:

> We distill a simple principle from *Jennings*, *Preap*, and the presumptions favoring judicial review. That principle informs how we read the phrase "arising under." We must ask: If not now, when? If the answer would otherwise be never, then § 1252(b)(9) poses no jurisdictional bar. In other words, it does not strip jurisdiction when aliens seek relief that courts cannot meaningfully provide alongside review of a final order of removal. As the First Circuit has noted, the point of the provision is to channel claims into a single petition for review, not to bar claims that do not fit within that process. *See Aguilar v. U.S. ICE*, 510 F.3d 1, 11 (1st Cir. 2007).

*Id.* at 185–86. The Third Circuit went on to recognize that section 1252(b)(9) does not touch collateral claims, which it found included certain conditions of confinement claims, as "review and relief may come too late to redress these conditions of confinement." *Id.* at 186.

In the wake of *Jennings* and *Preap*, the question then becomes whether the challenges Plaintiff brings here are collateral to the removal proceeding. The Court agrees with Plaintiff that its substantive due process claim alleging punitive conditions of confinement is not barred by section 1252(b)(9), especially as the plurality opinion in *Jennings* singled out such claims as collateral and suggested that they should not be barred:

> Suppose, for example, that a detained alien wishes to assert a claim under *Bivens v. Six Unknown Fed. Narcotics Agents* based on allegedly inhumane conditions of confinement. . . . The 'questions of law and fact' in all those cases could be said to 'aris[e] from' actions taken to remove the aliens in the sense that the aliens' injuries would never have occurred if they had not been placed in detention. But cramming judicial review of those questions into the review of final removal orders would be absurd.

*Jennings*, 138 S. Ct. at 840 (citations omitted). Plaintiff here does not challenge a final removal

order.  Instead, Plaintiff claims that the conditions at these four detention centers are so restrictive

that they are punitive in violation of the Fifth Amendment's substantive due process clause.  *See*

Pl.'s Mem. at 24–28.  Plaintiff's conditions of confinement claim is analogous to the conditions of

confinement claims that the plurality opinion in *Jennings* highlighted as collateral.  *See Jennings*,

138 S. Ct. at 840.  This claim is ancillary to the removal process and does not challenge "any part

of the process by which [Plaintiff's clients'] removability will be determined."  *Id.* at 841; *see*

*Torres*, 411 F. Supp. 3d at 1048 ("Plaintiffs take pains to tailor their claims only to the conditions

of their removal-related detention, and do not challenge the legal sufficiency or any procedural

aspect of their removal proceedings."); *cf. Innovation Law Lab*, 342 F. Supp. 3d at 1076 ("In the

pending case, however, Plaintiffs do not challenge the detainees' removal proceedings because

formal removal proceedings under 8 U.S.C. § 1229a have not yet commenced.").

Interpreting section 1252(b)(9) to reach conditions of confinement claims like the one

brought by Plaintiff would be problematic, especially because Immigration Judges are "powerless

to remedy the conditions alleged."  *Torres*, 411 F. Supp. 3d at 1049 (citing 8 C.F.R. §§ 1240.1,

1240.31, 1240.41; Executive Office for Immigration Review, *Immigration Court Practice Manual*

at 125 (rev'd June 10, 2013) ("Immigration Judges have no jurisdiction over . . . the conditions in

the detention facility.")); *see also E.O.H.C.*, 950 F.3d at 187 (finding that section 1252(b)(9) did

not bar claims that could not "be redressed at the end of the removal proceedings" and further

finding that court had subject-matter jurisdiction over conditions-of-confinement claim); *Castillo*

*v. Barr*, No. 20-00605 TJH (AFMX), 2020 WL 1502864, at *4 (C.D. Cal. Mar. 27, 2020)

("However, because the Petitioners, here, have asserted claims for violations of their Fifth

Amendment substantive due process rights, and those claims exceed the jurisdictional limits of the

Immigration Court and the Board of Immigration Appeals, Petitioners need not first exhaust their

administrative remedies.").

The cases cited by Defendants do not dictate a different result.  Most of Defendants' cited authorities focus on access to counsel claims.  *See, e.g.*, *J.E.F.M.*, 837 F.3d at 1029, 1033 (finding barred claim regarding whether immigrant minors had a "statutory right to appointed counsel at government expense in immigration proceedings" because "the alien's right to counsel [was] part and parcel of the removal proceeding itself," and that "[a]n alien's right to counsel possesses a direct link to, and is inextricably intertwined with, the administrative process that Congress so painstakingly fashioned" (internal quotation marks omitted));  *Aguilar*, 510 F.3d at 13 (finding barred plaintiffs' "claim that their detention and subsequent transfer by the government infringed their rights to counsel by barring their access to lawyers, interfering with preexisting attorney–client relationships, and making it difficult to secure counsel of their choosing"); *Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office of Immigration Review*, No. 1:20-CV-00852 (CJN), 2020 WL 2026971, at *8 (D.D.C. Apr. 28, 2020) (finding barred plaintiffs' "access-to-counsel and due process claims" because they arose "from the course of removal hearings"); *Avilez v. Barr*, No. 19-CV-08296-CRB, 2020 WL 570987, at *2 (N.D. Cal. Feb. 5, 2020) (finding barred claim that plaintiff's "transfer to [another facility] violate[d] her Fifth Amendment right to counsel"); *Alvarez v. Sessions*, 338 F. Supp. 3d 1042, 1048 (N.D. Cal. 2018) (finding barred claims alleging "disruption to an established representation relationship").

The Court noted above that it is not considering whether it has jurisdiction over Plaintiff's access to counsel claim here, and these two types of claims are sufficiently distinct that the reasoning in those cases does not carry over to this context.  It is true that Plaintiff's conditions of confinement claim raises issues addressing access to counsel.  Rather than questioning whether the detained clients' right to counsel has been violated, though, it concerns whether the conditions

imposed as a result of the limitations and restrictions adopted due to COVID-19 are punitive, in part because they result in limited access to counsel.  Moreover, Plaintiff's lawyers represent the detained immigrants in proceedings other than removal proceedings, such as bond and release proceedings.  The Court therefore does not view Plaintiff's substantive due process claim as a claim that directly invokes the detained immigrants' right to counsel in removal proceedings.

Other cases Defendants cite do not address either access to counsel claims or conditions of confinement claims, and as a result are also not persuasive in considering whether punitive conditions claims are barred or are collateral.  *See, e.g.*, *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012) (finding barred plaintiff's challenges to "the procedure and substance of the BIA's determination that he was ineligible for asylum, withholding of removal, and relief under the [Convention Against Torture]"); *P.L. v. U.S. Immigration & Customs Enf't*, No. 1:19-CV-01336 (ALC), 2019 WL 2568648, at *3 (S.D.N.Y. June 21, 2019) (finding that plaintiff's challenge to ICE's VTC policy with respect to actual removal proceedings was barred because "[h]ow immigrants appear for removal proceedings constitutes part of the process of these proceedings"); *Vetcher v. Sessions*, 316 F. Supp. 3d 70, 75 (D.D.C. 2018) (finding barred plaintiff's claims regarding "purported deficiencies with the law library at the facility where he is detained").

The Court accordingly finds that Plaintiff has sufficiently established that this Court has subject-matter jurisdiction over its conditions of confinement claim.  *See also, e.g.*, *Sallaj v. U.S. Immigration & Customs Enf't*, No. C.A. No. 20-167-JJM-LDA, 2020 WL 1975819, at *2 (D.R.I. Apr. 24, 2020) (exercising jurisdiction over conditions of confinement claim against ICE).

**C. Fifth Amendment Substantive Due Process Claim (Conditions of Confinement)**

The Court now applies the standard for issuing a temporary restraining order to Plaintiff's argument that the conditions of their confinement, and the restrictions Defendants have implemented, are likely punitive and therefore likely violate the rights of Plaintiff's detained clients.

### 1. Likelihood of Success on the Merits

Plaintiff claims that the conditions and restrictions imposed by Defendants in this case are punitive in violation of the substantive due process clause. Pl.'s Mem. at 24–27. Defendants' response focuses largely on Plaintiff's access to counsel claim, which this Court does not consider here. In fact, the Court cannot find a single mention of the words "punitive" or "punish" in Defendants' Opposition. The Opposition uses the word "substantive" only once, *see id.* at 29 ("Throughout its Motion and Memo, SPLC does not claim that any of SPLC's substantive rights that have been invaded by Defendants' response to COVID-19."), and not in relation to Plaintiff's substantive due process claim. In that sense, Defendants have failed to fully address this argument. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (internal quotation marks omitted)). Regardless, Defendants make general arguments about the restrictions that Plaintiff claims are punitive, *see, e.g.*, Defs.' Opp'n at 38–49, and rather than treat the entire argument as conceded, the Court will consider those arguments in this context.

Detention in this context is "undisputedly civil—*i.e.*, non-punitive in nature." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 187 (D.D.C. 2015). Plaintiff's detained clients, like pre-trial detainees, are therefore "entitled to more considerate treatment and conditions of confinement than

criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). "While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment [under the Eighth Amendment], a [civil] detainee, not yet found guilty of any crime, may not be subjected to punishment of any description." *Hardy v. Dist. of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)). As a result, "where it is alleged that a [civil] detainee has been deprived of liberty without due process, the dispositive inquiry is whether the challenged condition, practice, or policy constitutes punishment." *Block v. Rutherford*, 468 U.S. 576, 583 (1984).

"The Court's task in applying this standard is to determine 'whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'" *United States v. Moore*, No. CR 18-198 (JEB), 2019 WL 2569659, at *2 (D.D.C. June 21, 2019) (quoting *Bell*, 441 U.S. at 561). A civil detainee can prevail by introducing "evidence of a subjective intent to punish," or by showing "that a restriction is objectively unreasonable or excessive relative to the Government's proffered justification."[6] *Id.*; *see also Banks v. Booth*, No. CV 20-849(CKK), 2020 WL 1914896, at *5–6 (D.D.C. Apr. 19, 2020) (discussing standard to be applied to punitive-conditions claim in prison context). Under *Bell v. Wolfish*, courts have considered whether the conditions are "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods" as part of the determination of whether a condition or restriction is reasonably related to a legitimate governmental objective.

