**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUTHERN POVERTY LAW CENTER,<br><br>*Plaintiff,*<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>*Defendants*. | Civil Action No. 18-0760 (CKK-RMM) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO ENFORCE THE COURT'S JUNE 17, 2020 ORDER GRANTING INJUNCTIVE RELIEF**

Shalini Goel Agarwal (Fla. Bar No. 90843)
Southern Poverty Law Center
106 East College Avenue, Suite 1010
Tallahassee, Florida 32302
(850) 521-3024

Lisa Graybill (Tx. Bar No. 24054454)
Jared Davidson (La. Bar No. 37093)
Conor Gaffney (La. Bar No. 38225)
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
(504) 486-8982

Veronica Salama (Ga. Bar No. 888680)
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30031
(404) 221-5825

William E. Dorris (Ga. Bar No. 225987)
Susan W. Pangborn (Ga Bar. No. 735027)
Jeffrey Fisher (Ga. Bar No. 981575)
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
(404) 815-6104

John T. Bergin (DC Bar No. 448975)
Kilpatrick Townsend & Stockton LLP
607 14th Street NW, Suite 900
Washington, DC 20005
(202) 481-9942

## TABLE OF CONTENTS


I. Introduction ..... 1

II. Factual and Procedural History ..... 3

III. Argument ..... 5

A. Legal Standard ..... 5

B. Defendants' Partial Compliance at Each of the Facilities Is Both Facially Insufficient and Controverted by SIFI Staff and Clients. ..... 6

1. Defendants Fail to Meet the Optimal Requirements of PBNDS 5.6. ..... 8

2. Defendants Fail to Provide Clear Written Processes for Reporting and Troubleshooting Technical Issues. ..... 13

3. Defendants Fail to Ensure Confidentiality of Legal Communications. ..... 16

4. Defendants Have Not Provided Clear Written Procedures for Scheduling Remote Legal Communications. ..... 19

5. Defendants Have Taken No Significant Action to Comply with CDC Guidance. ..... 22

6. Defendants Have an Alternative Document Exchange System at Only One of the Facilities. ..... 26

7. Defendants Have Not Provided the Training the Court Ordered. ..... 28

C. The Court Should Find That Defendants Have Failed to Comply with Its Order and Grant Appropriate Relief. ..... 30

1. The Court Should Order Defendants to Fully Comply with Its Order within Thirty Days or Show Cause Why They Should Not Be Held in Contempt. ..... 30

2. The Court Should Appoint a Special Master to Oversee Enforcement of its Order. ..... 31

IV. Conclusion ..... 33

## TABLE OF AUTHORITIES

**Cases**

*Blackman v. District of Columbia*,
185 F.R.D. 4 (D.D.C 1999)........................................................................................ 32

*Broderick v. Donaldson*,
437 F.3d 1226 (D.C. Cir. 2006)..................................................................................... 30

*Damus v. Wolf*,
No. CV 18-578 (JEB), 2020 WL 601629, (D.D.C. Feb. 7, 2020)........................................... 5

*Flores v. Barr*,
No. CV 85-4544-DMG (AGRx), 2020 WL 2128663 (C.D. Cal. Mar. 28, 2020).............. 32, 33

*Gayle v. Meade*,
No. 20-21553-CIV, 2020 WL 4047334 (S.D. Fla. July 17, 2020)......................................... 33

*Hutto v. Finney*,
437 U.S. 678 (1978)............................................................................................................ 5

*In re Dist. No. 1-Pac. Coast Dist., Marine Engineers' Beneficial Ass'n (AFL-CIO)*,
723 F.2d 70, 75 (D.C. Cir. 1983)......................................................................................... 1

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
774 F.3d 935 (9th Cir. 2014)................................................................................................ 6

*Nat'l Org. for the Reform of Marijuana Laws v. Mullen*,
828 F.2d 536 (9th Cir. 1987).............................................................................................. 33

*Pullins-Graham v. District of Columbia*,
No. CIV.A. 98-03065 CKK, 2004 WL 6076865 (D.D.C. Sept. 16, 2004).............................. 30

*Reynolds v. McInnies*,
338 F.3d 1201 (11th Cir. 2003)........................................................................................... 33

*United States v. United Shoe Machinery Corp.*,
391 U.S. 244 (1968)............................................................................................................. 6

*United States v. W. Elec. Co.*,
46 F.3d 1198 (D.C. Cir. 1995)............................................................................................... 6

*United States v. Yonkers Bd. of Educ.*,
29 F.3d 40 (2d Cir. 1994).................................................................................................... 31

**Statutes**

28 U.S.C. § 1651(a) .......... 31

**Rules**

Fed. R. Civ. Pro. 53(b) .......... 32

**Other Authorities**

Stewart's Dention Center https://www.ice.gov/detention-facility/stewart-detention-center .......... 21

U.S. Dep't of Homeland Sec., Office of Inspector General, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (OIG-18-67) 1 (June 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf. .......... 10

## I. Introduction

Fifty-one days ago, this Court found, amid the rapid spread of COVID-19, that the conditions of and restrictions on remote legal communications at the four ICE detention facilities at issue in this case were likely punitive.[1] Concluding that Defendants' response to the critical need for video-teleconferencing ("VTC"), legal calls, and legal document exchanges was inadequate, the Court partially granted SPLC's Motion for Temporary Restraining Order ("TRO")[2] and ordered Defendants to undertake specific corrective measures. Defendants have failed comply with this Court's June 17, 2020 Order, filing only a Notice of Partial Compliance that identifies more deficiencies than solutions.

As COVID-19 has continued to spread at an exponential rate across the country and in the Facilities, Defendants have mustered a feeble response to the Court's emergency order to remove barriers to accessing legal representation. DHS and ICE appear to have made no effort to uniformly ensure compliance with the Court's Order by independently assessing or directing the Facilities' responses. Indeed, the Notice does not include a declaration of a single ICE official, relying only on declarations of the warden at each Facility. These declarations often repeat statements from Defendants' TRO Opposition, present controverted facts, and show that the Facilities have done little new to address the Court's Order. Defendants' Notice of Partial

---

[1] The four detention facilities at issue are: LaSalle ICE Processing Center in Jena, Louisiana ("LaSalle"); Pine Prairie ICE Processing Center in Pine Prairie, Louisiana ("Pine Prairie); Irwin County Detention Center in Ocilla, Georgia ("Irwin"); and Stewart Detention Center in Lumpkin, Georgia ("Stewart") (collectively, "the Facilities").

[2] The Court's Order granting SPLC's Motion for a Temporary Restraining Order was issued with notice to Defendants and did not contain terms for its own expiration. It therefore is "in the nature of a preliminary injunction." *In re Dist. No. 1-Pac. Coast Dist., Marine Engineers' Beneficial Ass'n (AFL-CIO)*, 723 F.2d 70, 75 (D.C. Cir. 1983).

Compliance describes a grab-bag of *ad hoc* solutions and vague assurances of compliance that, on their face, fail to satisfy the Court's mandates.

To name but a few, in response to the Court's Order to comply with the optimal requirement of 1:10 phone-to-detainee ratios from PBNDS 5.6, Defendants greatly exaggerate the availability of telephones by including devices that are unavailable due to social distancing requirements, that do not protect confidentiality, or that require detained people to pay money. Legal calls have taken more than a week to schedule, and Defendants have largely failed to even post new legal call and VTC-scheduling procedures on the Facilities' websites. And Defendants still have not taken sufficient measures to ensure the confidentiality of legal communications, continuing to route legal calls to shared dayrooms, to cubicles with walls that don't reach the ceiling, or to devices that operate over speakerphone. Furthermore, as of this filing, only one Facility provides a mechanism for electronic legal document exchange (the same facility that already did this at the time that SPLC filed its motion). As to the other three, one ordered fax machines over a month ago but still has not implemented a procedure or trained staff, while the other two continue to "explore the feasibility" of an electronic DocuSign-type system.

