**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Southern Poverty Law Center, | ) |
| Plaintiffs | ) |
| Vs | ). Civil Action No. 18-0760  (CKK) |
| Department of Homeland Security, | ) |
| Defendants | ) |

**REPORT OF SPECIAL MONITOR TO THE HONORABLE COLLEEN**

**KOLLAR-KOTELLY OF THE DISTRICT OF COLUMBIA DISTRICT COURT**

Pursuant to a court order by the Honorable Colleen Kollar-Kotelly of April 14, 2022, and then

amended May3, 2022, I am submitting this report of the evaluation I made of three facilities in

the above captioned matter. In preparing for this objective evaluation I accessed the court

documents through the PACER system. I reviewed the following documents:

1. The Complaint
2. The Amended Complaint and again
3. The Answer to the Amended Complaint
4. The Declarations of:
    a. Traci Mills
    b. Shad Rice
    c. Eric Staiger
    d. Russell Washburn
    e. David Paulk
    f. Dr. Dora Shriro
    g. Stalinist Goel Agarwal
    h. Laura Rivera
5. Several status reports
6. Temporary Restraining Order
7. Memorandum Opinion and Order of February 2, 2022
8. Recent Motion to Dismiss
9. Recent Order of Motion to Dismiss
10. Other pertinent documents in the PACER System

11. Newspaper account from Nola.COM concerning La Salle
12. Other pertinent documents

The Order of the Court specifically required that the Special Monitor determine:

1.  There is one (working) telephone (or VTC console)for every ten presently detained individuals

2.  Are legal calls made on those telephones direct or free?

3.  Has DHS and/or ICE implemented a clear process in writing for reporting and troubleshooting issues?

4.  Is there a designated point of contact in each facility for such troubleshooting?

5.  What technical issues have arisen (or do arise), how long has it taken (and does it take to remedy the issue?

6.  To what degree are legal calls monitored and based on the positioning of the phones can facility staff overhear a legal call?

7.  Have clear internal and external procedures been implemented in writing for scheduling and accessing telephone calls and VTC's?

8.  If so, how have the procedures worked in practice in the Relevant time?

9.  What is the compliance with the CDC Guidelines for Correctional Facilities as to the cleaning of devices and spaces for legal calls?

10. Are there procedures in writing  for the exchange of confidential documents and/or obtaining signatures via electronic means?

11. What are those procedures and how have they worked in the Relevant Time?

12. Has there been training for (the relevant) staff regarding the procedures for scheduling remote legal visits through telephone calls and VTC's implemented by the facilities on how to ensure attorney-client confidentiality for legal calls?

**LA SALLE ICE PROCESSING CENTER, JENA, LA.**

On May 25, 2022, I arrived at LaSalle ICE Processing Center in Jena, Louisiana in the morning. I was met by the facility deputy administrator, Ms. Lisa Bowen. Later we were joined by the facility administrator, Mr. Shad Rice. After requesting to see certain specific documentation, I toured the facility and then spoke to the Chief Physician. From their Alpha Run (a list of all of the detainees in the facility at the moment) I randomly selected ten detainees to interview. Around noon I contacted the contracted interpreter and began those interviews. At the termination of the interviews I returned to the Administrative area to review logs and other documentation that I had requested.

FINDINGS OF ABOVE CAPTIONED ITEMS AT LA SALLE

This facility was built as a youthful offender detention center and then repurposed as an ICE facility and managed by the GEO group, a private national corrections management corporation. It has a design capacity of over 1300. The highest number of detainees in the facility in the last two years was 649.  The average daily population for the last two years was below that (see exhibit ADP).

First, the facility has more than one phone for each ten inmates. The facility's capacity is slightly under 1100, but the average daily population for the last two years has been under 500. I adamantly disagree with the Plaintiff's (see complaint and Dr. Schriro's declaration) that the

correct measure is facility capacity. Built capacity in the correctional world is somewhat

spurious. Many facilities exceed built capacity by moving in "boats" or other temporary sleeping

accommodations and other facilities run chronically below design/built capacity. For the last two

years La Salle's average daily population (ADP-see attachment 1) was less than five hundred.

