# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Southern Poverty Law Center,

    Plaintiffs

Vs.                                      civil action # 1:18-cv-00760-CKK-RMM

Department of Homeland Security.

    Defendants

**RESPONSE TO PLAINTIFFS' RESPONSE TH REPORT OF SPECIAL MONITOR**

Plaintiff takes issue with several of the assessments of the Special Monitor. These are individually addressed below.

Section 2 of the Response

1. The statement that the Special Monitor appears to have made only a cursory inspection has no basis in fact. The court directed the Special Monitor to "…conduct one inspection at each facility lasting no longer than one day…". One full day was spent at each facility inspected.

2. The second point argues that the Special Monitor did not speak with any of the persons rendering legal services. The Special Monitor spoke to neither the plaintiff attorneys nor the defense attorneys as their positions were made abundantly clear in the PACER filings which were extensively reviewed by the Special Monitor.

3. The Special Monitor did address "external procedures" and clearly demonstrated their location on the various facility websites, as well as a variety of the logs demonstrating understanding of the processes by external parties because of the successful completion of detainee-attorney communications.

4. Language access was considered by the Special Monitor and addressed. Overwhelmingly, the native language in all three facilities evaluated was spoken Spanish. Most of the detainees were fluent in written Spanish (see report of one interviewee who was not literate in any language). There are translator services for 146 different languages spoken throughout the national ICE detention centers. These are telephonically accessed by the institution. Providing signage in English and Spanish easily communicates with the vast number of detainees and having readily available telephonic translation services upon inquiry facilitates communication in all but the very rarest of languages. (Many detainees spoke English as well as their native language, especially those who had been previously incarcerated in US jails and according to the interviews were able to assist other detainees in understanding the signage).

5. Some, not many, of the detainees speak neither English nor Spanish and as above they indicate issues with the telephones either through other detainees or gestures until the officer present in each living area secures translation services and then the officer communicates with the designated telephone repair individual. All of the phones available to detainees are checked each morning as the day shift starts working in their assigned detainee living areas.

6. There is roughly one tablet for every three detainees. Like the telephones, tablet functioning is assessed by the morning shift officers. Maintenance of the tablets did not rise to a level of significance, but as mentioned clearly in the report, detainees improperly keeping the tablets overnight did cause their batteries to discharge and require two to three hours recharging in the morning.

7. There is no time restrictions on calls made to legal services from the confidential phones. There is usually a time restriction on the phones made in the living areas except for the confidential phones in the Stewart dorms which have no restrictions. All detainees interviewed knew and understood this and knew they could request a confidential call without restrictions.

8. The fax log does not indicate any issues with transmission or reception and that would be logged if there were issues. The silence in the Report speaks to the success of the procedure.

9. The plaintiffs response mischaracterizes the response concerning the CDC guidelines and objects to use of the word "feels". Like all things in medicine the difference is not as clear cut in determining the triggers for routine precautions and enhanced precautions. One the threshold is tripped than the guidelines are clear cut, but tripping the threshold is a judgement. Does one case in the community require an entire community to move to enhanced or is it more than ten? The CDC guidelines do not specifically state in a bright line fashion what the threshold is. Also, the three ICE facilities took a very conservative approach and if there was one documented case of COVID19 the entire facility was moved to yellow precautions which in the PRR (Pandemic Response Requirements) went beyond the CDC's guidelines. As mentioned all staff in all facilities were masked indoors and out of doors and all detainees were encouraged to mask. In the cohort area staff used personal protective equipment (POE) although not suggested by the CDC enhanced guidelines. Although the newest CDC guidelines came out after the Special Master was appointed, the Special Master was well versed in both the previous guidelines and the newest and the PRR was quite consistent with them and exceeded them in several areas.

10. The plaintiffs response also confuses mask and respirator use with full personal protective equipment requiring the use of gowns and gloves, which use was observed by the Special Master and far exceeds the CDC guidelines.

11. All detainees are tested upon intake. They are the placed in a cohort where they are isolated from the rest of the facility and are retested. The isolation is for ten days and if no one testes positive the entire cohort is released into the general population. If someone does test positive, that individual is quarantined and the others retested and held as a cohort. All visitation is non contact and the facility tests appropriately.

12. The Special Monitor used a series of questions to inquire about the facility, the detainees access to legal services, their understanding of COVID19 precautions, their desire for legal assistance, the ease of legal assistance, and this served to frame the interview. The interviews were open ended and the detainees were all asked if they wished to inquire about anything else or any of their concerns. Each interview was preceded by the statement the plaintiffs wanted read precisely as directed by the court and each interview expressed understanding and agreed to the interview.

13. The interviewees were randomly selected by the Special Master from the Alpha list, the daily population list. It represents a truly random sampling and indicates that 5he overwhelming language was Spanish. The only exception to this was one detainee housed in medical and so as not to interfere with the care of that detainee ampnothervwas randomly selected.

14. On page 6 and top of page seven plaintiffs response states that I was at two institutions on the same day. That is totally incorrect. I spent a full day at each institution and evaluated

only one institution per day. If the Report of the Special Monitor states or alludes to anything other than that it is a typographical or date error.

15. The plaintiffs response states that the "other pertinent materials" and newspaper article reviewed "…undermines the credibility of the report." The Special Monitor armed himself by reviewing all of the documents on PACER as well as a variety of other items, but maintained an unbiased view as requested by the court and made an unbiased determination.

Section 3 of the Response

1. The plaintiffs response mischaracterizes the direction from the court concerning the number and availability of the telephones. To quote: "1. Has each facility provided, at minimum, one telephone (or VTC console) for every ten presently detained inmates?" As his report indicates there are far more functioning and available telephones than required. In fact two facilities exceed one per five detainees. The court did not direct the Special Monitor to review the facilities in regards to the TRO the plaintiffs response alludes to. As a point in fact, although not specifically counted or recorded detainees had access to a substantial number of confidential phones. Those logs were reviewed and revealed no issue or delay; and not one of the interviewees complained about access to confidential communications.

2. A fulsome and objective evaluation pursuant to the courts order was performed by the Special Monitor. Objectively, all three facilities complied with the items and issues presented in the court order appointing the Special Monitor.

Submitted July 17, 2022, by David L. Thomas, MD JD EDD