---

[6] Most cases that apply this standard do so in the context of pre-trial detainees in prison. However, there is nothing to suggest that the same standard should not apply to other civil detainees such as the detained immigrants here, and cases have recognized the same. *See, e.g.*, *Doe v. Kelly*, 878 F.3d 710, 714 (9th Cir. 2017) (applying standard in immigration detainee context); *Torres*, 411 F. Supp. 3d at 1064 (same); *cf. Matherly v. Andrews*, 859 F.3d 264, 274–75 (4th Cir. 2017) (applying standard to civil commitment under Adam Walsh Act).

*Bell*, 441 U.S. at 539 n.20; *see, e.g.*, *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004).[7]

Few cases consider conditions of confinement in the context of conditions that result, at least in part, in limited access to counsel.  Plaintiff cites to *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036 (C.D. Cal. 2019), in which the court considered whether certain alleged conditions at a detention facility were sufficient to sustain a conditions of confinement claim at the motion to dismiss stage, *id.* at 1064–65.  It found that they did, as plaintiffs there had sufficiently alleged that the conditions regarding access to counsel were "not more considerate than those at pretrial and prison facilities" and that the facility could have achieved its objective using "'alternative and less harsh methods.'"  *Id.* (quoting *Jones*, 393 F.3d at 932).  The Court agrees with the reasoning in *Torres* that plaintiffs may fairly claim that conditions resulting in limited access to counsel may be punitive in nature and may therefore violate the substantive due process clause. This is especially true when the access to counsel is not necessarily related to removal proceedings, but to proceedings in which detained immigrants are seeking release in light of COVID-19.

Below, the Court first addresses the "less harsh" alternative seemingly proposed by Defendants—in-person legal visitation—and finds that it is likely not a "less harsh" and viable alternative through which detained individuals may confer with legal representatives in light of

---

[7] Plaintiff suggests that this Court adopt the approach taken in *Jones v. Blanas*, in which the Ninth Circuit found that:

> With respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held, or where the individual is detained under conditions more restrictive than those he or she would face upon commitment.

393 F.3d at 934.  This approach has been rejected by the Fourth Circuit.  *See Matherly*, 859 F.3d at 275–76.  Because the Court finds that Plaintiff has a likelihood of success in demonstrating that the conditions are punitive without such a presumption, the Court does not adopt this approach here.

COVID-19.  The Court then discusses the conditions challenged by Plaintiff and considers the points raised by Defendants with respect to those conditions.  The Court thereafter considers whether the claimed restrictions and conditions are punitive, which also includes considering Defendants' proffered objectives and whether the conditions and restrictions are proportionate to those objectives.

### a. In-Person Legal Visitation as a "Less Harsh" Alternative

As previously noted, Defendants do not frame their briefing in terms of the substantive due process analysis.  However, their focus on access to in-person legal visitation indicates that they view such visitation as a "less harsh" alternative for ensuring that Plaintiff's clients have access to their counsel in the wake of COVID-19.  In other words, they appear to suggest that the conditions and restrictions that Plaintiff alleges regarding remote legal visits cannot violate any substantive due process rights because in-person legal visitation, with applicable restrictions, is still an option.[8] *See* Defs.' Opp'n at 38–40.  The Court therefore considers whether in-person legal visitation, with restrictions, is likely a "less harsh" alternative to ensuring that detained immigrants have access to their counsel under the current circumstances.

Defendants argue that the restrictions on in-person visits do not violate any constitutional rights.  They also stress, both in their briefing and declarations, that in-person legal visits are still possible with certain restrictions.  In doing so, they misunderstand the gravamen of Plaintiff's argument with respect to in-person visitation.  Plaintiff does not appear to question whether the

---

[8] Again, Defendants did not directly address Plaintiff's substantive due process arguments. However, the Court, in its discretion, is willing to consider Defendants' general arguments in this context, construed generously, rather than treat the entire argument as conceded.  *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[Local Civil Rule 7] is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court *may* treat the unaddressed arguments as conceded." (emphasis added)).

restrictions on in-person visitation, namely the PPE requirement, are punitive.  *See* Pl.'s Mem. at 25–27 (arguing that legal communications conditions are punitive without discussing whether in-person visitation restrictions are punitive); Pl.'s Reply at 19 ("But as SPLC has repeatedly explained, Plaintiff is 'in no way' challenging the PPE requirement." (citing Trans. of May 12, 2020 Hearing at 13:25–14:1)).  The Court therefore does not consider whether the PPE requirement or other restrictions relating to in-person visitation are themselves likely punitive.

At least with respect to the conditions of confinement argument, Plaintiff is suggesting that in-person visitation is currently not a viable alternative method of communication due to COVID-19 and that, in most instances, remote legal communication is necessary.  Plaintiff explains that "most of the legal profession has transitioned to remote communications (e.g., phone and video-teleconference) in order to protect not only themselves but also their clients and detention center staff from the prospect of transmitting the virus."  Pl.'s Mem. at 6.  The declarations submitted by Plaintiff demonstrate that Plaintiff's concern is "unknowingly expos[ing] clients to the virus or contract[ing] the virus themselves."  Rivera Decl. ¶ 19; *see also, e.g.*, Osorio Decl. ¶ 8 ("Because of a number of factors, including local and state directives on social distancing, ICE's requirements for attorneys to procure personal protective equipment (which is in short supply), and in order to limit exposure, I proceeded with preparation for this client's individual hearing via VTC."); López ¶ 11 ("Given the nationwide shortage of such protective equipment, even for medical personnel, such a requirement has, in practice, created a ban on in-person attorney visits."); *id.* ¶ 18 ("Our clients are understandably fearful of contracting the disease . . . This makes it incredibly difficult for us to meet with and represent our clients since going to facilities with confirmed cases, especially when travelling from the most affected area of the state, puts us, our clients, our families, and everyone with whom we come in contact at risk of infection.").  Indeed, there are already cases

of COVID-19 in these detention centers. *See, e.g.*, Rivera Decl. ¶ 14 (listing confirmed cases as of May 6, 2020); López Decl. ¶ 6 (explaining that "an entire dorm had been quarantined" at Pine Prairie due to suspected cases of COVID-19); *id.* ¶ 14 (discussing confirmed cases at Pine Prairie). And certain of Plaintiff's clients may be at high risk of becoming seriously ill if they contract COVID-19. For example, one of Plaintiff's clients has "Type II diabetes and hypertension" along with other conditions, which places him at a higher risk of becoming severely ill if he contracts COVID-19. Sanchez Martinez Decl. ¶ 3.

Defendants do not contend that in-person visitation, with the PPE requirement, is safe. They do not present any information or evidence suggesting that Plaintiff's concerns about attorneys infecting detained individuals, or contracting the illness themselves, are misplaced. Defendants do suggest that the mandatory use of PPE was implemented "to reduce the risk of spreading the virus." Defs.' Opp'n at 5; *see also* Bretz Decl. ¶ 17 ("Noncontact legal visitation is still permitted provided the visitor provides their own personal protective equipment and submits to screening prior to entering the facility."); Chambarlain Decl. ¶ 21 ("All visitors must wear PPE and if they do not have it the facility will provide it to them."); First Washburn Decl. ¶¶ 16–20 (explaining that all visitors must submit to screening and must bring their own PPE if making an in-person legal visit). The Court does not disagree that adopting a mandatory PPE requirement may work to slow the spread of COVID-19, especially in light of CDC guidance on face coverings. *See, e.g.*, *About Cloth Face Coverings*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html (last visited June 17, 2020); *Recommendations for Cloth Face Covers*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-

cover.html (last visited June 17, 2020).[9]

However, the Court cannot dismiss Plaintiff and its legal staff's valid concerns regarding infecting detained immigrants or contracting the illness themselves, especially as many of Plaintiff's clients are seeking to be released into the community to *decrease* their chances of contracting and becoming seriously ill with COVID-19.  As the CDC explains, "the virus can spread between people interacting in close proximity—for example, speaking, coughing, or sneezing—even if those people are not exhibiting symptoms."  *Recommendations for Cloth Face Covers*, Ctrs. for Disease Control & Prevention (last visited June 17, 2020).  While it recommends the use of face coverings to "*slow* the spread of the virus," it also emphasizes that "maintaining 6-feet social distancing remains important to *slowing* the spread of the virus."  *Id.* (emphasis added).  The CDC Interim Guidance subsequently suggests that detainment facilities   "[c]onsider suspending or modifying visitation programs" and "provide access to virtual visitation options where available."  *See* Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* at 13, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (last updated March 27, 2020).  It further advises that, to the extent in-person visits are suspended or modified, "alternate means (e.g., phone or video visitation)" should be provided "for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult."  *See id.*

Based on this language and the CDC Interim Guidance more generally, it appears that the

---

[9] Plaintiff has also submitted declarations that address how COVID-19 is spread.  *See, e.g.*, Venters Decl. ¶ 5(a) (listing "transmission by aerosolized droplets expelled from the mouth by speaking, coughing, sneezing, and breathing" as one method of transmission for COVID-19).  Defendants do not bring to this Court's attention in its briefing any evidence that this is not how COVID-19 is transmitted.  Nor do they appear to contest these assertions.