Despite a court order requiring Defendants to immediately meet this need for remote legal communications with the urgency it requires, Defendants have chosen to do not even the bare minimum. Indeed, the Court's words 51 days ago still apply today:

> [Defendants] do not explain why they have not more than minimally increased the number of VTCs, telephones, or other devices and spaces that detained individuals can use for confidential legal visits and/or communications. Nor do they address in full the other issues experienced by Plaintiff, its staff, and its clients, such as poor VTC or audio quality, delays in scheduling, and cancellations.

Mem. Op. 66, ECF No. 124. Defendants' insufficient response demonstrates not just non-compliance, but a disregard for this Court's Order and for the lives and constitutional rights of

the human beings in their custody. Accordingly, SPLC respectfully asks the Court to exercise its inherent authority to monitor and enforce its prior orders by entering the proposed enforcement order, requiring compliance within 30 days, and appointing a special master.

## II. Factual and Procedural History

On May 7, 2020, SPLC filed a Motion for a Temporary Restraining Order directing Defendants to remove barriers to remote legal communications and ensure safe conditions for persons detained in the Facilities during the novel coronavirus pandemic. ECF No. 105. On June 17, 2020, the Court granted this Motion in part, ECF Nos. 123 & 124, ordering the Defendants to comply with seven directives. The Court's Order requires Defendants to:

1. Comply with the optimal requirements of PBNDS 5.6, which governs telephone access. At a minimum, Defendants must comply with PBNDS 5.6(V)(A)(1), which requires one operable telephone for every ten detained persons, and PBNDS 5.6(V)(E), which requires that legal calls be direct and free.
2. Ensure that technology used to communicate with legal representatives, like phones and VTC systems, are in proper working order. Defendants must implement a clear written process for reporting and troubleshooting technical issues which includes designated points of contact for each facility. This process must be shared with detained persons, staff, and legal representatives.
3. Ensure that all phone calls and VTC communications between detained persons and their legal representatives are private and confidential. These communications shall not be monitored or take place in a common space where they can be overheard by staff or other detained persons.

4. Implement clear written procedures for scheduling and accessing phone calls and VTC communications. These written procedures must include information about point(s) of contact at each facility responsible for scheduling communications. Phone calls and VTC appointments must be scheduled and responded to within 48 hours of the request. These written procedures must be provided to detained persons, staff, legal representatives, and free legal service providers.
5. Comply with CDC Interim Guidance for Correctional and Detention Facilities, especially with respect to cleaning devices and spaces used for remote legal communications. In particular, Defendants shall clean surfaces and objects used in remote legal communications after each use.
6. Create and implement procedures for detained persons and legal representatives to exchange confidential documents and obtain signatures. These procedures shall ensure attorney-client confidentiality is maintained and designate a point of contact for questions or issues with the procedure. These written procedures must be provided to detained persons, staff, legal representatives, and free legal service providers.
7. Provide training to facility staff on the aforementioned (i) scheduling procedures, (ii) document exchange procedures, and (iii) how to ensure attorney-client confidentiality to facility staff. Staff who escort detained persons to VTC or telephone calls, or who monitor those communications, also shall be trained about troubleshooting and resolving technical issues.

The Court further ordered that Defendants either certify full compliance with its order at all four Facilities, or file a notice of partial compliance and state in detail the steps taken to achieve compliance.

Defendants filed their Notice of Partial Compliance on June 30, 2020. ECF No. 131. In it, they make various representations about the number of phones and VTC consoles at each Facility, their operability and maintenance, the level of privacy and confidentiality afforded to legal communications, and sanitization and cleaning procedures at each facility. The Notice also states that one Facility, Irwin, has an alternative document exchange system in place, another will by July 3, 2020, and that two Facilities are "exploring the feasibility" of alternative systems. Defs.' Notice of Partial Compliance 12, ECF No. 131. In addition, the Notice attaches documents meant to satisfy the Court's requirement for detailed written procedures regarding technical issue troubleshooting, and phone and VTC scheduling. One of these is a poster in English advertising a VTC pilot. Staiger Decl. Ex. D, ECF No. 131-4. Another is a document in English describing how attorneys, but not their clients, may request a VTC appointment. Rice Decl. Ex. B, ECF No. 131-2. Aside from this Notice of Partial Compliance from nearly two months ago, Defendants provide no further information to the Court about their compliance with its Order. SPLC has separately met and conferred with Defendants about the status of ongoing compliance efforts at the Facilities in advance of this motion. Declaration of Shalini Agarwal ¶ 5 [hereafter "Agarwal Declaration"]. Defendants largely restated and referred SPLC to their prior Notice, suggesting little progress has been made or is planned. *Id.* Ex. B. [hereafter "Defendants' Email"].

## III. Argument

### A. Legal Standard

Courts have broad authority to enforce their own injunctions by issuing additional orders, including an order to enforce compliance. *Damus v. Wolf*, No. CV 18-578 (JEB), 2020 WL 601629, at *2 (D.D.C. Feb. 7, 2020) (citing *Hutto v. Finney*, 437 U.S. 678, 687 (1978)). Such

orders may be granted at the request of the party who sought the equitable relief when defendants engage in conduct inconsistent with the "spirit of the injunction, even though its strict letter may not have been disregarded." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014). Furthermore, a court may "tighten" an injunction in subsequent orders to accomplish its intended result. *United States v. W. Elec. Co.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995) (citing *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 252 (1968)).

Defendants' actions show a failure to comply with the Court's June 17 Order, warranting further intervention to ensure that the constitutional rights of SPLC's clients are protected without further delay.

**B. Defendants' Partial Compliance at Each of the Facilities Is Both Facially Insufficient and Controverted by SIFI Staff and Clients.**

The Court's Order contains seven parts that apply to all four Facilities. Defendants' Notice of *Partial* Compliance asserts compliance with much, but not all of the Order. These assertions, though, are either facially deficient, factually inaccurate, or both. As such, they do not demonstrate even partial compliance with the Court's Order. For example, rather than develop "clear internal and external procedures…for scheduling and accessing telephone calls and VTCs" at Irwin, Defendants submitted a policy essentially identical to the one they already presented to the Court in opposition to SPLC's Motion for a TRO. *Compare* Paulk Decl. Ex. A, ECF No. 131-1 *with* May 15, 2020 Paulk Decl. Ex. B, ECF No. 112-14. For Pine Prairie, Defendants submitted only a VTC pilot "poster printed by ICE" from January 2020 that hardly qualifies as a procedure. Staiger Decl. 5, ECF No. 131-4; *id*. Ex. D. Other submissions by Defendants appear to simply be false. For example, Defendants certify that cleaning supplies are available in rooms used for remote legal communications. Rice Decl. 6, ECF No. 131-2. SIFI

clients say this is not so. *See* Declaration of Laura Rivera ¶ 25 [hereafter "Rivera Declaration"]. Defendants' Notice even openly defies the Court's Order at points. *See* Washburn Decl. ¶ 61, ECF No. 131-3 (flouting the Court's express order to clean VTC equipment after each use on the grounds that the PBNDS do not require it).

Taken as a whole, the insufficiency and inaccuracy of Defendants' Notice reveals a haphazard effort by Defendants to cobble together ad hoc and at times contradictory responses across the Facilities. At Stewart and Irwin, for instance, Defendants permit their contractors to use fax machines to facilitate confidential document exchange. Defendants, however, claim that they cannot use fax machines at Pine Prairie or LaSalle because, in those Facilities, faxes are somehow not confidential. *Compare* Paulk Decl. ¶ 43, ECF No. 131-1 *and* Washburn Decl. ¶ 70, ECF No. 131-3 *with* Rice Decl. 7, ECF No. 131-2 *and* Staiger Decl. 7, ECF No. 131-4. At Stewart, detained persons may not use gloves to protect against coronavirus transmission because "detainees have been known to use such gloves to cover and conceal contraband," Washburn Decl. ¶ 64, ECF No. 131-3, while at Irwin, gloves are given out to detained persons. Paulk Decl. ¶ 42, ECF No. 131-1. The irregularity of Defendants' compliance efforts and the variation in access to counsel conditions across the Facilities suggest that Defendants have, at base, failed to "provide[] substantive oversight or ma[ke] independent assessments of the facilities' compliance with and progress towards compliance with the Order." Declaration of Dora Schriro ¶ 31 [hereafter "Schriro Declaration"]. SPLC filed this lawsuit because Defendants failed to ensure uniform and constitutional access to counsel at their contract facilities. Defendants' Notice of Partial Compliance confirms that Defendants still do not exercise adequate oversight or control over the Facilities sufficient to satisfy either the Court's Order or Defendants' own detention standards.