Using that figure (ADP) there is one telephone for every five detainees.  A random selection of

telephones indicated that they were functioning and on the site visit several detainees were using

the telephones. (see exhibit 1)

Second, legal calls may be made on those phones. Each detainee is given a PIN which he or she

enters when making a call. If the number is to legal services then the detainee is not charged for

the call. The business office has a list of attorney numbers that are automatically not charged and

if the detainee calls a number not on the list the business office will call to determine if it is a

legal service provider and if so there is no charge. The detainee can request through their case

manager either in writing or through the tablet system a private call and this will be set up within

a short time (see logs). This was clearly pointed out in the detainee handbook and all but one of

the detainees interviewed understood this. (For convenience sake most of them stated that they

preferred the dorm phones for legal calls).

Third, posted in each living area in English and Spanish is a clear process for reporting

difficulties with the telephones and troubleshooting. The detainees are requested to notify the

housing unit officer who then notifies a single designated person. This is both posted and in the

Detainees handbook. (see photo and handbook attached)

Fourth, there is a designated point of contact at La Salle for troubleshooting. The housing officer notifies this single person of difficulties. The IT person (Cody) is on site and if he cannot resolve the issue in a few minutes he communicates with the repair service of the contracted telephone provider. (Taunton Communications contracted by ICE and mandated by ICE for detainee telephone communications).  While at the facility I observed Cody replace a partially functioning telephone (static and some difficulty understanding) with a clear working telephone to which the detainees had access.

Fifth, the technical issue I observed took less than ten minutes to resolve. Inquiries of the detainees (see report infra) in this area indicated it was not an issue of concern. On at least one occasion (see emails below- Exhibit 3) the entire telephone system in the facility was inoperative. According to the attached electronic messages it went down in an afternoon and was functioning again later in the early evening of the same day. There seems to be adequate responses to telephone difficulties and seems not to be of concern to the detainees.

Sixth, any calls made from the housing unit may be monitored or overheard. The detainees understand this. There is a mechanism for totally private telephone calls. Each detainee can access his or her case manager either in writing or on a tablet. The case manager then arranges a private office telephone communication for the detainee. Comparing the requests to the logs (see exhibit 4) indicates that this occurs within the same day or the next day usually. The VTC is requested in a similar fashion. There are three VTC rooms at La Salle and the logs indicate infrequent use (see Exhibit 5). The rooms are reasonably soundproof and I made a series of calls from one of them with a detainee in the room. An officer was outside and we could not hear what

he was saying even though he was speaking loudly. One could tell he was speaking, but could

not make out individual words. Likewise he denied being able to hear us. There is an exception

to the VTC request system and that is for the SPLC (see Rice declaration). From 5:00 pm until

7:00 pm daily the VTC unit is designated exclusively for the use of the SPLC. The logs reflect

that since the inception of this exclusive timeframe SPLC has never used it (see exhibit 5)

Seventh, for detainees the handbook indicates clear written internal procedures for scheduling

and accessing telephonic and VTC communication. (See exhibit which includes the detainee

handbook and a screenshot showing attorney visitation is seven days per week from 6:00am until

11:00 pm and includes holidays. Also see screen shots of the website).

Eighth, according to the detainee interviews no detainee had any complaints about accessing

their attorney or confidentiality with legal matters.  Of the ten detainees I randomly selected at

this institution three did not have an attorney. One of the three was dealing with his family to

arrange an attorney. The other two had called the pro bono numbers repeatedly but had not

received call backs. Seven detainees currently had attorneys or had had attorneys in the past.

None of these individuals felt it was onerous or difficult to speak to their attorney and knew how

to access private communication.  While at the facility I witnessed three attorneys in the

Attorney Visitation Area talking with their clients. I could not overhear any communication

either on the attorney side nor the detainee side. There was a small slot in the wood and glass

partition for passing documents between attorneys and their client. (See picture below)