CDC does not maintain that wearing face coverings or PPE guarantees that transmission of the virus will not occur.  Moreover, Defendants do not argue about or present any evidence regarding the effectiveness of PPE, and their other precautions, as related to the circumstances surrounding in-person legal visitation (such as the distance between attorney and client, the size of the room, etc.) for the Court to consider.  It may be that information regarding the effectiveness of PPE and their precautions in such circumstances, or even more generally, is limited.  But that too suggests that Plaintiff's concern that in-person legal visitation still poses tangible risks is legitimate, as there would be insufficient information to support that in-person legal visitation does not place numerous persons at risk of contracting COVID-19.  Nor do Defendants address whether in-person legal visitation complies with regional, state-level, or local stay-at-home orders.

Accordingly, to the extent that Defendants intended to suggest in their briefing that in-person legal visitation remains a less harsh alternative to remote legal visits, the Court finds that, under the circumstances presented here, it does not.  Considering how COVID-19 spreads, there is a real risk of attorneys or staff contracting the illness or infecting their clients (or even staff) at the Facilities.  While Defendants have established certain precautions aimed at decreasing those risks, they do not propose or present evidence indicating that such risks can be completely, or even mostly, ameliorated.  As a result, Defendants cannot maintain that in-person legal visits are likely to be a "less harsh" alternative to the current remote legal visitation systems, policies, and procedures that Plaintiff challenges.  *See Bell*, 441 U.S. at 539 n.20; *Jones*, 393 F.3d at 932.

### b. Challenged Conditions

#### i. Challenged VTC-related Conditions

Plaintiff raises various issues with VTC access.  Prominent among them are delays: "delays in receiving a response to a VTC request, delays between the date requested and the date made available, delays on the day of the appointment, as well as outright cancellations."  Pl.'s Mem. at 10; *see, e.g.*, Rivera Decl. ¶ 22 ("SIFI staff report delays relating to VTC requests at all four facilities, both in the time that it takes facility staff to send an initial response to the request, and in the number of days between the date of the request and the dates offered for VTC slot availability."); *id.* ¶ 23 ("With respect to VTC delays, at LaSalle, SIFI staff have repeatedly had to wait four to six days between the date they request a VTC call and the date they complete the corresponding VTC call."); *id.* (detailing how, in two instances, no time slots were available for six days); *id.* ¶ 24 (explaining how LaSalle acknowledged the delay and attributed it to "the high demand to use Skype during the pandemic and the limited resources at the facility"); Williams Decl. ¶ 11 (discussing Irwin and Stewart facilities and explaining that "[t]he detention center typically schedules our request for a one-hour appointment one to three days after our original request").

Plaintiff states that Defendants offered to "provide extended VTC days and hours of operation for the Facilities."  Pl.'s Mem. at 10; *see* Rivera Decl. ¶ 21; *id.* Ex B. (April 3 letter from Defendants to Plaintiff).  However, Plaintiff claims that it has seen no evidence of these extensions. Pl.'s Mem. at 10; Rivera Decl. ¶ 22 ("There is no indication that these extensions have been fully applied.  For example, for VTC slots on April 24 and April 27, SIFI attorneys at Stewart were offered the same hours that Stewart has always had – 9am to 3pm."); *id.* ¶ 24 ("Moreover, despite ICE's promise to extend VTC hours, SIFI staff still report scheduling delays.  On April 6, a SIFI

attorney at LaSalle requested a VTC for the next day.  She received a response on April 7, providing a slot on April 8.").

According to Plaintiff, delays can significantly harm their detained clients' causes, especially with respect to their efforts to be released due to the ongoing pandemic.  For example, in one instance involving a six-day delay between the date of the request and the date scheduled, the SIFI legal worker was attempting to meet with "medically fragile" detained clients who "required immediate assistance in seeking release due to their increased vulnerability to serious illness or death should they contract COVID-19."  Rivera Decl. ¶ 24.  The purpose of the calls was "to gather evidence for humanitarian parole applications in light of COVID-19 vulnerabilities," and each additional day of delay increased the possibility that they might contract COVID-19 within the facility.  *Id.*  In another instance, counsel requested a remote legal visit with an immigrant detained at Irwin to interview that individual "for potential inclusion" in ongoing habeas litigation filed by Plaintiff and SIFI, but Irwin allegedly failed to respond to the attorney's request despite multiple follow-up attempts and the visit was never scheduled.  Williams Decl. ¶ 19. Plaintiff claims that this "defeat[ed] their chances for release during this dangerous pandemic." Pl.'s Mem. at 11.

In addition to delays, Plaintiff alleges that "Defendants have restricted VTC access through sudden and seemingly arbitrary restrictions at the Facilities."  *Id.*  This includes Stewart effectively setting "a weekly cap on the number of VTC calls a SIFI attorney could have with the same client." *Id.*  As explained in the Rivera Declaration, an attorney had requested two more additional one-hour slots before a hearing to prepare with her client.  Rivera Decl. ¶ 25.  However, staff "quickly denied one of her two requests, saying two slots per week for one client was sufficient."  *Id.*  She was ultimately scheduled for one more slot the day before the hearing, but it was cancelled due to

a lockdown at the facility, which Plaintiff claims "denied counsel her final opportunity to speak to the client before the hearing." *Id.*

Plaintiff also claims that Defendants have scheduled, rescheduled, or canceled calls with little or no notice. Pl.'s Mem. at 11; Rivera Decl. ¶ 26 ("For example, on April 14, an officer at Pine Prairie told a SIFI attorney that the reason they had to reschedule the VTC appointment from the prior day was because the officer was on transport duty."); *id.* ¶ 28 ("This happened to a SIFI attorney on April 16, when he was unable to speak to one of four individuals inside Stewart with whom he had scheduled VTCs. All four individuals had disclosed COVID19 vulnerabilities at intake, prompting the need for time-sensitive follow-up given the rise in COVID-19 cases at Stewart. The VTC calls were set back-to-back, starting at 12 p.m. CoreCivic staff did not call until 1 p.m. At that point, the VTC took place with the second individual he was scheduled to meet. No mention was made of the first individual he had been scheduled to speak with at 12 p.m. The SIFI attorney completed three interviews from 1 p.m. to 4 p.m., then asked the VTC coordinator about the missed call at 12 p.m. He did not receive a response, so SIFI staff again had to follow up. Eventually, the SIFI attorney was forced to reschedule the meeting with that individual for six days later, April 22."); Williams Decl. ¶ 12 ("In my experience, when Irwin finally responds to a request for a remote legal visit, Irwin routinely provides very short notice of the selected time and day and does not give Habeas Counsel any opportunity to reschedule due to conflicts."); *id.* ¶ 20 ("On April 15, 2020, I requested remote legal visits for two of our petitioners detained at Irwin by emailing the designated contact at Irwin. I sent emails following up on this request on April 16 and 17. On April 17, I received an unexpected Skype call from one of the petitioners. Irwin had failed to confirm the date and time of this remote legal visit. While I was able to answer the call, I was unprepared for the visit and was unable to accomplish everything I had planned to address during

our visit."); Osorio Decl. ¶ 7 ("[O]n April 15, 2020, I requested a VTC legal visit for April 21 to finish preparing my client for her individual hearing scheduled for two days later, on April 23. Despite several emails to Irwin requesting the VTC appointment, I received no confirmation and was unaware if the meeting would be moving forward. Fortunately, my client's husband advised me on the morning of April 21 that the appointment had been confirmed to the client for 2 PM later that day.").

Plaintiff also alleges that Defendants, and in particular Irwin, also failed to properly notify clients of scheduled calls on at least two occasions. Pl.'s Mem. at 11; *see* Rivera Decl. ¶ 33 ("On March 13, a SIFI attorney had scheduled a VTC call with a client detained at Irwin. At the time of the VTC, Irwin employees told the SIFI attorney that the individual did not want to speak with him. It was not until a rescheduled call days later that he was able to meet with the client, and the client stated that if he had known it was the SIFI attorney on the VTC, he would have certainly taken the call."); Williams Decl. ¶ 21 ("On April 22, 2020 at 2 pm, Ms. Mesa was scheduled for a remote legal visit with one of our petitioners detained at Irwin. Irwin never presented our petitioner for the visit. Irwin represented to Ms. Mesa that our petitioner did not want to speak with her. Ms. Mesa subsequently spoke with our petitioner's immigration counsel and family, who informed Ms. Mesa that our plaintiff was told that Ms. Mesa was an attorney trying to "poach" her."). Quality of VTC calls is also at issue, as "one SIFI attorney now schedules only legal phone calls" at LaSalle. Pl.'s Mem. at 11; Rivera Decl. ¶ 24; *see also* López Decl. ¶ 9 (discussing similar issues at Pine Prairie).

Plaintiff also highlights "unreasonable time restrictions" for VTC calls. Pl.'s Mem. at 11. At Pine Prairie, the limit is thirty minutes, although in reality it is sometimes less "due to the time it takes to move quarantined and non-quarantined individuals separately." *Id.* at 11–12; *see* Rivera

Decl. ¶ 8 ("Until recently, Pine Prairie had only one VTC console; each VTC call is limited to thirty minutes."); López Decl. ¶ 8 (explaining calls are thirty minutes and detailing on in practice calls are often less time).  VTCs are limited to one hour at Stewart and Irwin.  Pl.'s Mem. at 12; Williams Decl. ¶ 11 ("Generally, visitation is limited to one hour, even when an interpreter is needed for the remote legal visit.").  These limitations are still in place even when interpreters are necessary, which "effectively doubles the time it takes to communicate."  Pl.'s Mem. at 12; *see* Williams Decl. ¶¶ 11, 16; Rivera Decl. ¶ 10.