**1. Defendants Fail to Meet the Optimal Requirements of PBNDS 5.6.**

Defendants fail to comply with Part 1 of the Court's Order, which requires that they meet the optimal requirements of PBNDS 5.6, including that Facilities provide "one operable telephone for every ten detained persons, ('1:10 PBNDS requirement')," and that legal calls be direct and free.[3] To show compliance with the 1:10 PBNDS requirement, each Facility employs the same flawed methodology for calculating its phone-to-detainee ratio. As detention operations expert Dora Schriro explains, the wardens' methodology likely exaggerates phone availability as it lowers the denominator by relying on bed usage (which changes daily) as opposed to bed capacity (which is fixed), and inflates the numerator by counting functionally inaccessible phones—those that cannot be used while maintaining social distancing guidelines, those in areas to which individuals have limited access, and those which do not have confidential calling capability at all (or do not have such capability without costs borne by detained individuals). *Id.* ¶¶ 15(b)(i), 15(b)(dd).

In calculating the 1:10 PBNDS requirement, LaSalle and Pine Prairie both improperly count the "tablets" located throughout the facilities. LaSalle claims there are "143 tablets located throughout the facility for detainee use." Rice Decl. 2, ECF No. 131-2. According to Defendants, because these tablets "have calling features" they are functionally the same as telephones and should be counted towards PBNDS 5.6's phone-to-detainee ratio. *Id.* at 3. But SIFI clients report that the actual number of tablets at LaSalle is closer to ten per housing unit, and two are usually broken. Rivera Decl. ¶ 23. These tablets cannot be used to call the SIFI helpline. *Id.* ¶ 24. In addition, unless the user purchases headphones from the commissary at her own expense, these

[3] While the Court's Order allows for "direct *or* free" calls, it requires compliance with PBNDS 5.6. As Dr. Dora Schriro explains, PBNDS 5.6 requires that legal calls be direct *and* free. Schriro Decl. ¶ 15(c).

tablets do not provide basic privacy. Rice Decl. 5, ECF No. 131-2. If the user must pay for confidentiality, these devices cannot count toward the phone-to-detainee ratio. Schriro Decl. ¶ 15(b)(i)(bb). Thus, Defendants admit, the tablets do not offer the direct and free legal calls that the Court ordered. *See* Order 1, ECF No. 123.

Furthermore, calls made via tablet are recorded and monitored by default at both LaSalle and Pine Prairie. Rice Decl. 5, ECF No. 131-2; Staiger Decl. 5, ECF No. 131-4. As to procedures for detained persons and their legal representatives to avoid being monitored on these tablet calls, LaSalle and Pine Prairie provided only the vague instruction that the Facilities needed "advance notice" and that legal representatives should "provide their telephone number and bar card." Rice Decl. 5, ECF No. 131-2; Staiger Decl. 5, ECF No. 131-2; *see also* Defs.' Email 8 (meet and confer correspondence reiterating prior position). Neither clarified who this information should be provided to, or how a detained person herself may also set up a confidential tablet call. LaSalle additionally purports to have a written procedure describing how to set up a confidential tablet call, *see* Rice Decl. Ex. B, ECF No. 131-2, but the document attached to the warden's declaration just outlines how attorneys may schedule a VTC, not a phone call. It does not describe how a legal representative may schedule an unmonitored tablet call or, more importantly, how a detained person would schedule such a call. Unsurprisingly, no SIFI staff has ever conducted a call with a client at LaSalle via tablet. Rivera Decl. ¶ 23. Defendants' claim that tablets at LaSalle or Pine Prairie are adequate means of providing legal communications cannot survive even mild scrutiny.

The documentation Defendants provide to show compliance with Part 1 of the Court's Order falls short. LaSalle, for example, submitted part of an undated[4] inspection report noting compliance with five parts of PBNDS 5.6. *See* Rice Decl. Ex. A, ECF No. 131-2. But Defendants' own Inspector General has found that "inspection practices are not consistently thorough" at ICE detention facilities and "[a]s a result, the inspections do not fully examine actual conditions or identify all deficiencies." U.S. Dep't of Homeland Sec., Office of Inspector General, *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (OIG-18-67) 1 (June 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf. And even if this report were reliable evidence of actual conditions at LaSalle, Defendants only provided a partial excerpt evaluating five of the 27 parts of PBNDS 5.6. *Cf.* Staiger Decl. Ex. A, ECF No. 131-4 (containing a complete inspection worksheet from Pine Prairie).

As to Irwin, in addition to these examples of erroneous calculations, there are unexplained discrepancies and erroneous calculations as to the phone-to-detainee ratios. In his June 29th declaration, Warden David Paulk stated that there are three VTC devices and one telephone located in private rooms that are available to the entire detained population. Paulk Decl. ¶ 7, ECF No. 131-1. But Warden Paulk's May 15, 2020 declaration indicated that there are four VTC devices at Irwin. Paulk Decl. ¶ 18, ECF 110-12. Confusing matters further, prior to the Court's order, ICE's Assistant Field Office Director ("AFOD") for Irwin, Patrick Musante, claimed that there were five telephones available for legal phone calls. Musante Decl. ¶ 25, ECF

[4] Defendants note only that LaSalle was inspected "in 2017, 2018, 2019." Rice Decl. 2, ECF No. 131-2. They do not state which of these years the report excerpt they attached is from.

110-10.[5] Defendants do not account for these discrepancies, but have since said they have installed six new community phone and VTC rooms. Defs.' Email 4. That these VTC devices and telephone are available to the "entire detained population," at Irwin means that people detained in ICE custody and in criminal custody alike utilize these devices for confidential legal communications. *See* Schriro Decl. ¶ 15(b)(i)(aa). It is unclear how many people must share these devices, as Defendants do not provide the total number of the individuals in the "entire detained population," but only those in ICE custody—511 as of June 26, while the facility allegedly has a capacity for 944 ICE detainees. Paulk Decl. ¶ 6, ECF No. 131-1. This introduces other discrepancies, as Defendants previously asserted that Irwin's capacity for ICE detainees is 920 individuals, Musante Decl. ¶ 18, ECF No. 110-10, and both figures exceed the total number of beds available, 912 in all. Paulk Decl. ¶¶ 8, 13, ECF No. 131-1 (16 closed dorms with a capacity for 32 individuals each and four open dorms with a capacity for 100 individuals).[6] While Defendants have installed additional phones to meet the 1:10 PBNDS requirement at Irwin, they erroneously include the telephones in the housing units to calculate the ratio, even though they appear "well within six feet of each other" and are not readily available to the detained population. Schriro Decl. ¶ 15(b)(cc); Musante Decl. ¶ 23, ECF 110-10 (describing "count" which occurs three times per day at 8-hour intervals, when phone access is blocked until count is completed).

---

[5] That the ICE AFOD and Irwin warden contradict each other underscores ICE's failure to monitor conditions on the ground.

[6] Even the total number of beds that Defendants claim is available at Irwin has changed since Defendants' May 26 declaration, which totaled 2,108 available beds. *See* Paulk Decl. ¶ 49, ECF No. 110-12 (listing 16 closed dorms with a capacity for 32 individuals, 6 open dorms with a capacity for 100 individuals, and 4 open dorms with a capacity for 24 individuals).

In addition, Defendants fail to provide direct and free calls to legal representatives at Irwin. Schriro Decl. ¶ 15(c). SIFI reports that calls from clients made from the phones in Irwin's housing units are limited to 15 minutes, after which the line cuts off and the detained individual must call back again. Rivera Decl. ¶ 11. These time-limited phone calls are also monitored. *Id.* ¶¶ 10–11. Such short and monitored calls at Irwin do not comply with Part 1 of the Court's Order.