Ninth, this facility does not follow the CDC guidelines for Correctional and Detention Facilities per se. There are Problem Based National Detention Standards (PBNDS) promulgated by ICE and supplemented by Pandemic Response Requirements (PRR's). A review of these documents indicates they track the CDC guidance fairly closely. They do use different nomenclature however. The CDC addresses only two levels of response- standard, also called routine (labeled Strategies for Everyday Response) and enhanced, Enhanced Levels. The level is determined by noting local community infections, correctional infections, transmission rates and other factors. If the correctional facility feels there is increased risk of COVID infections then Enhanced Precautionary Measures should be used. The CDC defines community risk as low, medium, and high and suggests for medium and high, correctional facilities should use enhanced measures. Note the Personal Protective Equipment (PPE) has been deleted by the CDC in this latest promulgation. Under the Enhanced Measures testing should occur on intake, upon transfer, after visitation, and before release. They also advocate "increased ventilation," minimize movements, and social distancing. They no longer address surface cleaning in the new guidelines other than in general. The facility wipes down the phones and areas twice per day and has signage and wipes available to encourage the detainees to clean the phones before and after each use. At the detainee interviews most indicated that this was being done and had no concerns in this area. The facilities follow the PRR's (and were aware a new PRR was to be released shortly (communication with the facility chief physician) and had initiated many of the expected recommendations. Similar to the CDC guidelines all new intakes remain in a single cohort for ten days with very limited movement. After ten days if the entire cohort tests negative they are released into general population. If someone becomes symptomatic or tests positive they are isolated from the cohort and the facility and the rest of the cohort remains for a full two weeks.

During my inspection of La Salle there was a detainee in quarantine who was asymptomatic. His record reflects he was evaluated twice per day with vital signs including temperature and partial pressure of oxygen (as measured by pulse ox). He remained asymptomatic. There is an evaluation and treatment strategy in the Pandemic Response Requirements and the physician had a very knowledgeable grasp of evaluating, treating, and referring these patients as appropriate. The PRR labels three levels of concern for detention facilities (unlike the CDC two levels- routine and advanced) and labels them 'Green," "Yellow", and "Red". Green comports with the CDC's routine, except every employee in the center must wear masks and detainees are encouraged to wear masks.  There is no such requirement in the CDC routine risk level. The PRR's "Yellow" and "Red" levels are similar to the CDC Enhanced recommendations. The facility encouraged social distancing, hand washing, personal hygiene, and all of the other CDC Enhanced measures. During my visit at La Salle the level was "Yellow" because of the asymptomatic quarantined detainee. Some social distancing was noted, but not aggressively enforced and about fifty percent of the detainees used masks. All of the staff wore masks.

I made specific inquiries concerning ventilation and was assured by the facilities manager that there were six air exchanges per hour. This is consistent with the CDC Recommendation. Of course,  there is no way to measure this without instrumentation which I did not have. (Although not a part of the CDC Recommendations nor the PRR some facilities have moved to U-V lighting in the ducts and other areas, HEPA filters, and laminar flow. La Salle did not incorporate any of these modalities).

Although the terminology is different the La Salle facility is in accord with the recent update from the CDC on Guidelines for Correctional and Detention Facilities. It should be noted that

93% of the staff is fully vaccinated by documentation and 78% of the detainees are fully vaccinated.

It is important to note that the current Pandemic Response Requirements limit the facility to 75% of capacity. It is expected that the new PRR will eliminate that requirement. It is also important to note that this facility would comport with the first telephone requirement of one phone for every ten detainees.

Tenth, the La SALLE facility has a dedicated facsimile machine located in the Case Managers area for electronic receipt and transmission of legal documents. Only the Case Management staff and the facility administrators have access to this facsimile. The logs show some minimal usage of this system (see attached log Exhibit 7).

Eleventh, facsimile communication seems to work well when it is used. The logs reflect about three or four transmissions per week. The interviewed detainees had no negative comments concerning the facsimile system.

Twelfth, there has been a training program for the Case Management staff (who are the only ones involved in arranging for and implementing the facsimile transmission and reception) and the exhibit attached (Exhibit 8) shows the log in sheet and curriculum used. Although the depth and breadth of the curriculum has been challenged (court documents and declarations) it appears adequate and the system is working.

CONCLUSION

La Salle ICE Processing Center is in compliance with the specific items enumerated to be

evaluated by the court at this time. The facility could enhance compliance by incorporating

material spread throughout the detainee handbook into a single succinct document.  The facility

is faced with interpreting one hundred forty six different languages and although they have

translators for that on call, the system is somewhat awkward. As a Special Monitor and at

direction of the court,  I made no suggestions on this but after the tour of the facility,  a Regional

GEO person indicated that they would place many of the handbook items in a succinct document

and made a suggestion to improve the translator communication. I have no knowledge to date as

to whether these have occurred.