Furthermore, Plaintiff notes that there are confidentiality issues with the current systems established by Defendants, such as staff interrupting calls or having calls occur in cubicles with thin walls through which attorney–client conversations are "clearly audible."  Pl.'s Mem. at 12; Rivera Decl. ¶¶ 30–31 ("Pine Prairie does not provide spaces that allow for private and confidential VTC conversations.  The VTC consoles sit in cubicles with thin walls that are not soundproof and do not reach to the ceiling.  A SIFI attorney was conducting a VTC call with a client on April 7 when she received a text message from a fellow attorney that practices with ISLA- Immigration Services & Legal Advocacy.  The attorney alerted her that they were conducting their own VTC with an individual at Pine Prairie and could clearly hear everything that the SIFI attorney and SIFI client were saying."); *id.* ¶ 32 ("At Irwin, it is very common for employees to go in and out of the library room during VTCs."); Williams Decl. ¶ 15 ("Additionally, at Irwin, if the library video-teleconference station is used for the remote legal visit, detention center staff frequently interrupt our visit by entering the library and answering calls on a phone placed just a few feet away from the detained individual."); Osorio Decl. ¶¶ 5–6 ("In all of these VTC legal visits, I have observed Irwin staff coming and going from the VTC room, compromising the confidentiality of the meeting.  At times, guards have sat in the back of the VTC room while I have discussed case

preparations with the client.").

Lastly, Plaintiff explains that Defendants have taken "inadequate safeguards to protect detained individuals from the virus during VTC calls," which has made Plaintiff's attorneys "think twice about proceeding with remote legal visits to avoid health risks to their clients." Pl.'s Mem. at 12. Plaintiff provides examples of how detained clients did not have access to gloves. *Id.* at 12; *see* Williams Decl. ¶¶ 8–9; Rivera Decl. ¶ 32; Sanchez Martinez Decl. ¶ 14. Plaintiff also gives an example of a VTC terminal not being disinfected after an individual from a quarantine unit was at the VTC terminal. Pl.'s Mem. at 13; López Decl. ¶ 16 (explaining how guards mistakenly brought wrong client from "cohorted dorm," or quarantined unit, and then replaced him with correct client "without wiping down the area" and noting that warden was emailed and did not respond regarding this incident). Plaintiff claims that the lack of PPE and other hygiene measures causes detained clients to risk exposure to the virus. Pl.'s Mem. at 15–16 (citing sources); Venters Decl. ¶ 11.

Defendants do not respond to the crux of Plaintiff's arguments that these conditions are punitive, as previously explained. *See* Defs.' Opp'n at 40–43 (arguing mostly that allegations regarding VTC access do not rise to violation of right to access counsel). Aside from Defendants arguments aimed at the access-to-counsel claim, which this Court does not consider here, Defendants point out a few other issues worth raising. First, they argue that Plaintiff "demands a system that involves both appointments of unlimited time and duration" but that also "is free of delays," and that these two conditions are incompatible. Defs.' Opp'n at 43. Defendants also argue at length that Plaintiff's requested relief would require the Court to micromanage "the day-to-day operations of the facilities." *Id.* at 43–44. The Court considers these two points later in the context of the balance of hardships, the public interest, and the scope of the injunctive relief

granted.

Defendants also claim that a ruling in Plaintiff's favor would "convert every video conference with poor picture quality, any dropped phone call, or a scheduling mishap into a federal lawsuit." *Id.* at 44. But that is not true: One single mishap does not necessarily a lawsuit make. Plaintiff alleges that it is the totality of these circumstances—the lack of viability of in-person visits, the scheduling and quality issues of VTC, and the other conditions discussed below—that are punitive, not any particular condition. Defendants' argument is therefore unpersuasive.

Defendants next point out that the relevant Performance-Based National Detention Standards ("PBNDS") do not require any generalized access to VTC under PBNDS 5.6. Defs.' Opp'n at 44. It is true that PBNDS does not provide details on access to VTC. That does not demonstrate that the conditions at the Facilities, in their totality, are not punitive. Moreover, as VTCs are essentially calls, the provisions in the PBNDS regarding telephone calls may be applicable or at least serve as guidance on how such conferences should be handled. Relevant provisions are discussed in more detail below, when discussing the claimed telephone conditions.

Lastly, Defendants take issue with some of Plaintiff's claims relating to VTCs. Defendants note that Stewart has a daily limit of one hour per attorney–client pairing, which it argues is reasonable under the PBNDS. Defs.' Opp'n at 45; Fourth Washburn Decl. ¶¶ 64, 82. Defendants here miss Plaintiff's point that due to the limited availability of time slots, that one hour in some cases effectively becomes the only time in a week that a detained immigrant may speak with counsel, thereby establishing a cap. *See* Pl.'s Mem. at 11.

Defendants respond that the VTC schedule at Stewart was in fact expanded from 8 a.m. to 6 p.m. on Monday through Friday. Defs.' Opp'n at 45; Fourth Washburn Decl. ¶¶ 62–63. Defendants further state that Plaintiff is "given special VTC treatment at LaSalle," which "includes

a daily exclusive two-hour VTC window from 5:00pm–7:00pm on one of LaSalle's VTC consoles." Defs.' Opp'n at 46. Plaintiff explains in its Reply that "this *ad hoc* remedy was offered only six days ago in response to a non-compliance notice sent by SPLC," and that it provides "*no* additional access beyond what the parties already negotiated in a prior settlement agreement at that facility." Pl.'s Reply at 16 n.8. Plaintiff also claims that this does not provide a "systemic 'fix'" for the "ongoing connectivity issues that have made VTCs wholly unreliable at LaSalle." *Id.* (citing Rivera Decl. ¶ 24). While Plaintiff does have additional time slots at LaSalle, the availability of those additional slots does not erase any issues with scheduling, delays, cancellations, or VTC quality.

### ii. Challenged Telephone-related Conditions

Plaintiff raises several issues with "facility legal calls," which it describes as "confidential phone calls coordinated by the facility." Pl.'s Mem. at 13. Plaintiff explains that the process for setting up legal calls is unclear to clients and attorneys at these Facilities, especially as such phone calls are new to Stewart and Pine Prairie. *Id.*; *see* Rivera Decl. ¶ 38 ("However, to SIFI's knowledge, there had never been a process to set up facility legal calls at Stewart or Pine Prairie."). For instance, when SIFI staff at Stewart approached employees there about facility legal calls, they were told that those employees "were not aware of any mechanism for facility legal calls." Rivera Decl. ¶ 39; *id.* Ex. B. The attorney had to contact the warden regarding a clear procedure for facility legal calls, which, based on Plaintiff's declaration, she did not receive. Rivera Decl. ¶¶ 39–40. When she did schedule facility legal calls, she experienced issues and delays. *Id.* ¶ 41 ("For the first call, the SIFI attorney was given a phone number to call at 10 a.m. She called the number and twice got voicemail. When she called a third time, a person answered and asked who she needed. About ten minutes later, her client spoke into the phone line and she was able to talk with

him.  The second call was scheduled for 12 noon.  It did not happen at 12 noon, and when the
attorney inquired, she was told she could do the call at 1 p.m.  She called at 1 p.m. and was finally
able to speak with the potential client.").

Moreover, as for Pine Prairie, Plaintiff explains that "although officials have represented
to SIFI that detained persons may request a facility legal call through their case manager, this does
not occur in practice" because "only one of SIFI's clients at Pine Prairie has been informed who
their case manager is."  Rivera Decl. ¶ 38.  This is complicated by the fact that the case managers
speak only English.  *Id.*  Moreover, Plaintiff claims that "none of their clients have been informed
by their facilities of any process for requesting a facility legal call."  *Id.* ("One SIFI attorney who
has been working with people detained at the facility since October 2018 states that no client of
hers has ever been able to successfully request a facility legal call.").

Plaintiff also claims that, aside from process-related issues, there are delays in scheduling
similar to VTC calls and that detained individuals have been restrained from accessing legal calls
due to lockdowns.  Pl.'s Mem. at 14; *see* Rivera Decl. ¶¶ 40–42.  There have been significant
connectivity issues at LaSalle when dialing in essential third parties, such as other attorneys and
interpreters.  Pl.'s Mem. at 14; *see* Rivera Decl. ¶ 43.  Plaintiff claims that Defendants' solution is
to have the client take the call while on speaker, which Plaintiff claims "raises similar
confidentiality concerns to the VTC calls because conversations can be overheard by individuals
in the next room."  Pl.'s Mem. at 14; *see* Rivera Decl. ¶ 43 ("On April 6, SIFI staff attempted to
conference an additional party into the call and the line stopped functioning.  When SIFI staff
raised the issue to Geo Group staff, they stated this was likely because the detained client was
attempting to use the receiver rather than take the call on speaker phone.  On April 23 and April
25, a SIFI attorney had legal calls with clients, but the phone connectivity each time was very

rough and the call itself kept breaking up.  In the April 25 instance, the client tried to hang up and call using another phone, but the issues remained.  Connectivity issues for legal calls at LaSalle are especially frustrating because, for example, one SIFI attorney only schedules legal calls due to LaSalle's extremely poor VTC quality.").

Furthermore, Plaintiff claims that it has had issues getting confirmation from the Facilities that their phone numbers are on a do-not-monitor list to address confidentiality concerns.  Pl.'s Mem. at 15.  They have received verbal, but not written, confirmation from LaSalle, Stewart, and Pine Prairie.  *Id.*; Rivera Decl. ¶ 44 ("In mid-March, SIFI also contacted ICE to request that a list of SIFI cell phone numbers be placed on a do-not-monitor-or record list for paid calls. SIFI requested written assurances that calls to these numbers would not be monitored or recorded. While ICE did not provide any promises of confidentiality in writing, the agency did verbally confirm that calls would be confidential at three of the four facilities."); Williams Decl. ¶ 14 ("SPLC has requested that several phone numbers of SPLC staff who regularly provide legal assistance to detained individuals at Irwin and Stewart be placed on a do-not-monitor list. While we have received verbal confirmation that these phone numbers have been placed on a do-not-monitor list for detained individuals at Stewart, Warden Paulk has refused to confirm whether our calls with detained individuals at Irwin are unmonitored.").  As of May 5, Irwin was unable to confirm whether the calls at its facility were monitored because "Defendants do not have a contract with that facility's phone vendor."  Pl.'s Mem. at 15; *see* Rivera Decl. ¶ 45 ("ICE's assurances concerning the privacy of paid calls do not apply to Irwin because this facility's phone vendor, Correct Solutions, does not have a contract with ICE. To obtain assurances of privacy for Irwin calls, SIFI staff spoke with the Irwin warden. He agreed to contact the vendor to request that certain phone numbers be placed on a do-not-monitor or record list. After that conversation, a SIFI

attorney emailed the warden with a list of the telephone numbers. The warden asked for the names of the phone owners; SIFI declined to provide the names of its legal workers. As of May 5th, the Irwin warden had not yet responded to SIFI's repeated requests for confirmation that calls made to these numbers are unmonitored."); Williams Decl. ¶ 14.