At Stewart, in addition to calculating the ratio in the same flawed way, Defendants also fail to provide sufficient details about the existing telephones to verify whether they are compliant. Defendants state that there are 214 detainee telephones in the housing unit and two VTCs. Washburn Decl. ¶ 15, ECF No. 131-3. Yet they do not provide the number of housing units, the capacity for each of those housing units, or the number of phones in each housing unit. Additionally, it seems that Washburn reaches the ratio of 5.51 detainees per telephone by calculating the current bed usage as opposed to the capacity. *Id.* Since the ICE population at Stewart increased from 984 on May 13 to 1,181 on June 26, Warden Washburn should be especially wary about relying on bed usage to calculate the ratio of telephones to detained individuals. *Compare* Washburn Decl. ¶ 8, ECF No. 110-19 *with* Washburn Decl. ¶ 15, ECF No. 131-3. As Dr. Schriro explains, the proper number to apply here is the facility's capacity, which is 2,040. Schriro Decl. ¶ 15(b)(i)(dd).[7]

In addition to the inadequate number of telephones overall for Stewart's capacity, because of detained people's limited access to these shared telephones, they should not all be counted in its ratio. As at Irwin, detained individuals at Stewart are not permitted to use these

[7] Further, Defendants must provide the total number of telephones in each unit and the capacity for individuals of each unit for this calculation to be accurate. For example, it would be irrelevant to a person in Unit B that there are, say, ten telephones in Unit A, because they cannot access them.

phones during count or lockdown. Washburn Decl. ¶ 43, ECF No. 131-3. According to ICE's Supervisory Detention and Deportation Officer ("SDDO") for Stewart, Tracy Moten, count happens seven times in a 24-hour period and lasts approximately 45 minutes each time. Moten Decl. ¶ 30, ECF No. 110-8; *see also* Schriro Decl. ¶ 15(b)(i)(aa) (devices to which detained individuals have limited access should not be included in the calculation of the ratio under the PBNDS). Furthermore, the attached photos of the telephones in the Stewart housing units show that these devices are, indeed, "well within 6 feet of each other," Schriro Decl. ¶ 15(b)(i)(cc); Washburn Decl. ¶ 35 Attach. 5, ECF No. 131-3, and very close to the nearest bed, as well as the main door. These telephones are much too close to each other to all be counted as usable amid the pandemic or for the conversations using them to be confidential. *Id*. ¶ 36 Attach. 6*; infra*, section 3.

Neither should the two VTC devices at Stewart—an inadequate number for a facility with a capacity of 2,040 individuals—count in its ratio because of a lack of confidentiality when using these devices. Stewart-facilitated legal calls, Defendants admit, may not be left unsupervised, but are continuously monitored by staff who observe the individual from a window outside the office. *Id.* ¶ 48. Since detained individuals do not have a direct and free method of communicating with their legal representatives in a confidential legal setting, Defendants have failed to comply with both Part 1 of the Court's order.

### 2. Defendants Fail to Provide Clear Written Processes for Reporting and Troubleshooting Technical Issues.

Defendants do not comply with Part 2 of the Court's Order, requiring them to ensure that communications technology are in proper working order, and to develop and distribute clear procedures for scheduling and troubleshooting phone and VTC calls. Defendants fail to provide "a clear process in writing" that includes designated points of contact at each Facility responsible

for implementing the procedures and is shared with facility staff, detained persons, and legal representatives. Order 1, ECF No. 123. To date, none of the Facilities provide detained individuals with a clear process for scheduling or initiating VTCs/legal calls, and none provide attorneys with a clear written procedure for scheduling or troubleshooting VTCs/legal calls that name designated points of contact—a person or persons who are answerable—and hours of operation. To the extent that Facilities have laid out procedures, they are missing at least one of the following: (1) a designated point of contact; (2) instructions for *both* VTCs and phone calls; or (3) confirmation that they have been distributed as directed in the Court Order.

Defendants' varying processes for troubleshooting requests are clearly deficient in substance and form, as they lack an accountable person as a point of contact. LaSalle's "VTC Request Process for Attorneys," for example, only provides that troubleshooting requests can be submitted to visitrequest@geogroup.com or by calling the LaSalle front desk. This email address is a distribution list to which general requests for visits are submitted, not a single point of contact, and the front desk phone similarly routes to a general switchboard. Rice Decl. 3, ECF No. 131-2. As Dr. Schriro opines, distributing a single responsibility over a rotating set of staff to a general inbox is different from designating a responsible point of contact and often results in a lack of real-time responsiveness. Schriro Decl. ¶ 16(a). Other than emailing the general distribution list or calling the front desk, the document lacks any further instruction on how to resolve a technical issue. There is no specified point of contact, nor an expected timeframe for when requests will be responded to or resolved—either for attorneys or for LaSalle staff who may be tasked with the resolution.

Irwin and Stewart also provide the same email address for scheduling a VTC appointment and for reporting technical issues. Paulk Decl. ¶ 33, ECF 131-1; *see, e.g.*, Schriro

Decl. 16(a) (faulting similar point of contact arrangement at Stewart as "leaving no one specifically accountable"). Irwin does not designate particular individuals to respond and is unable to provide a dedicated phone line for troubleshooting until some future date. Instead, most issues are rerouted to the Law Library Clerk, and most phone calls are rerouted to the main desk. Paulk Decl. ¶¶ 33–34, 43–44, ECF No. 131-1. Defendants do not purport to offer troubleshooting to detained individuals in the event of a technical issue with the housing unit phones. Rather, the instructions are "being posted" only in English and in Spanish. *Id.* ¶ 37.

Pine Prairie's troubleshooting procedures are similarly deficient. In response to the Court's Order, the Facility produced troubleshooting instructions in the form of a supplement to the detainee handbook, Staiger Decl. Ex. C, ECF No. 131-4, with no comparable guidance for legal representatives to report and troubleshoot technical issues. That handbook supplement also gives two different procedures if detained persons are unable to place a call, instructing them to "submit a detainee request form" and to "REPORT ANY PROBLEMS WITH THE TELEPHONES TO THE HOUSING UNIT OFFICER." *Id*. Further confusing things, these channels are both different from the point of contact, ppipcnotify@geogroup.com, that Pine Prairie says it has "shared with…staff, detainees and their legal representatives" to resolve technical issues. Staiger Decl. 4, ECF No. 131-4. A person confined at Pine Prairie, then, has three different options when her legal call drops. First, she can drop a detainee request form in a mailbox in the dining hall, though not if she is on "Cohort status" because she will no longer be allowed to take meals in the dining hall. *See* May 14, 2020 Staiger Decl. ¶ 23, ECF No. 112-17. Second, she can notify her housing officer, who likely only speaks English. Or third, she can email ppipcnotify@geogroup.com, though what level of email access detained persons have is

unclear.[8] This does not suffice as a "clear process" for a detained person to resolve a technical issue quickly and effectively. These assorted, partial directives are insufficient to comply with Part 2 of the Court's Order.

### 3. Defendants Fail to Ensure Confidentiality of Legal Communications.

Defendants do not show compliance with Part 3 of the Court's Order to "ensure that attorney–client confidentiality can be maintained on all telephone calls and VTCs with attorneys and legal staff." Order 2, ECF No. 123. Defendants have not met even the "most important" admonition in Part 3 that legal calls and VTCs be unmonitored and take place where the conversations cannot be overheard. *Id.* at 3. Instead, Defendants' assurances of confidentiality are either controverted, reflect no change from their assertions pre-dating the Court's Order, or include admissions that legal communications regularly take place where they can be easily overheard by others.

At LaSalle, for example, although the warden states that "[a]ll scheduled video conferences and legal telephone calls between detainees and their legal counsel is in private and are completely confidential," Rice Decl. 5, ECF No. 131-2, SIFI staff and clients report otherwise. While some legal calls and all VTC communications do take place in private rooms, other legal calls occur in open communal spaces in the housing units in LaSalle, which are filled with other detained people in conditions that do not allow for privacy—some phone banks don't even have metal dividers to separate them. Rivera Decl. ¶¶ 20–22. Making matters worse, legal calls that LaSalle routes to housing units sometimes occur over speakerphone, rendering the entire conversation audible to LaSalle staff and other detained persons nearby. *Id*. at ¶ 20.