PINE PRAIRE ICE PROCESSING CENTER

On May 25, 2022, I arrived at the Pine Prairie ICE Processing Center in the morning. (The

highway sign referred to it as the Pine Prairie Correctional Center referencing its original

purpose.) I was met by Facility Administrator Brick Tripp who had come to his position three

weeks ago. Prior to his arrival Mr. Shad Rice from La Salle had been to the facility on multiple

occasions for the transition to Mr. Tripp.  Mr. Rice was also present as well as a regional person

from GEO.

Pine Prairie ICE processing center is located in Pine Prairie, Louisiana and was originally built

as a state prison. It was repurposed into an ICE facility by the GEO group. The largest number of

detainees in the last year was 404 and the average daily population was 310. The design capacity

is 1094.

First, the facility has more than one phone for every ten detainees. In fact it currently has more than one phone for every five detainees. A random evaluation indicated all of the phones were in working order. (See photos) These phones do not afford privacy and the detainees understand they may be monitored, overheard, or recorded when on these phones.

Second, legal calls may be made from these phones and, if so, there are no charges to the detainees. The detainees understand that if legal calls are made from these phones in the dorm banks they may be overheard, monitored, or recorded and privacy is not achievable. A random selection of phones indicated that they were working.

Second, legal calls made from these phones are not charged to the detainee. Similar to La Salle the business office checks the number against a list of attorneys numbers and refunds any payments to the detainee. If the number called is not on the list the number is called and if it is an attorney there is no charge. (Throughout all three facilities evaluated the phone service is contracted by ICE through Taunton Communication. The individual facilities must use this service for detainees. They then use it for both detainees and non detainee telephonic communication).  The detainee can request through writing or the tablet system to their case manager for a private phone for legal calls and this is accomplished within a day or so. (See logs of request and calls made. Note the time frame is also dependent on the attorney's availability).

Third, posted in each living area adjacent to the phones as well as in the offices where private calls are made is clear guidance in English and Spanish as to how and to whom reports of

difficulties with the phones are reported. This is also repeated in the Detainees handbook. (See attachment and photo)

Fourth, there is a designated person for troubleshooting difficulties with the telephone and VTC System. At this facility the designated person was William King. Operationally, the detainee reports difficulties to either the dorm officer or to the officer observing, but not overhearing a private call and that individual reports it to Mr. King. The work orders seem to be responded to in a short period of time and none of the detainees interviewed expressed concern over the telephone operations.

Fifth, as above when technical issues do arise the process to repair them is clear and the repair times seem reasonable. Of the ten detainees interviewed none had issues with telephonic communication even in specific questioning. Logs of reported issues were observed and on site repairs were generally accomplished within less than two hours. Repairs requiring the contractor to come to the facility seemed to take one OT two days, but because of the number of phones available this did not pose an issue.

Sixth, any calls made from the dorm phones may be monitored, overheard, or recorded. The detainees understood this and there was multilingual signage concerning this. As above any detainee can request in writing or through the tablet system a private legal call. This is arranged, usually within 24-48 hours depending on the attorney's schedule. At the designated time the detainee is taken to a private office where an officer dials the number. Once the caller answers and identifies as an attorney or attorney's office the officer give the phone to the detainee and

leaves the office, closing the door. The officer then observes the detainee through the glass in the door. With the door closed the call cannot be overheard. I personally witnessed this at both La Salle and Pine Prairie facilities.

Seventh, the detainees handbook has clear written instructions in the detainees home language about how to make and receive legal calls. None of the detainees interviewed expressed a lack of understanding concerning this issue. This is supplemented by signage in the dorms in English and Spanish posted on the walls (see detainees handbook and photos)

Eighth, according to the interviews I made with a random selection of ten detainees none had complaints regarding the process nor the facility. Several without legal representation said the had called the pro bono numbers but were still awaiting any communication in return. One stated that no one answered the phone. Many detainees interviewed understood their attorneys were very busy and could not spend as much time with them as they wished.  At all of the facilities almost all of the detainees expressed anxiety concerning the indeterminate nature of their confinement. Unfortunately, neither facility staff nor ICE staff had the ability to give them definite answers.