Plaintiff also notes that these calls are made in an "open space, in close proximity to the individuals from their unit" and thus do not guarantee confidentiality.  Pl.'s Mem. at 15; *see* Williams Decl. ¶ 13 ("Because of the difficulty of scheduling remote legal visits with petitioners, we have relied heavily on petitioners' ability to call us using the same phones they use to call loved ones, which are located in open, shared spaces that do not allow for confidential conversations."); Rivera Decl. ¶ 46 ("Even if Correct Solutions and/or ICE were to confirm that collect calls to SIFI attorneys are not being monitored, these calls face the same confidentiality concerns as calls made to the SIFI hotline, as they are made in the unit on a shared telephone.").

Plaintiff additionally claims that there are hygiene concerns with the use of these shared telephones, as detained clients are often close to each other while waiting to use the telephones and lack protective equipment.  Pl.'s Mem. at 15; *see* Venters Decl. ¶ 11 (discussing general cramped nature and inability to effectively socially distance in detention environment); *id.* ¶ 36 (discussing how April 10, 2020 ERO COVID-19 Pandemic Response Requirements are deficient, in particular with respect to cleaning of shared spaces and objects, including telephones).  One client explains in his declaration that he was cautious to use the telephones:

> I also was very careful about what I shared during these telephone calls because I was not very comfortable speaking in the common area and surrounded by other detainees. I was also scared to be using the phone too often, because I knew that it was not cleaned, and it was used by many other detainees. Because we were not provided with our own additional cleaning supplies, I used to use the alcohol pad that the nurse gives me when I receive my insulin shot to wipe down the telephone.

Sanchez Martinez Decl. ¶ 7.  He also stated that he "never once saw a detainee or someone who

works at Stewart cleaning the telephones" and that they were not "provided with additional cleaning supplies to keep" such items and areas "disinfected and sufficiently clean." *Id.* ¶ 12. Plaintiff notes that clients are in units with few working telephones, which means that if the phones are not being cleaned between uses, there could be significant exposure issues. Pl.'s Mem. at 15–16; *see* Rivera Decl. ¶ 47; Sanchez Martinez ¶¶ 10–11; Venters Decl. ¶ 36.

In conclusion, Plaintiff claims that Defendants have failed to comply with its own ERO COVID-19 Pandemic Response Requirements, which require facilities "to ensure all detainees receive some number of free calls per week," Rivera Decl. ¶ 48; Schriro Decl. ¶ 58, and the CDC's guidance for detained populations, to "increase access to free or low-cost telephones and virtual visitation," Pl.'s Mem. at 16 (citing CDC Interim Guidance at 13–14).

Defendants' response to the telephone-related conditions focus on arguing that Defendants are in compliance with the relevant PBNDS provisions. *See* Defs.' Opp'n at 44, 46. The PBNDS's minimum requirement is 25 phones and a minimum limit of 20 minutes per legal call. *See* PBNDS 5.6(V)(A)(1) ("To ensure sufficient access, each facility shall provide at least one operable telephone for every 25 detainees."); PBNDS 5.6(V)(F) ("If time limits are necessary for [legal] calls, they shall be no shorter than 20 minutes."). Defendants explain that some of the Facilities in fact exceed the optimal ratio of 1:10 for telephones. Defs.' Opp'n at 46 (listing Facilities and using information from Plaintiff's declarations to calculate ratio). While the PBNDS provides a helpful touchstone, whether Defendants are in compliance with PBNDS does not indicate whether the conditions are punitive. Moreover, in light of the spread of COVID-19, some of the provisions in the PBNDS may be less relevant.

Next, Defendants "do not agree that legal calls are difficult to obtain." *Id.* at 47. They cite to various portions of their declarations, many of which outline processes for obtaining a VTC

and/or legal call, many of which have been recently adopted.  *See* Rice Decl. ¶ 37; Staiger Decl. ¶ 36; Fourth Washburn Decl. ¶¶ 55–60; Second Paulk Decl. ¶ 40.  These declarations establish that these Facilities have started to adopt processes by which attorneys and detained clients may schedule VTCs or legal calls.  However, they do not address many of Plaintiff's claims, such as issues with delays in scheduling, ensuring the confidentiality of legal calls, hygiene concerns, and quality of VTCs and phone calls.  In fact, at least one declaration provided by Defendants indicated that confidentiality may be a concern for certain phone calls, *see* Second Paulk Decl. ¶ 39 ("Attorneys wishing to speak to a detainee [at Irwin] via telephone are advised that phone calls are recorded and monitored, and attorneys are recommended to schedule a VTC appointment to speak to detainees for full confidentiality."), and another declaration submitted by Defendants indicated that the offices in which such calls are taken may be cleaned only once per day, *see* Fourth Washburn Decl. ¶¶ 58 (noting that offices "where these calls are scheduled to occur are cleaned and sanitized, at least once daily").

### iii. Challenged Mail-related and Document Exchange-related Conditions

Plaintiff also challenges the restrictions and conditions related to mail and document exchange at the Facilities.  To begin with, Plaintiff claims that Defendants "will not retrieve fax documents or download electronic documents for detained individuals at the Facilities."  Pl.'s Mem. at 16; *see* Rivera Decl. ¶ 53, Ex. B at 3 (Apr. 3, 2020 Letter from ICE Associate Legal Advisor stating that "[t]he facilities' unit managers and law library officers will continue to assist the detainees with their needs to exchange a hardcopy of legal documents with their attorneys, but will not retrieve facsimiles or download electronic copies of legal documents for detainees").

Plaintiff proposes that this is unreasonable because Irwin allows detained individuals to send faxes to their attorneys and, at least for a few weeks, "had allowed attorneys to send faxes for

their clients that the facility officer would retrieve for them before a VTC appointment." Pl.'s Mem. at 16; *see* Rivera Decl. ¶ 53 ("Out of the four facilities, SIFI has received faxes from their detained clients at Irwin, as it seems there is a system in place for this one-way communication. Additionally, for about two to three weeks before the pandemic, Irwin also allowed attorneys to send faxes to the facility before VTC appointments, to be delivered to their client."); Williams Decl. ¶¶ 23–24 ("Additionally, as far as I know, we are unable to send faxes to any of our detained petitioners at Stewart or Irwin. We are able to receive faxes from our petitioners detained at Irwin, but we are unable to receive faxes from our petitioners detained at Stewart."). Plaintiff also claims this restriction on use of faxes is unreasonable because faxes are used for certain documents such as medical records already. Pl.'s Mem. at 16–17; Rivera Decl. ¶ 12 ("Facilities have allowed SIFI attorneys to fax authorizations for release of medical records and often subsequently receive the medical records from the facility via fax."). Plaintiff claims that allowing the use of fax machines to obtain client signatures "would greatly improve access, especially with the restrictions on in-person visitation and delays in mail." Pl.'s Mem. at 17; *see* Rivera Decl. ¶ 54 (explaining that "Defendants' refusal to facilitate timely exchange of documents hinders effective representation" and providing example where "in late March a SIFI attorney requested her client's medical records from LaSalle after receiving express verbal authorization from her client to do so," but ICE officials refused to accept the medical records release without "a wet signature" from the detainee, which would require use of mail and delay process).

Plaintiff further claims that its attorneys and clients have experienced difficulties with mailing. They first discuss restrictions on metered and preaddressed envelopes. Their staff has had mixed success, for example, with sending pre-stamped envelopes to Stewart. Pl.'s Mem. at 17; Rivera Decl. ¶ 50. As stamps are not permitted in the Facilities, Plaintiff must deposit funds

into the clients' accounts or potentially not comply with stay-at-home orders to obtain prepaid envelopes.  Pl.'s Mem. at 17; Williams Decl. ¶ 23 ("In addition to the access issues related to remote legal visits, Habeas Counsel have been unable to exchange documents with petitioners in an expeditious manner. Before the pandemic, we typically exchanged documents and obtained signatures during in-person legal visits. Now, with in-person visitation effectively prohibited, the only means for documents exchange is postal mail, which is a slow and unreliable process. We are unable to include stamps in our written correspondence with petitioners because stamps are banned by the detention centers. This forces us to deposit funds into petitioners' commissary accounts or break social distancing protocols and stay-at-home orders to obtain prepaid envelopes that can be used by petitioners to return documents to us.").