---

[8] The detainee handbook supplement does not list email as a free, standard, or promotional app available on the tablets.

Pine Prairie appears to have taken no action to comply with the Part 3 of the Court's Order. In their Notice of Partial Compliance, Defendants simply refer to the declaration they submitted in opposition to the TRO motion, *see* Staiger Decl. 4, ECF No. 131-4 ("As noted in my May 14, 2020 Declaration…"), and repeat verbatim a number of statements from that declaration. *Compare id.* at 4–5 *with* May 14, 2020 Staiger Decl. ¶¶ 31–34, ECF No. 112-17. This does not show compliance with the Court's intervening Order, but only repackages evidence the Court already determined to be *insufficient* to show confidentiality at Pine Prairie. *See* Mem. Op. 67, ECF No. 124. In addition, as with LaSalle, Defendants make deceptive assertions about confidentiality at Pine Prairie. Specifically, while the warden claims that the "rooms made available for [attorney-client] communications . . . are sound proofed to ensure confidentiality," Staiger Decl. 5, ECF No. 131-4, these spaces are far from confidential. The allegedly "sound proofed" rooms are in fact the same cubicles that SIFI staff used before COVID-19 restrictions that sit in a busy staging area where detained persons and staff regularly congregate. Rivera Decl. ¶ 27; May 6, 2020 Rivera Decl. ¶ 31, ECF No. 105-7. These cubicles' thin walls do not reach the ceiling and are not soundproof. Conversations can be overhead by guards and detainees outside the cubicles, and by people using the adjacent cubicles. Pine Prairie appears to have taken no action since the Court's Order to make these cubicles confidential spaces for legal communications. Rivera Decl. ¶ 27.

At Irwin, SIFI staff reports that, to their knowledge, legal calls with clients that are made using the shared telephones in the housing units remain monitored. Rivera Decl. ¶¶ 10–11. Only three days ago, Defendants finally provided a procedure explaining how SIFI staff can place

their phone numbers on a do not monitor list. Defs.' Email 12–13.[9] In is unclear, however, if this new process is Irwin's final policy. Prior to this communication, it appeared that SIFI's calls were monitored. This is evident from the 15-minute limit SIFI staff experienced—something that allegedly only occurs for calls that do not take place through a secure PPC line. Rivera Decl. ¶ 11; Paulk Decl. ¶ 25, ECF No. 131-1.[10] Defendants have yet to post instructions for setting up a PPC account on their website. Paulk Decl. ¶ 21, ECF No. 131-1 (noting that Irwin is still "in the process" of posting the policy on its website to make it available to attorneys); Defs.' Email 2 (same). Additionally, despite Defendants' claim of strict confidentiality of VTC calls at Irwin, they acknowledge that staff enters the room during these calls, Paulk Decl. ¶ 39, and SIFI reports that unannounced interruptions from staff, especially for VTC calls in the library, continue. Rivera Decl. ¶ 8. Although Defendants maintain that staff cannot hear the conversations, they have previously acknowledged that staff stands just outside the VTC room, keeps "visual contact" such that the camera—and therefore the entire screen—is facing the officer, *and* that Irwin has "phased out" headset use during VTCs, which means that these legal calls by VTC must take place on speakerphone. Paulk Decl. ¶¶ 20, 25, ECF No. 110-12.

---

[9] Plaintiff notes that Defendants' provided this guidance only in response to Plaintiff's efforts and meet and confer about this motion, but did not generally disseminate a procedure to free legal service providers at the Facilities, as required by the Court's Order.

[10] SPLC has raised the issue of phone calls being monitored since the beginning of this litigation. SIFI has acknowledged its need to rely on this method of communication quite often, given the facility's unreliable options for other remote legal communication. That Defendants would now claim that it is "rare," in Irwin's experience, for a detained individual to seek to make a monitored attorney call from the telephones in their housing unit, shows a complete failure to even acknowledge the scope of this problem. Paulk Decl. ¶ 25, ECF No. 131-1.

#### 4. Defendants Have Not Provided Clear Written Procedures for Scheduling Remote Legal Communications.

Defendants' compliance with Part 4 of the Court's Order, which requires "clear internal and external procedures, in writing," including designated point(s) of contact, "for scheduling and accessing telephone calls and VTCs," response times of no more than 48 hours, and dissemination to people in detention, facility staff, and legal representatives, is facially insufficient. *See* Order 2, ECF No. 123. The "procedures" in Defendants' Notice of Partial Compliance are unclear, incomplete and, in some cases, contradict other policies submitted by Defendants. To date, none of the Facilities has provided detained individuals with a clear process for scheduling or initiating VTCs or legal calls. To the extent the Facilities claim to have done so, those claims are contradicted by Defendants' own admissions and by reports from SIFI staff.

LaSalle submitted the same "VTC Request Process for Attorneys" that it declared contained procedures for arranging confidential calls via tablet. Rice Decl. 3, 5–6, ECF No. 131-2. This procedure does not satisfy Part 4 of the Court's Order. The document provides instructions only as to VTC scheduling and access, not for legal telephone calls, and only as to "attorneys and accredited representatives," not for detained persons, who have no procedure to schedule a legal VTC or phone call. Finally, Defendants state they have shared this procedure with staff, detained persons, and their legal representatives by adding it to the detainee handbook, and by posting it in visitation rooms and in the LaSalle lobby. Rice Decl. 3, ECF No. 131-2. Posting the procedure in the facility is not a meaningful attempt to inform attorneys, as the Court has observed that the COVID-19 pandemic has made in-person visits to the Facilities "unsafe and not…acceptable." Order 1, ECF No. 123.

Pine Prairie similarly appears to have made no changes to its scheduling procedure in response to the Court's Order. Its written procedures for scheduling and accessing legal VTC and

phone calls consist entirely of "a poster printed by ICE" dating from January 2020. Staiger Decl. 5, Ex. D, ECF No. 131-4. Pine Prairie's poster describes a procedure only for attorneys to request a VTC appointment—with no instructions for detained people (whose exclusion is underscored by the fact that the poster is in English only) or protocols for how staff should receive, schedule, and respond to these requests. Further, the poster appears only to provide information about a "video teleconferencing pilot," with no procedures as to legal phone calls as the Court's Order requires. Moreover, the poster's guidance as to VTC calls—that they "will be scheduled for 1 hour and will automatically terminate"—contradicts Pine Prairie's policy that it will not "limit the duration of [legal] calls by rule or automatic cutoff." Staiger Decl. Ex B at 3, ECF No. 131-4. Because Pine Prairie's poster does not address detained persons or staff, has no procedures for phone calls, and is contradictory, it cannot satisfy Part 4 of the Order for clear internal and external procedures.

At Irwin, the written procedures are contrary to the spirit and letter of the order and fail to address basic issues. At the outset, Defendants have yet to properly distribute their policy, as they are still "working on" adding their "new policy" for scheduling attorney-client communications to Irwin's website, Paulk Decl. ¶¶ 21-22, 38, Ex. A, even though the policy is nearly identical to the policy filed in opposition to SPLC's TRO motion, *see* Paulk Decl. Ex. B, ECF No. 110-12 (detainee handbook). Nearly two months since the Court's order, Defendants *still* have not posted what seems to be a pre-existing policy. Defendants also have made no effort to mitigate VTC scheduling delays,[11] but actually extended response times at Irwin from 24 hours to 48 hours, Paulk Decl. ¶¶ 27, 29, ECF No. 131-1 which is inconsistent with the spirit of

[11] As stated earlier, all VTC devices are utilized by the entire detained population at Irwin, not just those in ICE detention. Paulk Decl. ¶ 7, ECF No. 131-1.

the Order, especially given other delays in Irwin's scheduling, *see* Rivera Decl. ¶ 7 (describing the VTC scheduling process, wherein Irwin often fails to schedule all individuals on SIFI's list of requests such that, by the time they schedule an appointment, it is at least a week after the initial request). Irwin also does not include VTC hours of operation, despite its earlier promise to extend these hours. May 6, 2020 Rivera Decl. ¶ 21, Ex. B, ECF No. 105-7. Finally, while Irwin reasserts that detained individuals may initiate a free and confidential attorney communication by submitting a request through tablets in their unit as instructed in the detainee handbook, Paulk Decl. ¶ 26, ECF No. 131-1, SIFI reports that it has never had a detained client schedule a legal call and that, to its knowledge, clients have never been instructed on how to submit such a request, Rivera Decl. ¶ 9. Nor does the handbook Irwin filed include any such instructions. Paulk Decl. ¶ 36, Ex. B, ECF No. 110-12.