Ninth, as at La Salle, Pine Prairie follows the current PRR in regards to the CDC guidelines. The current PRR limits capacity to 75% and the facility is not close to that. With the new PRR it is assumed that will no longer be mandated. The phones and areas are cleaned by staff supervising detainees twice per day and signage and wipes are present to encourage detainees to clean the phones between usage. None of the detainees interviewed expressed concern in this area. As per

the discussion above for La Salle, Pine Prairie's adherence to the current PRR is consistent with current CDC guidelines for Correctional Facilities. Unlike the PRR, the new CDC guideline for determining risk use the higher threshold of Community Cases rather than the previous threshold of Community Transmission.  Community cases permits many smaller communities (where most detainee facilities are located) to be considered low risk areas whereas the former Community Transmission threshold would have placed them at higher risk. The current PRR uses transmissions.  It should be noted that COVID19 cases and transmissions have been much less in the last few months than previously (see discussion and documentation below reference Stewart). The facility is compliant or exceeds current CDC guidelines. 89.7% of the staff are fully vaccinated and 70% of the detainees are fully vaccinated.

Tenth, confidential documents can be exchanged by USPS or by facsimile. The facsimile machine in Pine Prairie is located in the mailroom and has posted limited access with the names of the only persons permitted on the door. The door to the mailroom is locked and is in a corridor where un authorized persons would be readily observed entering. Once a facsimile transmission arrives if it is determined to be a legal document it is placed in an envelope with the detainees name on it and carried to the inmate. If it requires a signature or facsimile response that is accomplished through the case managers with access to the mailroom. (see logs). The detainees interviewed had no issues with facsimile communications, although most expressed they had no real need for it.

Eleventh, as per number ten above.  Although not used terribly frequently, the system seems to work well and both the logs and detainee interviews attest to that

Twelfth, Pine Prairie has a training program for legal communications for those people directly involved with generating or receiving legal communications. The curriculum was reviewed and the attendance log was examined (see attached). The facility seems to be in compliance with this issue.

CONCLUSION

Pine Prairie ICE Detention Center is in compliance with the specific issues enumerated by the court at this time. (See comments at the end of La Salle for potential enhancements)

STEWART ICE DETENTION CENTER

Stewart ICE Detention Center is located in Lumpkin, Georgia about fifty miles outside of Columbus, Georgia. It is run by the private corrections contractor, Core Civic. It was originally built as a part of the Georgia State Prison System. It was not aggressively used in that capacity and was taken over by Core Civic to serve as an ICE Detention Center. Its original design was for 1916 incarcerated persons. The largest number of detainees housed there recently was 1437 and the average daily population for the last year was 1137. I arrived at the facility in the morning and was met by Warden Russell Washburn. In the initial meeting we're the Deputy Warden, the Chief Custodial Manager, two employees of ICE and the Warden's secretary.

First, there are more than ten working phones for each detainee. In the dorms there are five or six along the walls and one or two 4-phone pods as well as portable phones. One of the phones in one of the pods was marked "Not Working" and a work order had been put in to repair it that

morning. It was discovered out of order that same morning.  The phones and tablets are checked by staff each morning (see logs and pictures). Other phones in various living quarters were randomly checked and seemed working. During the interviews one of the detainees said only four phones were working in her dorm. I asked the detainee if I could communicate this to staff and she agreed. This was checked immediately and all phones in that pod were working. Two had static on the receivers and a work order was placed for them to be repaired.

Second, when legal calls are made from these phones there is no charge to the detainee. The business office handles this in a similar fashion to the other two facilities evaluated.

Third, posted by the wall phones in each living area in English and Spanish is clear instructions on how to use the phones, how to access a private call, to whom the detainee should contact with difficulty with the phones and the fact that the calls may be overheard, monitored and/or recorded. This information is in the detainees
handbook and is taped to each phone (see photo)

Fourth, there is a designated person for troubleshooting and repairing the phones and VTC equipment. The phones are checked daily by the staff and if there are issues, the designated person is the Warden's Secretary, Brandi. She is contacted at the morning checks if there are issues or by the dorm officer if issues arise during the day. She then either submits a work order to the phone contractor, Taunton Communications, or notifies the facility maintenance personnel depending on the situation. In the last three weeks the facility is switching to an electronic

process where the reporting officer directly contacts either Taunton or facility maintenance, but Brandi still monitors the process.