As a result of the above restrictions, Plaintiff has relied upon postal mail, which it claims is also unreliable and may result in significant delays.  Pl.'s Mem. at 17; *see* Rivera Decl. ¶ 9 ("Mail has not proven to be a reliable method to exchange documents with clients. For example, at Stewart, where a single post office box number is shared by the court, ICE prosecutors, ICE Enforcement and Removal Operations agents, and people confined inside the detention center, mail sometimes does not reach its intended recipient. At Pine Prairie, detained individuals have reported that legal mail has been searched and evidence improperly confiscated as contraband. Delays in sending and receiving are the norm."); *id.* ¶ 50 ("SIFI staff has been using the U.S. Postal Service and FedEx to send mail to detained people. SIFI provides pre-stamped or pre-metered envelopes for the recipient to return documents to SIFI. SIFI staff report inconsistent results with receipt of correspondence from people detained at Stewart, while SIFI LaSalle have been successful. Mailings appear to be periodically rejected regardless of the delivery service or the type of postage.").  These types of delays may have serious consequences for Plaintiff's clients

that are seeking to be released due to the emergence and spread of COVID-19.  Pl.'s Mem. at 17–
18; *see* Rivera Decl. ¶ 51 ("A one-week delay amid this pandemic has grave consequences for
individuals medically vulnerable to COVID-19. To illustrate, in a matter of one week, ICE reported
the number of confirmed COVID-19 cases among individuals detained at LaSalle increased from
two to twenty."); *id.* ¶ 52 ("Delays also generally harm clients' chances of winning release. One
factor an immigration judge considers in a release motion is the applicant's flight risk. The closer
a person's final individual or merits hearing is, the more of a flight risk she is considered to be.").

Lastly, Plaintiff alleges that "Defendants have restricted SPLC's access to the ICE official
who oversees their clients' parole requests and *Fraihat* custody redeterminations."  Pl.'s Mem. at
18.  In particular, Plaintiff provides an example of a lengthy delay involved in a humanitarian
parole request on behalf of a medically vulnerable client.  *Id.*; *see* Rivera Decl. ¶¶ 55–56.

In response, Defendants point out that it requires legal documents be sent by post to ensure
confidentiality.  Defs.' Opp'n at 48.  However, considering that confidential medical records are
sent via fax (which Defendants do not contest), and that Irwin has devised such a system (which
Defendants admit), it is hard to understand why some system to assure confidentiality through the
fax system could not be devised for the other Facilities.  While Defendants point out that legal
mail is a low-risk alternative, that does not address Plaintiff's concerns regarding delays and other
difficulties with legal mail at these Facilities.

### c. Plaintiff Has Shown a Likelihood of Success on the Merits

The Court now turns to whether Plaintiff has demonstrated a likelihood of success with
respect to its claim that these restrictions and conditions, taking into account Defendants' related
arguments, are punitive.  As previously noted, a civil detainee can prevail by showing that
conditions are "objectively unreasonable or excessive relative to the Government's proffered

justification." *Moore*, 2019 WL 2569659, at *2. Moreover, as part of its analysis, the Court will consider whether the conditions and restrictions have been "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Bell*, 441 U.S. at 539 n.20.

To that end, the Court incorporates its discussion above regarding whether in-person legal visitation is likely an alternative and less harsh method of ensuring that detained immigrants have access to counsel in light of COVID-19. As the Court previously noted, in-person legal visitation was, before COVID-19, the primary vehicle through which detained individuals would communicate and exchange documents with their counsel. But in the wake of COVID-19, in-person legal visits are understandably no longer the appropriate default option and cannot reasonably be viewed as a less harsh alternative to remote legal visitation. Defendants' responses to this development, as the Court explains in more detail below, have been inadequate and insufficient.

To begin with, it must be noted that the emergence and spread of COVID-19 impacts the analysis of whether these conditions are punitive. The Court does not venture an opinion as to whether these conditions and restrictions would, in a world without COVID-19, be punitive. But COVID-19 exists. It is an unprecedented pandemic that poses dangerous risks, especially for those who cannot easily socially distance themselves or maintain recommended hygiene standards, such as Plaintiff's detained clients in this case. The Court therefore views the parties' arguments against the backdrop of COVID-19 and the circumstances surrounding it. This includes the above conclusion regarding the non-viability of in-person legal visitation at this point in time. *See, e.g.*, *Pimentel-Estrada v. Barr*, No. C20-495 RSM-BAT, 2020 WL 2092430, at *17 (W.D. Wash. Apr. 28, 2020) (discussing COVID-19 in context of conditions of confinement claim and rejecting argument that "the COVID-19 outbreak does not alter the conclusion that Petitioner's detention is

rationally related to the government's non-punitive responsibilities and administrative purposes"); *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at \*12 (D. Md. Apr. 3, 2020) (discussing how COVID-19 impacts conditions of confinement analysis); *Thakker v. Doll*, No. 1:20-CV-480, 2020 WL 1671563, at \*8 (M.D. Pa. Mar. 31, 2020) (considering emergence and spread of COVID-19, and recognized ways of effectively countering it, in determining that conditions likely amounted to punishment).

In broad strokes, Plaintiff argues that the above-discussed "policies, practices, and omissions concerning legal communications during the COVID-19 pandemic are unnecessarily restrictive." Pl.'s Mem. at 24. It argues that these restrictions are "excessive relative to any justification that Defendants could conceivably proffer." *Id.* at 24–25. It claims that these restrictions fail to "comply with ICE's very own standards and requirements," such as on confidential legal communications; that the failure "to ensure that spaces and devices used for legal communications are properly disinfected" and that detained individuals "have adequate access" to PPE is unreasonable; and that these conditions and restrictions are more punitive than "policies on legal communications for individuals in criminal custody" under the Bureau of Prisons COVID-19 Action Plan. *Id.* at 25–26.

Plaintiff's arguments require a discussion of Defendants' offered justifications. As noted above, Defendants do not frame their arguments in terms of the substantive due process analysis. Their justifications for the claimed restrictions and conditions, however, may be at least partially discerned from their briefing. First, the purpose underlying the adoption of certain new policies or restrictions appears to primarily be controlling the spread of COVID-19 within the Facilities. *See* Defs.' Opp'n at 9–24 (discussing COVID-19 response at Facilities). Plaintiff does not contest that this is a legitimate, non-punitive governmental objective. The Court agrees that Defendants

have a legitimate, non-punitive interest in minimizing the spread of COVID-19 within the Facilities.   However, as Plaintiff does not question the PPE or in-person restrictions, this justification is less relevant to Plaintiff's arguments.

Defendants also stress certain objectives in the PBNDS, such as ensuring that all detainees have "orderly and fair" access to VTCs and/or telephones: "A facility may neither restrict the number of calls a detainee places to his/her legal representatives, nor limit the duration of such calls by rule or automatic cut-off, *unless necessary for security purposes or to maintain orderly and fair access to telephones.*"   PBNDS 5.6(V)(F)(1) (emphasis added).   In other words, they argue that certain conditions, such as Stewart's daily limit of one hour per attorney–client pairing, are "necessary" to "maintain orderly and fair access to telephones."   Defs.' Opp'n at 13, 45. Defendants also suggest that certain restrictions, such as on mail and fax exchange, are to ensure confidentiality.  *Id.* at 48.  Plaintiff does not contend that such purposes are not legitimate, and the Court agrees that these justifications are generally legitimate and non-punitive.

However, Plaintiff has demonstrated a likelihood of success on the merits that the current conditions and restrictions on remote legal visits and communications through VTCs, legal calls, and document exchanges, taken together, are excessive in relation to those justifications, as COVID-19 makes in-person legal visitation no longer viable or safe and Defendants' responses have been inadequate and insufficient as to the use of alternatives, including telephones and VTCs.

Most notably, while Defendants describe at length the actions that they claim to have taken in response to COVID-19, *see* Defs.' Opp'n at 9–24, they do not claim that they have substantially increased the capacity for remote legal visits or communications despite the increased risks involved with in-person legal visitation.  For instance, they note that hours have been somewhat expanded for VTCs, either under certain circumstances or on a regular basis.  *See* Defs.' Opp'n at

13 (Stewart) (citing Fourth Washburn Decl. ¶¶ 62, 64); *id.* at 17 (Irwin) (citing Second Paulk Decl. ¶¶ 27–28); *id.* at 21 (LaSalle) (citing Rice Decl. ¶¶ 30–31, 34); *id.* at 23 (Pine Prairie) (citing Staiger Decl. ¶¶ 29–31).  LaSalle also represents that it has increased the VTC rooms available for legal visits from one to three units,[10] Defs.' Opp'n at 21; Rice Decl. ¶ 30, and both LaSalle and Pine Prairie represent that they have provided detainees access to tablets to communicate with legal representatives, Defs.' Opp'n at 23; Staiger Decl. ¶ 37; Rice Decl. ¶ 39.  However, these actions are not necessarily sufficient and there are still confidentiality issues that arise with the use of, for example, tablets.  Other than aforementioned steps, however, the Facilities do not claim that they have increased the number of telephones, telephone lines, or VTC rooms.[11]  Nor do they claim that they have increased access to remote legal visits and communications through other technologies.[12]  These actions, and the lack of action, are not proportionate to the increased demand

---

[10] The other Facilities have similar numbers of VTC devices.  Stewart has two sets of VTC equipment "dedicated for use only for attorney visits."  Fourth Washburn Decl. ¶ 61.  Irwin has four operational VTC devices used for legal visitation.  Musante Decl. ¶ 27.  The Court cannot discern from the briefing and declarations how many VTC devices that Pine Prairie has.

[11] To be complete, some of the Facilities do provide some information regarding how many telephones that they have.  Stewart has "214 detainee telephones in the housing areas, which detainees may use to call counsel."  Defs.' Opp'n at 14; *see* Fourth Washburn Decl. ¶ 41.  They seemingly also have other telephones that detained individuals may use for legal calls.  *See* Moten Decl. ¶ 32.  Defendants thus claim that Stewart has a "detainee-to-phone ratio" of 9.53 detainees per telephone at capacity, and currently has a ratio of 4.95 detainees to telephone.  Defs.' Opp'n at 14; *see* Fourth Washburn Decl. ¶ 41.  Irwin has 89 telephones: "one in the library, forty among the ten open dormitory units, and forty-eight among the sixteen closed cell units."  Defs.' Opp'n at 19; *see* Second Paulk Decl. ¶¶ 49–52.  Detained individuals also have access to five telephones that can be used for confidential calls with legal counsel.  Musante Decl. ¶ 25.  Pine Prairie does not appear to give exact telephone numbers, but states that detained individuals have received free minutes to call their counsel.  Defs.' Opp'n at 23; *see* Staiger Decl. ¶ 38.  However, Defendants do not indicate that any capacity has been increased due to COVID-19.  And while some of these telephones appear to be not monitored, many also appear to be in public places (such as the dormitories) where attorney–client confidentiality cannot be easily assured.