For Stewart, Defendants include a link to VTC scheduling procedures and state that Stewart has provided copies of this form to known attorney representatives. Washburn Decl. ¶ 49, ECF No. 131-3. However, SIFI staff report that they received notice of this form only through the warden's declaration, as it is not readily available on the ICE website and was not distributed to them otherwise. Rivera Decl. ¶ 13 (noting absence of the procedure on Stewart's website at https://www.ice.gov/detention-facility/stewart-detention-center). Apart from difficulties with distribution, the contents of the written procedure at Stewart do not satisfy Part 4 of the Order, as it does not provide VTC hours of operation or designate a point of contact. Nor does it set out a clear process for detained individuals to secure a legal call. *Cf*. Rivera Decl. ¶ 16 (stating that SIFI clients in Stewart cannot schedule a legal phone call upon their request). Although Defendants attach a "Detainee Information Request form" to request legal calls that is allegedly posted in all housing units, the form references a "telephone information officer," a

title that is not included or explained in the warden's declaration. *See* Washburn Decl. ¶ 50, Attach. 9, ECF No. 131-3. This lack of clarity in scheduling procedures continues to cause unexplained delays and cancellations of remote legal visits. In a recent example, SIFI staff at Stewart reported a six-day interval between the date they requested a legal phone call with a client and when the call took place:

> [O]n the morning of July 21, 2020, a legal worker requested a legal phone call. She got no response until the afternoon of July 23, 2020. The Stewart official noted they had been out of the office, and set the call for July 24, 2020 at 2 p.m. EST. The SIFI legal worker was asked to call the unit manager's phone at the scheduled time. At the time of the appointment, the SIFI legal called the unit manager, as requested. She called 9 times over a span of 20 minutes. No one answered. The SIFI legal worker tried the Stewart front desk, but no one answered. The SIFI legal worker emailed the Stewart official who had confirmed the appointment. She got no reply until three days later, on the morning of July 27, 2020. The legal phone call was then rescheduled for that afternoon at 2pm EST. The entire scheduling process, from the time the SIFI legal worker made the request to the time she was able to speak with the client, took almost one week.

Rivera Decl. ¶ 14. This incident reflects the prolonged delays for SIFI's clients that result from Defendants' failure to devise and distribute clear scheduling procedures, compounded by a failure to provide designated points of contact for when issues arise, and a failure to schedule legal calls within 48 hours of request. Defendants are not complying with Part 4 of the Order.

#### 5. Defendants Have Taken No Significant Action to Comply with CDC Guidance.

This Court ordered Defendants to follow the CDC Interim Guidance, including the sanitation regimen, based on a finding that "it does not appear that Defendants are uniformly ensuring that certain devices such as telephones, or the surrounding spaces such as offices, used for legal calls are cleaned between each use." Mem. Op. 68, ECF No. 124. In response, Defendants do little other than point back to those very same submissions. *See, e.g.*, Rice Decl. 6, ECF No. 131-2 ("Also noted in my May 14, 2020 Declaration to this Court, LaSalle has taken

numerous precautions to limit the spread of the COVID-19 virus…The details of those precautions are noted in my previous Declaration."); Staiger Decl. 6, ECF No. 131-4 (same). These submissions now, as then, do not demonstrate that Defendants are following the CDC's Interim Guidance, and are even further undermined by reports from SIFI staff and clients calling their accuracy into question.

As correctional health expert Homer Venters previously explained, and Dr. Schriro again confirms, ICE's implementation of the CDC Interim Guidance is "grossly deficient." Venters Decl. ¶ 14, ECF No. 105-5; Schriro Decl. ¶ 21(d) ("Facilities representations that they comply with CDC guidance is simply not true."). Defendants' response to the COVID-19 pandemic does not take seriously how the dangerous outbreak restricts access to counsel. For instance, several (but not all) of the Facilities claim they are cleaning shared areas and equipment used to communicate with legal representatives. But cleaning in detention facilities is typically done by detained persons, not staff, and Defendants' declarations are silent as to who has been tasked with this responsibility and whether they are properly trained and protected. Schriro Decl. ¶ 20(a)-(d); *see, e.g.*, Washburn Decl. ¶ 62, ECF No. 131-3 (stating that individuals who participate in the ICE Volunteer Work Program at Stewart have increased their frequency of cleaning the common areas, a claim that mirrors Defendants' prior submissions in Washburn Decl. ¶ 25, ECF No. 110-19).[12] Other facilities simply claim that they now provide detained individuals with sanitization chemicals for all housing units "to be cleaned by detainees in

[12] It seems that at Stewart, the only change in Defendants' conduct, as it relates to complying with the CDC guidance, is that staff are now assigned to disinfect the phones in the housing unit once a day. Washburn Decl. ¶ 63, ECF No. 131-3.

between uses." Paulk Decl. ¶ 41, ECF No. 131-1.[13] None of the facilities, nor ICE itself, has indicated whether they provide training, personal protective equipment, supervision, or proactive testing for these detainee cleaning crews. Schriro Decl. ¶ 20(a)-(d). This omission raises serious concerns about both the effectiveness of the cleaning performed and the risks posed to the detained persons doing it. At Stewart, for example, Warden Washburn claims that VTC equipment is not a contact point for potential transmission of COVID-19, a dubious claim that calls into question any alleged efforts to comply with the CDC guidance. *Id.* ¶ 67.[14] So long as spaces and devices used for legal communications are not properly sanitized, detained persons' use of them is impermissibly restricted. *See* Mem. Op. 68–69, ECF No. 124.

Additionally, the Facilities represent that they comply with the social distancing rules in the CDC Guidance, but do not address how social distancing may impact certain access to counsel procedures. Social distancing likely renders unusable a significant number of the phones Defendants say are available for detainee use. Schriro Decl. ¶ 21(a); *supra* section B.1. The CDC Interim Guidance also recommends quarantining new arrivals and those who are symptomatic or exposed to positive cases. Defendants' responses suggest that, at best, they are only in partial compliance with this guidance. *See* Venters Decl. ¶ 18, ECF No 105-5. Importantly, though, Defendants have not described how their less-than-compliant intake and quarantining measures guarantee any access counsel to people in isolation. Schriro Decl. ¶ 21(b). Similarly, Facilities which require detained persons to use written forms to request legal visits or

[13] Defendants recently informed Plaintiff that at Irwin, Facility staff are the ones who clean the VTC devices and community phones. Defs.' Email 9. They made no representations about who cleans communication devices in the housing units.

[14] Unlike at Irwin, detained individuals at Stewart are still not provided with gloves. Washburn Decl. ¶ 64; Paulk Decl. ¶ 42, ECF No. 131-1.

report technical issues, like Pine Prairie and Irwin, do not describe how people in restricted housing or otherwise isolated from the general population may make these written submissions.

More troubling than the facially insufficient representations, are the factual representations about cleaning and sanitation supplies which are directly controverted by SIFI's clients. For example, LaSalle claims that VTC rooms are cleaned and sanitized after each use, Rice Decl. 6, ECF No. 131-2, but SIFI clients report that they are not cleaned consistently, Rivera Decl. ¶ 25. LaSalle claims that sanitation wipes are provided in each room used for legal communications, Rice Decl. 6, ECF No. 131-2, but SIFI clients say there are not. Rivera Decl. ¶ 25. In fact, SIFI clients report having to use bathroom tissue to hold telephones as an improvised attempt to reduce the risk of picking the coronavirus up off a shared surface. *Id*. Finally, the warden of LaSalle claims he is not aware of "any complaints about the sanitation or cleanliness of the rooms or equipment used for communications." Rice Decl. 6, ECF No. 131-2. If true, this is an indictment of the warden's sources of information. A number of SIFI clients have complained about COVID-19 safety and sanitation conditions to the staff at LaSalle, but have received no response. Rivera Decl. ¶ 26. The sharp divergence between Defendants' representations about sanitary conditions at LaSalle and reports from people detained there undermines the credibility of the Defendants' alleged partial compliance and demonstrates the need for a neutral third party to monitor conditions at the facilities and ensure the Court's Order is followed.