Fifth, as above on site repairs were accomplished within two hours and contractor repairs within one to two days. In 2020 or 2021 all phones in the facility stopped working. Within two hours they were up and functioning again (see logs and emails). The repair process seems to be effective and without undue delay and there is a large excess phone capacity. (In areas with cells two cells are designated as private call cells and are equipped with phones that detainees can access by asking the dorm officer. The call is placed by the dorm officer and if it is verified as a legal call the detainee has audio privacy. The dorm officer does observe the detainee. This is in addition to the other telephones and VTC System so there is far more than one phone for every ten detainees even if the facility were at full capacity.

Sixth, with the exception of the above mentioned private calls from designated cells, all of the wall mounted phones and pod mounted phones may be overheard, monitored, or recorded and detainees are aware of this. This is posted in English and Spanish near the phones. During the interviews one of the detainees when specifically asked stated that awareness that legal calls were monitored because "the sign says." This detainee also knew how to access private phones, both in the dorm or in a private office. None of the other detainees had any issues with the phones. They all knew that private legal calls could be made by access though written request or their tablets. One of the detainees complained that tablets were not readily available.  There is approximately one tablet for every three detainees. Each tablet is supposed to be shared and surrendered at the end of the day to be placed in the locked charging station. Some detainees

refuse to surrender the tablet and use them overnight. When accessed by other inmates in the morning the batteries are depleted. Those tablet then must be recharged for several hours. In communicating with a dorm officer about this, it takes a minimum of two hours and better if three hours for recharging depleted tablets.

Seventh, the detainees handbook has clear language on how to make and receive legal phone calls. This is supplemented by postings in English and Spanish near the wall phones. None of the detainees interviewed had issues in understanding the process. One was apparently not sufficiently literate in his native language, but other detainees had explained it to him.

Eighth, none of the randomly selected detainees that I interviewed had issues with the process. As mentioned one claimed that only four phones were working for 60 detainees in her area, but upon witnessing this personally all phones were working except two with static for which work orders were generated. The other interviewed detainees had no complaints or issues and some stated the phone service was good.

Ninth, the facility follows the current PRR but exceeds this by obliging staff to use personal protective equipment in the cohort areas for incoming detainees and in areas if a detainee is positive. They wipe phones and areas at least once per day and encourage detainees to clean between uses. None of the interviewed detainees had issue with this and all were comfortable that the areas were being sanitized. However, I did not see readily apparent containers of wipes, but was assured they were available.  There was one detainee who was an asymptomatic positive housed in the medical area. He was followed personally by the facility physician with vital signs

including pulse oximetry twice per day. There was a plan if he became symptomatic or if his oxygen levels fell to transfer him. There were two hospitals roughly the same distance (50 miles) from Stewart and the physician stated that his preference for truly sick detainees was Piedmont in Columbus. The facility physician, Dr. Harris, stated that each morning upon arrival he checks the positivity rate. It has been steadily declining. For the last several months he has had a total of 38 COVID 19 positive detainees (see segment of attached document- it runs 52 pages so I only attached the first page). Prior to this Stewart was receiving 75-80% of the intake detainees as positive. He is closely monitoring the situation. Consistent with the new criteria from the CDC, Lumpkin is a very low risk community.

At Stewart, 92% of the staff is fully vaccinated, but only 7% of the detainees are vaccinated in spite of the fact that upon intake they are all advised that facilities like this spread and have a higher incidence of COVID19 and vaccinations are offered and encouraged. Dr. Harris was at a loss to explain such low vaccination numbers for the detainees. He was aware that a new PRR would be released soon.

Stewart Detention Center meets the current CDC Guidelines for Correctional Facikities and in some areas exceeds them.


Tenth, confidential documents can be exchanged electronically by facsimile or via USPS. The facility has three facsimile machines. One is in the main detainee law library where there is reasonably unfettered access other than an officer observation or actually in attendance. There are two other facsimile machines in the facility where detainees can receive legal documents. Similar to the other units these are monitored and detainee legal correspondence is placed in a sealed envelope and given to the detainee.

Eleventh, the system seems to work well and the logs indicate roughly 39 faxes for the time between May 16-20, 2022, far more than at the other facilities. None of the detainees interviewed had issues or concerns with facsimile communication.

Twelfth, Stewart ICE Detention Center has a training program for those persons directly involved in generating or receiving legal communications. The curriculum was evaluated and seems sufficient and the sign in log seemed to reflect the appropriate personnel.

CONCLUSION

Stewart ICE Detention Center complies with the issues enumerated by the court to be evaluated at this time.