[12] Stewart also explains that it has a purchasable email service at 63 kiosks for detained individuals to use to communicate with their attorneys.  Fourth Washburn Decl. ¶¶ 51–54.  The cost to send an external email message is "comparable to first-class postage to mail a letter."  *Id.* ¶ 53.  Defendants do not clarify whether this system predates or postdates COVID-19, but the cost of

for remote legal visitation in the wake of COVID-19.  They are, in short, inadequate.  The Court does not address here whether that lack of action would be problematic under normal circumstances, or in a pre-COVID-19 world in which remote legal visits and communications may be less necessary.  But these are not normal circumstances—the risks associated with COVID-19 render these circumstances exigent.  In this situation, when in-person legal visitation is no longer a less harsh alternative, such conditions are likely to be punitive.

The Court also finds that the current conditions and restrictions surrounding existing methods of remote legal communication and visitation are not objectively reasonable and are excessive in relation to the proposed objectives.  For example, Defendants appear to represent that the current restrictions and conditions regarding VTCs and telephones are to ensure "orderly and fair" access to the VTCs and telephones.  *See* Defs.' Opp'n at 13, 45.  The Court accepts that, to allow all detained individuals fair and orderly access, there likely must be some restrictions on the number and length of calls.  But Defendants have not explained why the current system is the least restrictive one that can achieve that objective.  In particular, they do not explain why they have not more than minimally increased the number of VTCs, telephones, or other devices and spaces that detained individuals can use for confidential legal visits and/or communications.  Nor do they address in full the other issues experienced by Plaintiff, its staff, and its clients, such as poor VTC or audio quality, delays in scheduling, and cancellations.[13]  In other words, Defendants do not explain why they cannot devise a system that allows for easier, quicker, and more consistent

---

postage is another of Plaintiff's concerns.

[13] LaSalle represents that, upon receiving notification of Plaintiff's complaint regarding VTC quality, it tested its VTC devices again and reported that they are, in Defendants' words, functioning "appropriately."  Rice Decl. ¶ 38.  While this type of testing is helpful, it does not provide on-the-spot assistance for these issues, nor do Defendants claim that they each have clear and consistent procedures for detained individuals and legal representatives to follow when encountering technical issues.

scheduling of VTCs and legal calls, that attempts to have consistent quality (or make allowances for when quality is not consistent), and that maintains confidentiality during those sessions.

The same is true of Defendants' offered justification for certain mail and fax restrictions with respect to confidentiality. Defendants even admit that Irwin has allowed faxes for certain documents in the past, but then claim that other Facilities are hesitant to adopt such a system in case there are breaches of confidentiality that may render them liable. *See* Defs.' Opp'n at 48. The Court is skeptical that the Facilities cannot create a fax (or email, or other electronic) system that would ensure confidentiality for at least some kinds of documents, especially as they have already used faxes in the past for medical records purposes, and would be free to detained individuals. It also makes little sense that Defendants cannot create systems for receiving and processing mail received that aims to ensure that legal mail is not rejected, is delivered to the proper recipients, and maintains confidentiality. This system could be communicated to Plaintiff's attorneys, and other legal representatives, to ameliorate the issues raised by Plaintiff.

Moreover, Plaintiff's other arguments show that there is a likelihood of success on the merits. The Declaration of Dr. Dora Schriro outlines how the Facilities have failed to comply with ICE's own Detention Standards related to confidentiality, Schriro Decl. ¶¶ 92–100, which supports that these restrictions and conditions are punitive since there are less restrictive alternatives, *see, e.g.*, *Torres*, 411 F. Supp. 3d at 1065 ("Plaintiffs argue that the conditions at Adelanto are in excess of restrictions in the PBNDS, which offer an example of less restrictive alternative measures." (citation omitted)). The same declaration opines that "ICE has failed to ensure that the Facilities provide expedient and reliable access to legal calls and video-conferencing services, as well as reliable facilitation of legal document exchange, in violation of its own standards." Pl.'s Mem. at 25; Schriro Decl. ¶¶ 57–59, 80–90. Defendants' briefing in response focuses on the possibility of

in-person legal visitation to ensure confidentiality and access, which the Court found above is not an acceptable alternative at this point in time due to COVID-19.

Because Defendants do not address Plaintiff's arguments, they also fail to explain how the conditions are less restrictive than those for criminal detainees.  Plaintiff, however, argues that even the Federal Bureau of Prisons COVID-19 Action Plan "provides clear instructions for attorneys seeking confidential calls with their clients via a chart listing consolidated legal centers and phone numbers."  Pl.'s Mem. at 26 (citing Fed. Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan*, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last updated March 13, 2020)).  Defendants do not argue that the current restrictions and conditions surrounding access to counsel are less restrictive than those put forward by BOP in the COVID-19 Action Plan.  This also supports that these conditions are likely to be punitive.[14]  *See Fraihat*, 2020 WL 1932570, at *25 (comparing BOP's actions to actions taken by ICE detainment facilities to support that conditions were likely punitive).

Defendants also claim that they are taking certain hygiene precautions, such as providing soap and other hygiene products to detained individuals, and some devices are touch-free.  *See, e.g.*, Defs.' Opp'n at 12, 20, 22; First Washburn Decl. ¶ 50; Fourth Washburn Decl. ¶ 72; Second Paulk Decl. ¶¶ 19–20; Paulk Decl. ¶ 6; Musante Decl. ¶ 30; Reaves Decl. ¶ 35; Staiger Decl. ¶¶ 19, 35; Moten Decl. ¶ 37.  However, despite these precautions, based on Plaintiff's claims and Defendants' submissions it does not appear that Defendants are uniformly ensuring that certain devices such as telephones, or the surrounding spaces such as offices, used for legal calls are cleaned between each use.

---

[14] The Court here does not comment on whether BOP has actually implemented the provisions in the Action Plan.  Instead, it considers the Action Plan as an example presented by Plaintiff of standards that contain less restrictive conditions.

It is unreasonable for Defendants not to take precautions to ensure that spaces and devices used for legal communications are disinfected or provide detained individuals with protective equipment. *See, e.g.*, *Fraihat*, 2020 WL 1932570, at \*25 ("During a pandemic such as this, it is likely punitive for a civil detention administrator to fail to mandate compliance with widely accepted hygiene, protective equipment, and distancing measures until the peak of the pandemic, and to fail to take similar systemwide actions as jails and prisons."); *Jeferson V. G. v. Decker*, No. CV 20-3644 (KM), 2020 WL 1873018, at \*8 (D.N.J. Apr. 15, 2020) ("Although Respondents have delineated the numerous measures they have undertaken to prevent the spread of COVID-19 in HCCC, those measures are insufficient to protect Petitioner whose asthma puts him at higher risk of severe illness from COVID-19."); *Castillo*, 2020 WL 1502864, at \*5 ("Civil detainees must be protected by the Government. Petitioners have not been protected.  They are not kept at least 6 feet apart from others at all times.  They have been put into a situation where they are forced to touch surfaces touched by other detainees, such as with common sinks, toilets and showers.  Moreover, the Government cannot deny the fact that the risk of infection in immigration detention facilities— and jails—is particularly high if an asymptomatic guard, or other employee, enters a facility.").  In fact, the CDC Interim Guidance suggests that if facilities "mov[e] to virtual visitation," they should "clean electronic surfaces regularly" and some objects on a "conclusion of use" basis.  *See* Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* at 9, 13 (last visited June 17, 2020).

At bottom, Plaintiff's conditions of confinement claim has a likelihood of success on the merits.  The restrictions and conditions that it claims and supports at length, most of which are not clearly contested by Defendants, are unnecessarily restrictive and excessive in light of the current circumstances—namely, COVID-19, which makes in-person legal visitation unsafe and not a less

harsh alternative to ensure that detained individuals have access to legal counsel. The current restrictions and lack of action relating to remote legal visitation and communications, including VTCs, telephone calls, faxes, and mail, are not proportionate to Defendants' objectives. *See Bell*, 441 U.S. at 539 ("[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."). Moreover, Plaintiff claims—and Defendants fail to contest—that the current conditions relating to remote legal visitation and communications at the Facilities are more restrictive and excessive than those for criminal detainees. Accordingly, Plaintiff has demonstrated a likelihood of success on the merits for its conditions of confinement claim.

### 2. Plaintiff Has Shown Irreparable Harm

Plaintiff has also demonstrated that the claimed conditions pose an irreparable harm to its clients' rights in the absence of preliminary relief. In the preliminary injunction and temporary restraining order context, both the United States Supreme Court and the D.C. Circuit have emphasized that a movant must show at least some likelihood of irreparable harm in the absence of an injunction. *See Winter*, 555 U.S. at 22 (holding that plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction," and not mere "possibility"); *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (concluding that plaintiff must demonstrate "at least 'some injury'" for a preliminary injunction to issue because "'the basis of injunctive relief in federal courts has always been irreparable harm'" (first quoting *Population Inst. V. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986); then quoting *Sampson v. Murray*, 415 U.S. 61, 68 (1974))). This is because a preliminary injunction or temporary restraining order "ordinarily is sought to preserve the status quo pending the resolution of the

underlying litigation . . . a preliminary injunction that would change the status quo is an even more extraordinary remedy." *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013), aff'd sub nom. *Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014) (citations omitted).