In sum, Defendants have provided no evidence that they have undertaken any substantial efforts to bring their facilities in line with the CDC's Interim Guidance as this Court ordered nearly two months ago. Instead, their prior submissions show that ICE has taken a piecemeal

response that ignores a number of critical CDC guidelines and fails to consider implications of these half-measures on access to counsel.

**6. Defendants Have an Alternative Document Exchange System at Only One of the Facilities.**

As of this filing, three of the four Facilities still do not have a mechanism for confidential electronic document exchange, and not one of the Facilities has provided a clear written procedure to attorneys, to staff, or to detained individuals. Order 3, ECF No. 123. As the Court noted, we are in the midst of "an unprecedented pandemic that poses dangerous risks" to those confined in ICE detention centers. Mem. Op. 62, ECF No. 124. The Court found that the delays caused by Defendants' exclusive use of postal mail for document exchange were unreasonable and ordered an alternative electronic system be implemented as part of its emergency relief. Defendants should have implemented this relief by now, and each day that passes without a functional system to exchange legal documents and obtain signatures is a day that SPLC's clients suffer the harm of delays in obtaining and signing documents critical to their cases.

Defendants admit that LaSalle and Pine Prairie are not currently in compliance with Part 6 of the Court's Order. Rice Decl. 6, ECF No. 131-2; Staiger Decl. 7, ECF No. 131-4. Both facilities have opted not to use a fax machine system, as Irwin and Stewart have, and are instead "exploring the feasibility" of a DocuSign-type system, which would utilize software on the facility tablets for document exchange and signature collection. Rice Decl. 7, ECF No 131-2; Staiger Decl. 7, ECF No. 131-4. While SPLC has concerns that the limited number and general unavailability of tablets reported at LaSalle and Pine Prairie will make the proposed document exchange system ineffective, *see* Rivera Decl. ¶ 23; *supra* section 1, more immediately, Defendants' representations that they are still "exploring" this solution and are in "preliminary discussions" with LaSalle and third-party vendors gives no indication of when compliance with

this part of the Court's Order will happen. Rice Decl. 7, ECF No. 131-2.[15] Defendants' most recent representations to SPLC indicate only that they are "still exploring methods of document exchange." Defs.' Email 1.

Even where Defendants have opted to use fax machines, those Facilities are still not compliant. Irwin, which has previously allowed the use of its fax machine for exchange of confidential legal documents, although with varying degrees of success, claims to have recently updated its policy to include the fax number that attorneys may use, as well as the current phone number for the Law Library Clerk, who is the designated point of contact for the facsimile process. ¶ 43.[16] However, as with its policy for scheduling attorney-client phone calls and VTCs, Irwin is still "in the process" of adding the fax machine policy to its website. *Id.* ¶ 44. Because Irwin has not distributed its fax machine procedure to attorneys, staff, or detained individuals, Irwin is not in compliance with Part 6 of the Court's Order. *See* Rivera Decl. ¶ 12 (as of August 5, 2020, SIFI staff had not been notified of an updated policy for electronic document exchange).

Stewart is also not in compliance with Part 6 of the Court's Order. Over a month ago, Stewart ordered two fax machines to be placed in the law library. Washburn Decl. ¶ 71, ECF No. 131-3. According to Warden Washburn, these machines should have been delivered by June 29 and operational on July 3. Additionally, Defendants recently represented that will disseminate fax procedures to detained persons at Stewart this week. Defs.' Email 1. However, SIFI reports

[15] In the absence of a functional electronic document exchange system, Defendants necessarily have also not provided training to staff, in violation of Part 7 of the Court's Order. *See* Rice Decl. 8, ECF No. 131-2 (stating that LaSalle will provide further training about the document exchange system when it is set up).

[16] Irwin seems to have assigned the Law Library Clerk as the designated point of contact for *all* its legal communication processes. *See* Paulk Decl. ¶ 23 Ex. A, ECF No. 131-1A (scheduling VTCs and legal calls); *id*. ¶¶ 33-34 (troubleshooting issues with phones and VTCs); *id*. ¶¶ 43-44 (using fax machine).

that as of August 5, they still have not received any information about a fax machine or procedure for such a machine. Rivera Decl. ¶ 18. SIFI staff continue to rely on postal mail to exchange confidential legal documents with their clients at Stewart, a process that continues to be delayed and unreliable. Furthermore, Defendants state that documentation regarding the fax machine process *will be* provided to known attorneys, acknowledging that they are not currently in compliance with Part 6 of the Court's Order. *Id.* ¶ 72.

**7. Defendants Have Not Provided the Training the Court Ordered.**

Defendants fail to demonstrate compliance with each aspect of Part 7 of the Court's Order, which requires training of staff regarding scheduling procedures, document exchange procedures, and measures to ensure attorney-client confidentiality. The Court also specifically ordered training for "[s]taff members who are responsible for escorting detained individuals to VTCs or telephone calls, or who monitor VTCs or telephone calls…on who to contact in the event of technical issues arising." Order 3, ECF No. 123. In response, no Facility has trained escort staff on troubleshooting procedures—Defendants do not even acknowledge this requirement. As to the remaining three parts of the Court's training order, Defendants offer only summary assurances of compliance at Irwin, provide documentation of insufficient training at Stewart, and attest to compliance with only one portion of the training ordered at LaSalle and Pine Prairie. This is insufficient.

At Irwin, Defendants broadly claim compliance without providing any details other than that staff "has been trained and retrained." Paulk Decl. ¶ 45, ECF No. 131-1. In keeping with their other promises of compliance-to-come at Irwin, Defendants state that the Facility is "in the process" of providing additional training to staff who are involved in attorney-client communications, though Defendants provide no more details than that. *Id.* These general

statements that trainings are—or will be—performed lack the necessary detail to verify their adequacy. Without information about the specific subject matter of the trainings or the staff that are trained, Defendants' assertions are insufficient. *See* Schriro Decl. ¶ 23 (finding Defendants did not provide sufficient information to determine compliance).

At Stewart, too, Defendants claim that they provided refresher staff training about some topics and attach some attendance rosters. A closer examination of these rosters shows a failure to meaningfully comply with the Court's Order. Washburn Decl. ¶¶ 74-75 Attach. 15, ECF No. 131-3 (showing six trainings that had three to six attendees in each, lasted between thirty minutes to one hour, and addressed only one issue; all of the trainings seemed to deal only with telephone issues, maintenance, and reporting, while one training, with just three attendees, also included "attorney calls" as training topic). Additionally, Defendants do not appear to have trained Stewart staff on scheduling legal calls for individuals who are in segregation. Although Defendants claim that there is a portable telephone in this unit and that a Stewart staff member will dial the call for the individual, Washburn Decl. ¶ 40, ECF No. 131-3, SIFI staff report difficulty with coordinating such calls, as facility staff have "improperly inquired into the subject of requested legal calls and tacitly required proof of an existing attorney-client relationship as a condition to initiating a legal visit," Rivera Decl. ¶ 15.

Finally, at LaSalle and Pine Prairie Defendants only assert compliance with one of the four specific parts of the Court's training order: training on scheduling legal communications. *See* Rice Decl. 8, ECF No. 131-2 (stating that LaSalle has trained "staff identified as points of contacts on how to schedule legal visitation"); Staiger Decl. 8, ECF No. 131-4 (claiming to have recently trained its staff, as well as detained persons, on the procedures to schedule remote legal

visits). Defendants do not even address the remaining three training orders contemplated by the Court at these Facilities.