To begin with, Plaintiff has sufficiently demonstrated a likelihood of success on the merits for its Fifth Amendment substantive due process claim, and "[i]t has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Moreover, as detailed above in the discussion of the challenged conditions, Plaintiff points out that the consequences of these conditions and restrictions, such as delays and substantially restricted access to counsel, can cause irreparable injuries related to the proceedings for which Plaintiff's clients are preparing. This is particularly pressing now, as many of Plaintiff's clients are seeking release from the Facilities based on the emergence of COVID-19; some of those same clients have medical vulnerabilities that put them at high-risk for severe illness if they contract COVID-19. *See* Pl.'s Mem. at 28–29; *see also, e.g.*, Rivera Decl. ¶ 24 (discussing harm related to delays in legal calls with "medically fragile" patients seeking release due to COVID-19); *id.* ¶ 52 ("Delays also generally harm clients' chances of winning release. One factor an immigration judge considers in a release motion is the applicant's flight risk. The closer a person's final individual or merits hearing is, the more of a flight risk she is considered to be. By obstructing a client's access to her attorney and therefore delaying the completion of her release application, the facilities also reduce her chances of succeeding."); *id.* ¶ 56 ("This problem will be exacerbated as attorneys prepare to submit custody redetermination requests in light of *Fraihat*, which requires ICE to identify and consider for release all medically vulnerable individuals in custody Case No. 5:19-cv-01546-JGBSHK (C.D. Cal. Apr.

20, 2020), ECF No. 13. *Fraihat* also gives all subclass members in ICE custody the right to submit a custody redetermination request. *Id.*").  Accordingly, Plaintiff has shown that the conditions and restrictions here pose irreparable harm to its clients' in the absence of preliminary injunctive relief.

### 3. The Balance of Hardships and the Public Interest Weigh in Plaintiff's Favor

The Court now considers the final factors to be considered in granting a temporary restraining order—the balance of the equities and the public interest.  In this case, where the Facilities are government entities and parties to the suit, the harm to the Facilities and the public interest merge and "are one and the same, because the government's interest *is* the public interest." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original). The Court agrees with Plaintiff that the public interest weighs in favor of granting injunctive relief.

First, Plaintiff has established a likelihood that it will succeed on the merits of its substantive due process claim.  And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (stating same).  Moreover, the injunctive relief granted here also touches on issues of hygiene in these Facilities, which seek to lessen the risk that Plaintiff's clients in these Facilities contract COVID-19 and become seriously ill.  The relief granted also aims to allow Plaintiff's clients access to counsel so that they may seek release due to COVID-19 as appropriate.  This too is in the public interest. *See Fraihat*, 2020 WL 1932570, at *28 ("[T]here can be no public interest in exposing vulnerable persons to increased risks of severe illness and death.").

Lastly, the Court finds that the relief to be granted, which is described in more detail below, does not impose an undue burden on the Facilities.  The Court begins by noting that the D.C. Circuit "has rejected any distinction between a mandatory and prohibitory injunction." *League of*

*Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). Furthermore, Defendants have not objected to, and have in fact expressed a willingness to adopt, some of the procedures and processes that the Court requires below. *See, e.g.,* Defs.' Opp'n at 14, 17, 19, 20–21, 22, 46; Fourth Washburn Decl. ¶¶ 56–57; Musante Decl. ¶¶ 28–29, 38, 59–62; Staiger Decl. ¶ 36. Other portions of the relief granted below are no more than what is required by the PBNDS, such as for the attorney–client confidentiality of legal calls. *See* PBNDS 5.6(V)(B); PBNDS 5.6(V)(F)(2).

Defendants frame Plaintiff's request as one for "this Court to broadly interfere in and assume oversight over the immigration-detention system." Defs.' Opp'n at 5; *see also id.* at 43 ("Without exception, each one of Plaintiff's preliminary injunction requests requires close supervision of each Facility by the Court."). The Court recognizes the public interest in allowing the government discretion to carry out its authorized functions. However, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011). The D.C. Circuit has previously authorized injunctive relief against detention facilities, even where the injunctive relief imposes a particular set of conditions. *See Campbell v. McGruder*, 580 F.2d 521, 551–52 (D.C. Cir. 1978) (finding specific conditions not unduly intrusive because there was "no alternative if the rights of pretrial detainees are to be respected"). As one court has put it, "[t]he global COVID-19 pandemic and the ensuing public health crisis now faced by American society have forced us all to find new ways of operating," including to "prevent virus transmission to the greatest extent possible. We expect no less of ICE." *Thakker*, 2020 WL 1671563, at *8.

Accordingly, the Court finds that the balance of equities and the public interest weigh in favor of granting injunctive relief. For the foregoing reasons, Plaintiff has a likelihood of success on the merits, Plaintiff has shown there is imminent irreparable harm absent preliminary relief,

and the balance of hardships and the public interest all weigh in favor of issuing a temporary restraining order.

## D. Specific Relief Granted

While the Court has concluded that, on the present record, Plaintiff is entitled to some injunctive relief on behalf of its clients, the Court is not granting the totality of the relief that Plaintiff has requested.[15]  *See* Pl.'s Mot. at 1–3 (listing relief requested).  The Court grants the following relief:

First, in light of the COVID-19 pandemic, which has resulted in in-person legal visits becoming unsafe and not an acceptable alternative, Defendants shall comply with the optimal requirements in PBNDS 5.6, Telephone Access.  This includes ensuring that there is, at minimum, one telephone (or VTC console) for every ten detained individuals, *see* PBNDS 5.6(V)(A)(1), and that calls to legal representatives such as Plaintiff are direct or free, *see* PBNDS 5.6(V)(E).

Second, Defendants shall ensure that their telephones, VTC systems, and other technology used to access legal representatives (e.g., tablets) are in proper working order.  *See* PBNDS 5.6(V)(A)(3)–(4).  Defendants shall implement a clear process in writing for reporting and troubleshooting issues, such as connection or quality issues, with telephone calls or VTCs.  As part of that process, Defendants shall designate point(s) of contact at each Facility to assist with or relay information regarding issues with telephone calls and VTCs.  The written process and point(s) of contact shall be shared with internal staff, detained individuals, and legal representatives.  *See* PBNDS 5.6(V)(A)(3).

---

[15] The Court finds Plaintiff's request in its Motion that "Defendants implement a system that requires Deportation Officers to provide immigrants and their attorneys confirmation of receipt of any parole request or custody redetermination requests within 24 hours and to provide a final determination within seven (7) days," Pl.'s Mot. at 2, to be outside the scope of the issues raised by Plaintiff's claims in this case and the instant Motion.

Third, Defendants shall ensure that attorney–client confidentiality can be maintained on all telephone calls and VTCs with attorneys and legal staff. Most importantly, telephone calls and VTCs should not be monitored and should not take place in an area where staff or other detained individuals can overhear attorney–client conversations. *See* PBNDS 5.6(V)(B); PBNDS 5.6(V)(F)(2). The Court will not dictate how Defendants comply with this requirement, as the Court recognizes that each Facility has its own circumstances, but it notes that PBNDS 5.6(V)(F)(2) suggests several alternatives for the Facilities to consider, including telephones with sufficiently spaced privacy panels, telephones isolated from areas where conversations may be overheard (e.g., areas where other detained individuals may be waiting to use the telephone), and allowing use of telephones in offices.

Fourth, Defendants shall devise and implement clear internal and external procedures, in writing, for scheduling and accessing telephone calls and VTCs so that Facility staff, detained individuals, and legal representatives such as Plaintiff and its legal staff have access to clear information regarding these procedures. These written procedures shall include information regarding the point(s) of contact at each Facility for those responsible for scheduling calls/VTCs and maintaining the schedule. Defendants shall provide these written procedures to internal staff, detained individuals, and externally to legal representatives and free legal service providers. These written procedures shall provide requests be responded to, and the requested calls and VTCs, be put on the schedule within 48 hours of the request.

Fifth, Defendants shall comply with the CDC Interim Guidance, especially with respect to the cleaning of devices and spaces used for remote legal visits. In particular, Defendants shall clean surfaces and objects involved in calls and VTCs after each use. *See* Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in*

*Correctional and Detention Facilities* at 9.

Sixth, Defendants shall create and implement procedures, in writing, through which detained individuals and legal representatives may exchange confidential documents, such as to obtain signatures, via electronic means (that is, not by "snail mail").  The Court will not order what form this system shall take, but in light of the COVID-19 pandemic and the fact that many detained individuals are seeking to be released in response to the pandemic, both the delays claimed by Plaintiff and those inherent in the legal mail process present problematic conditions.  Defendants shall ensure that attorney–client confidentiality is maintained with these written procedures. Defendants shall include in the written procedures the point(s) of contact designated for questions or issues with the devised processes.  Defendants shall provide these written procedures to Facility staff, detained individuals, and to legal representatives and free legal service providers.

Seventh, Defendants shall provide training to staff at the Facilities regarding the procedures for scheduling remote legal visits through telephone calls and VTCs implemented by the Facilities; on how to ensure attorney–client confidentiality for remote legal visits and communications in accordance with the circumstances and procedures at the respective Facilities; and on the document exchange systems implemented by the Facilities.  Staff members who are responsible for escorting detained individuals to VTCs or telephone calls, or who monitor VTCs or telephone calls, should also receive training on who to contact in the event of technical issues arising.

The Court shall require Defendants to file a notice with the Court with either a Certificate of Compliance certifying under oath that the Defendant Facilities are in compliance with the Court's Order *or* a detailed notice explaining steps taken so far and the current state of compliance with the Court's Order at each Facility.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Temporary Restraining Order, ECF No. 105, is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff has demonstrated a likelihood of success on the merits, irreparable harm absent preliminary relief, and that the balance of the hardships and the public interest weigh in its favor.  Accordingly, Plaintiff is entitled to the injunctive relief detailed above.

An appropriate Order accompanies this Memorandum Opinion.


Date:  June 17, 2020

> _____/s/_____
> COLLEEN KOLLAR-KOTELLY
> United States District Judge