**C. The Court Should Find That Defendants Have Failed to Comply with Its Order and Grant Appropriate Relief.**

As the foregoing demonstrates, Defendants have failed to achieve even a minimal level of compliance in the nearly two months since the Court issued its Order. Defendants' Notice of Partial Compliance is deficient on its face, and many of the factual assertions on which it rests are controverted by the reports from people detained at Defendants' Facilities. During the pendency of Defendants' noncompliance, SIFI clients continue to suffer real harms from Defendants' access barriers. An order both requiring compliance within thirty days on the pain of contempt and appointing a special master to oversee implementation and enforcement is appropriate given the extent of Defendants' noncompliance to date and the high stakes for persons detained at the Facilities.

**1. The Court Should Order Defendants to Fully Comply with Its Order within Thirty Days or Show Cause Why They Should Not Be Held in Contempt.**

The power to punish parties for contempt is inherent in all courts, and its existence is essential to a court's ability to enforce judgments and orders. *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006). "The purpose of holding a party in contempt is to remedy noncompliance with a court order." *Pullins-Graham v. District of Columbia*, No. CIV.A. 98-03065 CKK, 2004 WL 6076865, at *1 (D.D.C. Sept. 16, 2004). "A party's substantial compliance with a court order is not an affirmative defense[.]" *Id.*

Defendants' Notice of Partial Compliance provides clear evidence of widespread non-compliance with the Court's June 17, 2020 Order. The assertions in the Notice themselves—such as Defendants' admission that Stewart is in open defiance of Part 5 of the Order, Washburn Decl.

¶ 61, ECF No. 131-3, and Defendants' repeated reliance on declarations already deemed inadequate by the Court—provide ample evidence of this. In addition, Dr. Schriro's expert evaluation of Defendants' Notice, which concludes that "Defendants' own reports show they are far from compliance," Schriro Decl. ¶ 27, confirms the severity of Defendants' intransigence and demonstrates that further intervention is necessary. Defendants have had almost two months to comply with the Court's emergency Order. The harms created by Defendants' continuing non-compliance are felt by SIFI's clients every day. *See* May 6, 2020 Rivera Decl. ¶ 10 ("Taken together, these constraints lengthen the time it takes for SIFI staff to prepare a case, given the many steps involved in developing an application for release to EOIR or ICE."); ¶ 13 ("The outbreak of the novel coronavirus has heightened the urgency of release for clients confined in close quarters, as they and those around them contract the virus, face food shortages, and suffer violence in response to protesting for basic sustenance, hygiene supplies, and healthcare."), ECF No. 105-7. An urgent remedy is required. Accordingly, this Court should find that Defendants have not complied with its June 17, 2020 Order, and order Defendants to demonstrate full compliance within thirty days or show cause why they are not in contempt.

#### 2. The Court Should Appoint a Special Master to Oversee Enforcement of its Order.

SPLC requests that this Court exercise its authority to appoint a special master under Federal Rule of Civil Procedure 53(b) and the All Writs Act (28 U.S.C. § 1651(a)) to monitor compliance with the Court's Order. Indeed, "the power of the federal courts to appoint special masters to monitor compliance with their remedial orders is well established." *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994).

Where an injunction has entered, monitoring compliance is complex, and the threat associated with non-compliance is particularly immediate, appointment of a special master is appropriate. *See, e.g.*, *Blackman v. District of Columbia*, 185 F.R.D. 4, 6 – 7 (D.D.C 1999) (appointing special master to monitor injunction on behalf of children with disabilities where "children are facing a threat of immediate irreparable injury."); *cf. Flores v. Barr,* No. CV 85-4544-DMG (AGRx), 2020 WL 2128663, at *9 (C.D. Cal. Mar. 28, 2020) (ICE required to report "implementation of CDC-compliant guidances" to already appointed special master "[b]ased on the … near-certainty of the rapid spread of COVID-19 in ICE and ORR facilities, even if ORR and ICE take more urgent preventative measures, [because] Plaintiffs have demonstrated that 'they themselves are likely to suffer irreparable harm absent an injunction'") .

Here, in the unprecedented COVID-19 pandemic, the stakes of Defendants' non-compliance are particularly high. Multiple individuals at the Facilities have died from COVID-19, and hundreds have fallen ill.[17] All the while, custody, removal, and *habeas corpus* proceedings continue at full tilt. As such, SIFI's access to and representation of clients in the facilities is more vital now than ever before, but Defendants' flailing response to the pandemic has made access more restricted than it ever has been.

Compliance with the Court's Order addressing attorney access during the COVID-19 crisis therefore is urgent. However, the time and effort of monitoring compliance in light of the crisis's complexity and exigency may "exceed[] that which the district court judge with [her] full regular docket can devote to the case." *Reynolds v. McInnies*, 338 F.3d 1201, 1219 (11th Cir.

[17] Stewart Detention Center's population is just 3.5% of the population of Stewart County, Georgia, but represents 48% of the county's COVID-19 cases; Irwin's ICE detainee population is 5.4% of county population, but 18.5% of its cases; LaSalle represents 4% of the county population but 8% of the COVID-19 cases; and Pine Prairie represents just 1% of the county population but 8% of the cases.

2003). The court in *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 4047334, at *2 (S.D. Fla. July 17, 2020), a case involving conditions of confinement at ICE facilities in Florida, recognized this challenge. Just three weeks ago, the *Gayle* court appointed a special master in response to allegations that Defendants had not complied with a temporary restraining order mandating emergency remedies in response to COVID-19. *Id.; cf. Flores*, 2020 WL 2128663, at *9. Notably, the *Gayle* court had not yet determined ICE was not in compliance with emergency remedies. Rather, the special master's role is to "assess *whether* ICE is committing an ongoing violation of the detainees' constitutional rights." *Gayle*, 2020 WL 4047334, at *2 (emphasis added); *cf. See Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 542 (9th Cir. 1987) (holding that no determination of a constitutional violation or intentional disregard of a court order is necessary, but rather "the *prospect* of noncompliance is an 'exceptional condition' that justifies reference to a master") (emphasis added).

Therefore, for the reasons set forth above—the complexity involved in ensuring compliance with the Court's Order, the likelihood of severe and irreparable injury if ICE fails to comply with the Order on an expedited basis, the resources necessary for the Court to ascertain ICE's compliance, and the parties' disputes as to the implementation of the Order—SPLC respectfully requests the Court appoint a Special Master to monitor implementation and compliance with the Order.

## IV. Conclusion

For these reasons, and in light of Defendants' continued non-compliance with the Court's Order, SPLC respectfully requests that the Court grant the Motion to Enforce and order the remedies requested in the proposed order.

Dated: August 7, 2020

Respectfully submitted,

/s/ Shalini Goel Agarwal
Shalini Goel Agarwal (Fla. Bar No. 90843)*
Southern Poverty Law Center
106 East College Avenue, Suite 1010
Tallahassee, FL 32302
(850) 521-3024
shalini.agarwal@splcenter.org

/s/ Lisa Graybill
Lisa Graybill (Tx. Bar No. 24054454)*
Jared Davidson (La. Bar No. 37093)*
Conor Gaffney (La. Bar No. 38225)*
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
(504) 486-8982
lisa.graybill@splcenter.org
jared.davidson@splcenter.org
conor.gaffney@splcenter.org

/s/ Veronica Salama
Veronica Salama (Ga. Bar No. 888680)*
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30031
(404) 221-5825
veronica.salama@splcenter.org

/s/ William E. Dorris
William E. Dorris (Ga. Bar No. 225987)*
Susan W. Pangborn (Ga Bar. No. 735027)*
Jeffrey Fisher (Ga. Bar No. 981575)*
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
(404) 815-6104
bdorris@kilpatricktownsend.com
spangborn@kilpatricktownsend.com
jfisher@kilpatricktownsend.com

/s/ John T. Bergin
John T. Bergin (D.C. Bar #448975)
Kilpatrick Townsend & Stockton LLP
607 14th Street NW, Suite 900
Washington, DC 20005
(202) 481-9942
jbergin@kilpatricktownsend.com

*Counsel for Plaintiff*
**Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of August, 2020, I electronically filed the forgoing PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION TO ENFORCE THE COURT'S JUNE 17, 2020 ORDER GRANTING INJUNCTIVE RELIEF with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered CM/ECF users.

/s/ William E. Dorris
William E. Dorris